Keith E. Sharkin
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

Attorneys for Defendant and Counterclaim Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULTI-VET LTD., Plaintiff/Counterclaim Defendant, v. PREMIER PET PRODUCTS, INC., Defendant/Counterclaim Plaintiff. | CIVIL ACTION NO. 08-CV-03251 (LMM) |

**BRIEF IN SUPPORT OF DEFENDANT'S**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................1

II. FACTUAL BACKGROUND ..............................................................3

A. Premier's Pet Products ..............................................................3

B. Premier's GENTLE SPRAY ......................................................4

C. Multi-Vet's Broken Promises and Unfair Competition ..........................6

D. Irreparable Harm ..................................................................11

III. ARGUMENT ....................................................................................12

A. Legal Standard for a Preliminary Injunction ..........................................12

B. Premier will prevail on the merits of its case..........................................13

1. Premier will prevail on its claim for unfair competition under New York common law ..............................................13

a. The Legal Standard for New York Unfair Competition..............................................13

2. Premier is likely to prevail on its claims for trademark infringement and false designation of origin ..............................14

a. Ownership of the GENTLE SPRAY mark ......................14

b. There is a likelihood of confusion based on Multi-Vet's use of the GENTLE SPRAY mark ..................................15

1. The Marks and The Goods Are Identical ............16

2. The Confusion, and Confusion Potential, Is Great..............................................16

3. Multi-Vet Has Bad Faith.....................................16

4. No Amount of Sophistication Changes the Potential for Confusion…............................... ..................17

C. The Balance of Hardships Favors Entry of the Injunction ......................18

D. The Public Interest ........................................................................19

IV. CONCLUSION ........................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Hasbro, Inc. v. Lanard, Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988) ................................12, 18

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
596 F.2d 70 (2d Cir. 1979)........................................................................................12

*Mattel, Inc. v. Internet Dimensions, Inc.*, No.
99Civ10066, 2000 U.S. Dist. LEXIS 9747 (S.D.N.Y. July 13, 2000) .............................19

*Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*,
680 F.2d 891 (2d Cir. 1982)......................................................................................12

*Polaroid Corp. v. Polarad Elec. Corp.*,
287 F.2d 492 (2d Cir. 1961).................................................................................15, 16

*Roy Export Co. Establishment v. Columbia Broad. Sys. Inc.*,
672 F.2d 1095 (2d Cir. 1982)....................................................................................13

*Safeway Stores, Inc. v. Safeway Props., Inc.*,
307 F.2d 495 (2d Cir. 1962)......................................................................................18

*Telecom Int'l Am., Ltd. v. AT&T Corp.*,
280 F.3d 175 (2d Cir. 2001)......................................................................................13

## STATE CASES

*Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg., Co.*,
159 N.Y.S.2d 606 (1957)..........................................................................................13

## FEDERAL STATUTES

Fed. R. Civ. P. 65 .......................................................................................................12

## I. INTRODUCTION

Premier Pet Products, LLC ("Premier") and Multi-Vet, Ltd. ("Multi-Vet") are two companies that have had a long business relationship which has recently come to a bitter and disappointing end. Multi-Vet was the electronics manufacturer and Premier was the exclusive United States promoter, marketer and distributor of an anti-bark collar that is at the heart of this action. When the relationship began, Multi-Vet promised Premier that Premier's marketing and sales expertise would be rewarded with (at least) the conveyance to Premier of ownership in any trademark that Premier developed to sell the product in the United States. As the relationship grew, Multi-Vet also promised that it would never sell an anti-bark collar in the United States using the GENTLE SPRAY name. Premier has conducted its business, investing countless resources in the effort, in reliance upon Multi-Vet's central promises.

Just weeks ago, Multi-Vet broke both promises—without warning, hesitation, or remorse. Indeed, at the same time that Premier's President, Evan Wooton, traveled to Montreal to meet with Multi-Vet face-to-face to discuss the relationship, Multi-Vet was implementing an under-handed plan to not only break its promises to Premier, but to actively and brazenly take Premier's United States market. Not satisfied with the sales it could achieve under its own Multi-Vet label, and knowing that it would have to deceive customers into believing that its product was Premier's, Multi-Vet started selling to the United States market its anti-bark collar under the same name and in confusingly similar packaging as Premier's GENTLE SPRAY product.[1]

Multi-Vet's copy-cat product package directly competes with Premier's product, and indeed appears alongside Premier's product on store shelves and on online retail sites. Multi-

[1] Premier's GENTLE SPRAY packaging consists of an image of the profile of a barking golden retriever, and colors in contrasting purple and blue separated by an arc.

