## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **MULTI-VET LTD.,** | ) | |
| | ) | |
| **Plaintiff and** | ) | |
| **Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-cv-03251** |
| | ) | |
| **PREMIER PET PRODUCTS, INC.,** | ) | |
| | ) | |
| **Defendants and** | ) | **Declaration of Sharon Madere in** |
| **Counterclaim Plaintiff.** | ) | **Support of Premier's Motion for a** |
| | ) | **Preliminary Injunction** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF SHARON MADERE IN SUPPORT OF DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

I, Sharon Madere, do hereby state as follows:

1.    My name is Sharon Madere. I am the founder and an owner of Premier Pet Products, LLC, ("Premier"). I have personal knowledge of the facts stated in this declaration, and if called upon, could so testify.

2.    I submit this declaration in support of Premier's motion to ask this Court to prohibit any further sale by Plaintiff and Counterclaim Defendant Multi-Vet, Ltd. ("Multi-Vet") of its "Gentle Spray" anti-bark collar in the United States until there can be a final adjudication on the merits of legal disputes between Premier and Multi-Vet.

3.      I have been a dog and horse enthusiast since I was a young child, and I have been active in many aspects of animal training, breeding, competitions, and rescues throughout my life.

PREMIER PET PRODUCTS

4.      I founded Premier Pet Products in 1989 with a $5,000 loan and a couple of used sewing machines.  The original headquarters for Premier were in a guest bedroom of my house.  From the very beginning, Premier has been guided by a passion to do what is best for animals and to do what is right for our customers.

5.      Premier's reputation in the pet industry is unparalled.  Our products are designed to offer the best possible solutions for real life problems, and we are known for our innovation and development, quality, education, and customer service.

6.      Premier is a well-known source of safe and effective products in the pet industry.  Premier's products have consistently won awards and hold favor with veterinarians and pet enthusiasts.  Our awards include the National Small Business Persons of the Year award from the United States Small Business Administration.  Several of our products have also won awards, including Dog Fancy's Editor Choice Award.  A true and correct copy of the article related to the Dog Fancy Editor Choice Award is attached hereto as **Exhibit 1**.

7.      Because of our commitment to the profession, we have been the recipient of loyalty from all sectors.  Our products, especially the Gentle Leader® headcollar and the Gentle Spray® collar are consistently name brand endorsed by top influencers in the pet industry, including veterinarians and animal behaviorists.  We do not pay for these endorsements.  These recommendations and the acclaim accorded Premier products by

pet professionals have contributed heavily to Premier's success.

THE GENTLE LEADER® EXPERIENCE

8.      In the early 1990's, I was approached by Dr. R.K. Anderson, co-inventor of the Gentle Leader® headcollar, to manufacture and sell the product.  He owns the patent family and trademark family (through his company Alpha-M, Inc.) that covers various aspects of the GENTLE LEADER® Headcollar.  Since that time, Premier and Alpha-M have worked closely on initiatives in education and innovation to promote humane behavior modification for pets.

9.      Prior to my involvement, the Gentle Leader® headcollar was distributed by several successive companies, including the nation's largest collar and leash manufacturer, but sales of the headcollars lagged.   In my view, the Gentle Leader® headcollar was a revolutionary behavior product, allowing the owner to gain immediate, humane control.  Because behavior problems lead to dogs being relinquished to shelters and euthanized, I knew that the Gentle Leader® headcollar had the power to save countless lives.   The product itself was excellent – the problem was that no company had yet found an effective way to educate and promote.  Premier began promoting and selling the Gentle Leader® headcollar to veterinarians and animal trainers in the mid-1990's.

10.      In 1998, Premier became the exclusive licensee of the GENTLE LEADER patents and trademarks in the United States.

11.      In promoting the Gentle Leader® headcollar, my strategy was to work closely with pet professionals – veterinarians, trainers, shelter workers, and animal behaviorists - to educate them about the benefits of the headcollar and to provide support and materials for them to assist their clients.  This was accomplished by attending and

exhibiting at all major professional conferences, sponsoring educational sessions and hands-on wet labs, underwriting behavior education seminars, and supporting behavior and training non-profit organizations. Premier invests heavily in its relationships with the professional sector of the pet industry.

12.    As a result of Premier's marketing and education efforts, the Gentle Leader® headcollar has become the #1 recommended behavior product. In 2000, a leading pet retailer, PetSmart, made the decision to create an in-house dog training program. PetSmart contracted with several nationally recognized behavior experts, and the Gentle Leader® headcollar was written into the curriculum by name. As a result, PetSmart ordered the Gentle Leader® headcollar for all of its stores. Over 500,000 Gentle Leader® collars are sold each year. They outsell all similar products by a margin of at least 10 to 1. Premier has sold 4 million Gentle Leader® headcollars.

THE GENTLE SPRAY EXPERIENCE

13.    In the late 1990's, I became aware of a citronella anti-bark collar that was being sold by Animal Behaviors Systems, Inc. (ABS), a small Florida corporation. The collars were sold under the name ABS™ collar, which was supposed to convey the phrase "anti-bark collar."

14.    On April 30, 2001 Premier purchased substantially all of the assets of ABS, including all of its intellectual property and product designs and packaging. Included in those assets was a photograph of a barking golden retriever wearing and anti-bark collar. An unsigned true and correct copy of the first six pages of the agreement and schedules is attached as **Exhibit 2**.

15.    On the same day that Premier purchased the assets of ABS, April 30,

2001, Premier entered into a technology license and distribution agreement with Multi-Vet, then the majority shareholder of ABS.  Under that agreement, Premier sold citronella anti-bark collars that incorporated the technology subject of Multi-Vet's U.S. Patent No. 4,627,385 in the United States.  A true and correct copy of the agreement is attached as **Exhibit 3**.

16.    According to the 2001 technology license and distribution agreement, Multi-Vet would register on Premier's behalf any new trademark adopted by Premier for Premier's use and sale of those citronella anti-bark collars in the United States.  The agreement also stated that any U.S. Trademark Registration that Multi-Vet registered based on Premier's creation and use would be assigned to Premier upon termination of the parties' relationship.

17.    Pursuant to the agreement, Multi-Vet filed an application to register GENTLE SPRAY on September 19, 2007 on the basis of Premier's adoption and use.  At that same time, Richard Garon, of Multi-Vet promised in a September 20, 2007 facsimile that Multi-Vet had no interest in the GENTLE SPRAY mark in the United States.  The facsimile was directed to Dr. R.K. Anderson of Alpha-M and copied me.  A true and correct copy of the facsimile is attached hereto as **Exhibit 4**.

18.    Multi-Vet's promise not to use the GENTLE SPRAY name was confirmed five years later, in September 2006 by Douglas Belknap at Multi-Vet in an email to me wherein he stated that Multi-Vet's would never use the GENTLE SPRAY name.  A true and correct copy of the email with unknown handwriting is attached hereto as **Exhibit 5**.

19.    U.S. Trademark Registration No. 2,762,487 was eventually issued for the GENTLE SPRAY name, but Multi-Vet never assigned U.S. Trademark Registration No. 2,762,487 to Premier.

20.    Upon securing the distribution agreement to sell the patented citronella anti-bark collar, Premier wanted to develop a new name for the product. We decided that the new name should reflect four priorities: (1) that the product was not a shock collar; (2) that it was a humane product; (3) that it was an effective product; and (4) that the new product was associated with the same company that produced the Gentle Leader® headcollar. As a result, Premier branded the citronella anti-bark collar Gentle Spray®.

21.    Knowing that Alpha-M owned the trademark rights to the Gentle Leader® name and to various other GENTLE names for use in pet products, Premier sought out Alpha-M's approval of the new GENTLE SPRAY name. Alpha-M required that Multi-Vet promise that Premier, and only Premier, sell anti-bark collars in the United States with the GENTLE name.

22.    As with the Gentle Leader® headcollar, Premier invested heavily in marketing the GENTLE SPRAY collar to veterinarians, trainers, and animal behaviorists. Veterinarians in turn recommend the GENTLE SPRAY collar to pet owners. These same veterinarians publicly recommend the GENTLE SPRAY collar through articles and pet oriented books. Premier's quality product is associated with Premier's GENTLE SPRAY name. This technique was very effective; Premier learned through warranty cards submitted by owners of the GENTLE SPRAY collar that most of the customer made their purchase based on a recommendation of their veterinarian. These recommendations would likely not have occurred but for Premier's intensive marketing and education

efforts.

23.     The GENTLE SPRAY mark has been continuously used and developed by Premier.  The image of the profile of a barking golden retriever collared dog was originally created by Animal Behavior Systems and has served as the identifier for Premier's GENTLE SPRAY product since Premier bought the trade dress rights in 2001.  An arc and shades of blue have been in use on every GENTLE SPRAY box by Premier since 2001.  A true and correct depiction of a Premier's GENTLE SPRAY product packaging is attached as **Exhibit 6**.

24.     Premier has invested significant time and effort in marketing GENTLE SPRAY collars.  Premier spends approximately $250,000 per year promoting the GENTLE SPRAY mark.  To date, Premier has spent almost $2,000,000 on developing and promoting the mark.  The revenue generated from sales of product under the mark is significant.  As of 2007, Premier has made over $16,500,000 in sales of the GENTLE SPRAY collar.  This correlates to approximately 8% to 23% of Premier's annual revenue a year.

25.     As of 2004, Premier was selling 71,000 collars per year.

26     During the relationship between Multi-Vet and Premier, Premier branded anti-bark collars that were received from Multi-Vet's manufacturer.  Upon receiving those collars, defective rates were as high as 11% before shipment to customers.  As a result of this high defective rate, Premier instituted quality control procedures which drastically reduced the defective rate of the collars purchased by customers.

27.     Before Premier instituted its quality control procedures, many Multi-Vet devices failed due to faulty welds, faulty valves, and improper voltage.  In order to check

for these problems, Premier uses a voltage meter to ensure that a battery will work properly in the device. We then fill the device with spray and blow into the microphone of the device to ensure a proper spray. Each product is checked for correct functioning before it is packaged. Premier also maintains a customer service number where a customer may call in to get advice about products or to obtain replacements for any malfunctioning products.

28.      In 2005 Multi-Vet's patent expired. Subsequently, the exclusive distributor relationship ended between Premier and Multi-Vet. Premier, however, continued to purchase devices from Multi-Vet, and to sell an anti-bark collar under the GENTLE SPRAY name.

29.      At that time, Multi-Vet began to compete with Premier and introduced its own anti-bark collar under the ANTI-BARK COLLAR and SPRAY LOGIK ANTI-BARK COLLAR brands. The packaging on these collars pictured either Dalmatian or a West Highland White Terrier. A true and correct copy of an advertisement depicting Multi-Vet's packaging with the Dalmatian and the West Highland White Terrier is attached hereto as **Exhibit 7**.

30.      Due to this direct competition, Premier's sales began to erode. In 2007, Premier made the decision to manufacture its own anti-bark collar.

31.      In October 2007, in an effort to avoid litigation with Multi-Vet and compromise regarding our mutual misunderstanding regarding ownership of the GENTLE SPRAY name, Premier began selling its anti-bark collar under the name SPRAY SENSE.

32.      Upon resolution of this case in favor of Premier, Premier intends to

resume use of the GENTLE SPRAY name.

33.     Before May 2008, Multi-Vet never offered a citronella anti-bark collar in the United States with the GENTLE SPRAY name and packaging.

34.     Attached hereto as **Exhibit 8** is a true and correct copy of a NY Times article dated April 22, 2003, and titled, *New Collar Curbs Dogs, With Memories of Mom.*

35.     Attached hereto as **Exhibit 9** is a true and correct copy of a Richmond Times Dispatch article titled, *A Natural Leader, Premier Pet Products' Gentle Leader on Display in D.C.*

36.     Attached hereto as **Exhibit 10** is a true and correct copy of Star Tribune article dated December 26, 2002,  and titled, *Gentle Leader, a Head Collar Developed in Minnesota Makes Life Easier For Dogs and Their Owners*.

37.     Attached hereto as **Exhibit 11** is a true and correct copy of an advice column on Canine Behavior dated August 15, 2007, and titled, *Barking at People*.

38.     Attached hereto as **Exhibit 12** is a true and correct copy of a newsletter from Animal Behavior Associates, Volume II, Issues 1, dated 2003 and titled *Pet Behavior One Piece at a Time*.

39.     Attached hereto as **Exhibit 13** is a true and correct copy of published lecture notes from veterinarian Jacqueline Nelson entitled "Unruly and Annoying Behaviors".

40.     Attached hereto as **Exhibit 14** is a true and correct copy of excerpts from Horwitz and Nielson, *Canine & Feline Behavior, Blackwell's Five-Minute Veterinary Consult Clinical Companion,* 2007.

41.     Attached hereto as **Exhibit 15** is a true and correct copy of Chapter 4 from

Terry Ryan, *Coaching People to Train Their Dogs.*

42.    If called upon, I am able to testify to the matters stated herein.

The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

June 12/2008
_____
Date

_____
Sharon Madere



**Dog Channel**.com
the website for dog lovers

**GO GREEN!** BE AN EARTH-FRIENDLY DOG OWNER

DOGFANCY®

# DOG FANCY

THE WORLD'S MOST WIDELY READ DOG MAGAZINE

DECEMBER 2007

## THE BEST DOG GEAR OF 2007

### Stress-free Holidays
**10** Expert Tips

### PLUS:
- Cut back on training treats
- Keep his ears healthy
- Try yoga with your dog

*EXHIBIT 1*

### OLD ENGLISH SHEEPDOG

**DOG BREEDER** DIRECTORY page 109



**SAINT BERNARD**
PLUS: RAT TERRIER

#BXBHCHJ *******AUTO**SCH 5-DIGIT 23113
#DFY0023748148/7#                    JUL08

KRISTA NIXON
PREMIER PET PRODUCTS              USA1
14201 SOMMERVILLE CT
MIDLOTHIAN VA 23113-6884          P0038



# This Year's
# Best Dog
# Gear

Presenting our editors'
picks for outstanding
and innovative pet products.

**D**OG FANCY's annual Editors' Choice awards are BowTie Magazines' dog and product editors' picks of the top new products for dogs. Each year, we look for the most innovative, new pet products that reflect creativity and originality with safety and functionality in mind.

Each product we selected for 2007 reaches new heights in innovation, quality, and safety. Great pet products make life easier for us as dog owners and keep our beloved canine companions healthier, safer, and happier.



### K Pet Top Portable Drinking Device

Sometimes the simpler, the better. This patented bottle-top device fits on most standard water bottles so you can encourage your dog to drink water anywhere you go. The concept is similar to small-animal waterers that only release water when the ball bearing inside is touched. Screw the cap on your bottle, then turn the upper cap counterclockwise to open, allowing water out. Adjust the flow to the amount that's right for your pet. Turn the bottle upside down and allow your dog to lick the ball — no need to squeeze the bottle. Turn the upper cap clockwise to seal the bottle when done.

■ $5.99 to $9.99, from Pet Top Products LLC; (866) 473-8867; www.pettop.com

### L QuickFinder Clipper

Sensor technology in the Quick-Finder Clipper makes it easy to clip your dog's nails without making him wince or bleed. Quick-Sensor technology detects the vein, or quick, inside your dog's nail, telling you how far up to clip the nail. A green light means it's safe to clip, a yellow light indicates caution, and a red light means "stop right there." Two AAA batteries are included. Available in small and medium.

■ $29.99, from MiracleCorp Products; (800) 635-2044; www.quickfinderclipper.com

### M Busy Buddy Bouncy Bone

This three-in-one toy is a bouncy rubber ball with an embedded, durable nylon bone, plus chewy Gnawhide Ring treats. The nylon bone goes through the center of the ball and can be unscrewed to refresh the Gnawhides. The Busy Buddy comes with four replacement Gnawhide Rings, and is available in four sizes: small, medium, medium/large, and large. Additional replacement rings for each size sold separately.

■ $3.99 to $19.99, from Premier Pet Products LLC; (888) 640-8840; www.premier.com

### N Mini Nesting Mat

Designed for small dogs who like to burrow and nest in covers, this product combines a bed and a blanket in a colorful, cuddly design. A padded cotton and fleece base is surrounded by cozy fleece flaps in different sizes, stitched in place to encourage better nesting. The machine-washable mat provides a comforting resting spot, whether at home or on the road.

■ $19.99 to $24.99, from Petstages Inc.; (847) 504-4010; www.petstages.com

Find more great pet products at dogchannel.com

## ASSIGNMENT OF INTELLECTUAL PROPERTY

WHEREAS Animal Behavior Systems, Inc., a Florida corporation with its principal place of business at 5909-G Breckenridge Parkway, Tampa, FL 33610  ("ABS"), is the owner of certain Intellectual Property (as is defined below);

WHEREAS ABS is engaged, among other things, in the business of marketing and wholesaling or pet products to the professional pet industry (the "Business");

WHEREAS Premier Pet Products, LLC, a Virginia limited liability company with its principal place of business at 406 Branchway Road, Richmond, VA 23236. ("Premier") is acquiring certain assets of ABS, which assets include the Intellectual Property; and

WHEREAS ABS and Premier have entered into an Asset Purchase Agreement dated as of April 30, 2001 ("Asset Purchase Agreement") to effectuate the purchase by Premier of certain assets of ABS, including the Intellectual Property.

NOW, THEREFORE, in consideration of the covenants exchanged in the Asset Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, ABS does hereby agree and covenant as follows:

1.  The subject matter of this Assignment consists of all intellectual property interests used by, owned by or licensed to ABS and relating to the Business, as defined in the Asset Purchase Agreement, namely:  (i) trademarks and service marks, trade dress, product configurations, trade names and other indications of origin, all applications or registrations in any jurisdiction pertaining to the foregoing, all translations, adaptations, derivations and combinations thereof, and all goodwill associated therewith; (ii) all inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, improvements, ideas, know-how, formula methodology, processes, technology, software (including password unprotected interpretive code or source code, object code, development documentation, programming tools, drawings, specifications and data), and all applications and patents in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions, continuations-in-part, revisions, renewals or extensions; (iii) trade secrets, including confidential information and the right in any jurisdiction to limit the use or disclosure thereof; (iv) copyrights in writings, designs, software, mask works or other works, applications or registrations in any jurisdiction for the foregoing and all moral rights related thereto; (v) database rights; (vi) Internet Web sites, domain names and applications and registrations pertaining thereto and all intellectual property used in connection with or contained in all versions of ABS's Web sites relating to the Business; (vii) all rights under agreements relating to the foregoing; (viii) books and records pertaining to the foregoing; (ix) all copies and tangible embodiments thereof (in whatever form or medium); and (x) claims or causes of action arising out of or related to past, present or future infringement or misappropriation of the foregoing, and also including but not limited to the Intellectual Property and associated applications and registrations identified in Exhibit A (collectively, "Intellectual Property").

***EXHIBIT 2***

2.    ABS does hereby assign and convey unto Premier all right, title and interest in and to the Intellectual Property as well as the registrations and applications for registration associated therewith and, in the case of names and marks of any type, the goodwill of the business associated with such names and marks, and all common law rights associated with the Intellectual Property, whether registered or unregistered.

3.    ABS represents and warrants that:

a)    To ABS's knowledge, ABS possesses all right, title, and interest in and to the Intellectual Property.  ABS assigns the Intellectual Property pursuant to Section 2 of this Agreement free and clear of any joint-ownership interest, lien, license, security interest, encumbrance or other restriction.

b)    Each item of Intellectual Property owned or used by ABS immediately prior to the Closing hereunder will be owned or available for use by Purchaser on identical terms and conditions immediately subsequent to the Closing hereunder.

c)    No item of Intellectual Property is owned by any third party and used by ABS pursuant to license, sublicense, agreement, permission or similar arrangement.

d)    The Intellectual Property is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge.

e)    No action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or other challenge is pending or threatened which does or may challenge or affect the legality, enforceability, validity, registrability, nature, scope or extent of rights in the Intellectual Property, or subject the possession or use of the Intellectual property to any license fee or other obligation.

f)    To ABS's knowledge, there is no conflicting use, exploitation or infringement of the Intellectual Property by any other person.

g)    ABS has never agreed to indemnify any person for or against any interference, infringement, misappropriation or other conflict with respect to the Intellectual Property.

h)    ABS has not assigned or transferred any interest in the Intellectual Property to any other.

i)    To ABS's knowledge, the manufacture, use, sale, reproduction, distribution or other exploitation of the Intellectual Property by Premier or its successors, assigns or licensees, in a manner consistent with that as presently conducted and as presently proposed to be conducted by ABS, will not interfere with, infringe upon, misappropriate or otherwise come into conflict with, any intellectual property rights of third parties.

j)      ABS is not a party in any capacity to any franchise, license or royalty agreement respecting any item of Intellectual Property.

k)      ABS has received all necessary written assignments of copyright for material created, developed or published in connection with its ownership of the Intellectual Property.

l)      Any registrations made with respect to the Intellectual Property are true and accurate as well as valid, subsisting and enforceable

m)      ABS has taken reasonable precautions to prevent the unauthorized use or disclosure to third parties of any trade secrets or confidential information comprising the Intellectual Property, and to the best of its knowledge, no third party is using or has possession of trade secrets or confidential information comprising the Intellectual Property.

n)      To whatever extent the Intellectual Property incorporates or is derived from third-party subject matter, (i) such third-party subject matter and the owner(s) of rights in such subject matter are identified with specificity in Exhibit A, (ii) ABS has valid, enforceable and transferable licenses to use any such third-party material comprising the Intellectual Property, (iii) ABS properly conveys those licenses or rights to Premier, and (iv) ABS has obtained all necessary releases (whether right of publicity, right of privacy, performance right or otherwise) necessary for Premier, its assigns and authorized users to make unrestricted use and exploitation of the Intellectual Property.

