## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MULTI-VET LTD.,** | ) |
| | ) |
| **Plaintiff and** | ) |
| **Counterclaim Defendant,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 08-cv-03251** |
| **PREMIER PET PRODUCTS, INC.,** | ) |
| | ) |
| **Defendants and** | ) |
| **Counterclaim Plaintiff.** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## DECLARATION OF ELIZABETH ZIDONES IN SUPPORT OF DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

I, Elizabeth Zidones, do hereby state as follows:

1.      I am an attorney with the firm of Merchant & Gould, P.C., counsel for Defendant Premier Pet Products, LLC ("Premier"), in the captioned matter, and I submit this declaration in conjunction with Defendant Premier Pet Products LLC's, Motion For Preliminary Injunction.

2.      Attached hereto as **Exhibit 16** is a true and correct copy of a printout of the website at the United States Patent and Trademark Office depicting the U.S. Trademark Registration No. 2,685,911.

3.      Attached hereto as **Exhibit 17** is a true and correct copy of a photograph of the front of the Mult-Vet GENTLE SPRAY product packaging.

4.      Attached hereto as **Exhibit 18** is a true and correct copy of a photograph of the rear of the Mult-Vet GENTLE SPRAY product packaging.

5.      Attached hereto as **Exhibit 19** is a true and correct copy of the unpublished decision, *Mattel, Inc. v. Internet Dimensions, Inc.*, No. 99Civ10066, 2000 U.S. Dist. LEXIS 9747 (S.D.N.Y. July 13, 2000).

The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

June 12, 2008
_____
Date

_____
Elizabeth Z. Jones

Int. Cl.: 18

Prior U.S. Cls.: 1, 2, 3, 22 and 41

**United States Patent and Trademark Office**

Reg. No. 2,685,911
Registered Feb. 11, 2003

## TRADEMARK
### PRINCIPAL REGISTER



PREMIER PET PRODUCTS, L.L.C. (VIRGINIA LIMITED LIABILITY COMPANY)
406 BRANCHWAY ROAD
RICHMOND, VA 23236

FOR: ANTI-BARK COLLARS THAT SPRAY CITRONELLA WHEN THE DOG BARKS, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

FIRST USE 3-30-2001; IN COMMERCE 3-30-2001.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "NO SHOCK" AND "NO PAIN", APART FROM THE MARK AS SHOWN.

SER. NO. 76-355,226, FILED 1-7-2002.

STEVEN R. FOSTER, EXAMINING ATTORNEY

**EXHIBIT 16**



EXHIBIT 17



*EXHIBIT 18*

LEXSEE 2000 U.S. DIST. LEXIS 9747

**MATTEL, INC., Plaintiff, - against - INTERNET DIMENSIONS INC. and
BENJAMIN SCHIFF, Defendants.**

**99 Civ. 10066 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2000 U.S. Dist. LEXIS 9747; 55 U.S.P.Q.2D (BNA) 1620**

**July 13, 2000, Decided
July 13, 2000, Filed**

**DISPOSITION:**    [*1] Plaintiff's request for a permanent injunction barring defendants from the commercial use and infringement of any of Mattel's BARBIE trademarks.

**COUNSEL:** For MATTEL, INC., plaintiff: William Dunnegan, Perkins & Dunnegan, New York, NY.

For INTERNET DIMENSIONS INC., BENJAMIN SCHIFF, defendants: Benjamin Schiff, Internet Dimensions, Inc., President & General Counsel, Plantation, FL.

**JUDGES:** Harold Baer Jr., U.S.D.J.

**OPINION BY:** Harold Baer Jr.

**OPINION**

**MEMORANDUM & ORDER**

### Hon. HAROLD BAER, JR., District Judge: [1]

> 1  James Wallick, a second-year law student at Columbia University School of Law, assisted in the research and preparation of this Memorandum and Order.

Plaintiff Mattel, Inc. ("Mattel") commenced this action against defendants Internet Dimensions, Inc. ("Internet Dimensions") and Benjamin Schiff with the filing of a summons and complaint on September 28, 1999, asserting causes of action for (1) trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) [*2] trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (3) violation of the Anti-Cybersquatting Consumer Protection Act of 1999 ("ACPA" or "the Act"), Section 43(d) of the Lanham Act of 1946, as amended, 15 U.S.C. § 1125(d) and (4) common law unfair competition.