Vet's knock-off product has already created confusion in the marketplace. Multi-Vet's actions constitute unfair competition under New York common law and are in violation of the Lanham Act's provisions on unfair competition and trademark infringement.

A preliminary injunction will restore the status quo. Only weeks ago, Multi-Vet was selling its anti-bark collars under its own name and with its own packaging. There is no reason why it cannot do so again without minimal burden. If not granted, any purchaser interested in buying Premier's GENTLE SPRAY anti-bark collar may mistakenly buy Multi-Vet's knock-off product. In other words, entry of an injunction is necessary to prevent someone from buying this product:

**PREMIER GENTLE SPRAY CITRONELLA ANTI-BARK COLLAR** by Premier
Buy new: **$36.99** 4 Used & new from $36.99
In Stock
(2)
**Home & Garden:** See all 42 items

(note that this is a Multi-Vet product, but it is advertised on the website as originating from Premier) when the person intended to buy this product:

**Premier Gentle Spray Anti-Bark Dog Collar** by Premier (Jul 11, 2006)
Buy new: ~~$99.99~~ **$35.97** 11 Used & new from $32.89
In Stock
(195)
**Home & Garden:** See all 42 items

(Decl. Thanna Vickerman ¶¶ 5-6 (June 9, 2008); Ex. B.)

Even at this early stage, after only weeks on the market, there is ample reason to conclude that there is confusion, and to immediately enjoin Multi-Vet from continuing to use, advertise, promote and sell its anti-bark collar under Premier's GENTLE SPRAY name and packaging. There is no justification for Multi-Vet's unfair competition, and it must be stopped immediately.

## II. FACTUAL BACKGROUND

### A. Premier's Pet Products

Premier is a leader in the United States pet products industry, with nearly two decades of experience. (Decl. Sharon Madere ¶¶ 4-6 (June 12, 2008).) Founder Sharon Madere started the Virginia company in 1989 to focus on humane behavior modification for pets. (*Id*. at ¶ 4.) She spear-headed initiatives in education and innovation, leading to wide-spread industry recognition and respect. (*Id*. at ¶¶ 5-6.) Today, Premier is a well-known source of safe and effective products in the pet industry. (*Id*. at ¶ 6.) Premier's award-winning products hold favor with veterinarians and pet enthusiasts nationwide. (*Id*. at ¶¶ 6-7.) These recommendations and the acclaim accorded Premier products by pet professionals have contributed heavily to Premier's success. (*Id*. at ¶ 7.)

Premier's original success is still on the market today – the Gentle Leader® Headcollar. The Gentle Leader® Headcollar is a unique and patented[2] dog collar which fastens behind a dog's ears and has a strap that runs around its muzzle. (*Id*. at ¶ 34; Ex. 8.) The headcollar "takes advantage of the dog's innate behavioral tendencies." (*Id*.) It is an effective and humane alternative to choke collars. (*Id*.)

Premier began manufacturing and selling the Gentle Leader® headcollar to veterinarians and animal trainers in the mid-1990s. (*Id*. at ¶ 8.) During that time, Premier worked hand-in-

[2] The Gentle Leader® headcollar was developed by Dr. R.K. Anderson through his company Alpha M, a company with which Premier has a close and long term affiliation. (Decl. Madere at ¶ 8.)

hand with pet professionals on research and education relating to humane behavior modification techniques. (*Id.* at ¶ 11.) Premier sponsored educational sessions and laboratories, underwrote behavior education seminars, and contributed to support behavior and training non-profit organizations. (*Id.*)

Premier's development of the Gentle Leader® product caused sales to soar. As of March 2008, over 4 million Gentle Leader® Headcollars have been sold, and Premier made "Gentle Leader®" a household name. (*Id.* at ¶¶ 12, 35; Ex. 9.) The Gentle Leader® Headcollar is so revolutionary and integral to daily life with dogs that it was featured in an exhibition at the Smithsonian National Museum of American History where it was displayed alongside barbed wire, microwave ovens and Post It Notes®. (*Id.* at ¶¶ 34-35; Exs. 9-10.)