Notwithstanding anything in this Agreement to the contrary, none of the representations and warranties in this Section 3 apply to the extent that Intellectual Property is owned by MultiVet Limited, a Quebec corporation ("MVL"), or MultiVet International, a Quebec corporation ("MVI") and such Intellectual Property is licensed to Premier in that certain License Agreement by and among Premier, MVL, and MVI effective as of April 30, 2001.

4.      ABS agrees to execute additional assignments and documents and take such additional steps as Premier may reasonably request in order to convey, transfer, assign, register, record in the name of Premier or waive interests in the Intellectual Property. ABS agrees to provide Premier or its assigns with reasonable nonmonetary assistance in the enforcement or defense of its rights in the Intellectual Property.

5.      In the event that, after reasonably diligent efforts, Premier has not secured ABS's signature on any document needed to accomplish any of the purposes set forth in section 4. above, ABS hereby appoints any and all officers of Premier as its attorney-in fact solely for the sole purpose of doing any of the acts of ABS called for by section 4. above.

6.      Within forty-eight (48) hours of the execution of this Assignment, ABS shall deliver to Premier or its designee all documents and things in its possession, custody or control constituting, comprising, referring to or relating to the Intellectual Property.

7.      This Assignment and the Asset Purchase Agreement constitute the entire agreement between the parties with respect to their subject matter, and supersede all prior agreements and understandings relating to the subject matter of this Assignment and the Asset Purchase Agreement.   This Assignment can be modified only by a written instrument signed by both parties.  In the event any provision of this Assignment is finally determined by a court of competent jurisdiction to be void, unenforceable, invalid or otherwise contrary to law or equity, the parties agree to reform (or as necessary, authorize such tribunal to reform) this Assignment to the extent necessary to cure (or if necessary, delete) such offending term, and that the remainder of this Assignment that can be given effect without the benefit of such term shall be given effect.

This Assignment shall be effective as of April 30, 2001.


Animal Behavior Systems, Inc.

By: _____
Print Name: _____
Its: _____
Date: _____

Acknowledgment
On this ___ day of May, 2001, before me appeared _____, the person who signed the foregoing instrument, who acknowledged that he or she signed it as a free act on behalf of the identified corporation with authority to do so.

STATE/COMMONWEALTH OF: _____ )
CITY/COUNTY OF: _____ )

Subscribed and sworn to before me this ___ day of May, 2001.
My commission expires: _____.


_____
Notary Public

4

**Exhibit A**
**to**
**Assignment of Intellectual Property**
**of Animal Behavior Systems, Inc.**

| Mark | Reg. or App. Ser. No. | Issue/Filing Date |
|---|---|---|
| ABS ANIMAL BEHAVIOR SYSTEMS, INC (with design) | 2277615 | September 14, 1999 |
| ABS | N.A. | N.A. |
| ANIMAL BEHAVIOR SYSTEMS | N.A. | N.A. |
| ANTI-BARK SYSTEM | N.A. | N.A. |
| SPRAY BARRIER | N.A. | N.A. |
| SPRAY COMMANDER | N.A. | N.A. |

f:\jsanborn\premier pet products, inc\2001purchase\finaldoc\assignment#4-ip.doc

## Schedule 1.01 to Asset Purchase Agreement Dated April 30, 2001

The following are the Assets of the Seller comprising the Business:

1.  The Seller's tangible assets as listed on the attached document entitled "Tax Asset Detail 1/01/01 -12/31/01."

2.  Items 3 and 5 only of the Seller's agreements (the "Assigned Agreements") as listed on the attached document entitled "Agreement List."

TP003918;2

Multi-Vet/Premier Agreement

AGREEMENT ENTERED INTO AT Montreal, on the 30th day of April, 2001.

| | |
|---|---|
| **BETWEEN:** | **MULTI-VET LIMITED**, a Canadian corporation having its offices at 120, Ferland Street, Suite 11B, Nun's Island, Verdun, Quebec, Canada H3E 1L1, |
| | (hereinafter referred to as "**Multi-Vet**"); |
| **AND:** | **MULTIVET INTERNATIONAL INC.**, a Canadian corporation having its offices at P.O. Box 651, St-Hyacinthe, Quebec, Canada H2S 7R5, |
| | (hereinafter referred to as "**International**") |
| **AND:** | **PREMIER PET PRODUCTS, LLC**, a Virginia limited liability company with its principal place of business at 406 Branchway Road, Richmond, Virginia, 23236 U.S.A. |
| | (hereinafter referred to as "**Premier**"); |

WHEREAS Multi-Vet is the owner of patents and know-how related to the production of devices for the training of pets and of the spray technology used therein;

WHEREAS Premier is in the business of selling collars, leashes, and various other products for dogs, cats, birds and other small companion animals;

WHEREAS Multi-Vet has granted certain distribution rights to International with respect to anti-barking collars;

WHEREAS Premier desires to acquire from Multi-Vet an exclusive license allowing it to use the Spray Technology (as defined hereunder) and certain trademarks in association with the marketing, promotion, sale and distribution of Products (as defined hereunder) in the USA (hereinafter the «**Territory**»);

WHEREAS International has acquired valuable know-how with respect to the marketing and sale of Products in the Territory;

WHEREAS International is willing to renounce to said distribution rights in the Territory in consideration for the payment of consulting fees by Premier as further described in a Consulting Agreement entered concurrently with this Agreement;

WHEREAS Premier wishes to be supplied Products by Multi-Vet and Multi-Vet is willing to do so the whole in accordance with the following terms and conditions.

Final Version
**EXHIBIT 3**

THE PARTIES HAVE AGREED AS FOLLOWS:

## SECTION 1 - DEFINITIONS

In this Agreement,

**1.1    Affiliates.** A body corporate is deemed to be affiliated with an individual if such individual, directly or indirectly, controls (de jure or de facto) such body corporate. A body corporate is deemed to be affiliated with another body corporate, if one of them is the subsidiary of the other or both are the subsidiaries of the same body corporate or each of them is ultimately controlled by the same person(s). If two (2) bodies corporate are affiliated with the same person at the same time, they shall be deemed to be affiliated with each other.

**1.2    Confidential Information.** The meaning set forth in Section 15.

**1.3    Contract Year.** That period of time commencing on the Effective Date and ending on December 31, 2001 and any subsequent twelve month period ending on December 31st.

**1.4    Effective date.** April 30, 2001.

**1.5    International's Know-How.** All the present and future knowledge and accumulated experience acquired by International as a result of research, practical experience or otherwise in respect of the marketing and sale of the Products in the Territory.

**1.6    Net Sales.** The total number of units of Products as invoiced by Premier to its customers, less: (i) all credits and allowances actually granted by Premier to any of its customers in respect of uncollectible bad debt not to exceed two percent (2%), rejection or returns of units of Products and accounting errors; (ii) units of Products which are given away at no cost for promotional purposes, up to a total not to exceed three percent (3%) of total number of units of Products; and (iii) units of Products which are sold by Premier for a special defined promotion at a discount price, only with the prior approval of Multi-Vet, which shall not be unreasonably withheld. All of said exclusions shall not collectively exceed five percent (5%). Bad debt shall not be considered uncollectible until one (1) year after first invoiced, and Premier has turned the debt over to a collection agency.

**1.7    Patents.** Each and every presently-existing and after acquired unexpired patent of Multi-Vet in the Territory embodying any part of the Spray Technology, including, without limiting the generality of the foregoing, the following patents:

| COUNTRY | APPLICATION No. | PATENT No. | ISSUE DATE | EXPIRATION DATE |
|---------|-----------------|------------|------------|-----------------|
| USA | 709,433 | 4,627,385 | 9 December 1986 | 7 March 2005 |
| USA | 378,901 | 5,046,453 | 9 October 1991 | 12 July 2009 |

as well as all patents which may issue therefrom or from applications which may be filed in relation to the Spray Technology and any patent of importation, improvement or addition, utility models and inventors certificates, continuation, extension, division, re-validation, reissue or other combination or renewal of same in the Territory.

**1.8    Product.**  Any device to train, contain or otherwise control pets using a spray, including anti-barking devices.   Without limiting the generality of the foregoing, Products that are presently manufactured by Multi-Vet are listed in Schedule A, which can be amended from time to time as new Products are invented or created.

**1.9    Spray Technology.**  All the present and future commercial, scientific and technical knowledge and accumulated experience acquired by Multi-Vet and its predecessors in title as a result of research, practical experience or otherwise, in the design, manufacture, production, use, sale, distribution, marketing, advertising and/or merchandising of anti-barking collars and/or of other devices to train, contain or otherwise control pets using a spray, including, without limiting the generality of the foregoing: ideas, un-patented inventions, processes, manufacturing procedures, methods, designs and data pertaining to the Products and/or anti-barking devices using a spray.

**1.10    Territory.**  The meaning set forth in the preamble.

## SECTION 2 - EXCLUSIVE LICENSE

**2.1    Exclusive license to use the Spray Technology and the Patents.**  Subject to Section 2.7, Multi-Vet hereby grants to Premier an exclusive license in the Territory for the Term to sell, offer for sale, market, promote, distribute and service the Products which incorporate the Spray Technology and/or the Patents and for no other purpose.

**2.2    Right to use trademarks.**  Multi-Vet hereby grants to Premier the exclusive right and license, but not the obligation, to use the following trademarks in relation with the marketing, promotion, sale and distribution of Products in the Territory:  Anti-Bark System, ABS, ABOISTOP, DIRECT STOP, SMART CAP, SPRAY CAP, Spray Barrier, Virtual Fence, Spray Commander and/or any new marks associated with the Products in relation with the marketing, promotion, sale and distribution of Products in the Territory.

**2.3    New trademarks.**  Upon written notification of Premier's intent to use new marks associated with the Products, Multi-Vet is obligated to register these marks within

the Territory within sixty (60) days, and hereby grants to Premier the exclusive right and license, but not the obligation, to use the marks in relation with the marketing, promotion, sale and distribution of Products in the Territory. After the initial term of the Agreement, or any subsequent term, in the event the Agreement is terminated for any reason other than breach by Premier, then the new trademarks developed by Premier and registered by Multi-Vet will be sold to Premier by Multi-Vet for one (1) dollar each.

**2.4     Referral.**  If Multi-Vet receives any requests or inquiries from any country world-wide for products currently produced by Premier, Multi-Vet agrees to refer such requests or inquiries immediately to Premier. Similarly if Premier receives any requests or inquiries from any country world-wide for products produced by Multi-Vet, Premier agrees to refer such requests or inquiries immediately to Multi-Vet.

**2.5     Non-compete.**  Premier acknowledges that the Products are complementary to the products which it currently sells in the Territory. If applicable laws permit, Premier agrees that neither itself nor its Affiliates will, directly or indirectly, stock, distribute, promote or sell competitive products ("competitive" being defined as any product used to train, contain or otherwise control pets using a spray or a shock, including anti-barking devices) while this Agreement is in effect for any reason whatsoever without having previously obtained the written permission of Mult-Vet. In addition, in the event this License Agreement is rightfully terminated by Multi-Vet by reason of the breach of Premier, then Premier also shall not distriute, promote or sell competitive product for a period of one year (1) after termination.

**2.6     No sales outside Territory.**  Except as provided in Section 2.7, Premier shall not, except by written agreement with Multi-Vet, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product outside the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same outside the Territory. All requests or inquiries received by Premier with respect to any Product for delivery, use or purchase outside the Territory shall be referred immediately by Premier to Multi-Vet.

**2.7     No sales in the Territory.**  Except as provided in Section 2.7, Multi-Vet shall not, except by written agreement with Premier, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product in the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same in the Territory. All requests or inquiries received by Multi-Vet with respect to any Product for delivery, use or purchase in the Territory shall be referred immediately by Multi-Vet to Premier.

**2.8     Internet Sales.**  Notwithstanding any other Section of this Agreement, Multi-Vet shall have the right to sell Products through the Internet to individual consumers anywhere in the world, limited to normal consumer quantities. Notwithstanding any other Section of this Agreement, Premier shall have the right to sell Products through the Internet to individual consumers anywhere in the world, other than the below listed exclusions, limited to normal consumer quantities, provided that any and all Products

sold by Premier outside the Territory shall be purchased from Multi-Vet at Multi-Vet's lowest published wholesale price. Until such time as Multi-Vet notifies Premier in writing of the resolution of contract issues with Dynavet, Premier will not make Internet Sales in Europe.

## SECTION 3 - ROYALTIES and MINIMUMS

**3.1     Unit Royalty.** Premier will pay to Multi-Vet a unit royalty on the Net Sales of all Products and the spray refills it sells in the Territory while this Agreement in effect, in accordance with Schedule A annexed hereto.

**3.2     Change in Unit Royalty and Annual Minimum Royalty.** In the event a third party introduces a competing spray product in the Territory then Multi-Vet and Premier agree to negotiate, in good faith, to adjust the Unit Royalty and/or Annual Minimum Royalty and/or Purchase Price on the Product(s) which is (are) directly affected by such new competing product.

**3.3     Terms of payment.** Premier will make royalty payments to Multi-Vet within 60 days of the end of each calendar month

**3.4     Annual Minimum Net Sales.** Premier will be required to pay to Multi-Vet the royalties corresponding to the following minimum unit Net Sales of Products in the Territory:

| Year | Minimum Units Barking devices | Minimum Units Spray commanders |
|------|-------------------------------|--------------------------------|
| 2001 | None   | None             |
| 2002 | 30,000 | 5,000            |
| 2003 | 45,000 | 10,000           |
| 2004 | 65,000 | to be negotiated |

Premier will thereafter be required to maintain a 10% yearly increase in unit Net Sales over the actual average unit Net Sales of the two (2) previous years to maintain the agreement. However, it is agreed that the Annual Minimum Net Sales for any given year will never be less than the actual Annual Net Sales of the previous year.

**3.5     Adjustment.** If Multi-Vet cannot ship Product(s) to Premier for any period greater than thirty (30) days and thereby causing Premier to materially backorder its customers, or if Premier's ability to sell Products is otherwise materially impeded by circumstances beyond its reasonable control, Multi-Vet and Premier agree to renegotiate, in good faith, the Annual Minimum Net Sales and/or Royalties and make reasonable adjustments, as necessary.

**3.6     Calculation.** The above minimum royalties will be payable monthly by Premier based on a rolling twelve-month forecast by adding to each monthly royalty payment any

balance (if any) between the minimum royalty due for the year-to-date period and the royalties otherwise payable for such year-to-date period and such additional payment shall be credited as a prepaid royalty.

**3.7    Failure to meet Annual Minimum Net Sales.** If Premier does not make the Annual Minimum Net Sales provided in Section 3.4 during a given year, the parties agree to undertake a mutual review within 60 days of the end of the year of that year's sales activities and market conditions to determine the reason(s) for the shortfall. If in Multi-Vet's opinion Premier has not put forth diligent and best efforts to reach the Annual Minimum Net Sales, Multi-Vet shall have the right (in addition to any other rights it may have pursuant to this Agreement) to transform it into a non-exclusive license. Such transformation shall be effective thirty (30) days from the date of written notice from Multi-Vet to Premier.

**3.8    When sold.** For the purposes of this Agreement, Products shall be considered sold when invoiced out, or if not invoiced, when delivered or shipped to the customers.

## SECTION 4 - REPORTS & PAYMENTS

**4.1    When Report due.** Premier covenants and agrees to furnish royalty statements within twenty (20) days after each calendar month during the term of this Agreement.

**4.2    Content of Report.** All statements shall:

> **4.2.1**  include the total Net Sales of each Products and the spray refills made during such month;

> **4.2.2**  include a calculation of the amount due to Multi-Vet for the royalties in respect of the Net Sales so reported, and of the minimum royalties, when applicable; and,

> **4.2.3**  be certified as correct by the Controller or some other senior officer of Premier.

**4.3    When Payment due.** Premier covenants and agrees to make the royalty payment corresponding to the Net Sales of Products and the spray refills made during each calendar month during the term of this Agreement within sixty (60) days after the end of each such month.

**4.4    If no Sales.** If no Net Sales have been made in any month, Premier shall so advise Multi-Vet within twenty (20) days after the end of the month. The minimum Royalty for such month shall be payable within sixty (60) days after the end of each such month.

**4.5      Currency.** All dollar values expressed in this Agreement and any Schedule hereto and all payments required to be made by Premier, shall be in US dollars.

**4.6      Interest.** Any amount owed to Multi-Vet pursuant to this agreement which is not paid on its due date shall bear interest at the rate of one and one half percent (1½%) per month (eighteen percent (18%) per annum) or at the highest rate permitted by law, if lower than the above, calculated from the date upon which such amount was due. Unpaid interest will also bear interest at the same rate.

## SECTION 5 - ACCOUNTS

**5.1      Keeping of Records.** Premier shall:

>   **5.1.1**  Keep proper and detailed accounts and records, including invoices, receipts and vouchers relating thereto, (hereinafter referred to as the **"Records"**) in respect of its operations under this agreement, including the Net Sales of Products

>   **5.1.2**  Make the Records available during business hours on reasonable notice and permit representatives of Multi-Vet to audit and/or inspect the Records on an annual basis, to make notes or copies of documents relating to its operations under this Agreement, including royalty calculations and payments and to report to Multi-Vet only information relative to the accuracy of the royalties payable under the Agreement. In the event an error in favor of Multi-Vet is discovered during such audit or inspection, Premier shall pay the difference within thirty (30) days of such discovery. Furthermore, if such error exceeds three (3%) percent of the royalties actually paid, Premier shall reimburse Multi-Vet for all costs incurred in relation to such audit or inspection. Any inspection or audit of Records shall be subject to reasonable confidentiality agreements.

**5.2      Duration.** Premier shall preserve the Records for a period of five (5) years from their creation.

## SECTION 6 - SUPPLY OF PRODUCTS

**6.1      Purchases.** Premier undertakes to purchase all of its needs in Products from Multi-Vet or a supplier designated by Multi-Vet. Premier also undertakes to purchase all of its needs in the spray substances used in conjunction with any Product from Multi-Vet. Multi-Vet agrees to provide all Products and associated supplies ordered by Premier.

**6.2      Prices.** The prices charged by Multi-Vet to Premier for each of the Product(s) are specified in Schedule B. These prices are in 2001 dollars and may be increased by Multi-Vet as set forth in Section 6.8 due to materials, labor or currency fluctuations.

**6.3    Payment terms.**  The payment terms will be net forty-five (45) days, F.O.B. Multi-Vet plant, from the date of shipment.

**6.4    Net of other charges.**  The said prices shall be the net selling price by Multi-Vet, exclusive of all sales and other similar taxes, custom and excise duties, insurance premiums, freight and storage charges and all other charges of a similar nature, whether currently imposed or applicable in the future.

**6.5    Temporary license.**  Contingent upon the event Multi-Vet and its designated sub-contractors are unwilling or are not able to supply Premier with such Products and associated supplies ordered by Premier, Multi-Vet grants to Premier a temporary license to produce such Products and associated supplies, or have another produce same, but only for resale within the Territory and only for as long as such failure to supply lasts.

**6.6    Quality standards.**  Such License to use the Spray Technology and the Patents granted to Premier shall be restricted to such Products that have a high and merchantable quality which meet or exceed Multi-Vet's pre-existing quality standards as communicated to Premier.