This Memorandum and Order constitutes the Court's findings of fact and conclusions of law with respect to Mattel's federal claims for cybersquatting and trademark dilution. Mattel, through its proposed findings of fact and conclusions of law, withdrew its claim for trademark infringement under the Lanham Act and its state law claim for unfair competition.

### I. Background

### A. Procedural Background

The Court has subject matter jurisdiction over Mattel's first, second and third claims for relief in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Mattel is asserting rights under the Section 43 of the Lanham Act. The Court has supplemental jurisdiction over Mattel's remaining state law claim for unfair competition pursuant to 28 U.S.C. § 1367.

By notice of motion dated February 11, 2000, defendants [*3] moved to dismiss this action based upon the lack of personal jurisdiction. By order dated April 24, 2000, the Court denied that motion to dismiss, but held that Mattel would have the burden of proving the

*EXHBIIT 19*

2000 U.S. Dist. LEXIS 9747, *3; 55 U.S.P.Q.2D (BNA) 1620

existence of personal jurisdiction at trial. I also noted that I had not resolved whether this District has a compelling interest in adjudicating this matter. The jurisdictional issue was mooted when defendants, by a stipulation dated May 24, 2000, waived all objections to the Court's exercise of personal jurisdiction over them.

The Court conducted a bench trial in this action on May 4, 2000. It heard the testimony of two witnesses, Mr. Schiff and Mattel's private investigator, Michael Falsone. The Court also received into evidence 55 exhibits.

## B. The Parties

Mattel is a publicly held corporation organized and existing under the laws of the State of Delaware with its principal place of business in El Segundo, California. One of its principal products is the trademarked "Barbie" doll. In 1991, the Second Circuit observed that "the 'Barbie' doll is the best selling toy doll in the world--96 percent of three to eleven year old girls in the United States own at least one. [*4] In the past 30 years 600 million Barbie dolls have been sold--one is sold every two seconds--and, in 1990 alone 26 million of them were sold, earning gross revenues for Mattel of $ 740 million." The Miss America Organization v. Mattel, Inc., 945 F.2d 536, 537 (2d Cir.1991).

Internet Dimensions is a corporation organized and existing under the laws of the State of Nevada with its principal place of business in Broward County, Florida. Internet Dimensions owns Internet domain names for sites that provide, among other things, "adult" entertainment. One of its domain names is "barbiesplaypen.com." Internet Dimensions generates income by selling memberships in its "adult" sites through credit card orders placed over the Internet. Internet Dimensions and Mr. Schiff are both affiliated with a larger organization, Internet Access Solutions ("IAS"), which handled all the administrative work for Internet Dimensions' various sites. (Tr. 34.) Mr. Schiff is the sole officer, director, employee and shareholder of Internet Dimensions.

## II. Liability Under the ACPA

Mattel's primary claim in this action is that defendants violated the Anti-Cybersquatting Consumer Protection [*5] Act. The ACPA, signed into law on November 29, 1999, provides that "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark," 15 U.S.C. § 1125(d)(1)(C), if the domain name was "registered before, on, or after the date of the enactment of this Act," Pub. L. No. 106- 113, § 3010. It also provides that damages can be awarded for violations of the Act, but that they are not "available with respect to the registration, trafficking, or use of a domain name that occurs before the date of the enactment of this Act." Id.

The ACPA was passed to "protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks--a practice commonly referred to as 'cybersquatting'." S. Rep. No. 106-140, at 4 (1999).

The Act provides civil liability for cybersquatting as follows:

A person shall be liable in a civil action by the owner of a mark . . . if . . . that [*6] person (i) has a bad faith intent to profit from that mark . . . and . . . (ii) registers, traffics in, or uses a domain name that --

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark;

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

## A. BARBIE is "distinctive" and "famous"

The terms "distinctive" and "famous" are defined in 15 U.S.C. § 1125(c)(1):

In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited

2000 U.S. Dist. LEXIS 9747, *6; 55 U.S.P.Q.2D (BNA) 1620

to--

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for [*7] the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

It has not been seriously disputed that BARBIE and her logo are famous. In fact, defendant has all but conceded the point. (Tr. 32.) In any event, all of the above eight factors favor Mattel.