B. <u>Premier's GENTLE SPRAY</u>

In 2001, Premier purchased substantially all of the assets of a company called Animal Behavior Systems, including its intellectual property – namely, its trademarks, trade dress and copyrights. (*Id.* at ¶ 14; Ex. 2.) That same day, Premier became the exclusive licensee to sell Multi-Vet's patented technology for anti-bark collars in the United States. (*Id.* at ¶ 15; Ex. 3.) Within months, Premier adopted the name GENTLE SPRAY for the anti-bark collars and started to develop the product and brand. (*Id.* at ¶ 22.)

As with the Gentle Leader® Headcollar, Premier invested heavily in promoting the GENTLE SPRAY collar among veterinarians, trainers, and animal behaviorists. (*Id.* at ¶ 21.) This technique was very effective; Premier learned through warranty cards submitted by owners of the GENTLE SPRAY collar that most customers purchased the product after hearing a veterinarian recommendation. (*Id.*) By 2004, Premier was selling 71,000 collars per year. (*Id.* at ¶ 25.)

The commercial success of the GENTLE SPRAY collar is a direct result of the strong brand name, which has come to designate Premier as a service-oriented company with high quality products.  Premier has continuously used the GENTLE SPRAY mark in conjunction with the PREMIER name on the spray collar devices and on all packaging to further develop and enhance its reputation as a provider of quality, safe and effective pet products.  (*Id*. at ¶¶ 23-24.) In an effort to avoid litigation, Premier, in October 2007, began selling some of its anti-bark collar under the name SPRAY SENSE.  (*Id*. at ¶ 31.)  This, however, was done in an effort to compromise.  (*Id*.)  Premier, once its rights are fully adjudicated, intends to resume use of the GENTLE SPRAY name.  (*Id*. at ¶ 32.)

Premier instituted stringent standards to insure quality control which required that every product be checked to insure correct functioning before it was packaged.  (*Id*. at ¶¶ 26-27.) Premier has always maintained a customer service number where customers could immediately reach a source of information about its products.  (*Id*. at ¶ 27.)

The packaging and the images on the packaging also serve as symbols of Premier's standards.  Premier's investment is substantial.  Over the past eight years, Premier has spent approximately $2 million to develop and promote the GENTLE SPRAY mark.  (*Id*. at ¶ 24.) Premier's revenue attributable to sales of product under the mark is significant—ranging from 8 to 23 percent of Premier's annual revenue in a given year.  (*Id*.)

C.    Multi-Vet's Broken Promises And Unfair Competition

Multi-Vet's recent conduct is in violation of Multi-Vet's contractual obligations to Premier.  In the parties' original April 30, 2001 agreement, Multi-Vet agreed to register on Premier's behalf any new trademark Premier adopted for use in connection with the sale and marketing of the anti-bark collar.  (*Id*. at ¶¶ 15-16; Ex. 3.)

Muli-Vet's conduct is also in violation of promises it made to never sell an anti-bark color with the GENTLE SPRAY name in the United States. Premier's use of the GENTLE name in conjunction with the sale of its products stemmed from an exclusive licensing arrangement and a long-term business alliance that it enjoys with the owner of a family of marks associated with the GENTLE name owned by Alpha-M, a Minnesota company that holds all of the assets associated with the Gentle Leader® brand. (*Id.* at ¶¶ 8, 10.) In order for Premier to adopt the GENTLE name in conjunction with the sale of an anti-bark collar in the United States, Alpha-M required that Multi-Vet promise that Premier, and only Premier, sell anti-bark collars in the United States with the GENTLE name. (*Id.* at ¶ 21.) In September, 2001, Multi-Vet President Richard Garon stated, in a letter to Dr. Anderson (a co-inventor and co-founder of Alpha-M) and copied to co-CEO's at Premier:

> I am hereby confirming that Multivet has no interest in the name 'Gentle Spray'. It will only be registered in the United States and licensed to Premier for the US market.
>
> Sincerely,
> Multivet International Inc.
> Richard Garon
> President

(*Id.* at ¶ 17; Ex. 4.) This promise was confirmed five years later, in a September 2006 email to Premier's CEO and founder, Sharon Madere, from Doug Belknap at Multi-Vet:

> 6.) Gentle Spray Trademark: As you wanted Sharon this is Premier's to use as long as Premiers uses it only with products sourced by Multivet. It is not Multivet's intention to ever use the Gentle Spray brand and Richard has given his word that he will not use it.