**6.7    Inspection.**  Multi-Vet shall have the right, at all reasonable times, to enter and inspect any premises used by Premier in its operation under such License for the purpose of determining compliance with the standards, specifications and requirements referred to in Section 6.6.

**6.8    Changes in prices.**  Multi-Vet will inform Premier in writing at least three (3) months prior to any change in its list prices.  With respect to any written purchase orders for units which may be placed by Premier between the date of such written notice by the company and the effective date of the price change, the price for the units so ordered shall be the price prevailing at the time the purchase order is received and accepted by Multi-Vet or its sub-contractors, provided that such written purchase order specifies delivery dates not exceeding six (6) months from the order date, failing which the increased purchase price shall be applicable.  In the event that Premier, as a condition of making a sale, is required to enter into an agreement with a customer(s) in which Premier must guarantee no change in wholesale price for a specified period of time, Premier will provide Multi-Vet with a copy of the terms of the contract, and Multi-Vet will have the option to agree thereto, in which case it will honor the price prevailing during at the beginning of the contract and throughout its duration, limited to units sold only to that customer pursuant to such contract.

**6.9    No changes.**  Premier agrees not to add to, remove from or in any way change the Products without the prior written approval of Multi-Vet.  Premier also agrees not to alter, remove or otherwise tamper with any registration numbers, serial numbers, date codes, patent numbers or other tracking marks that appear on the Products.

**6.10    Notification of defects.**  Premier will have the obligation to advise Multi-Vet of the existence of any defect as soon as possible after same is brought to its attention and to

provide Multi-Vet with all useful information and explanations relating to same. Multi-Vet will have the obligation to advise Premier of the existence of any defect as soon as possible after same is brought to its attention and to provide Premier with all useful information and explanations relating to same. Multi-Vet shall promptly remedy any major design, material or manufacturing defects in Products sold to Premier.

## SECTION 7 - WARRANTY

**7.1    Warranty.** "IP Warranties:" Multi-Vet warrants that: (1) it is the lawful owner of the Patents and the Spray Technology, and that Multi-Vet otherwise has all power and authority to grant the rights and licenses granted herein; (2) that, to the best of its knowledge, the use and exploitation of the Patents and the Spray Technology as licensed herein, including the sale of the Products by Premier and the use of the Products by Premier's customers, shall not infringe or violate the patent or other intellectual property rights of any third party; (3) that as of the Effective Date, it has no knowledge that any third party is infringing any of the Patents; and (4) that the Patents and the Spray Technology collectively comprise all rights and know how to distribute and sell the Products in the Territory and to otherwise exercise Premier's rights under this Agreement. "Quality Warranties:" Multi-Vet warrants that all Products manufactured by or for it and sold to Premier pursuant to this Agreement shall be free from any major material or workmanship defects and in full compliance with its specifications, quality control standards and all applicable laws. A Product that does not meet the foregoing requirements shall be deemed to be "defective" for purposes of this Section 7. This Quality Warranty on the Products shall be valid for a period of eighteen (18) months from the date of shipment to Premier. The Quality Warranty obligations of Multi-Vet are strictly limited to the replacement/repair of any Products found to have major manufacturing defects in materials or workmanship. Multi-Vet is not obligated for damages due to error, misuse, neglect, etc. by Premier, Premier's customers, or the end consumer. In the event that three (3) percent or more of Products purchased from Multi-Vet have major defects and/or are the subject of Quality Warranty claims, then Premier shall be entitled to a reduction in Minimum royalties payable, the rate of actual royalties on Net Sales, and/or purchase price of Products, which adjustment the parties shall promptly negotiate in good faith.

**7.2    No liability to customers or end consumers.** Premier shall assume all warranty obligations to its customers and end consumers in respect of Products, and Multi-Vet shall have no liability either to Premier or to its customers and end consumers in respect of such warranty obligations except as expressly provided herein.

**7.3    LIMITATIONS** EXCEPT FOR THE WARRANTIES CONTAINED IN SECTION 7.1, MULTI-VET DOES NOT GRANT ANY WARRANTY, EITHER EXPRESSED OR IMPLIED, LEGAL OR CONVENTIONAL, WITH REGARD TO ANY PRODUCTS OR REFILLS AND DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE WARRANTIES EXPRESSLY CONTAINED IN SECTION 7.1 HEREOF ARE IN LIEU

OF ANY LIABILITY OR OBLIGATION OF MULTI-VET FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES (INCLUDING LOSS OF REVENUE OR OF BUSINESS OR OTHER SIMILAR LOSSES) SUSTAINED BY PREMIER (INCLUDING ITS EMPLOYEES, AGENTS, OR INVITEES) OR ANY OF ITS CLIENTS OR END CONSUMERS AND/OR IN ANY WAY ARISING FROM OR RELATING TO THE SALE, MAINTENANCE, USE, PERFORMANCE OR FAILURE OF ANY PRODUCTS OR REFILLS.

**7.4    Faulty actions.** Multi-Vet's warranty obligations do not cover any faulty or negligent manipulation, storage or use of any Products or refills or any such manipulation or storage or use which is not in conformity with instructions provided by Multi-Vet.

**7.5    Notification.** Premier will have the obligation to advise Multi-Vet of the existence of any warranty claim or any defect as soon as possible after same is brought to its attention and to provide Multi-Vet with all readily available useful information and explanations relating to same. Premier shall allow Multi-Vet to have free access to any Products at all reasonable times.

**7.6    Obligations of Multi-Vet.** Multi-Vet shall replace or repair, free of charge, all defective Products (as defined in section 7.1 above) returned by Premier to Multi-Vet subject to the following terms:

> **7.6.1** The defective Products will be shipped in full cases (minimum 100 units per shipment) to Multi-Vet (subject to prior co-ordination with Multi-Vet), at Multi-Vet's expense and will include a list of the serial numbers of all returned units together with a description of each alleged defect. Notwithstanding the above, Multi-Vet shall, at its own discretion, be entitled to replace the reported defective Products without requesting shipment of same to Multi-Vet.

> **7.6.2** Upon receipt of the defective Products shipment, Multi-Vet's personnel will inspect and sort same. All Products covered by the warranty as per Section 7.1 above will be replaced within thirty (30) days free of charge. However, Products that will be found to have been returned for other reasons (dirt, misuse, physical damage, repair by unauthorized personnel, etc.) will be repaired against payment by Premier for parts and labor, but not without prior written authorization from Premier

> **7.6.3** The replaced/repaired units will be shipped to Premier at Multi-Vet's expense and include an itemized report and invoice with regard to the number of replaced units and an invoice for repaired units, if any.

## SECTION 8 - PRODUCT DEVELOPMENT

**8.1    Product development.** Multi-Vet may, during the term of this Agreement, develop pet training products using the Spray Technology including but not limited to

remote trainers, containment fences and indoor animal control. Multi-Vet will provide a reasonably full disclosure of any R&D development to Premier. Multi-Vet will endeavor to get Premier's consultation as much as possible in the product development process, provided Premier will not charge any fees or expenses to Multi-Vet for such consultation unless otherwise agreed.

**8.2    Disclosure.** Subject to reasonable confidentiality obligations, each party shall promptly disclose to the other party any discovery or invention which is a new or improved Product which it makes or acquires during the term of this Agreement and shall make available to the other party all information relating thereto, including blueprints, sketches, drawings, designs, test information and other data. All such disclosures and information shall be treated as confidential information (within the meaning of section 15) by the recipient.

**8.3    Ownership.** Multi-Vet shall own all rights to the spray technology aspects of any such discovery or invention created while this Agreement is in effect, no matter by whom made. The other aspects of any such discovery or invention shall be owned by the party making it.

**8.4    Right to distribute.** Any products developed or created making use of any developments, inventions, discoveries or improvements covered by this Section 8 shall be deemed to be "Products" as defined by this Agreement and subject to the licenses granted herein and the other terms and conditions of this Agreement. Multi-Vet undertakes to sell such new products to Premier at Multi-Vet's lowest trade price to any non-Affiliated customer.

**8.5    Distribution/supply agreement.** The precise terms of such distribution/supply agreement will be incorporated in an addendum to this Agreement or a separate document.

## SECTION 9 - INTELLECTUAL PROPERTY

**9.1    No contest.** Premier shall not, at any time during the term of this Agreement or thereafter, question or contest, directly or indirectly, the validity of the Spray Technology, the Patents or the trademarks listed in Section 2.2 or assist any other person to do so.

**9.2    Patent notices.** Any labeling used in connection with the marketing, advertising, promotion and sale of every Product shall clearly indicate the existence of the Patents as well as their use under license and such label shall be in a form agreed upon by Multi-Vet in writing, and the consent of Multi-Vet shall not be unreasonably withheld. As an example, the following patent notice is agreeable provided in a font having at least 12 points:

«Covered by one or more of the following US Patents 4,627,385 and 5,046,453.»

«Made under license from Multi-Vet Ltd.»

**9.3    Trademark and copyright notices.** To the extent Premier uses a trademark or a copyrighted work of Multi-Vet, Premier will apply appropriate notices to the Products, their containers, accompanying materials and/or promotional materials in a form, size and location acceptable to Multi-Vet, acting reasonably.

## SECTION 10 - PROMOTION AND SALE

**10.1    Best efforts.** Premier shall exercise its diligent, best and good faith efforts at its expense to introduce, promote the sale and use of, obtain orders for, distribute and sell Products in every major part of the Territory and give adequate, efficient and prompt attention and service to local distributors and consumers.

**10.2    Premier discretion.** The details of the marketing, packaging and promotion of the Products shall be at Premier's discretion provided all the other terms and conditions of this agreement are respected by Premier.

**10.3    After sales service center.** Premier shall, at its own expense, organize and keep active an after sales service center for the Products in the Territory.

**10.4    Conformity with the law.** Premier shall ascertain that the Products and all packaging, instructions, advertising material, etc. is in conformity with the laws and regulations of every part of the Territory.

## SECTION 11 - MULTI-VET INTERNATIONAL

**11.1**    International hereby surrenders, waives and renounces in favor of Premier any distribution rights in the Territory granted to it by Multi-Vet for as long as this agreement remains in force.

**11.2**    In consideration for the above and to obtain access to International's Know-How, Premier undertakes to enter into a consulting agreement with International (the **"Consulting Agreement"**). Such Consulting Agreement will contain the usual clauses in such agreements and will provide that Premier will pay a fee of nineteen thousand eight hundred eighty-nine dollars ($19,889) per month to International for ten (10) years.

## SECTION 12 - TERM

**12.1**    This Agreement is deemed to have commenced on the date mentioned above and shall terminate on April 30, 2011 unless previously extended by mutual consent or terminated in accordance with the terms of this Agreement.

## SECTION 13 - TERMINATION

**13.1    Right to terminate by Multi-Vet.** Multi-Vet shall be entitled to terminate upon fifteen (15) days prior written notice in the event: i) Premier fails to pay when due any royalty (regular or minimum) or any other amount payable to Multi-Vet pursuant to this Agreement or  ii) the Consulting Agreement is terminated for any reason other than International's breach thereof. Such right shall be exercised by giving a written notice to Premier specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than fifteen (15) days subsequent to the date of such notice unless the Premier has cured such breach within fifteen (15) days from the date of such notice. In the case Premier fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

**13.2    Right to terminate by either party** In the event of the material breach of any other provision of this Agreement by one of the parties, the other party shall have the right to terminate this Agreement. Such right shall be exercised by giving a written notice to defaulting party specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than thirty (30) days subsequent to the date of such notice unless the breaching party has cured such breach within thirty (30) days from the date of such notice. In the case the defaulting party fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

**13.3    Material Breaches.**  Without limiting the generality of the foregoing, the occurrence of any one or more of the following events shall constitute a material breach under this Agreement:

**13.3.1** a party breaching a warranty it makes herein;

**13.3.2** a party institutes proceedings seeking relief under a bankruptcy law or any similar law, or consents to entry of an order for relief against it in any bankruptcy or insolvency proceeding or similar proceeding, or files a petition for or consent or answer consenting to reorganization or other relief under any bankruptcy act or other similar law, or consents to the filing against it of any request for the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of it or of any substantial part of its property, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due, or takes any action in furtherance of the foregoing;

**13.3.3** a party makes or attempts to make an assignment for the benefit of creditors;

**13.3.4** a Receiver is appointed over the whole or any part of the undertaking or assets of one of the parties;

**13.3.5** a party ceases or threatens to cease to carry on the whole or any substantial part of its business other than in the course of reconstruction or amalgamation; or,

**13.3.6** a party is convicted of a felony or other similar crime related to the conduct of the business related to this Agreement.

**13.4    No assignee rights.** No assignee for the benefit of creditors, receiver, liquidator, sequestrator, trustee in bankruptcy, sheriff or any other officer of the court or official charged with taking over custody of a party's assets or business shall have any right to continue the performance of this Agreement.

**13.5    No release.** Termination of this Agreement shall not release a party from any payments or obligations due and payable or accrued to the other or rescind any payment made or paid by one party to the other hereunder prior to the time such termination becomes effective nor release any party from those obligations hereunder which survive termination. Furthermore, termination of this Agreement prior to the expiration of its term shall be without prejudice to any other rights which one party may have against the other, including, without limitation, damages for breach to the extent that same may be recoverable.

**13.6    Option to purchase remaining inventory.** Premier hereby grants to Multi-Vet an option to re-purchase the inventory of Products and refills owned or controlled by Premier at the price at which it was sold to Premier, upon termination or expiration of this Agreement. This option shall apply only if and when the Agreement is terminated or expired. For example, the transformation of the license into a non-exclusive license pursuant to section 3.7 shall not trigger such option. If Multi-Vet does not exercise this option within thirty (30) days after the effective date of termination or expiration, as the case may be, then Premier shall be entitled, within the following ninety (90) days, to sell its inventory of such Products and refills notwithstanding the expiration or termination of the licenses herein.

**13.7    No additional amounts.** In the event of the termination of this Agreement pursuant to section, and unless otherwise provided for in this Agreement, no party will be liable for the payment of additional amounts to the other party.

# SECTION 14 - INDEMNIFICATION

**14.1** Premier shall indemnify and save and hold harmless Multi-Vet from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorneys' fees and expenses) which Multi-Vet or its Affiliates is or becomes liable for, arising from a third-party claim: (1) that Premier breached a warranty it made herein; (2) that Premier acted with gross negligence or wilful and malicious misconduct; or (3) that Premier made false or misleading claims with respect to the Products; or (4) that Premier exceeded the scope of the licenses granted herein.

**14.2**    Premier shall, at the request of Multi-Vet or one of its Affiliates, assume the defence of any demand, claim, action, suit or proceeding brought against Multi-Vet or any such Affiliate by reason of the foregoing and pay any and all damages assessed against or that are payable by Multi-Vet or any Affiliate as a result of the disposition of any such demand, claim, action, suit or proceeding. Premier's obligation hereunder is conditioned upon Multi-Vet promptly notifying Premier of all such liabilities, claims, causes of action or suits for which indemnity may by sought. In the defence of any such claim, Multi-Vet will cooperate fully with Premier, and will, from time to time, make available to Premier all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim. Premier shall not enter into any settlement or material admission without the prior consent of Multi-Vet. Notwithstanding the foregoing, Multi-Vet or its Affiliates as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

**14.3**    Multi-Vet shall indemnify and save and hold harmless Premier, its clients and their respective directors, officers, employees, agents and Affiliates from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorney's fees and expenses) which any of the above is or becomes liable for, arising from a third-party claim that: (1) Multi-Vet has breached a warranty it made herein; (2) that Multi-Vet acted with gross negligence or willful and malicious misconduct; (3) relating to product liability claims involving the Products; (4) that the sale or use of the Products and the practice of the licenses granted herein infringe or otherwise violate the intellectual property or other rights of any third party; or (5) resulting from proceedings instituted by Radio Systems Inc. based on its former relationship with Multi-Vet.

**14.4**    Multi-Vet shall, at the request of Premier, assume the defence of any demand, claim, action, suit or proceeding brought against Premier or any of the foregoing parties by reason of the foregoing and pay any and all damages assessed against or that are payable by Premier or any of the foregoing parties as a result of the disposition of any such demand, claim, action, suit or proceeding. Multi-Vet's obligation hereunder is conditioned upon Premier promptly notifying Multi-Vet of all such liabilities, claims, causes of action or suits for which indemnity may by sought. In the defence of any such claim, Premier will cooperate fully with Multi-Vet, and will, from time to time, make available to Multi-Vet all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim. Multi-Vet shall not enter into any settlement or material admission without the prior consent of Premier. Notwithstanding the foregoing, Premier or the foregoing parties as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

**14.5**    Should such suit, action or other proceeding contain allegations that the Spray Technology portion of any Product sold or distributed by Premier constitutes an infringement of one or more of the claims mentioned in such suit and that such action or

other proceeding has not been settled six (6) months after the date of service thereof, either party shall have the right to terminate this Agreement upon written notice to the other without any further liability to the other.

**14.6**    During the Term of this Agreement and for 3 years thereafter, both parties shall maintain minimum general liability insurance of two (2) million dollars naming the other party as an additional insured and provide certificates or other proof of insurance to the other party.

## SECTION 15 - CONFIDENTIAL INFORMATION

**15.1**    Each Party acknowledges and understands that the other Party is involved in research, development, production and/or sale of different devices to train, contain or otherwise control pets and has acquired or shall acquire in the future great quantities of secret or proprietary technical, scientific, marketing and commercial information relating to its business and that of its Affiliates, including, but not limited to, products, customer lists, pricing policies, marketing plans and strategies, product development techniques or plans, business acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions (patented or not) and research programs, trade know-how, trade secrets, specific software (source, object and documentation), algorithms, computer processing systems, ideas, methods, experiments and data, no matter their form or support medium including any sketch, report, model, prototype, chip, diskette, tape, CD-ROM, DVD and other similar documents or objects (the **"Confidential Information"**) and that it is imperative for it that the Confidential Information remains secret.

**15.2**    Each Party agrees to maintain the confidentiality of the Confidential Information of the other Party and not to disclose, directly or indirectly, any part to anyone without prior written authorization from the other Party.

**15.3**    Each Party agrees not to use, directly or indirectly, any Confidential Information of the other Party for purposes other than as provided herein and not to assist or collaborate with third parties using, directly or indirectly, any similar Confidential Information for purposes other than those provided for in the present Agreement, without prior written authorization from the other Party. Notwithstanding the foregoing, either party may disclose the other's Confidential Information to its employees, representatives and agents as is reasonably necessary in order to accomplish the purposes of this Agreement and to fulfil legal, regulatory or business obligations arising or likely to arise from performing pursuant to this Agreement, including without limitations making limited disclosures to bankers, investors, consultants and counsel in the course of obtaining professional services, making regulatory disclosures, and soliciting investors provided all such persons agree in writing to maintain the confidentiality thereof and to refrain from making any unauthorized use thereof.

Multi-Vet/Premier Agreement

**15.4**   The confidentiality and non-use undertakings specified in the present Agreement do not apply to any part of the Confidential Information which, through no breach of the provisions of the present Agreement:

> **15.4.1** the recipient can demonstrate was in the public domain at the time of disclosure of such information by the other party or which later becomes part of the public domain through no breach of this Agreement;

> **15.4.2** the recipient can demonstrate was in its possession, prior to disclosure of such information by the other party and had not been previously obtained directly or indirectly from the other party;

> **15.4.3** the recipient can demonstrate it had received from a third party after disclosure of such information by the other party hereunder, as a matter of right and having no direct or indirect obligation to the other party with respect to same, provided that such third party did not acquire such information directly or indirectly from the other party; or

> **15.4.4** must be disclosed by virtue of the law but only to the extent specifically required.

**15.5**   Notwithstanding the above, Confidential Information will not be deemed to be in the public domain or to have been known by a party mainly because it is embraced by more general information previously known to it or merely because it is expressed in publications, books, patents or other literature in general terms not specifically including such Confidential Information disclosed or made available to the other party.

**15.6**   Each party undertakes to cause those of its employees who are likely, by reason of their employment, to have access to any part of the Confidential Information from the other party, including confidential information relating to the Product, to sign an agreement in which said employee agrees to treat Confidential Information learned during the course of his employment in the same manner as his employer treats such information.

**15.7**   The confidentiality and non-use undertakings herein mentioned will remain in full force and effect for as long as the information at issue remains confidential.

## SECTION 16 - INFRINGEMENT

**16.1**   In the event that either party learns of any infringement or threatened infringement or piracy of any of the Patents in the Territory, it shall forthwith give notice thereof to the other party together with all such information with respect thereof as it may from time to time obtain. The parties undertake and agree to consult with each other with respect to how to respond to each infringement or piracy.