First, while there is no particular inherent distinctiveness in the name "Barbie," the mark as it applies to Mattel has acquired a distinctiveness through four decades of exposure of the American consumer to the plastic doll. See 15 U.S.C. § 1125(c)(1)(A). Second, Mattel has utilized its BARBIE marks consistently in their print and television advertisements for its dolls and their accessories since 1959. See id. § 1125(c)(1)(B). Third, Mattel has expended millions of dollars to promote its products. See id. § 1125(c)(1)(C). Fourth, [*8] the BARBIE trademarks are used throughout the United States and throughout the world. See id. § 1125(c)(1)(D). Fifth, Mattel sells its extensive line of products in a

variety of retail channels, including toy stores and on its own web site. See id. § 1125(c)(1)(E). Sixth, the Court concludes that the name "Barbie" and the font normally used to advertise BARBIE products is widely recognized throughout the world on the basis of the marketing efforts that have been undertaken by Mattel over the past four decades. See id. § 1125(c)(1)(F). Seventh, that Mattel aggressively litigates all would-be violators of their trademarks has been conceded by the defendant, and satisfies the Court that the plaintiff makes every effort to enforce it rights in the BARBIE marks. See id. § 1125(c)(1)(G). Finally, the BARBIE trademarks are registered with the United States Patent and Trademark Office. [2] See id. § 1125(c)(1)(H).

[2] Mattel has registered the following 26 Barbie trademarks with the United States Patent and Trademark Office: Registered Trademark Nos. 689,055; 728, 811; 741,208; 741,649; 768,331; 768,397; 772,298; 810,106; 814,091; 814,995; 816,601; 817,200; 1,000,125; 1,041,587; 1,300,766; 1,693,139; 1,746,477; 1,754,535; 1,769,285; 1,773,571; 1,775,637; 1,795,876; 1,710,196; 1,760,729; 1,947,330; and 1,995,873. (Compl. Exh. 1-26.)

[*9] The Court finds that, by any measure of the above factors which have been set forth by the Federal Trademark Dilution Act, the trademark BARBIE is both "distinctive" and "famous" for purposes of § 1125(d).

**B. The defendants' domain name was "identical and confusingly similar" to the BARBIE mark**

The next question is whether the domain name barbiesplaypen.com is "identical or confusingly similar to" the BARBIE mark. [3] 15 U.S.C. § 1125(d)(1)(A)(ii)(I).

[3] As the Second Circuit has noted, "'confusingly similar' is a different standard from the 'likelihood of confusion' standard for trademark infringement adopted by this [Circuit] in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961)." Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 498, n.11 (2d Cir. 2000).

The similarities between "barbiesplaypen.com" and the BARBIE trademark are as follows: (1) both contain the name "barbie;" (2) the name "Barbie" on [*10] the front page of the web site and the logo BARBIE both

Case 1:08-cv-03251-LMM    Document 15-5    Filed 06/13/2008    Page 4 of 9

Page 4

2000 U.S. Dist. LEXIS 9747, *10; 55 U.S.P.Q.2D (BNA) 1620

have approximately the same font, slant, size, etc.; (3) both BARBIE and "barbiesplaypen.com" are inextricably associated with the verb "play," in the broad sense of the term.

All of the above similarities make the website 'barbiesplaypen.com', and its domain name, "confusingly similar," though not "identical" to the BARBIE mark. Cf. Wella Corp. v. Wella Graphics, Inc., 874 F. Supp. 54, 56 (E.D.N.Y.1994) (finding the new mark "Wello" confusingly similar to the trademark "Wella").

## C.  Defendants  Registered  and  Used "barbiesplaypen.com" with a "Bad Faith Intent to Profit"

I next turn to the issue of whether the defendants either registered, used or trafficked in the domain name "barbiesplaypen.com" with a "bad faith intent to profit" from the Barbie mark. 15 U.S.C. § 1125(d)(1)(A)(i). The statute lists nine factors to assist courts in determining when a defendant has acted with a bad faith intent to profit from the use of a mark. [4] But the statute does not limit this Court to considering just the listed factors when determining whether the statutory criterion has been met. The [*11] factors are, instead, expressly described as indicia that "may" be considered along with other facts. Id. § 1125(d)(1)(B)(i).