(*Id.* at ¶ 18; Ex. 5.)

In violation of its own promises, in May 2008, Multi-Vet began selling its anti-bark collar

under the GENTLE SPRAY name and packaging in the United States. (Decl. Evan Wooton ¶ 4 (June 9, 2008).) Premier discovered this after Evan Wooton specifically traveled to Canada on May 20, 2008 to meet with Roger Garon of Multi-Vet in an effort to resolve ongoing conflicts between Premier and Multi-Vet in an open and friendly way. (*Id*. at ¶ 3.)

Before May 2008, Multi-Vet never offered a citronella anti-bark collar in the United States with the GENTLE SPRAY name or packaging. (Decl. Madere ¶ 33.) Multi-Vet had previously used the names ANTI-BARK COLLAR and SPRAY LOGIK ANTI-BARK COLLAR with its own packaging to market citronella anti-bark collars in the United States, but it never used anything like Premier's GENTLE SPRAY name and packaging. (*Id*. at ¶¶ 29, 33; Ex. 7.)

Multi-Vet has not only unfairly appropriated the GENTLE SPRAY name on anti-bark collars, it also is unlawfully using Premier's NO SHOCK NO PAIN mark. Premier started use of the NO SHOCK NO PAIN mark in 2001. It was registered in 2003 and has always been in use in connection with Premier's anti-bark collars. A side by side comparison of the packaging shows blatant copying:

Premier Package (Ex. 6.)

Multi-Vet Package (Ex. D.)[3]

[3] The Multi-Vet packaging contains notice in the form of ®, which enhances Multi-Vet's false designation since Premier owns the registration for this mark: U.S. Trademark Registration No. 2,685,911, attached as Ex. 16 to Decl. Elizabeth Zidones ¶ 2 (June 12, 2008).

Multi-Vet has also copied other aspects of Premier's packaging, including, but not limited to, the profile of a golden retriever, a photo of a row of dogs, promotional language, and even the exact text from two paragraphs on the back of the packaging.  The photos below show this misappropriation:





Premier Package (Ex. 6)                Multi-Vet Package (Ex D.)





Premier Package (Ex. 6.)                Multi-Vet Package (Ex. D.)





Premier Package (Ex. 6.)                Multi-Vet Package (Ex. D.)

The #1 recommended solution
Safe and comfortable for all breeds

Premier Package (Ex. 6.)

The #1 recommended solution
Stops problem barking - Lightweight & comfortable - One size fits all

Multi-Vet Package (Ex. D.)

Clinically proven
2X more effective
than electric shock!

Premier Package (Ex. 6.)

Clinically proven 2X more effective
than shock collars

Multi-Vet Package (Ex. D.)

The Gentle Spray® Citronella Anti-Bark Collar uses Spraylogik™ technology to deliver a harmless burst of citronella spray to interrupt your dog's barking. It acts on four of your dog's five senses – he hears it, sees it, feels it and smells it. Citronella is a unique scent that most dogs don't normally encounter. It's non-offensive to humans, yet unusual enough to distract your dog and interrupt the unwanted behavior. Shock and ultra-sonic collars attempt to reduce barking with pain. In addition to being less effective than spray, pain often increases anxiety and aggression, and makes some behavior problems worse.

NO SHOCK
NO PAIN

Premier Package (Ex. 6.)

The Gentle Spray® Citronella Anti-Bark Collar delivers a harmless burst of citronella spray to interrupt your dog's barking. It acts on four of your dog's five senses - he hears it, sees it, feels it and smells it. Citronella is a unique scent that most dogs don't normally encounter. It's non-offensive to humans, yet unusual enough to distract your dog and interrupt the unwanted behavior. Shock and ultra-sonic collars attempt to reduce barking with pain. In addition to being less effective than spray, pain often increases anxiety and aggression and makes some behavior problems worse.