Final Version

**16.2**   Multi-Vet shall have the right, but not the obligation, at its own expense, to take all actions and procedures which it may deem appropriate to defend against infringement of its intellectual property licensed herein and all actions and procedures which it may deem appropriate to enforce and protect Premier's right under this Agreement.   Any recovery shall inure to the benefit of Multi-Vet. Premier may, at its own discretion and at its own cost, join as plaintiff in an action against any such infringement and all recovery shall be divided between the parties hereto according to the losses and damages suffered by each party, including legal costs and fees associated with bringing the action and all other costs and damages related to the infringement.

**16.3**   In the event Multi-Vet undertakes the prosecution of any such legal proceedings, Premier agrees on behalf of, and at Multi-Vet's expense, to execute any and all documents and do such acts and things, including without limitation, being made a party to such proceedings, as may, in the opinion of counsel for Multi-Vet, be necessary or useful to carry out such prosecution.

**16.4**   Notwithstanding the foregoing, if Multi-Vet declines to institute legal proceedings, Premier shall have the right but not the obligation, at its sole expense, to commence legal proceedings against any third party infringing the Patents in the Territory or otherwise acting or exploiting the Spray Technology in a way that violates Premier's rights under this Agreement.  Multi-Vet agrees that, upon Premier's request and at Premier's cost, it shall join as a party in any such action and that it shall provide Premier with all reasonable non-monetary assistance in the enforcement of rights in the Patents or the Spray Technology.   To the extent any such claim results in an award resulting from infringement within the Territory, then Premier shall be entitled to such reward, as well as to any award of attorneys fees.

**16.5**   **"Legal proceedings"** as used herein shall include demand letters, negotiation and settlement of disputes, as well as the filing of formal legal actions with a court of proper jurisdiction.   Under no circumstances shall Premier have the authority to settle or compromise a matter which in any way mitigates, lessens or restricts the scope of the Patents or Multi-Vet's ownership in the Patents.

## SECTION 17 - ARBITRATION

**17.1**   Any dispute, controversy, claim or other matters of differences arising out of or relating to the contract, or the breach thereof, including any dispute relating to patent validity or infringement arising under this contract, shall be settled by arbitration in accordance with the Patent and International Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**17.2**   The place of arbitration shall be New York City, New York and the English language shall be used throughout the arbitration proceedings.

Multi-Vet/Premier Agreement

**17.3**  The parties expressly agree to confer upon the arbitrator the powers to fill gaps, cure contractual omissions and to perform all other activities which he may deem necessary and/or opportune.

**17.4**  The award of the arbitrator shall be the sole and exclusive remedy between the parties regarding any claims and counter-claims presented to the arbitrator. The parties undertake to fully and punctually abide by the award rendered by the arbitrator. Failing such voluntary compliance, judgment upon the award or any other appropriate procedures may be entered or sought in any court having jurisdiction thereof to secure enforcement of said award.

**17.5**  The final award will be payable in United States currency without deduction or offset and costs, fees or taxes incidental to the enforcement of the arbitration award shall be charged in accordance with the decision of the arbitrator against a party resisting enforcement. Payment of the award including interest from the date of breach and violation shall be made in accordance with the relevant provisions of this Agreement.

**17.6**  Nothing herein contained shall prevent any party hereto from instituting an action at law against the other party requesting temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain *interim* relief when deemed necessary by such court to preserve the *status quo* or prevent irreparable injury pending final settlement of such dispute by arbitration.

## SECTION 18 - NOTICES

**18.1**  Any notice, demand, consent or other communication to be given in connection with this Agreement (collectively and individually the "**Notice**") shall be in writing and addressed to its addressee at the address stated above or such addresses as the parties may specify from time to time by Notice.

**18.2**  Notices may be delivered by hand, registered mail or fax and shall be deemed to have been received as follows:

    **18.2.1** If delivered by hand:  at the time of delivery to a person who appears reasonably to be in charge.

    **18.2.2** If sent by fax:  at the time of confirmed transmission provided a confirmation copy is sent by airmail or registered mail within twenty-four (24) hours after the transmission.

    **18.2.3** If sent by registered mail: at the time of delivery or of attempted delivery in the case delivery cannot be completed due to no fault of the sender.

**18.3**   If the time of such deemed receipt as provided in paragraph 18.2 hereof is not during the customary hours of business, the Notice shall be deemed to have been received at 10:00 a.m. at the place of delivery on the first customary day of business thereafter.

## SECTION 19 - GENERAL PROVISIONS

**19.1    Preamble.** The preamble to this Agreement forms part hereof as if recited in full.

**19.2    Headings.** Headings are for reference purposes and do not in any way affect interpretation.

**19.3    Entire Agreement.**   This Agreement sets forth the entire Agreement and understanding between the parties with respect to the subject matter of this Agreement and merges, supersedes and cancels all prior discussions, representations, inducements, promises, undertakings, understandings, agreements or otherwise, whether oral, in writing or otherwise, between the parties with respect to such subject matter including the letter of intent of March 15, 2001. Without limiting the generality of the foregoing, no oral explanation or oral information by the parties hereto, or any of them, shall alter the meaning or interpretation of this Agreement. There are no statements, terms, conditions, undertakings, representations, warranties or collateral agreements still in force or effect which have not been embodied in this Agreement. This Agreement may be altered, modified or amended only by a written document signed by the parties.

**19.4    Further Agreements and Actions.** The parties agree to cooperate with each other and execute and deliver such further or other documents and assurances and do such other acts as may, from time to time, be required in order to complete or fulfil actions required or contemplated by this Agreement or deemed useful by the other party to protect the Spray Technology the Patents, the trademarks or the copyrights or to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement or to otherwise give effect to the provisions of this Agreement.

**19.5    Independent Contractors.** Each party is an independent contractor and does not have any power (nor will it represent itself as having any power) to in any way enter into commitments or contracts, assume obligations, give any warranties, make any representation or incur liability of any kind in the name of the other party or on behalf of the other party or to otherwise bind or obligate the other or to assume or create any expressed or implied obligation or responsibility on behalf of the other or in the other's name. Nothing in this Agreement shall construed to create a relationship of partners, joint venturers, fiduciaries, master-servant, agency or other similar relationship between the parties.

**19.6    Severability.** The parties agree that notwithstanding anything otherwise contained in this Agreement, in the event that any clause, term or provision of this Agreement or any portion thereof is determined by any Court, arbitrator or agency of competent jurisdiction to be invalid, unenforceable, in conflict with any applicable law or

regulations or otherwise illegal, this Agreement shall continue in full force and effect as if the offending clause, terms and provisions hereof or portion thereof are no longer incorporated herein.

**19.7    Modifications to render valid.** If any applicable and binding law or rule of any jurisdiction i) requires a greater prior notice of the termination of this Agreement than is required hereunder, or ii) requires the taking of some other action not required hereunder, or iii) makes any provision of this Agreement or any specification or standard prescribed by Multi-Vet invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and the parties agree to negotiate in good faith the modification of such invalid or unenforceable provision, specification or standard to the extent required to achieve validity and enforceability. If the parties cannot agree as to the modifications which are required, the matter will be submitted to arbitration as provided for in this Agreement.

**19.8    Waiver of Default.** The failure of any party at any time to take action against the other party, or the failure of either party to terminate the present Agreement as provided herein, shall not affect either party's right to require full performance of this Agreement at any time thereafter, and the waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach thereof nor nullify the effectiveness of such provisions or the right of such party to demand redress for their respective losses, damages and prejudices.

**19.9    Waiver in Writing.** No waiver of any breach of any term or provision hereof shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived.

**19.10    Assignment by Premier.** Premier shall not assign the rights and/or obligations created pursuant to the terms of this Agreement without the consent of Multi-Vet which it may withhold at its discretion except:

> **19.10.1**        to a related company in the context of a corporate reorganization; or

> **19.10.2**        to a successor, acquirer or purchaser of substantially all of Premier's business relating to its conduct hereunder, provided such successor is not a direct competitor of Multi-Vet and further provided a fee of $1,000,000 is paid to Multi-Vet at the time of closing of such assignment;

provided that the assignor will at all times guarantee performance by such assignee of each and every obligation assumed by the assignor under the terms of this agreement.

**19.11    Assignment by Multi-Vet.** Multi-Vet shall not assign the rights and/or obligations created pursuant to the terms of this Agreement to any direct competitor of Premier without the consent of Premier, which shall not be unreasonably withheld.

**19.12  Successors & Assigns.**  Subject to the provisions of paragraphs 19.10 and 19.11, this Agreement shall inure to the benefit of and be binding upon the parties, and their heirs, executors, administrators, successors, permitted assigns and insurers and reinsurers.

**19.13  Applicable Law.**  This Agreement shall be governed, construed and enforced in accordance with the laws in force in the Province of Quebec except for patent matters which shall be governed by the laws of the Territory.  The enforcement of any awards rendered by arbitration pursuant to Section 17 and any disputes arising under this Agreement, which for any reason cannot be resolved by arbitration as provided in Section 17, shall be subject to the exclusive jurisdiction of the Courts of the jurisdiction of the defendant in such proceedings and both parties hereby irrevocably attorn to the jurisdiction of such Courts. All such proceedings will be carried out in the English language.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

Final Version

Multi-Vet/Premier Agreement                                    Page 23

**IN WITNESS WHEREOF**, the parties hereto have signed as of the place and date indicated above.

PREMIER PET PRODUCTS, LLC

Per :

Name:   Evan C. Wooton
Title:   President

**MULTI-VET LIMITED**

Per :

Name:   Roger Garon
Title:   President

**MULTIVET INTERNATIONAL INC.**

Per :

Name: Richard Garon
Titre:  President

Final Version

Multi-Vet/Premier Agreement

Page 23

**IN WITNESS WHEREOF**, the parties hereto have signed as of the place and date indicated above.

PREMIER PET PRODUCTS, LLC

Per :

_____

Name:  Evan C. Wooton

Title:   President

MULTI-VET LIMITED

Per :

_____

Name:  Roger Garon

Title:   President

MULTIVET INTERNATIONAL INC.

Per :

_____

Name: Richard Garon

Titre:  President

Final Version

Multi-Vet/Premier Agreement                                    Page 24

Schedule A

Royalty Schedule

| Products Containing Patents or the Spray Technology | Royalty |
|---|---|
| Anti-Bark Collar Unit (device only) | $3.00 |
| Master Plus | to be negotiated |
| Spray Barrier | |
| Spray Commander | $6.00 |
| Virtual Fence | to be negotiated |
| Receiver Collar | to be negotiated |

Products Not Patented or containing any Spray Technology, but the use of which is exclusively limited as Accessories to Patented Products or containing Spray Technology

| | Royalty Fee |
|---|---|
| Citronella Refill | $0.35 |

Final Version

Multi-Vet/Premier Agreement                                    Page 25

## Schedule B

## Current Market-Ready Product Schedule
(To Be Purchased From Multi-Vet)


                                                    Purchase Price

Anti-Bark Collar Unit (device only)                    $20.00
Master Plus                                         to be negotiated
Spray Barrier                                       to be negotiated
Spray Commander                                        $50.00
Virtual Fence                                       to be negotiated

Citronella Refill                                       $3.50



# Télécopie/Facsimile

| **A/To:** | Dr. R. K. Anderson | **Fax:** | 651.644.4262 |
|-----------|--------------------|----------|--------------|
| **De/From:** | Richard Garon | **Date:** | 01-09-20 |
| **Re:** | Gentle Spray | **Pages:** | 1 |
| **CC:** | Evan Wooton, Sharon Bennett – Premier Products Inc. | | |

Dear R.K.,

Sorry we couldn't get together in Vancouver. I'm writing you in regards to the trademark 'Gentle Spray'.

Premier has requested to use the name 'Gentle Spray' in the United States to market our Anti-Barking Spray Collar. Our agreement calls for Multivet to register the name with the proper authorities.

I am hereby confirming that Multivet has no interest in the name 'Gentle Spray'. It will only be registered in the United States and licensed to Premier for the US market.

Sincerely,

Multivet International Inc.

Richard Garon

President

C.P. /P.O. Box 651
St-Hyacinthe, Qc
J29 7P5
T. 450.778.0244 F. 450.773.4009

*EXHIBIT 4*

**Evan Wooton**

| | |
|---|---|
| **From:** | Doug Belknap [doug.belknap@multivet.net] |
| **Sent:** | Thursday, September 28, 2006 8:00 PM |
| **To:** | Sharon Bennett |
| **Cc:** | Evan Wooton; Jason Hart; John Connell; Richard Garon |
| **Subject:** | RE: Responding to Your Proposal |

Sharon:

We appreciate your creativity with your thinking "outside of the box." We would like to advance it a step further to benefit all parties concerned including Petsmart, Petco and their customers.

**A.) As to your numbered points below:**
1.) Okay as you have written below.
2.) Premier WOULD get exclusivity for Petsmart & Petco on the:
    a.) base Anti-Bark unit
    b.) base Spray Commander
3.) Premier WOULD be granted exclusivity for vets, trainers and shelters.
4.) Premier WOULD commit to annual unit minimums for each exclusive product, provided that Multivet does NOT sell the same product to Petsmart and Petco.
5.) If Multivet starts selling to Petco or Petsmart direct the exclusive items (base Anti-bark and base Spray Commander) during the term of the agreement, provisions 1, 2 and 3 would remain in force, but Premier would no longer have to meet minimums.

**B.) Multivet's additional terms:**
1.) Special reduced promotional pricing: Premier receives a 20% discount (special price of $10.00) and is to place an order **now** for a minimum of 25,000 units of the Anti-Bark unit with payment terms of net 10 days.

*[handwritten notes: 20 days: existing P.O.'s / 10mm 10/15 / Dec. 10/31 / Yes - if gets us inventory we need. / Replace existing our P.O.'s / & reduces our costs]*

2.) Premier creates promo pricing (TMP) for Petsmart & Petco: Premier offers promos to both accounts at least four times per year at $29.97 so Petsmart / Petco can promote Anti-Bark units at $99.99 and maintain their margins. *— only if they share in cost.*

3.) Premier agrees to share 50% of the PR agency costs to promote spray. Premier will also participate in Petsmart advertising with $20,000 of Premier's funds as Premier previously agreed. *- same amounts*

4.) Non-compete clause of six months remains unchanged. as in # 5.9 page 4 of revised agreement (9/15/06) is agreed to by Premier. *Nope.*

6.) Gentle Spray Trademark: As you wanted Sharon this is Premier's to use as long as Premiers uses it only with products sourced by Multivet. It is not Multivet's intention to ever use the Gentle Spray brand and Richard has given his word that he will not use it. *contract.*

7.) Multivet will sell Petsmart & Petco directly the Multivet brand of: a.) Pro Anti-Bark, b.) Ssscat, c.) Garden Ghost and d.) (Pro Spray Commander, (if & when developed). Of course these same products would be available for Premier to purchase and sell under the Gentle Spray brand.

I believe it is now best to get past the emotion and stop using words such as "trust" and "fair" and make decisions, create strategies and implement action plans. We have a Multivet sales meeting next week and we will draft our plans for 2007. At that meeting we would like to announce that Premier is part of those plans.

So in order to move forward with us we need your approval of this agreement by the end of this month, (Sept. 30th.).

**EXHIBIT 5**

Thank you,
Doug

9/29/2006

**From:** Sharon Bennett [mailto:sbennett@premier.com]
**Sent:** Thursday, September 28, 2006 12:03 AM
**To:** Doug Belknap
**Cc:** Evan Wooton; Jason Hart; John Connell; R K Anderson
**Subject:** RE: Responding to Your voicemail

Doug –

It seems that over the past few days emotions are swirling, and our entire partnership seems on the brink of spiraling down the drain. **I'm trying to think outside the box, and see what we can do turn this around, and get on with what we should be focusing on, the business of doing business – which is what is best for both companies.**

As I see it, the huge deal killer for both sides is the 6 month clause. From Multi-Vet's perspective, you are worried that we're going to go to one of your competitors for our sourcing. From Premier's perspective, we're worried that MV is going to cut us off completely and give us no option to attempt to salvage part of our business.

So, how about this idea….

  1)  Multi Vet gives us a commitment to sell us products at an established price, for the next 18 months, with NO price increase for the first 12 months, and NO MORE than a 1% increase for the last 6 months. This commitment would renew for another 18 months, with no more than a 3% increase at the start of that second 18 months.
  2)  Premier would NOT require exclusivity for Petsmart & Petco
  3)  Premier WOULD be granted exclusivity for vets, trainers and shelters.
  4)  Premier WOULD COMMIT to annual unit minimums for each product, provided Multi-Vet does NOT sell to Petco & Petsmart.
  5)  If MV starts selling to Petco or Petsmart during the term of the agreement, provisions 1, 2 and 3 would remain in force, but Premier would no longer have to meet minimums.

My thought is that this helps address both party's fears, and if MV feels we aren't doing a good enough job, you can go directly to Petco & Petsmart.

What do you think?

Sharon

PS - Dr. Anderson called me today and told me of his phone call to Richard. He said that Richard gave him "his solemn promise, I will not use Gentle Spray in any way except with Premier, I give you my word."

---

**From:** Doug Belknap [mailto:doug.belknap@multivet.net]
**Sent:** Wednesday, September 27, 2006 5:41 PM
**To:** Sharon Bennett
**Subject:** Responding to Your voicemail

Sharon:

I received your voicemail while I was on other calls today and did not have time to call you back during the time your were available.

I will be unavailable to talk this evening and tomorrow am, so perhaps you could send me an email with the idea(s) you wanted to discuss I can take a look at later.

Thank you,

Doug

9/29/2006



PREMIER
# GentleSpray® *Bark*
Citronella Spray **Anti-Bark Collar**



PREMIER
## GentleSpray® *Bark*
Citronella Spray **Anti-Bark Collar**

**One Size Spray Device Fits ALL Breeds**

SprayLogic™

**When to use:**

The Gentle Spray Citronella Anti-Bark Collar can be used with any breed of dog that weighs 6 lbs. or more and is at least 6 months old. If your dog is smaller or younger, please check first with your veterinarian. It is ideal for controlling general nuisance barking both indoors and outdoors. It is not recommended for anxiety-related barking unless specifically directed by a behavior professional.

The Gentle Spray® Citronella Anti-Bark Collar uses SprayLogic™ technology to deliver a harmless burst of citronella spray to interrupt your dog's barking. It acts on four of your dog's five senses – he hears it, sees it, feels it and smells it. Citronella is a unique scent that most dogs don't normally encounter. It's non-offensive to humans, yet unusual enough to distract your dog, and interrupt the unwanted behavior. Shock and ultra-sonic collars attempt to reduce barking with pain. In addition to being less effective than spray, pain often increases anxiety and aggression, and makes some behavior problems worse.

**Clinically proven**
**2X more effective**
**than electric shock!**

Cornell University research found that **88.5%** of dogs responded to the Gentle Spray Citronella Anti-Bark Collar, while only **44.4%** responded to electric shock collars.

| | Gentle Spray Citronella Anti-Bark Collar | Electric Shock Collars |
|---|---|---|
| | **88.5%** | **44.4%** |

(1) Juarez-Diaz & Houpt, *American Journal of Veterinary Research*, 1996;57:1538-1543.

---

**This kit contains:**
• Spray device with ON/OFF switch
• 24" adjustable nylon collar
• 6-month battery
• 9-volt battery
• Lifetime warranty

PREMIER
*Your Pets. Our Passion.*
MCLOTHIAN, VA
888-640-8840
PREMIER.COM

©2007 Premier Pet Products, LLC. All rights reserved.
Gentle Spray is a registered trademark of Multi-Vet, Ltd.
Assembled in the United States with components made in
China and the United States. Printed in the United States.

---

## 3 Easy Steps:


**1** Fill the spray device


**2** Test by blowing into microphone


**3** Adjust collar to fit your dog


Sprays when dog barks

---

PREMIER
# GentleSpray® *Bark*
Citronella Spray **Anti-Bark Collar**



## **Stop** problem barking

**Clinically proven 2X more effective than shock collars**

**The #1 recommended solution**
Safe and comfortable for all breeds

Effective with either citronella or scentless spray

---

***EXHIBIT 6***

## More cool stuff from Premier™...

### Gentle Leader® Headcollar

Considered a training favorite, it controls leash-pulling, lunging and jumping and is the number one recommended head collar endorsed by leading veterinarians, trainers and behaviorists worldwide.

### Premier® Collar

This Martingale-style collar provides greater control and reduces the risk of escape. It's better than a buckle and safer than a choke collar.