4  15 U.S.C. (d)(1)(B)(i) provides as follows:

> In determining whether a person has a bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of

Case 1:08-cv-03251-LMM     Document 15-5     Filed 06/13/2008     Page 5 of 9

Page 5

2000 U.S. Dist. LEXIS 9747, *11; 55 U.S.P.Q.2D (BNA) 1620

the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

[*12] Most of the nine factors weigh in plaintiff's favor, i.e. the defendants did engage in a "bad faith attempt to profit" from the BARBIE trademark by maintaining the infringing domain name and web site. [5]

    5 The Second Circuit has "expressly noted that 'bad faith intent to profit' [is a] term[] of art in the ACPA and hence should not necessarily be equated with "bad faith" in other contexts. Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 499, n.13 (2d Cir. 2000).

With regard to the first factor, "the trademark or other intellectual property rights of the persons, if any, in the domain name," it is clear that the defendants do not own any intellectual property rights in the mark BARBIE.

The second factor considers "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person." Mr. Schiff is not known by the name "Barbie." The best he could do at trial was testify that an employee of Internet [*13] Access Solutions told him, a few days before trial, that "Barbie" was the nickname of the girlfriend of a former partner of Internet Dimensions in the site (Tr. 27.) That fact, even if true, would not tip this factor in favor of the defendant.

The third factor considers "the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services." In this case, Mr. Schiff never used the trademark BARBIE or BARBIE'S PLAYPEN before registering "barbiesplaypen.com" as a domain name.

Fourth, the defendants did not make any "bona fide noncommercial or fair use of the mark in a site accessible under the domain name." Instead, the defendants used the "barbiesplaypen.com" domain name exclusively in connection with the sale of "adult" entertainment.

Fifth, the Court should consider "the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." In this [*14] case, defendants made money by selling to Internet users memberships to defendants' "adult" sites. (Pl. Ex. 28, Tr. 23.) To sell these memberships, the defendants relied on Internet users visiting their website. These online visits are called "hits." (Tr. 18.) The most difficult aspect of the defendants' business appears to be generating these "hits." (Pl. Ex. 28 at 212.)

To generate "hits," the defendants used a variety of techniques. (Tr. 19.) One technique is called a "hits generating" page. (Pl. Ex. 28 at 231.) A "hits generating" page contains words, including names or trademarks, that Internet users are likely to enter into an Internet search engine to locate sites in which they are interested. (Pl. Ex. 28 at 227.) The "hits generating" page contained the trademark "hustler" and the names of popular female celebrities, including "Pamela Anderson," "Demi Moore" and "Uma Thurman." (Pl. Ex. 28 at 227.) The use of these words by the prospective customer can cause search engines to identify the defendants' sites and result in "hits" (Tr. 21) and, ultimately, sales. See Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1045 (9th Cir. 1999) [*15] ("Search engines look for key words in places such as domain names, actual text on the web page, and metatags.")

It is clear that the defendants expected the same result from the use of the domain name "barbiesplaypen.com." The defendants must have expected that consumers putting the word BARBIE, or perhaps the words "BARBIE and PLAY," into an Internet search engine would be directed to defendants' "barbiesplaypen.com" site, which contained pornographic photographs. (Pl. Ex. 30.) The diversion of internet users to a site presenting pornographic images, if viewed by a consumer hoping to view information about one of Mattel's products, may well tarnish the image of Mattel's BARBIE products in the minds of those consumers.

The sixth factor examines "the person's offer to transfer, sell, or otherwise assign the domain name to the

mark owner or to any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct."

This factor cuts in favor of the defendants. After being served with the complaint in this case, Mr. Schiff wrote to Mattel's [*16] counsel by letter dated November 2, 1999, and offered to "settle" by selling the domain name "barbiesplaypen.com" to Mattel for $ 2,500, if Mattel would drop the case. (Pl. Ex. 36.) However, when this offer was refused, Mr. Schiff offered to "settle" by giving the site and domain name to Mattel, in exchange for Mattel's discontinuance of this lawsuit. (Tr. 35.) I find that the defendants acquired the domain name "barbiesplaypen.com" to engage in the bona fide offering of goods, such as they are. Put another way, defendants did not acquire the domain name in order to offer it for sale to the plaintiff, but rather to use the domain name as a platform for its own seamy sales.