Multi-Vet Package (Ex. D.)

**When to use:**
The Gentle Spray Citronella Anti-Bark Collar can be used with any breed of dog that weighs 6 lbs. or more and is at least 6 months old. If your dog is smaller or younger, please check first with your veterinarian. It is ideal for controlling general nuisance barking both indoors and outdoors. It is not recommended for anxiety-related barking unless specifically directed by a behavior professional.

Premier Package (Ex. 6.)

**When to use:**
The Gentle Spray Citronella Anti-Bark Collar can be used with any breed of dog that weighs 6 lbs. or more and is at least 6 months old. If your dog is smaller or younger, please check first with your veterinarian. It is ideal for controlling general nuisance barking both indoors and outdoors. It is not recommanded for anxiety-related barking unless specifically directed by a behavior professional.

Multi-Vet Package (Ex. D.)

D. Irreparable Harm

Multi-Vet's copying is a serious concern not only because it constitutes unfair competition given the relationship between these parties, but also because the confusion, and the potential for confusion, is rampant. For example, any current or prospective purchaser going to a website like <amazon.com> will encounter a situation where a search for the term GENTLE SPRAY yields three pages of results. (Decl. Vickerman ¶ 5.) There, one can see that depictions of the Multi-Vet product, the Premier product, the Multi-Vet name, the Premier name, the Premier packaging and the Multi-Vet packaging are all confused. (*Id.* at ¶ 6.) The consumer reviews for the Premier and Multi-Vet product names, pictures and reviews are all confused.

(*Id*.) Just a cursory review of <amazon.com> shows that there is confusion at all levels in the marketplace at this point in time.

## III. ARGUMENT

### A. Legal Standard for a Preliminary Injunction

An injunction prohibiting Multi-Vet from continuing to sell its anti-bark collar in the United States with the GENTLE SPRAY name and packaging is reasonable and appropriate in this case. The law provides that a preliminary injunction should issue where the moving party demonstrates that (1) irreparable harm will follow without an injunction, and (2) there is either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case and that the balance of hardships tips in its favor. *Hasbro, Inc. v. Lanard, Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).). Federal Rule of Civil Procedure 65 provides grounds for this Court to enter an Order enjoining Multi-Vet from continued use, advertising and sales of its anti-bark collar in the United States under the GENTLE SPRAY name and packaging. Fed. R. Civ. P. 65.

Courts recognize that injunctive relief is particularly appropriate in cases where a knock-off has created confusion in the marketplace. *See Paco Rabanne Parfums, S.A. v. Norco Enters, Inc.*, 680 F.2d 891 (2d Cir. 1982) (reversing the denial of a preliminary injunction where the product packaging of two products was similar). The standard for irreparable harm is exacting, but irreparable harm is a real risk any time an imitative competitor introduces a competitive product with a similar name and in similar packaging. *Id*. at 893-94. Irreparable harm can result from confusingly similar packaging even in the absence of side-by-side sales. *Id.* (reversing

ruling on a preliminary injunction where lower court failed to find irreparable harm). When direct competition for a product is involved, the likelihood of damage to reputation and goodwill entitles a plaintiff to preliminary relief.

A preliminary injunction is necessary here because there is no question that Premier faces immediate and irreparable harm. Premier is also likely to prevail on its claims of unfair competition and infringement. An injunction should issue immediately.

B. Premier will prevail on the merits of its case

*1. Premier will prevail on its claim for unfair competition under New York common law.*

**a. The Legal Standard for New York Unfair Competition**

The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods. *Roy Export Co. Establishment v. Columbia Broad. Sys. Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982). New York's unfair competition law covers "commercial immorality" or any conduct that misappropriates for commercial advantage the skill, expenditures and labor of another. *Id.*; *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) (describing New York's law of unfair competition as a broad and flexible doctrine that is highly fact-dependent); *Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg., Co.*, 159 N.Y.S.2d 606, 609-10 (1957) (stating "[t]he incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use").