### Fido Fleece®Cloud Bed™

Our signature two-piece design combines a cuddly overstuffed pillow with cushy bolsters to create a wonderfully comfortable bed. Completely machine washable and drier safe. Available in five distinctive, fully reversible styles and sizes to accommodate every breed.

### Busy Buddy™ Toys

A full line of treat-holding rubber chew toys designed to "keep your dog busy with good things to chew". Each toy offers a unique chewing experience and helps redirect potentially destructive behavior into positive playtime.

## PREMIER®
Your Pets, Our Passion®

Midlothian, VA
888.640.8840 / premier.com

©2007 Premier Pet Products, LLC. All rights reserved.    0507



# PREMIER®
# GentleSpray Bark
### Citronella Spray Anti-Bark Collar

## Instruction Guide



MULTIVET

Language    Shopping Cart    Site Map    Contact

Home : **Products** : Endorsements : Service : Info Center : Distributor : About Us

**Anti-bark** : Spray Commander : Ssscat : Virtual barrier : Accessories : Refills

**Overview**

**Proven effective**

**How it works**

**Product details >>**

## Product Details



**The new deluxe kit includes:**

1. New deluxe spray device
2. Adjustable collar
3. Longer lasting battery life CR2
4. Training manual & CD
5. Scentless spray refill (citronella spray refill available).
6. A see-through window that permits you to see the liquid level inside.
7. 2 levels of spray strenght.
8. Ergonomic design for a more comfortable fit for all dogs.
9. A rubber sleeve for protecting the device.

Order your new deluxe kit.


Order now



**The original 3rd generation model includes:**

1. Original spray device
2. Adjustable collar
3. Battery
4. Training manual
5. Citronella spray refill or scentless refill

Order your Original kit


Order now



 Anti-bark user's guide

*EXHIBIT 7*



Home - Products - Endorsements - Service - Info Center - Distributor - About Us

Copyright © 2006 Multivet. All rights reserved.

Anti-bark Collar - Stop Dog Barking - Cat Deterrent - Dog Obedience Training - Stop Dog Barking Dog Behavior Problems - Dog Training Products - Barking Dog Collar - Dog Training Collar - Dog Products Cat Products - Citronella Dog Collar - SSSCAT Refill - Spray Collar Refills - Citronella Refills - Cat Electronic Repel

# The New York Times

Copyright © 2003 The New York Times

**TUESDAY, APRIL 22, 2003**

## New Collar Curbs Dogs, With Memories Of Mom

### By MARK DERR

An enduring image of the modern dog depicts an animal straining at the end of its leash, choking itself, leaping on passers-by, dragging its overmatched owner behind.

Owners faced with the problem have sought control through heavy-duty choke collars or prongs that can damage the dog's trachea. Or they have abandoned the dog to the yard or an animal shelter as unmanageable.

Now, though, many dog owners are turning to halterlike devices that teach even the dogs that pull the hardest not to strain at their leashes.

Though several varieties are now on the market, by far the biggest seller is called the Gentle Leader Head Collar.

Unlike other collars, this one fastens behind the dog's ears and has a strap that runs around its muzzle. The design takes advantage of the dog's innate behavioral tendencies, said Dr. R. K. Anderson, an emeritus professor of veterinary medicine at the University of Minnesota. Dr. Anderson invented the Gentle Leader with Ruth Foster, a Minneapolis obedience trainer, in the early 1980's.

It puts pressure on the back of the dog's neck when the dog pulls forward, he said. That pressure calms the dog, he added, by touching off the kind of neurochemical response that makes a puppy relax when its mother picks it up by the scruff of the neck.

Also, he said, it applies pressure on the dog's nose, the kind of pressure a dominant wolf or dog conveys when it takes a troublesome youngster's muzzle in its mouth without biting down. This pressure tells the dog to relax and defer to the handler.

By contrast, Dr. Anderson said, ordinary collars set off dogs' "opposition reflex," which impels them to pull against pressure. The greater the pressure from a neck collar or traditional harness, he said, the harder the dog pulls, even if choking. But resisting pressure from the Gentle Leader makes the leash go slack.

Because the dog effectively corrects its own behavior, the head collar gives the owner more control over it while walking, said Dr. Katherine Houpt, director of the animal behavior clinic at Cornell's College of Veterinary Medicine.

Originally, Dr. Anderson and Mrs. Foster sold the Gentle Leader through veterinarians and dog trainers. In the mid-1990's, Premier Pet Products took over making and selling the Gentle Leader Head Collar,

and since then annual sales have jumped, said Sharon Bennett, the company's founder and chief executive.

Still, said Dr. Nicholas Dodman, leader of the animal behavior clinic at Tufts University, Americans have a long way to go in adopting more humane collars and less stressful walking habits. In Britain, he said, about 60 percent of dogs wear halterlike collars, compared with fewer than 2 percent in the United States.

### Gentle Persuasion

The lifting of a puppy by the scruff of the neck and the gentle holding of the muzzle are ways that dominant dogs can control other dogs. Both techniques are mimicked by the collar below.



**NOSE LOOP** Applies pressure the nose.

**NECK STRAP** When leash is pulled tight, it applies pressure to the back of the neck.

Source: Premier Pet Products

Al Granberg/The New York Times

*EXHIBIT 8*

# Richmond Times-Dispatch



JOE MAHONEY/TIMES-DISPATCH

Sharon Bennett is founder and CEO of Premier Pet Products, which makes, markets and distributes the Gentle Leader. Piper models the nontraditional collar, which will be part of a new exhibit at the Smithsonian.

# A natural leader

## *Premier Pet Products' Gentle Leader on display in D.C.*

BY GREGORY J. GILLIGAN
TIMES-DISPATCH STAFF WRITER

Earning a place in the hallowed halls of the Smithsonian Institution doesn't happen all that often.

But a unique dog collar manufactured solely by a Richmond-based company has garnered such recognition.

The Gentle Leader collar joins Post-it notes, Velcro and the microwave oven as inventions on display in a new exhibit at the Smithsonian's National Museum of American History.

The exhibit, called Invention at Play, opened yesterday and runs through Dec. 29.

"I was amazed at first about the recognition," said Sharon Bennett, founder and CEO of Premier Pet Products, which makes, markets and distributes the Gentle Leader and other pet products to retailers and veterinarians across the country.

"But when I thought about it and realized the Gentle Leader and these other inventions and inventors really revolutionized certain aspects of daily lives, then it made sense," she said.

A Gentle Leader has two straps — one fits at the back of the neck and the other fits loosely around the nose behind the corners of the mouth. The collar's design is supposed to give an owner better and more natural control of a dog.

More than 1 million Gentle Leader collars have been sold.

Veterinarian and animal behaviorist Dr. R.K. Anderson and dog trainer Ruth Foster invented the Gentle Leader in 1980. They wanted to find a way for dog owners to have better control of their pet while removing the pain and choking associated with using traditional collars.

"It is tremendously remarkable and so unbelievable for us that we would be chosen for such a recognition at the Smithsonian of all places," said Anderson, a professor emeritus of veterinary medicine at the University of Minnesota.

It is ironic, he said, because there were plenty of skeptics who said the product would never succeed. "They kept saying you can't sell something that looks like a muzzle."

Sales of the Gentle Leader languished for years. But in 1995, the inventors gave Premier Pet exclusive rights to manufacture and distribute it. Sales have soared ever since.

"They have really made it a house-hold word around the country," Anderson said.

The Gentle Leader earned its place in the Smithsonian exhibit because of its inventors and the process they went through to devise it, said Christine Broda-Bahm, a spokeswoman for the Lemelson Center at the National Museum of American History.

"The inventors are celebrated in this exhibit because of the way they went about designing these products and the inspirations they had for the products," she said. "We looked at what sparked the idea and what they drew from when they created it."

Anderson and Foster looked to nature to devise the collar.

They noticed how a halter leads horses by applying pressure to the back of the neck rather than the front of the throat. "We were trying to use natural instincts," Anderson said.

He and Foster expect to see the exhibit soon.

And Bennett said she plans to take the company's 100-employee work force to Washington later this summer to see the exhibit. "I'm sure it will be inspirational," she said.

The Smithsonian looked at hundreds of inventors and their products before narrowing the list to a few dozen.

Others recognized include the inventors of Scotchgard, the telephone and barbed wire.

• Contact Gregory J. Gilligan at (804) 649-6379 or ggilligan@timesdispatch.com

SEE **LEADER**, BACK PAGE ►

*EXHIBIT 9*

# StarTribune

## NEWSPAPER OF THE TWIN CITIES

www.startribune.com

## Thursday

### DECEMBER 26, 2002

50¢

A head collar developed in Minnesota makes life easier for dogs — and their owners.

# GENTLE LEADER

By Joy Powell
Star Tribune Staff Writer

Spotting a rabbit, my dog Kizzy pulled so hard on his leash that I had to dig my heels in to hold onto him. But he jerked the leash right out of my hand and dashed away.

This, and a rare escape when he chewed through a leash, were leaving me wondering whether I would be able to keep the stray that I had from the woods near my Wisconsin cabin. But I found that a powerful German shepherd can be difficult to control when chasing its quarry.

Wisconsin cabin. But I found that a powerful German shepherd can be difficult to control when chasing its quarry.

Every day, owners surrender their healthy pets to shelters because of such behavioral problems. More kinds of those animals are put to death. In fact, experts say behavioral problems directly kill more dogs than parvovirus, distemper, heart-worms and all other diseases combined.

That realization prompted two-dog experts from Minnesota to invent the Gentle Leader head collar, which uses a dog's natural instincts to control behavior without choking.

Because of its unique and effective design, the Gentle Leader was named in July by the Smithsonian Institution as one of the world's 100 best inventions.

The collar was invented by R.K. Anderson, veterinarian and former University of Minnesota professor, and Ruth Foster, a leading dog trainer.



Photographs by Joey McLeister, Star Tribune
Kismet models the Gentle Leader. The collar's inventors have been honored by several organizations.

## KEY FACTS

**What:** Gentle Leader, a patented head collar named the Smithsonian Institution as one of the world's 100 best inventions.

**Who:** Invented by Minnesotans Dr. R.K. Anderson, veterinarian and former University of Minnesota professor, and Ruth Foster, a leading dog trainer.

**Why:** Changes behavior within minutes to stop dogs from taking you for a walk, uses physics and natural instincts to stop lunging without choking.

**Where:** Sold at pet stores, veterinarian offices, doggie day cares and training facilities across the country for $20 to $27, or $40 with a video.

**More info:** Call Premier Pet Products at 1-888-640-8840 for a location near you.

> **LEADER continues on E4:**
> *More than 1.3 million Gentle Leaders have been sold in the United States.*

## Gentle Leader offers a more humane approach

### Steers a dog's nose

More than 1.3 million Gentle Leaders have been sold in the United States, plus hundreds of thousands more around the world, according to the manufacturer, Premier Pet Products of Richmond, Va.

The head collar enables an owner to "power steer" a dog. The collar fits snugly under a dog's jaw and fastens behind its ears. A soft loop encircles the muzzle.

"You steer your dog's nose, and the rest of the head follows naturally follow," Anderson said.

In that morning last August, Foster walked Kizzy and me into a ring where dogs of all sizes were practicing. To be close to all those other dogs was a big challenge for Kizzy.

But Foster showed me how to pull Kizzy up on the leash, which connects under Kizzy's chin to the Gentle Leader. His nose went down, his hindquarters dropped and he promptly sat. When he would get up, I'd sit quit while pulling on the Gentle Leader, which closed his



A former state fencing champion, Foster also holds degrees in biology and psychology. She and her husband, Bob, and their four children, have had dogs for years. Sunny, a golden retriever, serves as a "miracle worker for several animals."

Foster "a miracle worker with dogs."

### A more humane approach

Anderson and Foster agreed that there must be a better way to control dogs — one that they believed would be more humane. And they set out to find it.

They applied the best scientific information and practical experience, veterinary behavior medicine, obedience training and shelter management. They looked, for example, to the bundling of horses, on which neck nooses work poorly but head halters function wonderfully for leading. They recognized that dogs have a natural aposition reflex.

"Kizzy acts when they pull, and you pull, they pull harder," Foster said.

The pressure from choke chains or harnesses actually causes dogs to pull forward. That's how sled dogs work.

Foster and Anderson wanted to find a collar that would make use of this opposition reflex. In 1986, they perfected this design along with its unique "double-I" ring.

Unlike traditional collars that press against the animal's windpipe, the Gentle Leader is designed so that pull pressure is put on the back of their heads — much as a pup would feel when carried by its mother.

"It's physics, plus knowing the psychology of the dog," Foster said.

In effect, the dog pulls against itself when it relaxes. Anderson said.

Foster recently displayed the Gentle Leader at a news conference in a conference room at the Bell Museum. Paul Science Museum in a exhibit on female inventors. She and Anderson have been honored by the American Veterinary Association and other organizations. But while they're becoming known worldwide for their invention, they aren't getting rich.

Nearly all the royalties from the patent are going to the University of Minnesota, mostly to the Center to Study Human-Animal Relationships and the Environment, which Anderson directs. Foster's associate director.

They've taken the Gentle Leader to shelters such as the Humane Society in Minneapolis, where they teach how to instill the behavior of strays so they could be adopted rather than euthanized.

A lot of patience, affection and good care have helped Kizzie calm down and become a loving pet. But he continues to pull hard on leashes. We're not up in the country.

We begin obedience school next month, where we'll use the Gentle Leader and giving Kizzie has come a long way, but we still have lots of work to do.

— Joy Powell is at jpowell@startribune.com.

Inventor Ruth Foster, pictured with her golden retriever Sunny, has extensive experience training dogs. In the mid-1980s, Foster and Minneapolis R.K. Anderson set out to develop a humane way to control dogs.

Joey McLeister/Star Tribune

R.K. Anderson, University of Minnesota professor emeritus and a dog consultant, uses the Gentle Leader on Kismet. Anderson, who invented the collar with dog trainer Ruth Foster, says it uses a dog's natural instincts to work quietly, experts say, is essential.





## EXHIBIT 10

 Search  AllExperts > Experts

# Canine Behavior

Volunteer
Answers to thousands of questions

Home · More Questions · Answer Library                    · Encyclopedia · Make this Site Your Homepage!

Sponsored Links

**Help Itchy Dog w/Allergy**
Safe. Vet Formula. Works Great. Help Your Dog the Natural Way.
www.allergicpet.com/

**Poyz Dog Calming Formula**
Safe, All-Natural, Vet Recommended. Fast Results. Risk-Free Trial!
www.poyzpet.com

**Are You Killing Your Dog?**
Responsible Dog Care - Do You Know Which Dog Foods Can Kill Your Dog?
www.TheDogFoodConspiracy.com

**Dogs Eye Health**
Safely Removes Your Pet's Tear Stains: Go From Tears to Clear!
www.AngelsEyesOnline.com

**More Canine Behavior Answers**

**Question Library**

**Ask a question about Canine Behavior**

**Volunteer**
**Experts of the Month**
**Expert Login**

**Awards**

**About Us**
**Tell friends**
**Link to Us**
**Disclaimer**

You are here: **Experts** > **Animals/Pets** > **Dogs** > **Canine Behavior** > Barking at people

## Topic: Canine Behavior

**Expert:** Ailigh Vanderbush
**Date:** 8/15/2007
**Subject:** Barking at people

**Question**
I have a 6-year old neutered male Golden Retriever.  He has the habit of barking at the window or the door whenever a person comes to our house or drives by in the neighbor's driveway.  We've tried getting him to lay down and stay when someone approaches the house.  He'll stay & when he's released from his command, he'll start barking at the person once they're in the house.  He does this to every person, including myself & my husband.  He's all noise, never vicious; more curious (not scared).  We've also tried using a calm approach; not raising our voices (but remaining assertive) and commanding him to be quiet.  Nothing we've done has worked consistently.  We have a baby on the way & want to break this habit so he won't startle an infant with his barking.

**Answer**
The problem is that he is doing what a good dog does, bark to warn you that someone is coming.  It is a really difficult problem to work with, especially when the person doesn't actually come to the house.  For people that come into the house continue to place him in a down/stay.  Make sure the people have treats (even you) and pet and treat him when he is quiet.  You can also train him to pick up a toy when someone comes into the house - he can't always bark with a you in his mouth.  I will say that babies are very adaptive and probably won't even notice the dog since that will be the babies first and only experiences.  Most quickly learn to tune it out.  The only other things I would recommend is a Citronella collar (NOT a shock collar).  The dog wears it when someone is home and when he barks it send a spray of citronella from his neck outwards so he smells it.  This can curb barking, but it must be used in conjunction with training a quiet and only when someone is home.  Premier products makes one that I would recommend.  Usually a store that carries a gentle leader will also carry the citronella collar.

**Add to this Answer**     **Ask a Question**

**Rate this Answer**
Was this answer helpful?

Not at all ○ ○ ○ ○ ○ Definitely     Submit     *EXHIBIT 11*
1   2   3   4   5

Advertisement

Ads by Google

**The Health Info You Need**
No need to be embarrassed. We'll Help you understand skin disorders
www.RightHealth.com/SkinDisorders

**Help Itchy Dog w/Allergy**
Safe. Vet Formula. Works Great. Help Your Dog the Natural Way.
www.allergicpet.com/

**Poyz Dog Calming Formula**
Safe, All-Natural, Vet Recommended. Fast Results. Risk-Free Trial!
www.poyzpet.com

**About** Ailigh Vanderbush
**Expertise**
I can assist in all areas of canine behavior. I am a certified pet behaviorist and own a consultation business as well as dog training, working with exotics and animal education. I am not a vet, but can direct you to vets if needed. Feel free to check out my web site www.animalia.us I am a reward based clicker trainer and will often suggest you find a training class in your area that is a clicker class and reward based.

**Experience**
I am a CABT and have been working with pet behavior problems for about 8 years.

**Organizations**
APDT, IAABC

**Publications**
Ferrets magazine

**Education/Credentials**
Working on my masters in

Applied Animal Behavior and certified in animal behavior. Also a certified dog trainer.

**Related Articles**

- Canine behavioral issues
- Health Benefits of Pets: How Owning a Dog or Cat Reduce Stress
- Water -- Don&#39;t Leave Home Without It
- About Dogs - Why the Pet Business is Booming
- 3-4 - Gulliver&#39;s Travels - Jonathan Swift

**About Us** | **Advertise on This Site** | **User Agreement** | **Privacy Policy** | **Help**

Copyright © 2008 About, Inc. About and About.com are registered trademarks of About, Inc. The About logo is a trademark of About, Inc. All rights reserved.

"



## In This Issue

**Dr. Hetts on CBS in February**
**Tethering and Anti-Tethering Laws**
**Is Training Your Cat to Use the Toilet a Good Idea?**
**Using Time-Outs To Discourage Unwanted Behavior**
**Telecourse Updates**
**Crazy Kitten**
**Creation of Island Dog Press, Inc. - our publishing company**

---

## Editor's Piece

### Dr. Hetts on CBS in February

Suzanne was interviewed by the Denver CBS News Service for an upcoming story on behavior problems in dogs. CBS in New York will feed this story to all their local affiliates for possible airing the week of February 6, 2004 (sweeps week!). It will be up to each local CBS station to decide whether or not to air the story and when.

If you'd like to see the piece, you might want to give you local CBS affiliate a call and encourage them to show it in your city. We don't know exactly what parts of Suzanne's interview the story will include - other people were interviewed for the piece as well. If you see it - give us your feedback, as we don't know whether or not it will air in Denver!

**A Big FYI** - With all the new anti-spam changes ISP's have made, to ensure that you will continue to receive this newsletter, you should add our ezine@AnimalBehaviorAssociates.com address to your address book or "safe list". This is especially important for AOL users. If you no longer wish to receive this newsletter, you can easily unsubscribe by clicking on Manage Your Subscription at the end of this newsletter.

---

## Dog Piece

### Tethering and Anti-Tethering Laws

Volume II Issue 1

<u>Subscribe</u> now!

### Our Piece

**Using Time-Outs To Discourage Unwanted Behavior**

It's common for pet owners to resort to positive punishment - the delivery of some unpleasant thing - to stop an unwanted behavior. The **Gentle Spray citronella anti-bark collar**, **SSSCat** or **Snappy Trainer** deterrent devices are examples of positive punishers. These remote punishers are probably the best type to use when this approach is warranted.

However, an alternative technique is negative punishment. This involves taking away the reward for unwanted behavior.