The seventh factor considers "the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct." The registration information that defendants initially provided to Network Solutions for the "barbiesplaypen.com" domain name listed an address in Las Vegas, Nevada. (Pl. Ex. 29.) After the filing of the complaint, [*17] defendants changed their registration information with Network Solutions to list an address in Escarzu, Costa Rica. (Pl. Ex. 34, Tr. 40-41.) Defendants, however, never maintained a place of business at either location. (Tr. 40.) The effect of providing false registration information, i.e. an address where the defendants did not maintain a place of business is to impede third-parties, including trademark owners such as Mattel, from serving process.

The eighth factor considers "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties." Defendants have registered and used the domain names "clits-r-us.com" and "billgatesnude.com." (Pl. Ex. 52, 53, 54; Tr. 30-31.) When the toy retailer Toys 'R Us sent a letter to Internet Dimensions demanding that it cease and desist from using the "clits-r-us.com" domain name, Mr. Schiff testified that he immediately recognized "clits-r-us. [*18] com" as a "trademark infringement" and stopped using it. (Tr. 30, 31.) Similarly, defendants registered the domain name "billgatesnude.com." (Pl. Ex. 52, 53) It takes no leap of faith to conclude that defendants acted with the "specific intent to profit" from Mr. Gates's name. Although there is no evidence that Bill Gates has trademarked or would trademark his famous name, this pattern of behavior certainly does not help the defendants.

The ninth factor considers "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43." As discussed above, I find that Mattel's BARBIE trademark is both "famous" and "distinctive."

Accordingly, based on the evidence in the record, and a weighing of the nine factors set forth in the Act, this Court finds that the defendants exhibited a "bad faith intent to profit" from the use of the BARBIE trademark in their domain name. Defendants are therefore liable to Mattel under the ACPA.

**D. Remedies Under the ACPA**

Although the ACPA applies retroactively, the provisions relating to damages apply only to post-enactment registrations, [*19] uses or traffickings. Pub. L. No. 106-113, § 3010. Defendants used the domain name after the date of enactment. Defendants continued, at least until trial, to post a site at "barbiesplaypen.com." (Pl. Ex. 47.) Although at the time of trial, that site had no content other than a directory, the plain language of the ACPA indicates this "use" of the domain name triggered the availability of the damage provisions of the ACPA. The legislative history of the Act confirms this interpretation of the Act.

> The fact that a person may use a mark in a site in . . . a lawful manner may be an appropriate indication that the person's registration or use of the domain name lacked the required element of bad faith. This factor is not intended to create a loophole that might otherwise swallow the

Case 1:08-cv-03251-LMM    Document 15-5    Filed 06/13/2008    Page 7 of 9

Page 7

2000 U.S. Dist. LEXIS 9747, *19; 55 U.S.P.Q.2D (BNA) 1620

bill, however, by allowing a domain name registrant to evade application of the Act by merely putting up a non-infringing site under an infringing domain name.

S. Rep. No. 106-140, at 14 (1999).

Mattel seeks several remedies under the Act in this action. First, I find that Mattel is entitled to an order directing defendants to transfer the registration of the domain name "barbiesplaypen.com" [*20] to Mattel. See 15 U.S.C. § 1125(d)(1)(C). Second, this Court finds that a permanent injunction barring defendants from the commercial use and infringement of any of Mattel's BARBIE trademarks is warranted. Having found that defendants infringed Mattel's famous BARBIE trademark, irreparable injury is assumed. The issuance of a permanent injunction poses no harm to the defendants, who are free to set up other non-infringing "playpens," compared to the great harm that might accrue to Mattel, which has invested large sums in advertising and defining its youth-oriented trademarked Barbie dolls. Issuance of a permanent injunction advances the public interest of avoiding trademark confusion.