Multi-Vet's conduct falls squarely within rubric of unfair competition prohibited by New York's common law. Multi-Vet's GENTLE SPRAY product employs the same name, the same golden retriever photograph, the same NO SHOCK NO PAIN mark, the same text, the same

color scheme, and the same overall impression as Premier's product. Apparently, Multi-Vet must use Premier's trademarks and pass-off its product as a Premier product in order to make a sale. Such conduct is a shocking misappropriation of Premier's labor, and is explicitly designed to cause confusion or deceive Premier's customers.[4]

Because relevant customers are likely to be confused, and there already exists strong evidence that consumers in the marketplace have trouble distinguishing between the two products, Premier is likely to prevail on the merits of its common law unfair competition claim.

*2. Premier is likely to prevail on its claims for trademark infringement and false designation of origin.*

**a. Ownership of the GENTLE SPRAY mark**

Premier's name may not appear on the Registration Certificate issued by the United States Patent and Trademark Office, but the evidence in this case will prove that Premier is the legal, equitable and beneficial owner of the GENTLE SPRAY mark and registration and that the public associates the GENTLE SPRAY with Premier.

Pursuant to a Technology License and Distribution Agreement dated April 30, 2001, Premier sold citronella anti-bark collars that incorporated the technology subject of Multi-Vet's U.S. Patent No. 4,627,385 in the United States. (Decl. Madere ¶ 15; Ex. 3.) According to that agreement, Multi-Vet would register on Premier's behalf any new trademark adopted by Premier for Premier's use and sale of those citronella anti-bark collars in the United States. (*Id.* at ¶ 15-

[4] This is consistent with Multi-Vet's unfair business practices, which in truth are very covert in nature. For example, the same day that Premier committed to spend almost one million dollars ($1,000,000.00) to purchase the assets and intellectual property of Animal Behavior Systems, where Multi-Vet was a majority shareholder, Multi-Vet presented its Technology and Distribution Agreement which purported to license to Premier some of the same rights that Premier was buying through Animal Behavior Systems. (*Compare* Decl. Madere Ex.2 *with* Madere Decl. Ex.3.) The marks ANTI-BARK SYSTEM, ABS, SPRAY BARRIER, SPRAY COMMANDER were subject of the asset purchase and also subject of the purported license. (Exs. 2, 3; *compare* Exhibit A of the Asset Purchase Agreement of Ex. 2 *with* Paragraph 2.2 in Ex. 3.) Both of these agreements were drafted by Multi-Vet's lawyers and presented to Premier's business executives.

16; Ex. 3.) Under that Technology License and Distribution Agreement, any U.S. trademark registration that Multi-Vet registered based on Premier's creation and use would be assigned to Premier upon termination of the parties' relationship. (*Id*. at ¶ 16; Ex. 3.)

Premier created and adopted the GENTLE SPRAY mark after the April 30, 2001 agreement for Premier's use and sale of citronella anti-bark collars that incorporated technology subject of Multi-Vet's U.S. Patent No. 4,627,385. (*Id*. at ¶ 20.) On Premier's behalf, and based on Premier's use and development of the mark, Multi-Vet filed for and obtained U.S. Trademark Registration No. 2,762,487. (*Id*. at ¶ 17.) The PREMIER trademark and name always appeared along with the GENTLE SPRAY mark on the anti-bark collar itself and on the product packaging. When the parties' relationship ended on or around July of 2007, the assignment of U.S. Trademark Registration No. 2,762,487 was never executed or recorded with the United States Patent and Trademarks Office. (*Id*. at ¶ 19.) Premier always maintained the quality and uniformity of the anti-bark collar sold under the GENTLE SPRAY name. (*Id*. at ¶ 26.)

As the evidence will establish, Premier is the owner of the GENTLE SPRAY trademark.

**b. There is a likelihood of confusion based on Multi-Vet's use of the GENTLE SPRAY mark.**

In assessing likelihood of confusion, courts in the Second Circuit apply the eight *Polaroid* factors. *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). No one factor is determinative, as the factors are applied and balanced for assessing likelihood of confusion. *Id.* They are: (1) strength of the senior user's mark; (2) degree of similarity between the marks; (3) competitive proximity of the product; (4) likelihood that the senior users will bridge the gap; (5) evidence of actual confusion; (6) defendant's bad faith; (7) the quality of the defendant's product; and (8) sophistication of the relevant group. *Id*. Analysis of the factors

here demonstrates that – even at this early stage – it is apparent that Multi-Vet's use of the GENTLE SPRAY name and packaging creates a likelihood of confusion.