A time-out is an example of negative punishment. Many parents are familiar with the idea of the time-out. If a child draws on the living room walls with crayon, she is sent to her room for some period of time. In this case the child is removed from the opportunity to play and be with the family. We assume that being socially isolated is aversive to the child and therefore punishing. Time-outs can also be used with companion animals.

A dog that paws at her owner to get attention could be put in a small bathroom or laundry room for two minutes as a negative punishment. Time-outs can be effective if certain requirements are met.

First, the time-out area must be barren and not leave the animal anything to do. If the dog can play with the toilet

**EXHIBIT 12**

We ran across an interesting new anti-tethering law in Wichita Kansas. The ordinance prevents dog owners from keeping animals chained for more than an hour at a time or more than three hours per day.

Through a little online research we found that almost 50 cities have ordinances regarding tethering. To view the list, and examples of anti-tethering ordinances go to http://www.helpinganimals.com/a-tether.html.

Just to clarify, the type of tethering these laws address is tying a dog outside, unattended. Other types of tethering are sometimes used as training techniques. For example a leash can be used to "tether" a dog to the owner as a means of indoor supervision. To prevent housesoiling or the dog jumping up on the owner's bed, we've recommended using a leash, as an alternative to a crate, to keep a dog on his bed overnight (with sufficient room to turn around and comfortably adjust body position) as long as the dog is sleeping in the same room with the owner.

The article in the **Wichita Eagle** lists a number of reasons, provided by the Humane Society of the U.S. why tethering or chaining a dog is a bad thing. Obvious ones include the dangers of entanglement and strangulation. From a behavioral perspective, unsupervised tethering can create significant frustration for dogs. It's like being on leash for an extended time, and never being able to get to all the things you see and hear.

Some bite statistics show a correlation between bite likelihood and whether a dog is chained. There's no way to know whether this reflects increased opportunities for contact between people and chained dogs (as compared to those behind a fence), whether chaining actually promotes aggressive behavior, or both. We do know that dogs with threatening and aggressive problems are usually worse on leash than off.

The HSUS also states that tethered dogs rarely receive sufficient care. While we've all seen cases in which this is true, we've also had clients who've resorted to tethering their dogs in the yard to prevent them from digging out of, chewing through, or jumping over fences. These dogs are otherwise receiving sufficient care, but have escape problems. There may be a qualitative difference between dogs who are chained as a primary means of containment and those who are chained or tied within a fenced area.

It can be very difficult to prevent a motivated dog from getting out of a fence that would be adequate for the majority of dogs. For these dogs, escaping is often a manifestation of a separation anxiety or other fear-based problem such as a thunderphobia. When dogs are panicked, they will tolerate pain to get out of where they are.

Putting substantial energy into creating an escape-proof yard for these dogs is often wasted effort. We've seen yards that resembled obstacles courses but the dogs were still finding a way out. A more successful approach is to identify what the

paper roll while in the bathroom, it will not be an effective punishment.

Second, timing is critical. The pet must be put in the time-out immediately after starting the unwanted behavior. Delays of even a few seconds can ruin the effectiveness of the time-out.

Third, the punishment must be delivered consistently. Every time your cat scratches the furniture, she must go in a time-out. This may not always be practical.

Fourth, don't make the time-out too long. Only 30 seconds to two minutes are needed for the animal to learn. Longer time-outs may actually interfere with learning.

Finally, all punishment works best if your pet is given another behavior to do to take the place of the unwanted behavior. Teaching your dog to sit quietly in front of you to get attention or providing a more desirable scratching object for your cat and rewarding her for using it can make the learning from a time-out more effective.

Pets don't need to be put in a room to be put on a time-out. For a cat that meows to get fed, you can simply leave the room until he is quiet, then return and feed him. This is a time-out because by meowing, the cat loses the opportunity to be fed.

Time-outs and negative punishment can't always be used to stop unwanted behavior. If you can't identify a rewarding thing to take away, or if you can't control your pet's access to the reward, negative punishment won't work.

On the good side, negative punishment doesn't cause animals to become fearful or aggressive as often as some types of positive punishment.

To learn more about how to create good behavior in your pets, take our **Just Behave** or **What Your Cat Wants You to Know** telecourses.

---

**What's New at ABA**

**TELECOURSE UPDATES**

Our first **Becoming a Great Dog**

dog is afraid of and help him overcome his fears.

Click here to view articles about fears and phobias on our website. If you want to view excerpts from the articles in the **Wichita Eagle**, go to www.kansas.com and search on articles on tethering. There is a fee to download entire articles.

## Cat Piece

**Is Training Your Cat to Use the Toilet a Good Idea?**

A recent article in **Prevention Magazine** (February, 2004, p.183-185) told how to teach your cat to eliminate in the toilet. On first thought it sounds like a great idea. No more litterboxes, no more changing litter and scrubbing boxes, no more obnoxious sights and smells.

Kits to toilet train cats and books describing the procedures have been around for at least 25 years. Dr. Benjamin Hart of the University of California at Davis has a wonderful photograph of a Siamese cat straddling a toilet seat and eliminating that appeared in **Feline Practice** in 1975.

However, think carefully about the possible disadvantages of toilet training your cat. Not all cats are amenable to such training. Some cats become disturbed with the slightest changes to their litterboxes or their routines. Other cats may not be able to physically climb onto the toilet and balance there.

The training can be slow and tedious, and could take weeks or months before a cat is using the toilet reliably. The reason for the slowness is obvious when you think about a cat's normal predispositions. A toilet seat over a bowl of water is very different from a litterbox and doesn't correspond to what we know of the behavioral needs of cats for elimination sites.

Cats are born with predispositions to eliminate in soft, sandy material (like kitty litter) where they can dig around. In our September newsletter, we discussed these preferences for litter and litterboxes.

A toilet doesn't offer these elements so it will take considerable training to get a cat to accept the toilet as a substitute.

Finally, accidents can happen to the cat while using the toilet. It's very easy for the cat to slip and fall into the toilet or to fall onto the floor. Such accidents can cause the cat to abandon the toilet, and if there is no other litterbox available, can lead the cat to soiling anywhere in the house.

Retraining a cat that has had such an accident may take weeks or months. If the accident was sufficiently traumatic, the cat may never be retrained.

Owners who have trained their cat to use the toilet should have a back-up litterbox available at all times to deal with unexpected situations.

Training Instructor telecourse taught by our friend and colleague Ms. Pia Silvani begins January 22, 2004. This is sure to be a great class - Pia's a great speaker and good at sharing what she's learned from years of teaching classes. Click here to view the course outline, which you can also access from our website. CCPDT CEU's for this course have been applied for and should be available by completion of the course.

We are proud to announce that our **Fundamentals of Canine Ethology** and **Fundamentals of Animal Learning** telecourses have been approved by CCPT for continuing education credits.

Courses are now in progress, and a new session of Canine Ethology begins February 4, 2004 and Animal Learning on March 11, both at 6pm Mountain time. Sign up now before sessions fill up! If you'd like to see the course outlines, click here for Ethology, and here for Learning.

We'll again be offering our **Managing Chaos at the Door** free telecourse on February 5, 2004 at 6pm Mountain time. A course description will be available on our website by Friday, January 16. To register, send an email to ezine@AnimalBehaviorAssociates.com with your name and email address. We'll send you the phone number and access code. Class size is limited so get your name in TODAY!

By February 17, 2004, you'll be able to access our free **Creating a Cat-Friendly Litterbox** teleclass directly from our website via streaming REAL audio. If you aren't familiar with streaming audio, be sure and try this course, because in the future our **Fundamentals** courses and a new course **Behavioral Solutions for the Barking Dog** will be available in this format as well (these will remain fee-based courses however). View course descriptions now at our website, and make yourself a note to come back on February 17!

## About Our Services

**Animal Behavior Associates, Inc.** helps people have better relationships

All in all, toilet training your cat can be labor intensive and may put her at risk for elimination problems. It is far easier to meet your cat's behavioral needs by providing a desirable litterbox (or boxes) and keeping it (them) clean.

Learn about cat-friendly litterboxes from our booklet Cats Come Clean or listen to a free audio presentation on Creating Cat-Friendly Litterboxes which will be available at our website by February 17, 2004. Our What Your Cat Wants You to Know telecourse teaches you how to create a cat-friendly indoor environment.

---

### Your Piece: Reader's Question

**Question:**
*My eight month old kitten is wreaking havoc in my house. He's torn up 3 shower curtains, slides down the banister, climbs into the fireplace, and opens drawers and cabinets. He gets into the trash and jumps up on a shelf to knock off plants. I love him but he's driving me crazy. Spray bottles and time-outs don't work.*

We know your kitten's behavior is extremely annoying but at the same time we couldn't help but laugh at his escapades. Our 11 year old cat Buffett was pretty wild when he was a kitten, and would push items off shelves just for the joy of seeing them fall.

Kittens are some of the most playful creatures on earth. You'll need to take extra time to meet this little guy's need to play. Find both interactive toys - such as a cat dancer with a feather that you can use to entice him to jump high in the air and probably turn somersaults - and toys that he can amuse himself with.

A cat puzzle box is a good play-alone toy. It's a short cardboard box with cut-outs on the top and inside you can place a ball or other small object. Your kitten will have fun swatting at the ball through the cut-outs. He'll really have to work to get the toy out of the box.

He might also like a battery-operated toy such as the Panic Mouse that changes directions when it hits an obstacle. I can see your kitten chasing this all over your house. All of these toys are available at most major pet stores or on-line catalogs.

In addition to making sure you've given him plenty to do, you'll also need to "booby-trap" the trash, drawers, etc. Our article on Time-Outs in this newsletter lists two booby traps that would be good for you - the **Snappy Trainer** and **SSSCat.**

Your spray bottle hasn't worked because it's unlikely you can spray him quickly enough or consistently. The remote punishers can accomplish these goals. And if you are chasing him around the house with the spray bottle, he may think that's a great game. YAHOO!! Check the Time-Out article to see if you are using this technique correctly.

with their pets through education and behavior problem solving.

We've created a publishing company - **Island Dog Press, Inc** - to create books, booklets and CD's to give pet parents needed information about pet behavior. Look for our publications that we'll be unveiling later this year!

Animal Behavior
Associates, Inc.
4994 S. Independence Way
Littleton, CO 80123

303-932-9095
AnimalBehaviorAssociates.com

If he was an only kitty, acquiring another kitten might be an option. The two could then play with each other rather than everything else in your house. However, because you also mention you already have two other adult cats, adding a fourth will create cat-introduction issues.

To gain a bit of perspective, videotape your kitten. When he's in his golden years as our Buffett is, you'll love being able to watch that video and remember his younger days fondly, even if they don't seem that way now.

© Copyright 2003 Animal Behavior Associates, Inc. All rights reserved.

You are subscribed as sspence@premier.com
Manage your subscription

powered by
<CL> consultlogic
email publishing experts

# Unruly and Annoying Behaviors
### Jacqueline Neilson, DVM, DACVB
### Animal Behavior Clinic
### Portland, OR

While some behavior problems can seriously threaten the welfare of the animal or people, many behavior problems are just annoying or upsetting to the owner. Although these behavior problems are not momentous, they can weaken the human-animal bond. They often can be dealt with efficiently during an office exam, therefore creating an opportunity to integrate behavioral therapy into your practice.

**Jumping up**
Dogs are social animals and often jump up on people when they are greeting them. This behavior may have originated from wolves as they will lick each other on the face in greeting. Although often considered "cute" as a puppy, this behavior can become more annoying as the puppy grows or when the pet has muddy feet. The behavior persists in our pet dogs because people reinforce the behavior by interacting with the dog when it jumps up. The interaction may be something positive such as petting the dog or may be negative such as pushing the dog down and saying "no". In either case, the dog achieves its goal of getting the person's attention. To control the behavior, the dog should be given an alternative, acceptable behavior to perform such as sitting during greetings. When the dog sits, reward with praise. It can be helpful to have a leash and head collar on the dog so that you can correct the jumping behavior – a slight pull up on the head collar will actually encourage the dog to sit down. It is important to remove any rewards for the jumping behavior. People should be advised to turn away if the dog jumps up on them. Then the command for the appropriate behavior can be given and the dog greeted.

**Play biting**
Puppies use their mouths for social interactions, including play. It is important let a puppy know when that biting hands is not acceptable because a bite, even if given in play, may lead to injury. When a puppy starts to bite at hands, interaction with the puppy should cease. Find an appropriate object for the puppy to mouth and offer this to the puppy. A sharp "yip" emitted by the person at the time of the bite may stop the puppy from biting, allowing the person to withdraw from play for a few minutes. Exercise in the form of walks and games such as fetching objects can also lower the desire to bite at the hands. Owners should not engage in forms of play that encourage biting/mouthing of the human. Interactive punishment for play biting in the form of yelling or hitting the puppy should not be performed as these methods may serve to make the puppy frightened of people, specifically hands reaching towards the face. If a kitten engages in biting, interaction should cease and then play should be redirected to an appropriate object (*e.g.* fishing rod type toy).

**Pulling**
Dogs pulling on their leashes during walks can be very unpleasant for the handler and sometimes can be painful or dangerous. The consequence may be decreased exercise for the dog, often exacerbating other behavioral issues. A collar does little to discourage pulling and in fact may encourage the dog to resist and pull more when it feels the pressure on the front of the neck. A body harness is a device designed to allow a dog to pull heavy loads, therefore it doesn't inhibit the pulling behavior. An accessible and successful tool to manage pulling is the head collar. There are several brands of head collars (Gentle Leader, Halti, Snoot Loop, etc.) and each clinic should investigate and decide which collar works best in their hands. Proper fitting of head collars is important and although not difficult, it does require some attention. Obedience training the dog to heel via positive reinforcement is advised. A dog that heels well on command is a pleasure to walk.

**Barking**
Barking usually starts between 2-4 weeks of age and persists throughout the life of the dog. Dogs bark for many different reasons including greetings, play, solicitation, herding, defense, distress and alarm. Dogs will use different tones of barks in different situations. For example, a play bark is usually higher in tone than a bark to defend the territory. If a dog is barking excessively you first need to determine what is the motivation behind the vocalization and then steps can be taken to control the underlying motivation.

**EXHIBIT 13**

**Some motivations/characteristics and solutions are listed below:**

- Social barking: dog barks in response to other dogs barking or associated with play; solution: increase non-vocal play and exercise; remove dog from stimuli
- Attention seeking: the dog receives attention for the barking; solution: remove any reinforcement for barking
- Anxiety related: specific stimuli trigger barking such as noises, separation from owners; solution: identify trigger and perform systematic desensitization and counterconditioning
- Territorial defense: intruders on or near territory trigger barking; solution: remove dog from stimuli; systematic desensitization and counterconditioning

Bark collars work on the premise that they will deliver a form of punishment when barking occurs. Bark collars should not be used on dogs that are engaging in anxiety related barking. The citronella bark collar (Gentle Spray, Premier Pet Products) that releases a harmless but disagreeable spray of citronella may be used in conjunction with other treatments for non-anxiety related barking. A study conducted by Moffat and Landsberg evaluated the efficacy of the citronella bark collar on barking in the veterinary hospital setting. Seventy-eight percent of the dogs were controlled or improved in their barking when wearing the collar. Electronic bark collars can be helpful in some non-anxiety related barking situations but should be used with supervision and caution.

### Digging

There can be different motivations for digging including regulation of body temperature, play and exploration, hunting, escape behaviors and burying food items. To control unwanted digging, you must first determine the motivation for the digging. If the pet is trying to control body temperature, offer the pet other cool locations on hot days or heated areas on cool days. Providing the pet with plenty of exercise and attention can decrease digging for exercise and exploration. If the digging appears to be due to anxiety, a diagnosis and treatment plan should be developed for the specific anxiety. If prey is the motivation for digging, the prey must be removed from the environment. Sometimes, especially for those dogs engaged in recreational digging, it can be helpful to provide them with an acceptable digging area. Encourage use of a special area by providing soft, loosely packed dirt and burying things that a dog may like to dig up. Make other unacceptable digging areas unattractive by placing booby-traps such as motion activated sprinklers or rocks in those sites. Limiting unsupervised access to attractive digging sites by kenneling the dog or keeping the dog inside can also control the problem.

### Chewing

Chewing is a normal form of exploration and activity for pets. They learn information about their environment when they sniff, taste and chew on objects. Other reasons for chewing behavior include teething (3-6 months of age), attention-seeking behavior (owner gives attention or treats for chewing), anxiety, escape behaviors and obsessive-compulsive behaviors.

When dealing with this problem, you first need to identify the underlying cause for the chewing. If the pet is young and is chewing a variety of objects in the household, puppy/kitten exploration and play/teething are the most likely reasons for the behavior. To correct this problem, you first must provide acceptable objects for the puppy/kitten to chew. Puppies and kittens then need to be supervised so that chewing behavior can be redirected to acceptable objects. If caught in the act of chewing on an unacceptable target, a startling noise (can with some pennies, clap) or a water squirt can be used to interrupt the behavior. The pet should then be encouraged to chew on an appropriate toy. When supervision of the pet is not possible, it should be confined to a safe area. If there are certain objects that are particularly harmful for the puppy or kitten to chew, for example electrical cords, these can also be coasted with an unpleasant material such as a bitter apple spray to discourage chewing. Alternatively, home improvement stores sell protective sheaths for electrical cords.

If you determine that the pet only chews on items when an audience is present, the pet may be chewing to get attention. Similar to the jumping up behavior, the pet often gets a reaction, although it is often negative, when it is caught chewing on unacceptable items. Providing this pet with structure and exercise may help with the problem. Also, the owners should be counseled to give the pet attention when it is being well-behaved. However, the owner must also stop giving the pet the "reward" of attention for the unacceptable chewing. Either ignoring the pet or using a remote punishment to interrupt the unwanted chewing should curtail attention-seeking chewing.

When anxiety is the motivation behind the chewing, a trigger for the unacceptable chewing should be identifiable. For example, loud noises or separation from the owner may consistently elicit the chewing behavior. With anxiety related chewing the target item is often something with an owner's scent or may be directed towards exit points. Treatment for anxiety related chewing involves identification of the anxiety provoking stimulus and successful management of that problem.

Some cats will present with the complaint of sucking or ingestion of fabric. Oriental breeds are more likely to present with this complaint, Neville and Bradshaw reported 55% of fabric-eating cats were Siamese and 28% were Burmese in a study of 152 cats with the disorder. There does not appear to be an identifiable nutritional deficiency in these cats, although this should always be investigated. The behavior appears to involve stereotypic oral movements. Over 93% of cats with this disorder started with wool as the target in the Neville and Bradshaw study thus resulting in the name "wool-sucking". However, many of these cats generalized to other fabrics including cotton (64%) and synthetics (54%). Some cats will target non-fabric (i.e. plastic). Sex and reproductive status do not appear to be correlated with incidence of the behavior. The role that early weaning plays in the development of this behavior is not clear. While early weaned kittens appear to be over-represented in this population of fabric-sucking/consumption cats, a causative relationship has not been substantiated in studies. Cats that actually ingest the material are at much greater risk of serious complications, specifically intestinal blockage or owner relinquishment.

Treatment for wool-sucking includes providing a high fiber diet; providing items to chew such as grass, rawhide, microwaved chicken bone; removing target items from the environment, if possible; applying aversive materials to targets or remote punishment for engaging in behavior; increasing interactive play; identifying and decreasing environmental stressors; and drug therapy for refractory cases. Drugs used to treat wool-sucking include fluoxetine (0.5-1.0 mg/kg PO q 24 hours); clomipramine (0.5 mg/kg q 24 hours); amitriptyline (5-10 mg/cat PO q 12-24 hours) or paroxetine (2.5-5 mg/cat q 24-48 hours).

**Coprophagia**

Coprophagia, the ingestion of feces, is a form of pica. Some dogs consume their own feces and others eat the feces of other dogs or other species. There are different theories as to why this behavior occurs, including exploratory behavior, establishing intestinal microflora or compensating for a nutritional deficiency. Young dogs are most likely to engage in corprophagia but it can be seen at any age. Puppies will often outgrow the behavior without specific intervention. The behavior is inherently self-rewarding and therefore may become a habit that is difficult to eradicate. A careful history should be collected, focusing on past gastrointestinal disturbances. A medical examination should be performed to rule out any underlying nutritional deficiencies/diseases. Laboratory evaluation should include fecal analysis, CBC, chemistry panel and serum folate, cobalamin, and trypsin-like immunoreactivity. Additional tests may include serum bile acids, fecal alpha1 protease inhibitor, and lactulose absorption. If no medical problems are discovered then a behavioral treatment approach can be implemented. Consider changing diet to alter the characteristics of the stool. Addition of monosodium glutamate (Adolph's meat tenderizer, Forbid) to the food can make the feces less attractive. Ensure that the animal has plenty of outlets for exercise and play. Finally, denying access to feces is the most successful treatment plan.