Finally, the plaintiff also seeks statutory damages and attorneys' fees. Any award will be the subject of a supplemental memorandum unless within ten days from the date hereof the parties resolve these issues and file a stipulation to that effect with the Court.

### III. Federal Trademark Dilution Act

#### A. Liability Under the Dilution Act

Mattel's second claim is under the Federal Trademark Dilution Act of 1995 (the "Dilution Act"), 15 U.S.C. § 1125 [*21] (c). To prevail on this claim, plaintiff must demonstrate "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 215 (2d Cir. 1999). Mattel has proven each of these elements.

"The elements numbered (1) and (4)--fame of the senior mark, and junior use beginning after the senior mark has become famous--use terms in their ordinary

English language sense. Their meaning is clear." Id. As discussed above, BARBIE constitutes a famous mark. Furthermore, the defendants' first use of"barbiesplaypen.com" occurred after Mattel's BARBIE had become famous. In fact, Mr. Schiff admitted knowing about Mattel's BARBIE doll before the registration of "barbiesplaypen.com." (Tr. 32.) The third element is also met, as the defendants' maintenance of a website clearly constitutes a "commercial use in commerce." Nabisco, 191 F.3d at 215.

Distinctiveness is a concept quite distinct from fame. "Distinctiveness is a crucial [*22] trademark concept, which places marks on a ladder reflecting their inherent strength or weakness. The degree of distinctiveness of a mark governs in part the breadth of the protection it can command." Nabisco, 191 F.3d at 215. On the lowest rung are generic words totally without distinctiveness, such as "car," for which no one can claim protection. Id. At the top of the ladder are "marks that are entirely the product of the imagination and evoke no associations with human experience that relate intrinsically to the product. The arbitrary or fanciful quality is what renders the mark distinctive; another seller of the same product or service would have no justification for using the same or a similar mark. The strongest protection of the trademark laws is reserved for these most highly distinctive marks." Id. at 216.

The mark BARBIE, unlike for example the name "dolly," is not in any way intrinsically evocative of the word "doll." It is probable that, but for Mattel's marketing of the doll and her playhouse over several decades, no American consumer would associate the name BARBIE with the word "doll." It is beyond peradventure that the mark BARBIE [*23] has arbitrary or fanciful quality that make it distinctive for purposes of the Dilution Act.

Mattel alleges that Internet Dimension's altered use of the BARBIE mark dilutes its distinctive quality. The Dilution Act establishes a federal cause of action to ensure that famous trademarks are protected from unauthorized users who seek to trade on the fame and goodwill of the famous mark and dilute its image. See Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242, 257-258 (S.D.N.Y. 1999). The legislative history of the Act indicates that its purpose is "to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of a likelihood of confusion." H.R.Rep.

2000 U.S. Dist. LEXIS 9747, *23; 55 U.S.P.Q.2D (BNA) 1620

No. 374, 104th Cong., 1st Sess. 3 (1995) U.S. Code Cong. & Admin. News 1029, 1030.

Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127; see also, Clinique Laboratories, [*24] Inc. v. Dep Corp., 945 F. Supp.547, 561 (S.D.N.Y. 1996). Under federal law, dilution can occur either by blurring or by tarnishment, see Trustees of Columbia University v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 750 (S.D.N.Y. 1997). Blurring occurs when a party uses or modifies the plaintiff's mark and creates the possibility that the mark will lose the ability to serve a unique identifier. See Trustees of Columbia, 964 F. Supp. at 750. "Dilution through tarnishment occurs where the defendant uses the plaintiff's mark in association with unwholesome or shoddy goods or services." Id.

The Second Circuit affirmed a preliminary injunction based on dilution by tarnishment and stated in part:

'Tarnishment' generally arises when the plaintiff's trademark . . . is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. In such situations, the trademark's reputation and commercial value might be diminished because . . . the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services.

[*25] Deere & Co. v. MTD Products, Inc., 41 F.3d 39, 43 (2d Cir.1994). The Deere case involved an advertisement of the defendant wherein the famous John Deere "leaping deer" trademark was depicted as fleeing in terror from a lawnmower manufactured by the defendant, a competitor of plaintiff Deere.