1. *The Marks And The Goods Are Identical*

Multi-Vet's product is advertised and sold under the exact same name and in substantially similar packaging to that of Premier. Both products are essentially the same anti-bark collars in appearance. Multi-Vet copied nearly word for word text on its packaging from Premier's packaging. Multi-Vet also displays in a flagrant manner copies of both a photo of the "row of dogs" and the NO SHOCK NO PAIN mark.

2. *The Confusion, and Confusion Potential, Is Great*

Multi-Vet's use of the GENTLE SPRAY name and product packaging causes confusion. The products look the same. They are sold and advertised to the pet industry through the same media. Recent analysis of the search results from a search for GENTLE SPRAY on <amazon.com> shows that confusion exists and that the potential for additional confusion is great. (Decl. Vickerman ¶¶ 5-6.)

3. *Multi-Vet Has Acted in Bad Faith*

Despite its repeated promises, Multi-Vet introduced to the United States market an anti-bark collar under the GENTLE SPRAY name and packaging that use Premier's trademarks. Multi-Vet presumably was unable to make sales of its product under its own name, so it copied Premier to compete. Its patent expired, so Multi-Vet resorted to use of Premier's GENTLE SPRAY name and packaging to compete.[5] Multi-Vet has the requisite bad faith - it intentionally

[5] One can only interpret Multi-Vet's conduct with respect to its handling of intellectual property rights more broadly as indicative of bad faith. Multi-Vet was party to Premier's $1,000,000.00 purchase of intellectual property assets in 2001 while at the same time Multi-Vet purported to license some of those same intellectual property assets to Premier under a royalty scheme. Multi-Vet never executed the assignments due Premier for the GENTLE SPRAY mark and now has introduced confusingly similar product to the United States market. Multi-Vet is also engaged in other acts of trade piracy against Premier, as explained in the Declaration of Evan Wooton, filed herein. The introduction of an anti-bark collar under the same name and nearly identical packaging is bad faith.

introduced its product under the GENTLE SPRAY name and packaging to deceive purchasers into buying its product rather than Premier's, and to confuse the public.

4. *No Amount of Sophistication Changes the Potential For Confusion*

There is no end to the confusion created by Multi-Vet's introduction of its anti-bark collar under the name GENTLE SPRAY. On <amazon.com>, one can see that any person—regardless of sophistication or care—could mistakenly purchase the Multi-Vet product. There is no question that <amazon.com> identifies the Multi-Vet product as a product from Premier:

**PREMIER GENTLE SPRAY CITRONELLA ANTI-BARK COLLAR** by Premier

Buy new: **$36.99** 4 Used & new from $36.99

In Stock

(2)

**Home & Garden:** See all 42 items

This is a depiction of the Multi-Vet product, but it is identified on <amazon.com> as the "Premier GENTLE SPRAY anti-bark dog collar."

An end user (the pet owner with a barking-dog-problem) could easily be confused into buying the Multi-Vet product, when in fact they wanted to buy the Premier product. For example, a dog owner on the <amazon.com> web page can see an excerpt from a book about barking control that recommends the "Premier GENTLE SPRAY product" by name. At the same time, the name "GENTLE SPRAY by Premier" and "Premier GENTLE SPRAY anti-bark dog collar" is displayed in connection with an opportunity to purchase the Multi-Vet product. The end user might think he or she is buying the Premier product but he or she will actually buy the Multi-Vet product.

The *Polaroid* factors clearly favor Premier. GENTLE SPRAY is a strong mark, entitled to a broad scope of protection. GENTLE SPRAY has acquired distinctiveness through seven years of continuous and extensive use and development. It is the only registered GENTLE SPRAY mark on record at the United States Patent and Trademark Office. Premier owns the NO SHOCK NO PAIN mark and has proprietary rights in the packaging and the images on the packaging. The arc and shades of blue, likewise, have been in use on every GENTLE SPRAY box by Premier since 2001. Consumers are likely to be confused by Multi-Vet's use of Premier's trademark and the GENTLE SPRAY name and packaging, making entry of a preliminary injunction appropriate.