**Eating house plants**

Cats will often ingest house plants. This may be associated with play and exploration or may satisfy some nutritional craving for fiber. A complete physical exam, including oral exam should be performed to rule out any underlying problems. Since many houseplants are toxic if ingested, this can be a serious problem. The treatment includes removing plants from cat=s access, providing the cat with safe plants to consume (e.g. cat grass); providing daily interactive play time with appropriate toys; and remote punishment for chewing on unacceptable plants (e.g. motion detectors, water squirt).

**Getting on countertops**

Many cat owners want their cats to stay off the kitchen countertops and dining tables. This can be a challenging goal, considering cats like to perch on high spots. Owners usually try verbal reprimands, squirting the cat with water or physically removing the cat from the location when they catch the cat on that "off-limit" surface. While some cats will learn and respect the fact that the owners don't want then to be on those surfaces, many cats will just avoid that surface while the owner is present. This is because the cat has been conditioned to expect a negative consequence if

it gets on the surface with the owner present. To truly condition the cat to avoid a surface, the cat will have to be provided with alternative attractive perches and perhaps receive a negative consequence of getting on the surface regardless of owner presence. Some tools that deliver a negative consequence include ScatMat (www.scatmat.com), Invisible Fencing, double sided tape, upside down mousetraps place under newspaper. Obviously this can become a high-tech, challenging endeavor. A more reasonable solution may be to wash down the counters prior to food preparation and consistently use a remote punishment such as a squirt bottle to discourage the behavior in the owners' presence.

**Scratching**

Cats tend to inflict the most property damage by scratching. In a survey of cats not presenting for behavioral problems, owners reported 60% of the cats scratched furniture. Scratching is a normal behavior that serves a variety of purposes including scent marking, visual marking, stretching of muscles and grooming of claws. In studies of free-living cats it was noted that scratching behavior increased when other cats were present as compared to when the cat was alone. The social implications of scratching should be explored if scratching is a problem. Cats may have a preference for material and orientation for scratching. A study by Hart and Hart identified fabrics with a longitudinally oriented thread were preferred over tightly woven knubby fabric for scratching. Some cats prefer to scratch on horizontal surfaces while others like vertical surfaces. Observing individual cats will identify their personal preferences. Cats often target prominent locations for scratching and areas near their resting spots. Cats must be given and taught appropriate places to engage in this behavior.

   If a cat is scratching inappropriate items, it should be provided appropriate sturdy scratching posts in prominent locations (near areas of rest or previously scratched targets). Proper use of post should be praised. Encouragement to scratch on the post may be aided by placing treats on the post, playing with toys near/on the post or placing catnip on the post. A well worn/used post should be retained instead of replaced.

   Inappropriate scratching surfaces should be made unavailable or aversive (e.g. double stick tape, foil). Placing a bell on cat's collar to track cat's location in house and scratching activity can help with the appropriate delivery of remote punishment (water squirt) for scratching behavior. Remote punishment is often unsuccessful at curtailing this problem since owners are often inconsistent with its delivery. Nails should be trimmed regularly as this may decrease the damage inflicted upon targets. Soft Paws are another treatment option; these pliable nail caps are glued onto the nail and prevent destruction. Finally, onychectomy (declaw surgery) is a treatment option. The practice of declawing is controversial and in some countries is illegal. Declawing involves amputation of the third phalanx. It is an invasive surgical procedure that may have complications associated with the procedure. That said, most cats that undergo the procedure have no obvious long term negative effects. Appropriate surgical technique and pain medications can minimize complications.

   There have been unsupported claims about the consequences of declawing that include an increase in biting behavior, an increase in house-soiling problems, resolution of predatory behavior. Studies that have been done on cats counter these myths. Declawed cats are no more likely to bite than non-declawed cats. There is also no difference in the incidence of house-soiling between the two groups. Cats that are declawed have been observed to still climb trees and capture prey.

**Conclusion**

Addressing the concerns of pet owners regarding these annoying but manageable behavioral issues can greatly improve the human-animal bond. It also may bond an owner to your practice, when they realize that you care about their pet's welfare, well-being and behavioral health.

Blackwell's Five-Minute Veterinary Consult

# Clinical Companion



FIVE
MINUTE
VETERINARY CONSULT

# Canine & Feline
# Behavior



*EXHIBIT 14*

Debra F. Horwitz & Jacqueline C. Neilson



**Blackwell**
Publishing

© 2007 Blackwell Publishing
All rights reserved

Blackwell Publishing Professional
2121 State Avenue, Ames, Iowa 50014, USA

Orders:      1-800-862-6657
Office:      1-515-292-0140
Fax:         1-515-292-3348
Web site:    www.blackwellprofessional.com

Blackwell Publishing Ltd
9600 Garsington Road, Oxford OX4 2DQ, UK
Tel.: +44 (0)1865 776868

Blackwell Publishing Asia
550 Swanston Street, Carlton, Victoria 3053, Australia
Tel.: +61 (0)3 8359 1011

Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by Blackwell Publishing, provided that the base fee is paid directly to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923. For those organizations that have been granted a photocopy license by CCC, a separate system of payments has been arranged. The fee codes for users of the Transactional Reporting Service are ISBN-13: 978-0-7817-5735-5/2007

First edition, 2007

Library of Congress Cataloging-in-Publication Data

Horwitz, Debra.
    Blackwell's five-minute veterinary consult clinical companion : canine and feline behavior / Debra F. Horwitz, Jacqueline C. Neilson. — 1st ed.
        p. ; cm.
    Includes bibliographical references and index.
    ISBN 13: 978-0-7817-5735-5 (alk. paper)
    ISBN 10: 0-7817-5735-5 (alk. paper)
    1. Dogs—Behavior therapy.   2. Cats—Behavior therapy.
I. Neilson, Jacqueline C.   II. Title.   III. Title: Five-minute veterinary consult clinical companion.
    [DNLM: 1. Dog Diseases—psychology—Handbooks.   2. Cat Diseases—psychology—Handbooks.   SF 991 H824b 2007]
SF433.H76 2007
636.7'089689142—dc22
                                                            2006013975

The last digit is the print number: 9  8  7  6  5  4  3  2  1

Disclaimer: Every effort has been made to ensure that the information in this book is accurate; however, errors may be present. The author and the publisher assume no responsibility for and make no warranty with respect to results obtained from the procedures, treatments, or drug dosages used, nor shall the author or publisher be held liable for any misstatements or errors that may have been obtained by any person or organization using this book.

Case 1:08-cv-03251-LMM     Document 14-15     Filed 06/13/2008     Page 3 of 8

- Risk assessment may help the owner objectively evaluate the situation; all parties must understand that aggressive dogs are never cured, although sometimes the behavior can be managed successfully.
- Euthanasia is an appropriate measure in cases where safety of people or other pets is at significant continued risk.
- Recommend techniques to reduce human risk from the aggressive dog until the owner obtains treatment including the avoidance of triggers.
- Management success is often achieved with a combination of multiple modalities: environmental control, behavioral modification, pharmacotherapy.

## Behavioral Modification Techniques

- Improve physical control of the dog using barriers (fences, baby gates), muzzles, leashes, and headcollars (e.g., Gentle Leader®).
- Avoid the use of punishment, which tends to escalate aggression.
- For most cases of aggression, it is appropriate to institute a clear rule-structure in the home. This can be done by implementing a command/reward relationship where the dog has to defer to the owner by performing a command prior to being given things such as attention, food, etc. (See Structuring Your Relationship with Your Pet handout in Appendix D for additional details.)



■ **Fig. 2-1** Dog wearing a soft nylon basket muzzle (Pro Guard Softie Muzzle™). There is a tough mesh screen at the front for airflow; the dog can open its mouth and pant but the bite is inhibited.



# DIAGNOSTICS

- Physical and neurological examination should be performed.
- Further diagnostic testing is based on physical examination findings and minimally would include CBC, chemistry profile, endocrine testing, and urinalysis.



# THERAPEUTICS

## Safety Precautions

- Preventing human injuries must be the first concern.
- The dog must be confined away from potential victims in a secure location or under the direct physical control of a responsible adult whenever an aggression-provoking situation could arise (e.g., in any public locations, on walks, when visitors arrive at the house).
- All known aggressive situations must be identified and avoided.
- Treatment is aimed at controlling the problem, not at achieving a "cure."
- Owners must be aware that the only way to prevent future injuries is euthanasia.
  - Re-homing dogs may not be practical or safe.
- All family members need to comply with treatment recommendations.
- Treatment is generally lifelong.

## Management Techniques

- Teach the dog how to tolerate secure confinement either in a crate, behind a baby gate, or in a secure room.
- Use a headcollar (e.g., Gentle Leader®) for increased control.
- Do not physically punish or reprimand the dog.
- Avoid all situations known to trigger the unwanted behavior.
- Basket muzzles are recommended.

## Behavioral Modification Techniques

- All interactions based on a command/response relationship, nonconfrontational methods to teach the dog to view household members as leaders and in control.
- Restructuring the pet-owner relationship: create rules for interaction so the owner knows when and how to interact with their pet. (See the Structuring Your Relationship with Your Pet handout in Appendix D.)
  - In the beginning, all attention is initiated by the owner.
  - The pet can receive attention when it is calm and quiet.
  - The pet must earn attention by either performing a task such as "sit" or by remaining calm and quiet nearby.
  - The owner calls the pet over, begins the attention session, and also ends it before the pet does.

## Management Techniques

- Do not allow the dog on furniture or to sleep in the bed.
- Avoid valuable treats or toys (e.g., rawhides). All treats should only be those that can be quickly consumed such as a dog biscuit.
- Pick up toys and have owner control playtime and activity.
- Do not physically punish or reprimand the dog.
- Do not attempt to take items the dog may have/want, instead offer an alternative activity or trade at a distance for a food reward. (See Chapter 10, Aggression/ Canine: possessive and Chapter 58, Stealing Household Objects: canine and feline for more detail.)

## Behavioral Modification Techniques

- Treatment is aimed at controlling the problem, not at achieving a "cure."
- All interactions are based on a command/response relationship, nonconfrontational methods to teach the dog to view household members as leaders and in control. Use reward-based training to teach the dog to obey commands in daily situations.
- Restructuring the pet-owner relationship: create rules for interaction so the owner knows when and how to interact with their pet.
  - In the beginning, all attention is initiated by the owner.
  - The pet can receive attention when it is calm and quiet.
  - The pet must earn attention by either performing a task such as "sit" or by remaining calm and quiet nearby.
  - The owner calls the pet over, begins the attention session, and also ends it before the pet does.
  - Initially, the pet is required to "earn" all things such as food, access to the outdoors, play, walks, etc., by performing a task on command such as "sit." Later if the animal requests the item by calmly sitting and waiting, it will be given.
- Limit physical contact with the dog, including petting. Control affection by having the dog follow a command prior to attention.
- Teach the dog to obey commands to end situations where aggression has occurred in the past.
  - Use "off" commands to remove the pet from furniture.
  - Use "drop it" commands to obtain objects.
- The CCDS technique is used to decrease responsiveness to situations that have resulted in aggression in the past. A muzzle may be needed for safety. The CCDS technique should not begin until the owner has assumed a greater level of control over the dog through affection control and reward-based training. Individual situations that need CCDS will vary with each case.
- Teach the dog to comfortably and safely wear a headcollar (Gentle Leader®) and/or basket muzzle. Have the dog wear the headcollar with a lightweight 8- to

- If the case has an unusual presentation such as acute onset of aggression in a middle-aged dog with no identifiable inciting cause, advanced diagnostics such as a CSF tap or MRI are indicated.

## Pathological Findings

- No specific pathology associated with this condition

 **THERAPEUTICS**

It is important for owners to realize that treatment is aimed at controlling the problem, not achieving a "cure." Some of the management and treatment steps such as no off-leash freedom in public settings will likely be lifelong. With any aggression problem, safety issues are a priority, and if the owners cannot protect others, the dog should be re-homed if this is practical/safe or be euthanized.

### Safety

- A complete list of aggression provoking situations should be compiled.
- The dog must be confined away from potential victims or under the direct physical control of a responsible adult whenever an aggression-provoking situation could arise.
- Consider ancillary safety precautions as a second line of defense in case primary management fails:
  - Basket muzzles
  - A second tier of doors/gates at exit points from house/yard
- Redirected aggression is possible whenever a dog is aggressively aroused.

### Management

- Try to avoid all aggressive displays toward unfamiliar people. This may involve all or some of the following:
  - Preconfinement in a secure location such as a crate or locked room when guests expected
  - Avoiding exposure to unfamiliar people on walks/outings
  - Blocking or removing access to vantage points in the home/yard
- If an aggressive event occurs despite attempts to avoid, remove the dog from the situation as expediently as possible without using punishment. When far enough away from the trigger stimulus, engage the dog in obedience commands.
- Any punishment including leash corrections, verbal, or physical reprimands should not be used. While they might suppress outward expressions of aggression, underlying emotional affect such as fear and anxiety may remain and intensify.
- Introduce a headcollar (e.g., Gentle Leader®) for additional control.



■ **Fig. 6-1** Dogs are under better control walking with a headcollar. Photograph courtest of Premier Pet Products.

## Behavioral Modification Techniques

■ All interactions with the dog should be based on a command/reward relationship to increase consistent and reliable interactions with the owners. Prior to any attention, food, access to areas, etc., the dog should be given an obedience command. If the dog responds immediately to the command, it can be given the reward of attention, treat, dinner, access to yard, etc. If the dog does not obey the command, the dog should not be rewarded and the owner should temporarily cease interaction with the dog. Nonresponse should not result in repeated requests or forcing the dog to comply with the command. This training establishes owner leadership and teaches the dog to look to the owners for cues.

- Since food is often a trigger for aggression between dogs, it should be carefully managed so that it isn't a source of conflict. At meal feedings, use separate feeding areas, and only use small readily consumed treats.

■ In severe cases, the owner may elect to place basket muzzles on one or both of the dogs when dogs are together and/or the dogs may initially need to be physically separated by glass doors/baby gates or tethers.

■ In less severe cases, a headcollar (e.g., Gentle Leader®) with drag leashes may be placed on dogs for added owner control when dogs are together.

## Behavioral Modification Techniques

■ All human/dog interactions should only occur if the dog responds to a command from the owner. (See the handout Structuring Your Relationship with Your Pet in Appendix D for specific steps.)

■ Condition the dogs to be calm, relaxed, and obedient on a verbal cue from the owner. (See the Tranquility Training Exercises handout in Appendix D for specific steps.)

■ Identify the dog of higher status or the dog most likely to assume that position; if one dog is behaving abnormally and the other normally, the normal dog should be supported as the dominant dog.

■ All household members are instructed to support the dominant/normal dog as such by giving that dog preferential access to resources including but not limited to affection, food, resting spots, access to areas. The subordinate dog should be ignored or instructed to back away if it tries to intervene on the dominant dog's preferential treatment.

■ If tension (stiffening, locked stare, growl, snarl) is noted between the dogs, owners can attempt to diffuse the situation by giving a verbal interruption/command. Often times this command is directed toward the subordinate or abnormal dog. If the dog is wearing a headcollar with a drag leash, a pull on the leash attached to the headcollar or a time-out may be helpful to diffuse the situation.

■ If a fight breaks out between the dogs, safely separate them using a remote technique as outlined above and then put the dogs in separate time out locations until their arousal levels have decreased.

■ Identify triggers that increase arousal levels in one or both dogs and design a desensitization and counterconditioning program for that trigger(s). For example, if both dogs get highly aroused by the doorbell, make a tape of the doorbell sound and introduce it at low levels and teach the dogs to sit/stay. With success, gradually increase the volume until they are no longer aroused every time the doorbell rings at full volume and instead will hold a quiet sit/stay.

■ If an abnormal dog is part of the dyad, that dog may need special treatment designed to make it less reactive to certain stimuli.

■ Be aware that status may be context dependent

## Accompanying Handouts

Acute Management of Problem Behavior
Desensitization and Counterconditioning: the details

 **THERAPEUTICS**

## Safety

- People and pets are at risk of injury from dogs that display redirected aggression. Therefore, avoidance of triggers for primary aggression is paramount.
- If triggers cannot be avoided, try to avoid direct interaction with an aggressively aroused dog; especially avoid active restraint, punishment, and small spaces.
- Basket muzzles, barriers, etc., may all be used to decrease opportunities for redirected events.

## Management

- By avoiding primary triggers of aggression, redirected aggression is essentially resolved.
- To curtail the redirected component of the aggression, keep people and other animals away from aggressively aroused dogs.
  - The critical distance where the dog may redirect will vary between dogs and situations but the further away the less likely one is to become a secondary target for the aggression.
  - In a dog-fight situation, take the time to obtain a remote device that can help break up the fighting dogs, such as water from a hose/bucket, a loud noise, or a thick blanket. If there is no remote device and the client feels compelled to physically separate the dogs, it is better to separate by pulling apart from the rear quarters (flank/tail) than by grabbing their collars or near the face/mouth.
  - If there is a reliable trigger for aggression, such as the doorbell ringing or the presence of unfamiliar dogs, steps should be taken to remove those triggers. For example, the doorbell could be disconnected; fencing that creates a full visual barrier so that dogs inside can't see dogs outside, etc.

## Behavioral Modification Techniques

- Identify and treat the primary cause for the aggression. (See specific chapters listed in the See Also section.)
- Train the dog to go to a spot or do a command on verbal cue.
- At the initial stages of aggressive arousal, the dog should be given the command to do the alternative, desirable behavior. The dog should be rewarded for displaying the desired behavior.
- Having the dog wear a headcollar (e.g., Gentle Leader®) with a drag leash when the owner is present may allow the owner to remotely manage the dog if it gets into an aggressively aroused state and shape the desired behavioral response.

- All of these dogs should be trained to accept/wear a muzzle via desensitization and counterconditioning; this will allow the owner/staff to apply the muzzle as an added level of protection against an unexpected relapse.
- Chemical restraint should be implemented as needed.

## Management

- Postpone any nonurgent veterinary care until after completion of the treatment protocol.
- If veterinary visits are required during the retraining, anxiolytic medication or sedation is suggested.
- Minimize waiting time for anxious animals.

## Behavioral Modification Techniques

- Avoid veterinary procedures and visits unless associated with treatment program. Exposure to full strength stimulus during a systematic desensitization and counterconditioning protocol can significantly compromise progress.
- Foundation work: Weeks 1 and 2
  - Identify small tasty treats and reserve for use in training.
  - Fit dogs with a headcollar (e.g., Gentle Leader®) and have dog wear for all training exercises.
  - All interactions with the dog should be based on a command/reward relationship. Prior to any attention, food, access to areas, etc., the dog should be given an obedience command. If the dog responds immediately to the command, it can be given the reward of attention, treat, dinner, access to yard, etc. If the dog does not obey the command, the dog should not be rewarded and the owner should temporarily cease interaction with the dog. Nonresponse should not result in repeated requests or forcing the dog to comply with the command. This training establishes owner leadership and teaches the dog to look to the owner for cues. (See the Structuring Your Relationship with Your Pet handout in Appendix D for additional details.)
  - Implement tranquility training exercises from the handout. These daily training sessions reward the dog for being calm, relaxed, and obedient in response to owner commands and in the presence of increasing owner created distractions.
  - Institute adequate daily exercise based upon the age, breed, and health of dog.
- Perform CCDS to veterinary facilities: Weeks 2+
  - Identify and list actual triggers for fear/aggression. Some dogs may become anxious/aggressive when they arrive in the parking lot. Others may be comfortable until physical restraint is attempted. Just before the dog shows signs of anxiety or aggression is the starting point for training exercises.
  - Expose the dog to the veterinary visit at a level where the dog is relaxed. Ask the dog to perform obedience commands and reward with treats and praise for relaxed, obedient behavior.

petite, and handling

ons for the pet pre-

w feeding is handled
it began



wner present, owner

f other animals?
behavior, including

et to house training?
nt?



NOSTICS



ical disease and identi-

■ Based upon the dog's signalment, historical profile physical exam, the follow-
  ing tests may be considered: CBC, chemistry panel, thyroid profile, trypsin-like
  immunoreactivity, serum cobalamin, serum folate, fecal fat, fecal trypsin; ACTH
  stimulation test, bile acids
    • Serum cobalamin and folate levels are measured to evaluate for small in-
      testinal bacterial overgrowth and severe small intestinal mucosal disease.