Even more to the point, a mark can be tarnished when its likeness is placed in the context of sexual activity, obscenity, or illegal activity. See Eastman Kodak Co. v. Rakow, 739 F. Supp. 116 (W.D.N.Y.1989); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 467 F. Supp. 366 (S.D.N.Y.), aff'd, 604 F.2d 200 (2d Cir. 1979).

Mattel here essentially claims that linking BARBIE with pornography will adversely color the public's impressions of BARBIE. I agree. The BARBIE doll has been associated with wholesomeness by generations of preteen girls. The BARBIE dolls, with their long blonde hair and anatomically improbable dimensions, are ostensibly intended to portray wholesomeness to young girls. The "models" on the "barbiesplaypen.com" site, although many have long blonde hair and anatomically improbable dimensions, can in no [*26] way be described as engaging in "wholesome" activities. The plaintiff has made a clear showing that the defendant's website will create negative associations with BARBIE and that there is a likelihood of confusion under the tarnishment theory of dilution. The obvious intent of the defendants is to cash in an the favorable public image of the Barbie doll, including the image of a particular kind of feminine appearance and character. Given the fame and distinctiveness of the BARBIE trademark, defendants' use of the mark BARBIE'S PLAYPEN in its adult Internet site diluted the BARBIE trademark in violation of the Dilution Act.

## B. Remedies Under the Dilution Act

Mattel seeks two remedies under the Dilution Act -- injunctive relief and award of damages and attendant attorneys' fees. I find that the defendants' use of the mark began "after the [plaintiff's] mark had become famous and caused dilution of the distinctive quality of the [plaintiff's] mark." 15 U.S.C. § 1125(c)(1). Accordingly, Mattel is entitled to an injunction restraining further acts of dilution. See id. Second, the plaintiff also seeks statutory damages and attorneys' fees. [*27] Any award will be the subject of a supplemental memorandum unless within ten days from the date hereof the parties resolve these issues and a stipulation to that effect is filed with the Court.

## IV. Personal Liability of Benjamin Schiff

Mr. Schiff is the sole officer, director, employee and shareholder of Internet Dimensions. (Tr. 14-15.) Mattel alleges that the corporate veil should be pierced and that Mr. Schiff should be held personally liable for the conduct of Internet Dimensions.

2000 U.S. Dist. LEXIS 9747, *27; 55 U.S.P.Q.2D (BNA) 1620

Here, liability on Defendant Schiff is imposed to reach an equitable result without regard to piercing of the corporate veil. "If an individual actively and knowingly caused the trademark infringement, he is personally responsible. Specifically, a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement *without regard to piercing of the corporate veil.*" Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1184 (11th Cir. 1994) (emphasis added); Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349, 354 (E.D.N.Y. 1998) ("while a corporate [*28] officer is not necessarily individually liable for torts committed on behalf of the corporation, personal liability for trademark infringement and unfair competition is established if the officer is a moving, active conscious force behind [the defendant corporation's] infringement.") (citations and internal quotation marks omitted).

Schiff has not denied his personal involvement in the trademark infringement and cybersquatting. Accordingly, he can be held personally liable for money damages and subject to injunctive relief. With respect to equitable relief, an order and injunction will be issued contemporaneously with this Memorandum and Order. With respect to money damages, any award will be the subject of a supplemental memorandum unless within ten days from the date hereof the parties resolve these issues

and a stipulation to that effect is filed with the Court. To deny such relief would leave Mr. Schiff free to form another corporate entity for the sole purpose of continuing his infringement of Mattel's trademarks.

**V. Conclusion**

For the reasons stated above, this Court will enter an order directing defendants to transfer the registration of [*29] the domain name "barbiesplaypen.com" to Mattel. This Court also GRANTS plaintiff's request for a permanent injunction barring defendants from the commercial use and infringement of any of Mattel's BARBIE trademarks. This injunction bars the defendants from engaging in further acts of dilution. The plaintiff's request for money damages and attorneys' fees will be the subject of a supplemental memorandum unless within ten days from the date hereof the parties resolve these issues and a stipulation to that effect is filed with the Court. The Clerk of the Court is instructed to close the case.

**SO ORDERED.**

Dated: July 13, 2000

New York, New York

Harold Baer Jr.

U.S.D.J.