C. The Balance of Hardships Favors Entry Of The Injunction.

Settled trademark law provides that when the conduct at issue creates a likelihood of confusion, a presumption of irreparable injury attaches. *Hasbro, Inc.*, 858 F.2d at 73. When the party sought to be enjoined is a newcomer to the market, there is no hardship to tip the balance of hardships in its favor. *See e.g., Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 500 (2d Cir. 1962) (concluding that grant of an injunction will not significantly harm the defendant where "[t]he defendant was incorporated fourteen months before issuance of the preliminary injunction and its use of the [trade name] cannot be said to be a long standing use").

Multi-Vet faces limited harm, if any. Multi-Vet never advertised or sold product under the GENTLE SPRAY name and packaging in the United States prior to May 2008. Multi-Vet, in fact, sold the same anti-bark collar under its own trademarks ANTI-BARK COLLAR and SPRAY LOGIK ANTI-BARK COLLAR and in packaging that was substantially different from Premier's packaging. (Decl. Madere ¶ 29; Ex. 7.) There is no reason that Multi-Vet cannot return to use of those names to compete in a fair way.

Premier, on the other hand, faces irreparable harm if Multi-Vet is allowed to continue its use of Premier's trademarks and the GENTLE SPRAY name and packaging. Given the likelihood of confusion, this Court can and should presume that Premier will suffer irreparable harm. The balance of hardships cannot, under any reasoning, favor Multi-Vet's interest in continuing to copy Premier's name and packaging, to steal Premier's sales and to diminish Premier's goodwill and reputation. Injunctive relief is the appropriate and best means to prevent further damage to Premier.

D. <u>The Public Interest</u>

It is well-established that trademark law recognizes a strong public interest in preventing consumer deception as to the source of goods. *See, e.g., Mattel, Inc. v. Internet Dimensions, Inc.*, No. 99Civ10066, 2000 U.S. Dist. LEXIS 9747, at *20 (S.D.N.Y. July 13, 2000).

In this case, pubic interests would only be served by the entry of an injunction prohibiting Multi-Vet's use of Premier's trademarks and the GENTLE SPRAY name and packaging. Premier's GENTLE SPRAY product is a safe and effective anti-bark device, sold to end-consumers only after Premier's standards for high quality and effectiveness have been met. Pet owners who have come to know and rely upon the Premier GENTLE SPRAY anti-bark collar are entitled to protection from Multi-Vet's unlawful actions. Granting a preliminary injunction here will protect consumers from deception and protect Premier from Multi-Vet's continued acts of unfair competition. Entry of an injunction is appropriate.

## IV. CONCLUSION

Defendant brings this motion and its counterclaims to stop Multi-Vet's unfair competition, at least until such time as a full adjudication of the parties' claims is completed. In approximately November 2007, at what was effectively the end of the parties' supplier-

distributorship relationship, Multi-Vet abruptly claimed ownership of the GENTLE SPRAY mark. This claim to ownership was contrary to the parties' written and signed agreement regarding ownership. It was contrary to the parties' course of dealing. It was contrary to Multi-Vet's promises and assurances. Multi-Vet's claim to ownership culminated in the filing of the present action. Its unfair business practices, namely the recent introduction of a knock-off product that directly competes with Premier's anti-bark product, have risen to an overt violation of the common law of unfair competition and the Lanham Act. Premier therefore respectfully requests that this Court grant its motion for a preliminary injunction.

KING & SPALDING LLP

DATE: June 13, 2008

By: /s/ Keith E. Sharkin
Keith E. Sharkin
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
ksharkin@kslaw.com

Of Counsel:
Christopher J. Sorenson
Kristine M. Boylan
Elizabeth A. Zidones
MERCHANT & GOULD P.C.
80 South Eighth Street, Suite 3200
Minneapolis, Minnesota 55402-2215
Telephone: (612) 332-5300
Facsimile: (612) 332-9081

**Attorneys for Premier Pet Products, LLC**