 ## THERAPEUTICS

### Management

■ Decrease access to feces by prompt disposal; walk dogs on a leash to facilitate
  removal from vicinity of feces.
■ Allow no unsupervised outdoor access unless the pet has defecated and the area
  is free of fecal matter.
■ Move litter boxes to an area inaccessible to the dog or provide covered litter box
  if this will not result in nonlitter box use by the cat.

### Behavioral Modification Techniques

■ Use a muzzle or headcollar (e.g., Gentle Leader®) on walks. Give the dog a food
  reward when it defecates, thereby counterconditioning it to expect food rather
  than search for feces.
■ Teach a "leave it" command to call the dog away from feces when outside under
  supervision; a headcollar with a leash attached will facilitate compliance with this
  technique. Reward pet when it complies.
■ Teach "leave it" using a headcollar and leash. With the dog wearing a headcollar
  and an adult holding the leash, the dog is walked toward an item he may wish to
  pick up such as a ball or chew toy. As the dog reaches for the item, calmly say,
  "leave it" and turn the dog's head using the headcollar and quickly offer a food
  reward and "good dog" as the head comes toward you. Repeat several times with
  low value items.
    • As the dog learns the meaning of the phrase, he will begin to turn his head
      prior to the pull of the leash. Immediately reward that behavior.
    • Progress to more valued items and gradually phase out food rewards while
      retaining verbal praise.
■ Provide additional outlets for activity and eating including feeder toys and food-
  finding games.
■ Other recommendations, although unsupported by any published data, include
  feeding a less digestible diet, using a meat tenderizer or pancreatic enzymes, and
  sprinkling noxious tasting/smelling substances on feces.
    • Some dogs are less likely to eat soft stools so the addition of fiber or vegetable
      oil to the food may make the dog's own stools unappealing.

## Behavioral Modification Techniques

- Treatment will depend upon underlying motivation.
- Punishment is rarely successful in managing digging problems since punishment must be consistent, immediate, and effective. These are difficult criteria to implement.
- Deprived environment
  - Adequate daily physical exercise: "Adequate" will depend upon breed and individual dog. Daily off-property walks/runs provide both physical and mental stimulation.
  - Adequate daily mental stimulation: Social interaction, puzzle type food toys, obedience work, playing games, agility, or other sports are helpful.
  - Monitor when dog is in locations where digging has occurred. If digging starts, immediately interrupt (voice command, remote device such as a water squirt, headcollar [e.g., Gentle Leader®] with remote lead attached) and redirect inappropriate digging to a more acceptable behavior (obedience, play with toys, etc.).
  - Consider providing an acceptable digging area in yard for dog to engage in this species typical behavior. Dig up dirt, bury attractive items and encourage dog to explore the area, praising them when they do. Concurrently, make unacceptable sites unattractive or unavailable.
- Roaming
  - If intact male, castration may reduce the desire to roam.
  - Reinforce fencing with an underground component to prevent easy escape.
  - Provide adequate daily physical and mental stimulation.
  - Remove any rewards that dog may acquire once it has escaped (entry to neighbor's home, treats, play with neighborhood kids).
  - Adult supervision is needed when the dog is in the yard to stop escape attempts and reward other activities.
- Barrier frustration
  - Use systematic CCDS to teach dog to tolerate a barrier.
  - Remove barriers, and provide large secure enclosure.
- Predatory
  - Remove prey from environment.
  - Don't allow dog in area where prey is located.
- Noise phobia or other anxiety
  - See Chapter 50, Noise Phobia: canine and feline.
- Separation anxiety
  - See Chapter 56, Separation Anxiety: canine and feline.
- Burying items
  - Don't give dog items it is likely to bury.
  - Consider providing an acceptable digging area in yard for dog to engage in this species typical behavior. Dig up dirt, bury attractive items, and encourage dog to explore the area, praising them when they do. Concurrently, make unacceptable sites unattractive or unavailable.

- Have the predator wear a sensitive bell (or other noise maker) so that both the prey and the human can keep tract of its location.
- Remove any items from the prey that makes them more vulnerable. They should not wear bells or tags that make noise.

## Behavioral Modification Techniques

None of the behavioral modification techniques are considered curative; however, depending upon the situation, it may be prudent to engage in these treatments to minimize the likelihood of predation if there is a break in management.

## Dogs

- Depending upon the target and the situation, different treatment objectives may be desired. Full avoidance/aversion to target may work in some situations while, in others, being able to verbally interrupt the predatory sequence may be adequate. In all of these situations, the dog must be managed during the training so the dog can't practice the uninhibited predatory behavior.
- Ensure that diet is meeting the caloric needs of the dog.
- Ensure that the dog is getting adequate physical and mental stimulation in the form of walks, play, etc.
- If the dog does not have basic obedience skills, these will need to be established via positive-based reinforcement training before proceeding with other training.
  - Headcollars (e.g., Gentle Leader®) and leashes help with control.
- Owners should implement the suggestions in the Structuring Your Relationship with Your Pet handout. All interactions are based on a command/response relationship, to teach the dog to view household members as predictable, consistent, and reliable leaders. This regular practice of deference may help to improve overall responsiveness of dog to owners' commands.
- Owners should implement the Tranquility Training Exercises (see handout) initially with very few external distractions present. These daily training sessions reward calm, relaxed, obedient behavior. With success, the sessions should be repeated in more distracting circumstances. This will help to strengthen responsiveness to owners' commands.
- Make target aversive.
  - Identify a form of punishment that is significant enough to inhibit the predatory behavior but does not compromise the dog's welfare. The punishment needs to be remotely activated so the dog doesn't associate it with the presence of a person. A remotely activated citronella collar is an example of remotely activated punishment device. It is advised that owners work with a trained professional when implementing this type of training to assure proper timing, intensity, and consistency in training.
  - Set up the dog in a situation where it is likely to exhibit the predatory sequence but not put others at risk. For example, dog may be able to view

- The pet is then given the food, gently taken by the collar or in the case of a cat, picked up if they will reliably allow that without aggression and put into another room with a closed door or outside. Only at that time does the owner retrieve the item. The exchange NEVER takes place right in front of the pet and the item. See Table 10.1 for more detail.

■ Teach "**leave it**" for dogs using a headcollar (e.g., Gentle Leader®) and leash: With the dog wearing a headcollar and an adult holding the leash, the dog is walked toward an item he may wish to pick up such as a ball or chew toy. As the dog reaches for the item, calmly say "leave it" and turn the dog's head using the headcollar and quickly offer a food reward and "good dog" as the head comes toward you. Repeat several times with low value items.

- As the dog learns the meaning of the phrase, he will begin to turn his head prior to the pull of the leash. Immediately reward that behavior.
- Progress to more valued items and gradually phase out food rewards while retaining verbal praise.

■ Teach "**drop it**" to a dog: The goal is to teach the dog to give up items with a verbal command.

- Initially, this task is taught using an item of low value that the dog has never guarded or stolen paired with high value rewards.
- Since dogs are more likely to relinquish an item of which they only have partial control, you should start by engaging the dog in a gentle game of tug with a low value item. The human should stop tugging and the pet is offered a small piece of food along with the words "drop it" as the dog opens his mouth to take the food. Repeat several times so that the dog begins to anticipate the actions.
- Next, hold the food away from the dog and say "drop it," only giving the food once the item has been dropped. Repeat until the response is reliable and then begin to phase out the food by skipping the food reward on some repetitions.
- Gradually, use items of higher value to the dog. As you increase the value of the item, you may need to reinstate continuous food rewards until the drop command becomes reliable.
- Then practice the command when the dog has full control over an item.
- Once the "drop it" command is well established, it can be used to retrieve stolen items.

■ Punishment must be avoided since harsh verbal or physical reprimands may cause the pet to become defensive and/or aggressive, which could lead to owner injury.

■ Chasing the pet should also be avoided since it may be interpreted as play.

## Accompanying Handouts

Maximizing Treatment Success
Safety Recommendations for Aggressive Animals
Structuring Your Relationship with Your Pet
Teaching "Drop it" and Retrieving Stolen Items

## Management

- If inciting triggers can be identified and controlled, they should be avoided unless they are part of the treatment process.
- Secondary dermatological infections need to be treated.

## Behavioral Modification Techniques

- Behavior therapy is based on the assumption that the behavior is a compulsive disorder and is potentially related to conflict, frustration, and stress in the pet's environment.
- Reduce stress by creating a predictable environment for the pet.
  - Change the pet-owner interaction to be more predictable and based on a command-response relationship. Perform reward-based training to teach the dog to obey commands in daily situations. (See the handout on Structuring Your Relationship with Your Pet in Appendix D.)
  - Feed on a routine schedule.
- Provide daily scheduled exercise, social interactions, and play.
  - Ignore all attention-seeking behavior and only give attention when earned and when the pet is calm and quiet.
- Stop all punishment for the behavior.
- Practice tranquility training (see the handout) by rewarding the dog for obedient, relaxed behavior.
- Desensitize and countercondition to triggering situations if these can be identified.
- Teach a competing response when the dog engages in the tail chasing such as sit, get a toy, or perform a trick.
  - In some cases, headcollars (e.g., Gentle Leader®), which allow control of the muzzle and face, may be useful to interrupt the behavior and redirect the dog to other activities.
- For cats, owner may anticipate and redirect the cat onto another activity such as chasing a tossed toy.
- Treat any concurrent behavioral conditions.

## Accompanying Handouts

Acute Management of Problem Behavior
Desensitization and Counterconditioning: the details
Maximizing Treatment Success
Structuring Your Relationship with Your Pet
Tranquility Training Exercises

## Drugs

- Note: All medication dosages are for oral dosing (PO)
- In cases where a compulsive component is suspected, serotonergic medication may be indicated. Medication can help facilitate the treatment program.

JION

hat the owner pay
difficult for owners
eye contact, saying
esponse stronger. If
ed that vocalization
vhat is known as an

: **substitution**): The
sponse to the stim-
xcitement vocaliza-
toy and sit quietly
For this to be effec-
here are no distrac-
d when visitors are

y or down/stay and
ons.
sed is utilized.
form the task when

e given when the cat

blem is the doorbell
loorbell.
g; these must be ex-

one family member,

l comes to the front

vith them.
the door unimpeded.
arrow the treats inside

be blocked.
been chosen, the dog

the treats again.
tions since when the
y not bark.
r barking or at least
aining techniques can

at in teaching a quiet
ases is indicating that

the pet should be silent. If this does not happen, then the pet has not learned that no vocalization is what is requested.

- If possible, the dog should be fitted with a headcollar (e.g., Gentle Leader®) and a leash. When the dog barks, the owner can pick up the end of the leash, close the dog's mouth and say the term that will be used to signify silence such as "quiet, enough, no bark," but they must use the same phrase each time.
  □ If the dog is quiet, they should release the tension on the leash and reward the dog with a food treat and praise.
  □ The dog should be allowed to bark again and the steps repeated.
  □ Over time, the dog should learn that the phrase used signifies silence and respond to the phrase alone.
  □ If done repeatedly, the dog will learn that the phrase means silence and then the interval between silence and reward can be lengthened.
- Disruption devices such as shaker cans or noisemakers can be used to interrupt barking. At the same time the owner makes the noise, they must



■ **Fig. 63-1** Dog wearing a citronella bark collar. Photograph courtesy of Premier Pet Products.

# Coaching People to Train Their Dogs

**Practical Information & Expert Advice for Dog Training Instructors. You'll find chapters on**
- Ethology
- Learning Theory
- People Skills
- Class Organization
- Plus Lesson Plans and Class Handouts

by Terry Ryan



*EXHBIIT 15*

## Gentle Leader® Head Collar

There are various brands of head collars or head halters. Legacy has tried most of them. We use and sell the Gentle Leader® brand. Friends of Terry's, professional trainer Ruth Foster (this book is dedicated to Ruth) and board certified veterinary behaviorist R. K. Anderson, joined forces to produce the Gentle Leader® head collar. Legacy was one of the official field testers of the device and has continued to use the Gentle Leader® in classes ever since. It's like power steering—where the dog's head goes, the dog will follow. If you recommend Gentle Leaders® in your class, I suggest that you invest in a few of the Gentle Leader® videos. Send one home for the entire family to view. If a Legacy client decides to try a Gentle Leader® we include a private 20-minute fitting and use lesson free of charge.

**Why Use a Gentle Leader®?** People have been using halters to lead animals for centuries. Which is easier—leading a horse wearing a head halter or one with only a rope around its neck? Similar to a halter, the Gentle Leader® does not put pressure on the dog's throat; it fits up higher and rests on the jawbones of the dog.

**How the Gentle Leader® Works.** The Gentle Leader® works in the natural manner of canine communication. In addition to physical help in controlling the dog, the strap around the muzzle delivers a psychological message as well. In watching a group of dogs, you might see a higher ranking dog encircle the muzzle of another dog with his or her own mouth. Gentle Leaders® use this instinctual muzzle control to make a statement of rank. Most dogs recognize the muzzle strap as an extension of your leadership and will often settle into a mellower attitude with minimal training.

**Introducing and Fitting the Gentle Leader® to the Dog.** Gentle Leaders® are available in several sizes and each size is fully adjustable. Gentle Leaders® fit most dogs nicely. Possible exceptions are short-nosed dogs such as Pugs, Pekingese, or Boxers. Some dogs act up when the Gentle Leader® is first put on them. Usually, the dogs that do so are the ones who need a Gentle Leader® the most! These are dogs that do not want to be restricted in any way! The video will have made the client aware of this. Your personal attention in fitting and using the Gentle Leader® is invaluable in helping the dog and owner work through any possible resistance quickly and humanely. Ask the owner to apply pressure to his throat. It's tender. This is where a regular collar rests. Then ask him to apply pressure to his jawbones. The jawbones are not as tender as the throat. This is where the Gentle Leader® rests.

The first few minutes of class are not the appropriate time to fit the Gentle Leader®. Meet with the dog and owner before or after a class when you can take your time. For safety's sake, when you fit the dog, the regular leash and collar

should remain on with you or the owner hanging on to the leash. An additional leash can be snapped to the ring of the Gentle Leader®. The weight of the leash on the Gentle Leader® shows both you and the owner "which end is up" during the fitting procedure. The owner should have a handful of really good treats.

**Start with the Neck Band.**  Unless the dog is very comfortable with you, do not face and reach over the dog. Have the dog at your side, it's less threatening for the dog and requires less reach on your part. The owner can be in front of the dog with treats. Fit the neckband first. Attach it high, at the base of the ears, and buckle. As you fasten it, admire the dog, and encourage praising and treating from the owner. Keep it on for less than 15 seconds. When you take it off, all praise stops. Say nothing and disengage attention from the dog. Never praise when or directly after you take it off. If the dog struggles, wait for a few seconds of calmness before taking it off. Never take it off while the dog struggles or directly after the dog struggles. Repeat this a few times until the neckband is accepted, then check for proper neckband fit: The band needs to be as high up behind the ears as possible. It should be very snug, like a watchband, a shoe, or the cinch on a horse. Only one finger should fit in the collar. If it does not fit snugly, the dog can back out of it and will be in danger. Almost as bad—the dog has learned it's worth it to struggle. The struggling lottery sometimes pays off! One of the biggest mistakes is not fitting the Gentle Leader® snugly enough.

If the dog's coat type makes it difficult to fasten the collar without snagging some of the hair, lay a paper napkin on the back of the dog's head. It will keep the hair down and in place. Should you catch the napkin in the fastener, just pull the bits of paper out, but be sure the fastener is secure!

**Choices for Fitting the Nose Band.**  There are two alternatives when introducing the nose band in combination with the neck band. Choose the one that appeals to your client. Either way, go through the fitting process first!

1. **ALL AT ONCE**
   Put it on and if he doesn't like it at first, simply work through it; don't give in by taking it off while the dog is opposing it. The dog may rub his nose with his paw, scoot his nose along the floor, or otherwise act like a flopping fish. This is sometimes hard for the owner to watch and often difficult for the owner to do. It may work best if you get permission from your client to fit and handle the dog yourself for the first few minutes. Point out that the dog has a choice. He can put his body in a position where the Gentle Leader® is less restrictive. When there he gets treats, treats, and more treats and lots of praise. If he bucks, he is ignored. At any time, if the dog voluntarily starts to slacken the leash, give him even more slack and start treating. You can use food in your hand as a dispenser for him to nibble his way along for a few steps. He will learn by a few quick trial sessions. Most dogs quickly realize that they might as well put up with it

because it's linked with rewards. In short: A quiet dog turns on the owner's attention, and cues the owner to put even more slack in the leash. Acting up gets no attention at all.

2. **LITTLE BY LITTLE**

If the client would rather you take the slower route, take these preliminary steps to ensure acceptance. Do the following several times a day. At the end of the day, most dogs look forward to wearing the Gentle Leader®. Even stubborn dogs are habituated to it in a couple of days.

*Start with the Nose Band.* Take a little time to stroke the dog on her nose. Get her used to your hands being there before you start with the band. Don't worry about fit. Extend it to the full size and lay it over the dog's nose a couple of times. If you have trouble with the clasp, insert a dime and twist. The owner can give treats "through" the Gentle Leader®. Take the collar off and the treats and attention go away. Repeat. If you are lucky, just a couple of reps and the dog will be stabbing her nose through the loop in anticipation of the treat. You can start to "eyeball" the fit and adjust slightly between repetitions.

*Fit the Nose Band and Neck Band Together.* The nose band should fit in front of the dog's eyes, but behind the corners of the mouth. The dog should be able to pant, drink, eat, and bark. The nose band should be able to slide almost to the black part of the dog's nose tip. If it is too loose, the dog can rub her nose on the floor or use his front paw to get it off. Now, this is where your coordination and mechanical skill comes in. Slip it over the dog's nose and quickly fasten it behind the ears. As soon as the nosepiece goes on, the owner can start treating and praising the dog. A quick check and you'll probably find you need to adjust it. Take it right off, and stop the attention, praise, and treats. Adjust and repeat the above. It often takes a few tries to get it right. You might have to readjust the neck band before everything fits properly.

*Go for a Walk!* When you think you've got it right, either coach the owner or do this yourself: With a good treat in one hand, move several steps forward and turn into the dog, feeding all the way. Help the client remove the Gentle Leader®. When the Gentle Leader® is off, the dog receives no treats, and no attention. The dog is safe on his regular collar and leash.

*Final Fit.* After a few "test drives," mark both Gentle Leader® fasteners with a pen so everyone knows the proper fit. The neck band was designed to be very large. Once it is fitted properly to the dog, there is apt to be lots of leftover strap. Tell the owner to allow a little extra for growth and cut off the excess. The nylon material can be "sealed" with the flame of a match. This might seem silly, but remind them to take the collar off their dog first!

Although clients are responsible for providing their own treats and toys, we have a bin of small loaner toys in our training room. It's an easy way for the client to see just what type of toy turns her dog on! We also have a variety of packaged food treats. Because it's offered in small sealed packaging, the client can read the contents and not worry about what he's feeding his dog. Sealed treats give you freedom from preparation, refrigeration, and storage!

## REMOTE OR HAND-HELD ELECTRONIC TRAINING DEVICES

These devices require the dog to wear a collar designed to deliver an attention-getting stimulus. Some collars will vibrate, like some cell phones do. Other collars deliver a sound that can be used as a secondary reinforcer to convey approval and mark the behavior as rewardable. Other models use an aversive high-pitched sound as a punisher. Some use shock to communicate with the dog; invisible perimeter fences work on these principles. Our program might, on occasion, use vibrating collars for deaf dogs. More information can be found under the topic "Deaf or Blind Dogs," in Chapter 7.

### Citronella Release Devices for Barking

We might recommend a Gentle Spray™ collar as an anti-barking device for home use. It comes in a model that automatically releases a spray of citronella, a harmless but aversive scent. It's similar to the smell from a freshly peeled orange. We don't recommend this aversive if the dog is barking from fear or anxiety. We help the client evaluate the reason for the barking. There is a brief overview of the information found in our book, *The Bark Stops Here,* listed in the Appendix as INFO Barking.doc, "The Bark Stops Here." Sometimes wearing the collar, even though it is "out of juice" is enough of a reminder for a dog to be quiet. Some dogs will never bark again if they SEE the collar. A collar lying on the windowsill, for example, is enough for some dogs to be quiet even if they may have experienced the smell only once.

## CRATES

Crates are becoming more common with pet owners. We do crate training in puppy classes by letting the pup hang out in a crate for a few minutes while the owner is sitting alongside. Various uses of these versatile portable kennels are outlined in the Appendix handout PUPPYCratesHousetrain.doc, "Crate Training and Housetraining."