**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MULTI-VET LTD.,

                    *Plaintiff,*

        -against-

PREMIER PET PRODUCTS, INC.,

                    *Defendant.*

08 Civ. 03251 (LMM)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION**

**ABELMAN FRAYNE & SCHWAB**
666 Third Avenue
New York, NY 10017
(212) 949-9022

**Attorneys for the Plaintiff**

**TABLE OF CONTENTS**

PAGE

I.   PRELIMINARY STATEMENT ......................... 1

II.  SUMMARY OF THE FACTS
     RELEVANT TO DEFENDANT'S MOTION ................ 6

     A.   The Relationship Between The Parties ...... 6

     B.   Premier Does Not Own
          The GENTLE SPRAY Trademark ............... 7

     C.   Post Termination Events .................. 11

III. ARGUMENT ...................................... 13

     A.   Premier Is Not Entitled
          to a Preliminary Injunction .............. 13

          1.   Premier Will Not Prevail on
               Its Cause of Action for
               Trademark Infringement .............. 15

               a.   Premier Does Not Own
                    The GENTLE SPRAY Trademark ...... 15

               b.   Likelihood Of Confusion ......... 18

               c.   Premier Does Not Own The
                    NO SHOCK NO PAIN Trademark ...... 20

               d.   Premier Does Not Own The
                    Image Of A Golden Retriever
                    Or The Package Coloring ......... 20

          2.   Premier Will Not Prevail on
               its Cause of Action for
               Common Law Unfair Competition ....... 21

          3.   Premier Will Not Be
               Irreparably Harmed in the
               Absence of an Injunction ............ 22

          4.   The Balance of Equities and
               The Public Interest Weigh
               Against Issuance of
               A Preliminary Injunction ............ 25

IV.  CONCLUSION .................................... 26

## TABLE OF AUTHORITIES

PAGE

### CASES

*American Direct Marketing v. Azad Intern.*,
783 F. Supp. 84, 91 (E.D.N.Y. 1992) .................. 19

*Audioson Vertriebs - Gmbh v. Kirksaeter
Audiosonics, Inc.*, 196 U.S.P.Q. 453,
1977 WL 22588 (T.T.A.B. 1977) ...................... 16

*Baskin-Robbins Ice Cream Co. v. D & L
Ice Cream Co.*, Inc., 576 F.Supp.
1055, 1060 (E.D.N.Y.1983) ......................... 18

*Bell & Howell v. Mosel Supply Co.*,
719 F.2d 42, 45 (2d Cir. 1983) ..................... 22

*Borey v. Nat'l Union Fire Ins. Co.*,
934 F.2d 30, 34 (2d Cir. 1991) ..................... 23

Brennan's, Inc. v. Brennan's Restaurant, L.L.C.,
360 F.3d 125, 129 (2d Cir. 2004) ................... 14, 15

*C & A Carbone, Inc. v. Town of Clarkstown*,
770 F.Supp. 848, 854 (S.D.N.Y. 1991) ................ 21

*Centaur Communications v. A/S/M Communications*,
830 F.2d 1217, 1225 (2d Cir. 1987) .................. 18

Church of Scientology Int'l v.
The Elmira Mission of the Church of Scientology,
794 F.2d 38, 43 (2d Cir.1986) ...................... 18

*Citibank, N.A. v. Citytrust*,
756 F.2d 273, 277 (2d Cir. 1985) ................... 14, 24

*Cleary v. Waldman*,
959 F.Supp. 222, 234 (D.N.J. 1997) ................. 21

*Comcast of St. Paul, Inc. v. Boyle*,
2004 WL 2801588, * 1 (D. Minn. 2004) ............... 21

*Comic Strip, Inc. v. Fox Television Stations, Inc.*,
710 F. Supp. 976, 980-81 (S.D.N.Y. 1989) ............ 14, 24

*Earthweb, Inc. v. Schlack*,
71 F.Supp.2d 299, 308 (S.D.N.Y. 1999),
*aff'd in part*, 2000 WL 232057 (2d Cir. 2000) ........ 22, 23

*Far-Best Corporation v. Die Casting
"Id" Corporation*, 165 U.S.P.Q. 277,
1970 WL 9893 (T.T.A.B. 1970) ...................... 16

*Gruner+Jahr USA Publishing v. Meredith Corp.*,
991 F.2d 1072, 1075-76 (2d Cir. 1993) ............... 15, 18

Hanson Trust PLC v. SCM Corp.,
774 F.2d 47, 60 (2d Cir. 1985) ..................... 13

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,
596 F.2d 70, 72 (2d Cir. 1979) ..................... 14

*JSG Trading Corp. v. Tray-Wrap. Inc.*,
917 F.2d 75, 79 (2d Cir. 1990) .................... 23

*Majorica, S.A. v. R.H. Macy & Co.*,
762 F.2d 7, 8 (2d Cir. 1985) ...................... 24

*Mazurek v. Armstrong*,
520 U.S. 968, 972, 117 S.Ct. 1865,
138 L.Ed.2d 162 (1997) ............................ 13

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
580 F.2d 44, 47 (2d Cir. 1978)

*New York Stock Exchange, Inc. v. New York,*
*New York Hotel, LLC*,
293 F.3d 550, 554 (2d Cir. 2002) .................. 15

*Playtex Products, Inc. v. Georgia-Pacific*
*Corp., et al.*, 390 F.3d 158,
166 (2nd Cir. 2004) ............................... 19

*Ringling Brothers-Barnum & Bailey*
*Combined Shows, Inc. v. B.E. Windows Corp.*,
937 F.Supp. 204, 207 (S.D.N.Y. 1996)  .............. 13, 14

*Roman Chariot, LLC. v. JMRL Sales & Service, Inc.*,
2006 WL 4483165, * 4 (D.N.J. 2006) ................. 21

*SCM v. Xerox*,
507 F.2d 358 (2d Cir. 1974) ....................... 19

*Shaw v. Time-Life Records*,
38 N.Y.2d 201, 206-07,
379 N.Y.S.2d 390, 395-96 (1975) ................... 22

*Spencer v. VDO Instruments, Ltd.*,
232 F. Supp. 735, 739, 142 U.S.P.Q. 72
(E.D. Mich. 1964), *order aff'd*, 352 F.2d 784,
147 U.S.P.Q. 380 (6th Cir. 1965) .................. 15

*Sunward Electronics, Inc. v. McDonald*,
362 F.3d 17, 25, 69 U.S.P.Q.2d
2002 (2d Cir. 2004) ............................... 21

*Tactica Intern., Inc. v. Atlantic Horizon*
*Intern., Inc.*, 154 F. Supp. 2d 586,

600 (S.D.N.Y. 2001) .................................. 16

*Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27, 34 (2d Cir. 1995). ..................... 14

*Tough Traveler, Ltd. v. Outbound Prods.*,
60 F.3d 964, 968 (2d Cir. 1995) ..................... 23

**<u>Rules, Statutes and Treatises</u>**

11A C. Wright, A. Miller, & M. Kane,
Federal Practice and Procedure,
§ 2948, 129-30 (2d ed. 1995)) ..................... 13

11 C. Wright & A. Miller,
Federal Practice and Procedure,
§ 2948, 431 (1973) .................................. 14

15 U.S.C. §§ 1114 or 1125 ........................... 16

Restatement (Third) of Unfair
Competition § 21 cmt. a (1995) ..................... 15

Thomas McCarthy, *McCarthy on Trademarks and
Unfair Competition*, § 16:48 (West 2008) ............. 15

I.  __Preliminary Statement__

   The plaintiff, Multi-Vet Ltd. ("Multi-Vet"), submits this memorandum in opposition to the Rule 65 application of the defendant, Premier Pet Products, Inc. ("Premier"), for a preliminary injunction.

   Premier's request to enjoin Multi-Vet's use of its "GENTLE SPRAY" trademark is woefully inadequate and should be denied.  Indeed, Premier has no likelihood of success on the merits of its claim that Multi-Vet is infringing the GENTLE SPRAY trademark as it is Multi-Vet, not Premier who has owned the U.S. Trademark Registration for "GENTLE SPRAY" since 2003.

   Premier's motion appears to be primarily based on its "belief" that Multi-Vet "promised" to assign the GENTLE SPRAY trademark to it.  *See* Premier's Memo in Support [Document 13] at page 1 (where Premier refers to an alleged promise on 4 occasions).  The simple fact is that Multi-Vet never "promised" to assign the GENTLE SPRAY trademark to Premier.  *See* ¶ 19 of the Declaration of Multi-Vet's President, Richard Garon (the "Garon Dec.").

   Indeed, since the registration for the GENTLE SPRAY trademark issued, Premier has repeatedly acknowledged and acquiesced in Multi-Vet's ownership of the trademark in numerous distribution and licensing agreements that Premier has conveniently neglected to advise the Court of.  In fact, the "... true and correct depiction of a Premier's GENTLE SPRAY product packaging [that] is attached as Exhibit 6 ..." to the Declaration of Sharon Madere in Support of Premier's motion (the "Madere

Dec."), includes a trademark notice that states "Gentle Spray is a registered trademark of Multi-Vet, Ltd."[1/] *Id.* ¶ 23.

Since Multi-Vet owns the GENTLE SPRAY trademark, Premier clearly cannot establish a likelihood of prevailing on the merits of its claim that Multi-Vet's use of its own GENTLE SPRAY trademark is likely to confuse consumers concerning the source or origin of its spray anti-bark collars.

Indeed, consumers only associate the GENTLE SPRAY trademark with the Multi-Vet collar. *See* ¶ 22 of the Garon Dec. As a result, the premiss underlying Premier's analysis of the *Polaroid* factors, namely that consumers associate the GENTLE SPRAY trademark with Premier's products, is wrong – as is its ultimate conclusion.

Moreover, Multi-Vet's use of its GENTLE SPRAY trademark on its collars will not confuse consumers because they are the same collars that have long been identified by the GENTLE SPRAY trademark, albeit previously distributed by Premier, not Multi-Vet.  Confusion would occur however, should Premier resume its use of the GENTLE SPRAY trademark – as consumers would wrongfully assume that Premier's new and different product is Multi-Vet's anti-bark spray collar – when it is not.

Premier's argument that a preliminary injunction is necessary because it is being irreparably harmed rings hollow as well in view of Premier's substantial delay in asserting its purported rights in the GENTLE SPRAY trademark.  Until filing this motion, Premier did nothing to pursue its current claim that

---

[1/]  Premier's packaging shown in Ex. 6 to the Madere Dec. also makes reference to Multi-Vet's registered "SPRAYLOGIK" trademark.

Multi-Vet "promised" to assign the GENTLE SPRAY trademark to it. It did nothing in the nearly seven years since Multi-Vet applied to register the GENTLE SPRAY trademark, in the nearly five years since the trademark registration issued to Multi-Vet, nothing in the year and a half since the expiration of its last distribution and license agreement permitting it to use the trademark (and putting it on notice as well that other parties would be distributing GENTLE SPRAY collars), nothing in the seven months since it voluntarily discontinued its use of the trademark in response to Multi-Vet's objections, and nothing in the four months since Multi-Vet's counsel sent it a cease and desist letter.

Instead, Premier waited for Multi-Vet to file this action accusing it of infringing the GENTLE SPRAY trademark and then, six weeks after the case was filed, Premier filed this motion for a preliminary injunction seeking to disturb the *status quo* that it has long accepted.

In addition to seeking an injunction stopping Multi-Vet's use of its GENTLE SPRAY trademark, Premier appears to be seeking an injunction against Multi-Vet's use of the "NO SHOCK NO PAIN" trademark, an image of a golden retriever, and packaging colors.[2]

---

[2]     Premier's also suggests that Multi-Vet "copied other aspects of Premier's packaging, including, but not limited to ... a photo of a row of dogs ..." <u>See</u> Premier's memo at p. 12.  The photograph of the five dogs in a row was created at Multivet's request from a series of photos taken by a professional photographer and has been used on other Multivet products, an example of which is attached as Ex. 2 to the Garon Dec., which also shows another version of the NO SHOCK NO PAIN trademark. *Id.* at ¶ 2.

Premier cannot establish a likelihood of success concerning the NO SHOCK NO PAIN trademark because, like the GENTLE SPRAY trademark, it is owned by Multi-Vet.  It was developed by Multi-Vet in Québec for use with its anti-bark spray collars.  The bilingual version is illustrated to the right.  *See* ¶ 7 of the Garon Dec. and exhibits 3 and 4 attached thereto.



Moreover, like the GENTLE SPRAY trademark, Premier has acknowledged Multi-Vet's ownership in the distribution and license agreements between the parties.  In fact, Premier's registration of the NO SHOCK NO PAIN trademark was obtained fraudulently.  *See* ¶ 9 of the Garon Dec.

Even if Premier owned the NO SHOCK NO PAIN trademark, and it does not, Premier has not demonstrated that its use on Multivet's packaging is likely to cause consumers to be confused.  Indeed, since it appears on the reverse of Multi-Vet's packaging and is quite small, it is unlikely to suggest to consumers the source or origin of the product.  *See* ¶ 12 of the Garon Dec.

In fact, when used on the Premier product packaging, the NO SHOCK NO PAIN trademark is deceptive and misleads the public.  The trademark was developed by Multi-Vet to emphasize the results of research undertaken by the College of Veterinary Medicine at Cornell University using its patented anti-bark spray collar technology.  *See* ¶ 10 of the Garon Dec.

Premier's collar was not tested by Cornell.  Therefore, the statement on Premier's packaging that its collar is "clinically proven 2X more effective than shock collars," and the

- 4 -

reference to the Cornell research, *see* exhibit 18 to the Zidones Declaration, although correct when referring to Multi-Vet's product, is not correct when applied to Premier's product.  *See* ¶ 11 of the Garon Dec.

Apparently even Premier has little faith in its claim concerning the NO SHOCK NO PAIN trademark, and it certainly does not consider it to be of any urgency as it failed to even assert it in its original counter-claims, waiting to raise it until filing its Amended Answer [Document 11] on June 11th, 2008.

Moreover, since Premier has not asserted counter-claims for infringement of an image of a golden retriever or packaging colors, it cannot establish a "likelihood of success on the merits of its claims" of infringement of these purported trademarks.  However even if Premier had pled these counterclaims, it could not establish a likelihood of success. The golden retriever photograph was not, as Ms. Madere states, an asset acquired from a third party, Animal Behaviors Systems, Inc., but rather was created by Multi-Vet.  *See* Exhibit 1 and ¶¶ 4 and 5 of the Garon Dec.  Nor has Premier provided any evidence that the image of a golden retriever or the packaging colors have achieved consumer recognition, *i.e.*, secondary meaning, and that they can therefore function as trademarks.  Even if the foregoing is overlooked however, Premier has not met its substantial burden of proving a likelihood of consumer confusion.

For these and the additional reasons that follow, it is respectfully requested that Premier's motion be denied in all respects.

## II.  SUMMARY OF THE FACTS
##      RELEVANT TO DEFENDANT'S MOTION

### A.    The Relationship Between The Parties

Premier, based in Midlothian, Virginia, began in the mid-1990's to distribute "head collars"[3] under a license for the patents and GENTLE LEADER trademarks owned by a third party, Alpha-M Inc. ("Alpha-M").  *See* ¶ 13 of the Garon Dec.

Multi-Vet, based in Saint-Hyacinthe, Québec, Canada, was founded by the Garon family in 1996 and has since become one of the world's leading providers of animal behavioral systems designed to assist with the modification of pet behavior.  *See* ¶ 3 of the Garon Dec.



In 1997, Multi-Vet began distributing its anti-bark spray collar using the "ABOISTOP" trademark.  Multi-Vet's packaging, illustrated to the right, used the image of a golden retriever and the general color scheme Premier now claims is its trade dress.  *See* Ex. 1 attached to, and ¶ 4 of the Garon Dec.

After having achieved some success as a licensee and distributor of Alpha-M's collars and leashes, on April 30, 2001 Premier acquired the assets of a distributor of anti-bark spray collars, Animal Behaviors Systems, Inc., from its majority shareholder, Multi-Vet.  *See* ¶ 14 of the Garon Dec.

---

[3]    A "head collar" "consists of two woven fabric loops, one of which fits snugly around the dog's neck just behind its ears, while the other loops around the muzzle loosely enough that the dog can eat, drink, bark, and even bite were it so inclined." *See* «http://www.mmilani.com/canine-head-collars.html».

On the same day, Multi-Vet and Premier entered into an agreement (the "2001 Agreement"), permitting Premier to distribute Multi-Vet's patented (U.S. Patent No. 4,627,385) anti-bark spray collars in the United States. *See* Exhibit 5 and ¶ 15 of the Garon Dec.

**B.    Premier Does Not Own
         The GENTLE SPRAY Trademark**

After signing the 2001 Agreement, Premier began distributing Multivet's anti-bark collar in packaging that was essentially a of copy Multivet's "ABOISTOP" packaging, with the GENTLE SPRAY trademark substituted for the ABOISTOP trademark. An illustration of the original "GENTLE SPRAY" packaging is shown to the right. *See* Ex. 16 and ¶ 6 of the Garon Dec.



Under the 2001 Agreement, Multi-Vet permitted Premier to use its trademarks in connection with its distribution of Multi-Vet's products in the United States.[4]  On September 19, 2001, Multi-Vet filed its application with the United States Trademark Office to register the GENTLE SPRAY trademark. The trademark was published for opposition on August 20, 2002 and the registration issued on September 9, 2003. *See* ¶ 21 of the Garon Dec.

---

[4]    Page 1 of the 2001 Agreement provides that "WHEREAS Premier desires to acquire from Multi-Vet an exclusive license allowing it to use the Spray Technology (as defined hereunder) and certain trademarks in association with the marketing, promotion, sale and distribution of Products (as defined hereunder) in the USA."

Premier urges that the 2001 Agreement "... stated that any U.S. Trademark Registration that Multi-Vet registered based on Premier's creation and use would be assigned to Premier upon termination of the parties' relationship." *See* ¶ 16 of the Declaration of Sharon Madere in Support of Premier's Motion for a Preliminary Injunction (the "Madere Dec.").

This is not correct. The 2001 Agreement provided that, <u>if</u> Premier notified Multi-Vet that it intended to use a new trademark in connection with the distribution of Multi-Vet's products, Multi-Vet would register and license the trademark to Premier.[5] Since Premier never provided the requisite notice concerning the GENTLE SPRAY trademark, it has no claim to it. *See* ¶ 18 of the Garon Dec.

Paragraph 2.3 of the 2001 Agreement further provided that new trademarks developed by Premier would be sold to Premier – but only "<u>[a]fter the initial term of the Agreement</u>". Significantly, Premier has never sought to compel the transfer through arbitration as provided for in paragraph 17.1 of the 2001 Agreement. *See* ¶ 20 of the Garon Dec.

---

[5] The 2001 Agreement provides at pp. 3-4 of that "2.3 New trademarks. Upon written notification of Premier's intent to use new marks associated with the Products, Multi-Vet is obligated to register these marks within the Territory within sixty (60) days, and hereby grants to Premier the exclusive right and license, but not the obligation, to use the marks in relation with the marketing, promotion, sale and distribution of Products in the Territory. After the initial term of the Agreement, or any subsequent term, in the event the Agreement is terminated for any reason other than breach by Premier, then the new trademarks developed by Premier and registered by Multi-Vet will be sold to Premier by Multi-Vet for one (1) dollar each."

Premier never did so presumably because before the event triggering any possible obligation to convey the GENTLE SPRAY trademark occurred, *i.e.*, the termination of the 2001 Agreement on April 30, 2011, *see* ¶ 12.1, it was merged on November 1, 2004 into an "Exclusive Distribution Agreement" (the "2004 Distribution Agreement"). *See* ¶ 24 of and Exhibit 8 to the Garon Dec.[6]

Although the Madere Declaration discusses the 2001 Agreement at length, it conveniently neglects to advise the Court of the 2004 Distribution Agreement. Nor does Premier discuss that fact that the 2004 Distribution Agreement provides that (i) Premier would not independently sell dog training spray collars,[7] and (ii) that <u>all intellectual property used on the products are the property of Multi-Vet</u>.[8]

---

[6] On October 30, 2003, the parties entered into a "First Amended and Restated Licensing Agreement". *See* Exhibit 7 to the Garon Dec. Other than providing that "Premier will reimburse on closing the balance of note dated July 1st. The capital due as of the date hereof is $204,426.56 ...", the agreement is similar to the 2001 Agreement in all relevant aspects.

[7] The 2004 Distribution Agreement provides at ¶ 2.4 that "... the Products are complementary to the products which it currently sells in the Territory. The Distributor agrees not to, directly or indirectly, stock, distribute, promote or sell competitive products ("competitive" being defined as any product used to train, contain or otherwise control pets using a spray or a shock, including anti-barking devices) during the Term of this Agreement within the Territory without having previously obtained the written permission of Multivet."

[8] The 2004 Distribution Agreement provides at ¶ 13.1 that "... The Distributor recognizes and admits that any invention, patent, trade mark, trade name or other identifying mark, industrial design, model, copyrightable document or object as well as any technical or commercial know-how or trade secret including, but without limitation, any price lists, specifications, technical data used by Multivet in association with its Products (hereinafter described as the "Intellectual Property") is the exclusive property of Multivet."

Moreover, paragraph 2.3 in the prior 2001 Agreement relating to "New Trademarks", *see* page 8 *supra*, was modified in the 2004 Distribution Agreement to omit the language which provided that, if after its initial term the agreement was terminated, Multi-Vet would sell Premier new trademarks developed by it. As the merger provision in the 2004 Distribution Agreement made it clear that it superceded 2001 Agreement, any possible rights Premier might have had to the GENTLE SPRAY trademark under the 2001 Agreement were extinguished by the 2004 Distribution Agreement. *Id.* at ¶ 19.3.

The 2004 Distribution Agreement provided that Multi-Vet was the owner of all trademarks used with its collars, and did not obligate Multi-Vet to transfer any of its trademarks to Premier. The 2004 Distribution Agreement thus extinguished any obligation Multi-Vet may have had sell the GENTLE SPRAY, or any other trademark to Premier.

The 2004 Distribution Agreement was terminated on October 5, 2005 by the "Termination of Exclusive Distribution Agreement". *See* ¶ 27 of and Exhibit 9 to the Garon Dec. The following day, the parties entered into a "Distribution Agreement" (the "2005 Distribution Agreement"). *See* ¶ 28 of and Exhibit 10 to the Garon Dec.

The 2005 Distribution Agreement granted Premier a non-exclusive license to "... continue[] to purchase devices from Multi-Vet, and to sell an anti-bark collar under the GENTLE SPRAY name...," confirming the parties' understanding that Multi-Vet, not Premier, owned the "GENTLE SPRAY" trademark. *Id*. at ¶ 29.

The language in the 2005 Distribution Agreement providing that "Multivet grants to Distributor the exclusive right to use the trademark "Gentle Spray" free of any royalties or charges ...", further confirms that the parties agreed that Multi-Vet owned the GENTLE SPRAY trademark. *Id.* at ¶ 1.3.

The 2005 Distribution Agreement provided as well that "Multivet will supply the Distributor with Products on a NON-EXCLUSIVE BASIS ...." *Id.* at ¶ 1.2. Premier was thus on notice, after October 5, 2005, that Multi-Vet intended to distribute its GENTLE SPRAY anti-bark collars itself or through other U.S. distributors.

The 2005 Distribution Agreement, and with it Premier's license to use Multi-Vet's GENTLE SPRAY trademark, terminated on December 31, 2006. *Id.* at ¶ 1.1.

**C.    Post Termination Events**

After the 2005 Distribution Agreement expired at the end of 2006, and Multi-Vet ceased supplying Premier with anti-bark spray collars, Premier undertook efforts to develop and market its own collar to compete with Multi-Vet's products. *See* ¶ 30 of the Garon Dec.

Indeed, Premier's Vice President, Charles David Mann, was quite clear regarding Premier's intentions, threatening in a November 6th, 2007 letter to Multi-Vet's President, Richard Garon, to "... chase you into every consumer spray product channel you have or will ever find. I am vindictive that way and I do not have any contractual requirements that require me to stop if Sharon and Evan say so." *See* Exhibit 11 and ¶ 33 of the Garon Dec.

- 11 -

When Multi-Vet learned in late 2007 that Premier had begun packaging and selling anti-bark spray collars using the trademark that had been used in connection with Multi-Vet's collars and, pursuant to the distribution and licensing agreements between the parties, was owned by Multi-Vet, it demanded that Premier discontinue use of the GENTLE SPRAY trademark.  *See* ¶ 31 of the Garon Dec.

In October 2007, Premier discontinued use of Multi-Vet's GENTLE SPRAY trademark and began selling its anti-bark collar using the name SPRAY SENSE.  *See* Madere Dec. at ¶ 31.

When Multi-Vet subsequently learned that Premier was selling an anti-bark collar identified as the "Gentle Spray® Bark Citronella Anti-Bark Collar", its counsel sent a letter to Premier on February 19, 2008 demanding that it cease doing so.  *See* Exhibit 12 and ¶ 34 of the Garon Dec.

After Premier refused to agree to discontinue its infringing conduct, Multi-Vet filed this action on April 1, 2008, alleging that Premier was infringing its "GENTLE SPRAY" trademark.

On June 12, 2008, Premier filed its Amended Answer and Counterclaims [Document 11], adding the NO SHOCK NO PAIN trademark to its counter-claims and denying Multivet's allegation that Premier "... sold and is selling dog training collars in the United States bearing the infringing designations 'Gentle Spray' and 'Gentle Leader Spray Sense' in direct competition with Multi-Vet's products."  *See* ¶ 16 of Premier's Amended Answer and Counterclaims.

Premier further denied Multivet's allegation that its "... sale of dog training collars bearing the infringing designations "Gentle Spray" and "Gentle Leader Spray Sense" is without the permission, consent or authorization of Multi-Vet, constitutes trademark infringement, and gives rise to a likelihood of confusion, deception and mistake among the public." *See* ¶ 18 of Multi-Vet's Complaint and ¶ 18 of Premier's Amended Answer and Counterclaims.

Apparently, Premier believes that its use of its GENTLE SPRAY trademark will not cause consumer confusion, but that Multi-Vet's use of its mark will.

## III. ARGUMENT

### A. PREMIER IS NOT ENTITLED TO A PRELIMINARY INJUNCTION

Because a preliminary injunction is "... one of the most drastic tools in the arsenal of judicial remedies," *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985), it "... is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)(*emphasis omitted)(quoting* 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, 129-30 (2d ed. 1995)); *see also Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F.Supp. 204, 207 (S.D.N.Y. 1996) ("Because of the great potential for harm which may occur from the issuance of a preliminary injunction, the party seeking the injunction must sustain a heavy burden.").

To obtain a preliminary injunction in the Second Circuit the moving party "must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor." *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004)(*citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)(*per curiam*)).

Since Premier is seeking a mandatory injunction, *i.e.*, it will alter, rather than maintain, the *status quo*, it must show a "clear" or "substantial" likelihood of success. *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

Significantly, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.' *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)(quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 431 (1973)); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 980-81 (S.D.N.Y. 1989)(same quote).

Premier is not entitled to a preliminary injunction because as set forth more fully *infra*, it has not established a likelihood of success on the merits of its claims, it is not being irreparably harmed, the balance of equities do not favor it, and because an injunction would not protect the public interest.

### 1. PREMIER WILL NOT PREVAIL ON ITS CAUSE OF ACTION FOR TRADEMARK INFRINGEMENT

To prevail its claim of trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114 or 1125, Premier must prove that:

- it owns the GENTLE SPRAY trademark or another valid trademark that is entitled to protection,

- Multi-Vet is an unauthorized user of the mark, and

- the likelihood that a substantial number of customers are likely be confused concerning the source or origin of Multi-Vet's products identified by the mark.

*Brennan's, Inc. V. Brennan's Restaurant, L.L.C., et al.*, 360 F.3d 125, 128, 69 U.S.P.Q.2d 1939 (2d Cir. 2004); *Gruner+Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993); *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002); Restatement (Third) of Unfair Competition § 21 cmt. a (1995) ("The test for infringement is whether the actor's use of a designation as a trademark... creates a likelihood of confusion ....").

#### a. Premier Does Not Own The GENTLE SPRAY Trademark

Multi-Vet owns the Federal trademark registration for the GENTLE SPRAY trademark that issued on September 9, 2003, and ownership of the registration entitles it to a presumption of ownership.

Moreover, as the manufacturer of the product sold using the GENTLE SPRAY trademark, it is presumed to own the mark as a matter of law. Premier was merely a dealer licensed to use the GENTLE SPRAY trademark and as such, has no rights in the trademark. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:48 (West 2008); *Spencer v. VDO Instruments, Ltd.*, 232 F. Supp. 735, 739, 142 U.S.P.Q. 72 (E.D.

- 15 -

Mich. 1964), order aff'd, 352 F.2d 784, 147 U.S.P.Q. 380 (6th
Cir. 1965) ("[A]s a matter of law, plaintiff being a mere
'exclusive seller' was not entitled to register the mark as his
own. Plaintiff has cited no case in which an 'exclusive seller'
has obtained a permanent right to a trade-mark put on a product
by the manufacturer thereof and generally used by the
manufacturer as his mark."); *Audioson Vertriebs - Gmbh v.
Kirksaeter Audiosonics, Inc.*, 196 U.S.P.Q. 453, 1977 WL 22588
(T.T.A.B. 1977) (A distributor does not acquire ownership of a
manufacturer's mark anymore than a wholesaler can acquire
ownership of an American manufacturer's mark, merely through the
sale and distribution of goods bearing the manufacturer's
trademark.); *Tactica Intern., Inc. v. Atlantic Horizon Intern.,
Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) ("As a general
rule, when a manufacturer and exclusive distributor contest the
ownership of a trademark and no agreement controls, it is the
manufacturer who presumptively owns the mark.").

Additionally, Premier has repeatedly acknowledged and
acquiesced in Multi-Vet's ownership of the trademark in numerous
distribution and licensing agreements.  Even the GENTLE SPRAY
packaging it distributed indicated that Multi-Vet is the owner of
the trademark.  In manufacturer/distributor disputes, contractual
provisions as to trademark ownership are determinative.  *Far-Best
Corporation v. Die Casting "Id" Corporation*, 165 U.S.P.Q. 277,
1970 WL 9893 (T.T.A.B. 1970) ("[t] is well settled that the
question of ownership of a mark as between the manufacturer of a
product to which a mark is applied and the exclusive distributor
of the product is a matter of agreement between them, ....").

Premier urges that its claim that Multi-Vet promised to convey the GENTLE SPRAY trademark to it is substantiated by the fact that it had a similar license and distribution agreement for the "GENTLE LEADER" brand dog "head-collar" with Alpha-M. Indeed, Ms. Madere's states that the GENTLE SPRAY trademark was selected to draw an association with "the same company that produced the Gentle Leader® headcollar", namely Alpha-M.  *See* the Madere Dec. at ¶ 20.  Like Multi-Vet's GENTLE SPRAY trademark, Premier does not own the "GENTLE LEADER" trademark, but rather merely licenses it from Alpha-M.  Neither its trademark license with Alpha-M or with Multi-Vet transfers the manufacturers' goodwill or trademarks to Premier – and it is not entitled to any presumption that the GENTLE SPRAY trademark is merely an extension of *its* rights in GENTLE LEADER trademark.

Nor do the statements in correspondence from Multi-Vet's President Richard Garon and its Executive Vice President Doug Belkap support Premier's ownership claim.  Indeed, Mr. Garon's statement in 2001 that, at the time Multi-Vet had no interest in directly using the GENTLE SPRAY trademark and would license it to Premier simply confirms Multi-Vet's ownership of the mark and is consistent with Multi-Vet having exclusively licensed it to Premier in the 2001 Distribution Agreement became effective.

Moreover, Mr. Belkap's September 2006 email stating that the GENTLE SPRAY trademark "... is Premier's to use as long as Premier uses it only with products sources by Multivet ..." is consistent with the license granted to Premier in the then

effective 2005 Distribution Agreement (which expired on December 51, 2006).

Simply put, Premier is not likely to prevail on its infringement claims because it doesn't own the GENTLE SPRAY trademark.  Indeed it is Premier, should it resume using the GENTLE SPRAY trademark, that should be enjoined.  *See Church of Scientology Int'l v. The Elmira Mission of the Church of Scientology, 794 F.2d 38, 44 (2d Cir.1986); see also Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co.*, Inc., 576 F.Supp. 1055, 1060 (E.D.N.Y.1983) ("The continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes an additional trademark infringement[.]") (citations omitted).

### b.    Likelihood Of Confusion

To establish a likelihood that consumers will be confused, Premier must show that a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be mislead, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978); *cited in Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1225 (2d Cir. 1987).

Probable confusion must be shown -- possible confusion is insufficient.  *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993).

In this case there is no need to even undertake the traditional *Polaroid*[9] analysis concerning likelihood of

---

[9]    The Second Circuit test for likelihood of confusion balances the "*Polaroid* factors", namely the strength of the mark, the

confusion because Premier does not own the GENTLE SPRAY trademark.  Indeed, Multi-Vet's use of its GENTLE SPRAY trademark on its collars will not confuse consumers because they are the same collars that have long been identified by the GENTLE SPRAY trademark.

Even if the Court were to consider the issue of likelihood of confusion however, Premier has not met its burden of making a *prima facie* showing of confusion, warranting denial of it motion even without considering Multi-Vet's evidence in opposition.  *American Direct Marketing v. Azad Intern.*, 783 F. Supp. 84, 91 (E.D.N.Y. 1992) (citing *SCM v. Xerox*, 507 F.2d 358 (2d Cir. 1974)).

Indeed, the only "evidence" of confusion proffered by Premier are a few listings from the website «amazon.com».  This is at best evidence that an employee at Amazon.com was confused – not that consumers are confused.  *See Playtex Products, Inc. v. Georgia-Pacific Corp., et al.*, 390 F.3d 158, 166 (2nd Cir. 2004)(Agreeing with the district courts conclusion that "'the fact that the computer associates `moist ones' with `Wet ones' reflects little, if anything, about whether consumers are actually confused.'").

Clearly, Premier has not meet its substantial burden of proving likelihood of confusion.

---

junior user's bad faith *vel non* in adopting the mark, the proximity of the products, the likelihood that the senior user will bridge the gap, the quality of the junior user's product, the degree of similarity between the two marks, the sophistication of the relevant consumer group, and evidence of actual confusion.  *Centaur Communications*, 830 F.2d at 1225 (*citing Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)).

**c.   Premier Does Not Own The**
**NO SHOCK NO PAIN Trademark**

Premier's motion is unclear as to exactly what trademarks it was "promised" and exactly how those marks are being infringed.  With regard to the NO SHOCK NO PAIN trademark however, Premier cannot succeed on its infringement claim because the trademark does not belong to it – despite it having wrongfully obtained its registration.

The NO SHOCK NO PAIN trademark was created by Multi-Vet in Canada and was later used on Multi-Vet product packaging provided to and distributed by Premier pursuant to the 2001 Agreement.  *See* ¶¶ 7 and 8 of and as Exhibits 3 and 4 to the Garon Dec.

Moreover, the NO SHOCK NO PAIN trademark continued to be used under the subsequent 2004 Distribution Agreement which provided that Premier "... recognizes and admits that any ... trade mark, trade name or other identifying mark ... is the exclusive property of Multivet.  *See* 2004 Distribution Agreement at ¶ 13.1.  Registration of the NO SHOCK NO PAIN trademark was in fact, fraudulently obtained by Premier.

Finally, even if the NO SHOCK NO PAIN trademark is owned by Premier, it has not shown that Multi-Vet's use of the trademark on the reverse-side of its packaging, and in a relatively small size, is likely to lead consumers to be confused concerning the source or origin of the Multi-Vet product.

**d.   Premier Does Not Own The Image Of A**
**Golden Retriever Or The Package Coloring**

Premier does not own the image of a golden retriever or the packaging colors.  They were developed by Multi-Vet and used

- 20 -

on its "ABOISTOP" spray collar packaging since 1997.  See ¶¶ 4
and 5 of the Garon Dec. and Ex. 1 attached thereto.  Multi-Vet,
as the first to use the packaging owns any rights to it, as was
confirmed and acknowledged by Premier in the various distribution
and licensing agreements.

Moreover, to succeed on its motion based on its claim
that Multi-Vet is infringing the package design, Premier would
have to have proven a likelihood of success on the merits of that
claim, and it cannot do so as it has not pled in its Amended
Answer that it owns the design and that it has been infringed.[10]/

Moreover, even if the golden retriever or packaging
colors were the subject of Premier's counter-claims, to prevail
on its motion, Premier would have to prove that they were
distinctive, and that "numerous ordinary prudent purchasers are
likely to be misled or confused as to the source of the product
in question ...." *Sunward Electronics, Inc. v. McDonald*, 362
F.3d 17, 25, 69 U.S.P.Q.2d 2002 (2d Cir. 2004).  Premier has even
not attempted to prove that the design is distinctive or has
achieved secondary meaning, and thus that it could act as a
trademark or trade dress, or that its use is likely to cause
confusion.

---

[10]/    *See Comcast of St. Paul, Inc. v. Boyle*, 2004 WL 2801588, * 1
(D. Minn. 2004)(requiring a "... substantial likelihood of
success on the merits of its claims asserted against the
Defendants ...", emphasis added); *Cleary v. Waldman*, 959 F.Supp.
222, 234 (D.N.J. 1997); *Roman Chariot, LLC. v. JMRL Sales &
Service, Inc.*, 2006 WL 4483165, * 4 (D.N.J. 2006); *C & A Carbone,
Inc. v. Town of Clarkstown*, 770 F.Supp. 848, 854 (S.D.N.Y. 1991).

### 2. Premier Will Not Prevail on its Cause of Action for Common Law Unfair Competition

Separate and apart from its other claims, Premier has alleged that the Multi-Vet's acts constitute common law unfair competition. New York recognizes an unfair competition cause of action for "palming off" goods as those of another, which occurs when the goods of one manufacturer are offered for sale as those of another, or when it is falsely implied that there is a connection between the plaintiff's and the defendant's businesses or products. *Shaw v. Time-Life Records*, 38 N.Y.2d 201, 206-07, 379 N.Y.S.2d 390, 395-96 (1975).

To establish a likelihood of success on its unfair competition claim, Premier would have to prove: 1) an association of origin by the consumer between the marks and the first user, that is, secondary meaning; and 2) a likelihood of consumer confusion when the mark is applied to the second user's good." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 150 (2d Cir. 1997).

For the same reasons that Premier has not sustained its burden regarding its Lanham Act claims discussed *supra*, it has not done so with regard to its common law claims.

### 3. Premier Will Not Be Irreparably Harmed in the Absence of an Injunction

A demonstration of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Earthweb, Inc. v. Schlack*, 71 F.Supp.2d 299, 308 (S.D.N.Y. 1999), *aff'd in part*, 2000 WL 232057 (2d Cir. 2000)(*quoting Bell & Howell v. Mosel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983).

"The mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied." *Earthweb, Inc.*, 71 F. Supp.2d at 308 (*citing JSG Trading Corp. v. Tray-Wrap. Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

"If irreparable harm is remote, speculative, or a mere possibility, the motion must be denied." *Earthweb. Inc.*, 71 F. Supp.2d at 308 (*citing Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

Moreover, the law is clear that "a preliminary injunction will not lie if the movant can be adequately compensated by money damages." *Earthweb*, 907 F. Supp. at 563.

Although the Second Circuit has made it quite clear that one of two prerequisites to obtaining a preliminary injunction is proof of irreparable injury, Premier's submissions are strangely silent in this regard. Neither Ms. Madere or Mr. Wooton, although they submitted declarations in support, offer any testimony concerning, for example, actual confusion among Premier's customers, any lost sales, a tarnished image, or lost good will resulting from Multi-Vet's use of its GENTLE SPRAY trademark.

The fact is Premier is not suffering any irreparable harm. Indeed, Premier's delay in claiming any right to the GENTLE SPRAY trademark, and its failure to even assert infringement of the NO SHOCK NO PAIN trademark in its initial pleading, undercuts its claim that it is being irreparably injured, precluding the issuance of a preliminary injunction. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d

- 23 -

Cir. 1995). "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Id.* (*quoting Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985)(internal quotation marks and citation omitted)(ten week delay sufficient to defeat the presumption of irreparable harm)); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) (seven month delay precludes preliminary relief since it shows lack of irreparable harm); *Comic Strip, Inc.*, 710 F. Supp. at 976 (three month delay vitiates notion of irreparable harm).

This rule is mandated by the policy underpinnings of preliminary injunctions which "are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights." *Citibank*, 756 F.2d at 276. "Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Id*. This reasoning led the Second Circuit to conclude in *Citibank* that "[s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Id*. at 276.

Premier's lack of diligence in enforcing its purported claims militates strongly against enjoining Multi-Vet pending a trial. *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F.Supp. 976, 981 (S.D.N.Y. 1989) (finding that plaintiff's three month delay in seeking preliminary injunction since the last

settlement communication with defendant negated the presumption of irreparable harm).

####     4.    The Balance of Equities and
              The Public Interest Weigh Against
              Issuance of a Preliminary Injunction

Premier suggests that the equities favor it because Multi-Vet is, in its view, a copy-cat that breaks its promises "... without warning, hesitation, or remorse." *See* page 1 of Premier's Memo in Support. From the foregoing however, it is clear that it is Premier, not Multi-Vet, that has reneged on its obligations.

Moreover, Premier's requested mandatory injunction upsetting the *status quo* that has been in place for some time would work a sever hardship on Multi-Vet and its employees. *See* ¶ 37 of the Garon Dec. Indeed, the damage to Multi-Vet's reputation, which has been earned as the result of many years of dedicated work to develop, market, distribute, promote, and advertise its high quality products, would be irreparable. *See* ¶ 39 of the Garon Dec. Indeed, forcing Multi-Vet to change or recall its packaging would damage its reputation and customer relationships in a way that would be impossible to repair or measure. *See* ¶ 40 of the Garon Dec.

In addition, the financial cost of changing its advertising and marketing materials, and repackaging its product would be in excess of US $ 1,000,000. *See* ¶ 38 of the Garon Dec. Accordingly, should the Court see fit to enjoin Multi-Vet, an appropriate bond would be in that amount.

Moreover, the public interest weighs against enjoining Multi-Vet's use of its GENTLE SPRAY trademark. Multi-Vet's

GENTLE SPRAY product is the same product that has always been identified using the GENTLE SPRAY trademark.  It is the product that the public has come to identify with the GENTLE SPRAY trademark.  On the other hand, the collar Premier has sold using the "SPRAY SENSE" name is a completely different design – and its distribution using Multi-Vet's GENTLE SPRAY trademark would lead to consumer deception and confusion.

## IV.  CONCLUSION

A preliminary injunction is not only unwarranted under the circumstances, Premier's submissions are fatally deficient on so many grounds that to grant the relief requested would be inappropriate as a matter of law.  Accordingly, it is respectfully urged that the Court deny Premier's application for a preliminary injunction.

Dated: June 27, 2008
       New York, NY

**ABELMAN FRAYNE & SCHWAB**

_____/s/_____
Lawrence E. Abelman (LA 6486)
Michael Aschen (MA 6336)
666 Third Avenue
New York, NY 10017
(212) 949-9022

Counsel for the Plaintiff

**CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the Foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion For A Preliminary Injunction was this 27th day of June, 2008, filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULTI-VET LTD., <br><br>         *Plaintiff,* <br><br>   -against- <br><br> PREMIER PET PRODUCTS, INC., <br><br>         *Defendant.* | 08 Civ. 03251 (LMM) <br><br> **DECLARATION OF MICHAEL ASCHEN IN OPPOSITION TO DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, Michael Aschen, declare and say that:

1.  I am a partner with the firm of Abelman Frayne & Schwab, counsel for the plaintiff, Multi-Vet Ltd. ("Multi-Vet"), and I submit this declaration in opposition to the defendant Premier Pet Products LLC's Motion For Preliminary Injunction.

2.  The purpose of this declaration is to provide the Court with copies of cases cited in the Plaintiff's Memorandum in Opposition to Defendant's Motion For A Preliminary Injunction that are not published in any reporter and available only from online data bases.

3.  Attached hereto as Exhibit 1 is a copy of the decision *Comcast of St. Paul, Inc. v. Boyle*, 2004 WL 2801588, * 1 (D. Minn. 2004).

4.  Attached hereto as Exhibit 2 is a copy of the decision *Roman Chariot, LLC. v. JMRL Sales & Service, Inc.*, 2006 WL 4483165, * 4 (D.N.J. 2006).

5.  For the reasons in Multi-Vet's other submissions, it is respectfully requested that the Court deny Premier's motion in all regards.

6.  I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 27, 2008                 _____/s/_____
     New York, NY                Michael Aschen

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing Declaration of Michael Aschen in Opposition to Defendant's Motion for a Preliminary Injunction was this 27th day of June, 2008, filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____/s/_____

Exhibit 1

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.))

**C**Comcast of St. Paul, Inc. v. Boyle
D.Minn.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
COMCAST OF ST. PAUL, INC., a Minnesota
corporation, Plaintiff,
v.
Timothy BOYLE, individually and d/b/a Sales Direct, a
fictitious name for an unregistered Minnesota business,
and d/b/a Direct Sales, a fictitious name for an
unregistered Minnesota business, and d/b/a JK
Distributing, a fictitious name for an unregistered
Minnesota business, and d/b/a RF Sales, a fictitious
name for an unregistered Minnesota business,
Defendants.
No. Civ.04-SC-4698 JRT.

Nov. 4, 2004.

Jeffrey R. Platt, Maureen A. Beck, Coman & Anderson,
PC, Lisle, IL, Richard I. Diamond, Richard I. Diamond,
PA, Minnetonka, MN, for Plaintiff.
Timothy Boyle, Lauderdale, MN, pro se.

ORDER GRANTING TEMPORARY RESTRAINING
ORDER, EXPEDITED DISCOVERY, ASSET
FREEZE, ACCOUNTING, AND PERMITTING
IMMEDIATE ENTRY UPON AND INSPECTION OF
BUSINESS PREMISES, RECORDS, AND
DECODERS

TUNHEIM, J.

*ORDER*

*1 WHEREAS an ex parte application by Order to Show
Cause has been made by the Plaintiff Comcast of St. Paul,
Inc. a Minnesota corporation ("COMCAST" or
"Plaintiff"), directed at Defendants Timothy Boyle
individually and d/b/a Sales Direct, d/b/a Direct Sales,
d/b/a JK Distributing, and d/b/a RF Sales ("Defendants")
for a Temporary Restraining Order and Preliminary
Injunction pursuant to Fed.R.Civ.P. 65 and 47 US.C. §
553(c)(2)(A) and 17 U.S.C. §§ 1201et al.; an Order of
Expedited Discovery pursuant to Fed. R.Civ. P. 30, 33,
34, 36 and 45; an Order directing an Accounting pursuant
to 47 U.S.C. § 553(c)(3)(A)(i); a Temporary Restraining
Order directed at Defendants' assets and prohibited gains
obtained in violation of 47 U.S.C. § 553 pursuant to
Fed.R.Civ.P. 64 and/or 65 and 47 U.S.C. §
553(c)(3)(A)(i); an Order pursuant to Fed.R.Civ.P. 64
and/or 65 directing seizure of Defendants' business
records, including computers and computer accessories
such as tapes and disks on which records are stored, and
Defendants' inventory of "pirate" cable television
decoding equipment and any proceeds of Defendants'
illegal business; and

WHEREAS the Court having read and duly considered the
Complaint, the Affidavits of Judy Maples and Lawrence
Barre (and the exhibits annexed thereto), the Memoranda
of Law submitted by the Plaintiff in this matter, and the
oral argument presented to the Court and having found
that Plaintiff has satisfied the statutory provisions of 47
U.S.C. §§ 553et al. and 17 U.S.C. §§ 1202et al. regarding
the issuance of temporary restraining orders, and further
having found that Plaintiff has satisfied the provisions of
Fed.R.Civ.P. 65(b), in that Plaintiff has demonstrated (i)
that it has a substantial likelihood of success on the merits
of its claims asserted against the Defendants in this action,
(ii) that absent this Court's grant of the relief sought,
Plaintiff would suffer substantial and ongoing irreparable
harm, (iii) the resulting harm to Plaintiff in not granting
this relief is far greater than any injury that granting this
relief will inflict on the Defendants, and (iv) it is in the
public interest to grant this preliminary relief, and the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.))

Court determining that good cause having been shown,

NOW, THEREFORE, it is hereby,

ORDERED, ADJUDGED and DECREED that the Defendants, Defendants' agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by Defendants or acting on Defendants' behalf or in concert with Defendants, are hereby

1. Enjoined and restrained from the sale, transfer, advertisement (including advertisement on the Internet or other on-line service), movement and/or offer for sale, modification, manufacture, storage and distribution of cable television decoding devices and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, movement, modification, manufacture, storage or distribution of such equipment, with such equipment including but not limited to cable television decoders, converters (if modified so as to be capable of decoding scrambled cable transmissions, or if connected *to* other decoding equipment described herein), descramblers, descrambling cubes or "programmers," converter-decoder combination units, integrated circuits, quick boards, smart boards, test kits, chips, E proms and circuit boards (hereinafter "Decoding Devices") until further Order of this Court;

*2 2. Restrained and enjoined from destroying, altering, removing or secreting any of the Defendants' books and records, including but not limited to invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, insurance policies, shipping labels, or tax returns, including all records stored on computer discs or tapes or within computer terminals, hard drives, servers or otherwise, which contain any information whatsoever concerning the business or finances of any of the Defendants or otherwise reflect transactions of any kind involving Decoding Devices;

3. Restrained from transferring, removing, encumbering or permitting the withdrawal of any assets or property, including the contents of any safe deposit boxes, presently or formerly belonging to the Defendants, jointly or severally, whether real or personal, tangible or intangible, including but not limited to cash, bank accounts of any kind, stock and bond accounts, and title to Defendants' property,

4. Ordered, no later than two (2) days following service of this Order, to provide to the Plaintiff identification of all asset accounts and safe deposit boxes held in Defendants' name or accounts or safe deposit boxes to or from which transfers have been made by any of Defendants within the preceding twelve months. This identification shall include name, custodian (including banks), address and account number in which such is held, the balance of such account (or the contents of such safe deposit box), and the authorized signers or persons authorized to access such safe deposit boxes, and it is further,

ORDERED, ADJUDGED and DECREED that Plaintiff is granted expedited discovery (to be responded to within ten (10) days of receipt) from Defendants, any of Defendants' accountants and other agent(s) or person(s) acting on Defendants' behalf, and any electronic mail or Internet service providers regarding Defendants' decoder sales business, and the location, nature and amount of Defendants' assets, including discovery of business records, banking records and invoices, including all records stored on computer terminals, servers, hard drives, disks or tape or otherwise, regarding the purchase, sale, modification, storage and distribution of and payment for cable television Decoding Devices and related equipment by or from Defendants or any of Defendants' agents, employees, servants, successors, assigns or any person and/or entity acting directly or indirectly on Defendants' behalf. This expedited discovery shall include depositions, interrogatories, requests for admissions, production of documents, and service of subpoenas pursuant to Fed.R.Civ.P. 30, 33, 34, 36 and 45; and shall apply irrespective of whether any of the Defendants have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.))

answered, and irrespective of any local rules providing that Discovery may not commence prior to a Rule 26(f) (or equivalent thereof) conference, and it is further

ORDERED, ADJUDGED and DECREED that the United States Marshal for the United States District Court, District of Minnesota, the deputy and those persons acting under their supervision, including Plaintiff's representatives and attorneys, are hereby commanded within two (2) days of the signing of this Order to enter upon the business premises of the Defendants, located at 1926 Eustis Street, Lauderdale, Minnesota 55113, and any adjoining areas occupied by Defendants, and seize any and all correspondence with customers, sales invoices, purchase orders, return forms, receipts, bank records, safe deposit box records, proceeds of sales, insurance policies, safes, shipping labels and tax returns or other business records, including all computer terminals, hard drives, servers, disks and tapes in Defendants' possession, which Plaintiff reasonably believes contain or indicate the names or addresses of distributors, suppliers, manufacturers and/or purchasers of Decoding Devices or any related equipment, or which contain, indicate or otherwise reflect or pertain to any transactions of any kind involving Decoding Devices or other business activities, and any and all Decoding Devices, and the illicit proceeds of the sales of such Decoding Devices, and the Plaintiff's representatives and Defendants' attorneys may assist the U.S. Marshal, the deputy and all persons acting under their supervision in effort to identify those items which fall within the scope of this Order, and that the United States Marshal, the deputy and all persons acting under their supervision are further empowered to take all steps necessary to proceed in a lawful manner, including the reasonable use of force, and breaking and entering upon such premises if necessary, in order to enter and secure the premises and examine, seize and remove said business records, illicit sales proceeds and Decoding Devices, and to deliver said business records, illicit sale proceeds, and Decoding Devices after having been inventoried, to the Plaintiff for inspection and impoundment at a secured location within Plaintiff's Minnesota business premises; and it is further,

*3 ORDERED, ADJUDGED and DECREED that the Plaintiff may copy and use any and all of Defendants' records relating to or reflecting sales of Decoding Devices, whether such records are obtained via the seizure provided for herein, or through discovery, or otherwise, and may disseminate such records to its affiliated cable systems and other cable operators for use in, *inter alia* identifying those persons residing within the areas serviced by such systems who have purchased such Decoding Devices for personal use or resale and it is further,

ORDERED, ADJUDGED and DECREED that the Defendants, Defendants' employees, agents, bookkeepers and/or accountants be required to identify (by address) in writing at the time: of the seizure, under pain of contempt for non-compliance, any other locations at which Decoding Devices are held, stored, manufactured, modified, received, shipped directly or indirectly to or by the Defendants or their employees and agents, or persons acting on Defendants' behalf or in concert with them, or locations where its records are kept or from which telephone or other sales of Decoding Devices are made, and the Defendants shall provide immediate access to such locations to the U.S. Marshal and Plaintiff's agents and/or attorneys, and Defendants shall also immediately provide passwords to all computers which store information regarding sales, purchases, assets, inventory, etc., and shall provide the Plaintiff with an accounting, no later than two (2) business days after the Defendants are served with this Order, listing the total number of sales and purchases of any and all Decoding Devices made by or on behalf of any of the Defendants to or from any person and/or entity; this accounting shall also include any and all profits, transfers or withhdrawals of assets, property (including property in safe deposit boxes) or any other funds made by, to and/or between any of the Defendants from January 1, 1999 to the present; and it is further,

ORDERED, ADJUDGED and DECREED that in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.))

event Defendants, at the time of the seizure provided for herein, identify any other locations where inventory or records are stored, the United States Marshal, his deputy and all persons acting under his supervision are directed to immediately go to such locations along with the Plaintiff's representatives and, taking all steps necessary to proceed in a lawful manner, including the reasonable use of force, and breaking and entering upon such premises if necessary, in order to enter and secure the premises, are directed, as provided for in this Order with respect to Defendants' known business location, to seize and remove business records, computers and related items, Decoding Devices, and illicit sales proceeds, and to deliver said business records, computers and related items, illicit sale proceeds, and samples of Decoding Devices, after having been inventoried, to the Plaintiff for inspection and impoundment at a secured location within Plaintiff's Minnesota business premises; and it is further,

*4 ORDERED, ADJUDGED and DECREED that if after this order is served on Defendants, or any of Defendants' agents, employees or others controlled by Defendants or acting on Defendants' behalf or in concert with them, obtain the possession or presently are in the possession, custody or control of any additional quantity of the above-described items (*i.e.*, Decoding Devices, business records, computers or proceeds from the sale of sold equipment), they will immediately notify the Plaintiff's attorneys, and retain without sale or other transfer such items or proceeds until further order of this Court; and it is further,

ORDERED, ADJUDGED and DECREED that, pursuant to Fed.R.Civ.P. 65, the Plaintiff shall file a bond with the Clerk of the Court in the amount of $20,000 should it be determined that the Plaintiff is not entitled to the relief set forth in this Order, and it is further,

ORDERED, ADJUDGED and DECREED that Defendants are Ordered to show cause at a hearing to be held on November 16, 2004 at 11:30 AM in Courtroom

13E of the United States District Court, District of Minnesota, located at 13E U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415 why this Temporary Restraining Order should not be confirmed and a Preliminary Injunction entered in the above form, and it is further,

ORDERED, ADJUDGED and DECREED that Defendants shall file a responsive memorandum and any supporting documents not later than two (2) business days prior to the hearing set forth herein and serve a copy of said responsive papers on Plaintiff's Minnesota counsel by hand or electronic filing, and the Plaintiff may file reply submissions no later than one business day prior to the hearing; and it is further,

ORDERED, ADJUDGED and DECREED that a copy of this Order and the papers submitted in support thereof shall be served upon Defendants, Defendants' managing agent(s), or Defendants' employees at Defendants' place of business at the time of the seizure ordered herein; and it is further

ORDERED, ADJUDGED and DECREED that the Temporary Restraining Order as described herein shall enter, once signed and the bond requirement in place, by its terms and expire after such time of entry not to exceed ten (10) days, unless for good cause shown it is extended. Plaintiff shall satisfy the bond requirement herein by filing with the Clerk, a Notice of Filing and a copy of bond issued that shall also be served upon Defendants at the time the provisions of this Order are carried out. Upon receipt of the original bond issued, Plaintiff shall file same with the Clerk; and it is further

ORDERED, ADJUDGED and DECREED that Plaintiff will notify the Court within two (2) business days of the Defendants being served with this Order. At that time the Court will issue an Order unsealing the case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.))


D.Minn.,2004.
Comcast of St. Paul, Inc. v. Boyle
Not Reported in F.Supp.2d, 2004 WL 2801588 (D.Minn.)


END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 2

Westlaw.

Slip Copy                                                                                                      Page 1
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

MEMORANDUM OPINION

**H**Roman Chariot, LLC. v. JMRL Sales & Service, Inc.
D.N.J.,2006.

COOPER, District Judge
**\*1** Plaintiff, Roman Chariot, LLC ("RC"), moves, pursuant to Federal Rule of Civil Procedure ("Rule") 65, for a preliminary injunction to enjoin the defendants from, *interalia*: (1) disclosing RC's trade secrets and confidential information relating to the ownership and sale of specialty sightseeing buses, (2) selling and delivering sightseeing buses without authorization from RC, and (3) accepting and fulfilling orders for sightseeing buses without consent from RC. (2-21-06 Order to Show Cause, dkt. entry no. 3.)

United States District Court,D. New Jersey.
ROMAN CHARIOT, LLC, Plaintiff,
v.
JMRL SALES & SERVICE, INC., et al., Defendants.
**No. Civ.A. 06-626 MLC.**

filed Feb. 3, 2006.
July 11, 2006.
terminated Aug. 15, 2006.
last filing Aug. 15, 2006.

RC brought this action on February 3, 2006. (Dkt. entry no. 1). RC generally alleges that it developed the idea and specifications for a specialty sightseeing bus, and entered into an agreement with defendant JMRL Sales & Service Inc. ("JMRL") whereby JMRL would manufacture the buses. (Compl., at 3.) [FN1] RC and JMRL executed (1) a "Confidentiality and Exclusive Rights Agreement" in October 2004, and (2) an agreement in January 2005 that governed JMRL's manufacture of a sightseeing bus for Private One of New York ("Private One"), a customer of RC. (*Id.* at 3-4.)RC alleges that JMRL has manufactured and sold buses embodying RC's ideas and specifications without authorization from RC, in breach of the agreements. (*Id.* at 6.) The complaint specifically asserts causes of actions for (1) misappropriation and conversion, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, (4) tortious interference with prospective economic advantage, and (5) unfair competition. (*Id.*)

Richard H. Brown, Day Pitney, LLP, Morristown, NJ, Lead Attorney, Attorney to be Noticed, for Roman Chariot, LLC, (Plaintiff).
Christopher Iannicelli, Morgan, Lewis & Bockius, LLP, Princeton, NJ, Attorney to be Noticed, for JMRL Sales & Services, Inc., (Defendant).
Gregg Andrew Ilardi, Day Pitney, LLP, Morristown, NJ, Attorney to be Noticed, for Roman Chariot, LLC, (Plaintiff).
George William McClellan, Jr., Morgan, Lewis & Bockius, LLP, Princeton, NJ, Attorney to be Noticed, for JMRL Sales & Services, Inc., (Defendant).
Maureen C. Pavely, Day Pitney, LLP, Morristown, NJ, Lead Attorney, Attorney to be Noticed, for Roman Chariot, LLC, (Plaintiff).
Robert D. Piliero, Piliero, Goldstein, Kogan & Miller, LLP, New York, NY, Lead Attorney, Attorney to be Noticed, for JMRL Sales & Services, Inc., (Defendant).
Robert Alan White, Morgan, Lewis & Bockius, LLP, Princeton, NJ, Lead Attorney, Attorney to be Noticed, for JMRL Sales & Services, Inc., (Defendant).

> FN1. JMRL does business as Craftsmen Limousine and Specialty Bus Manufacturers, LLC. The Court will refer to this entity as JMRL for the purposes of this opinion.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 2
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

The Court has considered the papers submitted by the parties, and heard oral argument on May 24, 2006. The basic historical facts are not disputed, therefore, the Court did not conduct an evidentiary hearing. The Court now issues its findings of fact and conclusions of law as required by Rule 52. The Court, for the reasons stated herein, will deny RC's motion.

### CONCLUSIONS OF FACT

This matter concerns a dispute between RC and JMRL over the development and manufacture of speciality tour buses. (Compl.) [FN2] The majority of the certifications, briefs, and documents submitted in support of, and opposition to the motion are subject to a protective order, and have been filed under seal. (*See* 4-05-06 Protective Order, dkt. entry no. 21; 6-06-06 Order.) The Court declines to seal this opinion; therefore, the conclusions of fact articulated here will be limited to the non-confidential information that is necessary for the resolution of this motion.

> FN2. RC uses the name "Roman Chariot CTB" to refer to a tour bus comprised of a single elevated deck with an open top. As discussed, *infra*, the dispute in this action also surrounds the development and manufacture of a bus with a single elevated deck and a transparent top. For the purposes of this opinion, both types of buses will be referred to collectively as "RC CTBs." The Court, where necessary, will distinguish between those buses with an open top and those buses with a transparent top.

The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation. *See* Fed.R.Civ.P. 65(a). The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits. *See* Clark v. K-Mart Corp., 979 F.2d 965, 969 (3d Cir.1992) (noting that because of the limited nature of preliminary injunction proceedings, any facts and conclusions of law made are of no binding effect).

**\*2** RC describes itself as a limited liability company that designs and develops specialty tour buses with either a single or double deck. (Compl., at 3.) The tops of the buses may be open, or enclosed with a "see through top." (*Id.*) Ronald Romano ("Romano") formed RC, and is its sole member. (Romano Supp. Certif., at 3; 5-24-06 Tr., at 11.)

Defendants Robert J. Haswell ("Bob Haswell") and Robert M. Haswell ("Marc Haswell") founded JMRL in 1989. (Defs. Br., at 6-7.) JMRL is a company based in Missouri that designs and manufactures custom-made limousines, limousine buses, and "single deck, open-top sightseeing buses." (*Id.* at 7.)

Romano alleges that in 2002, Mark Marmurstein ("Marmurstein") of Private One wanted to get involved in the New York City tour bus industry. (Romano Supp. Certif., at 2.) Romano had a business relationship with Private One, and tried to find a company that would manufacture a double-deck tour bus for Private One. (*Id.*) Romano alleges that during this process, he developed the idea of creating a tour bus with a single elevated deck and an open top. (RC Supp. Br., at 4.) To pursue the development of such a product Romano formed RC in 2004. (Compl., at 1.)

Bill Molitor ("Molitor"), a business associate of Romano, approached Bob Haswell at a bus trade show in September 2004. (RC Supp. Br., at 5; Defs. Br., at 8.) RC alleges that Molitor told Bob Haswell that RC had an idea for a new type of bus. Bob Haswell agreed to execute a confidentiality and exclusivity agreement in exchange for hearing about the new idea. (RC Supp. Br., at 6.) [FN3] RC and JMRL executed a "Confidentiality and Exclusive Rights Agreement" on October 4, 2004. (Compl., at 3; *see*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 3
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

Pavely Certif., Ex. A.) The agreement provides, *interalia,*

> FN3. The defendants allege that Molitor disclosed the new bus idea before any confidentiality agreement was signed. (Defs. Br., at 12.) For the purposes of this opinion, however, the resolution of this dispute is not dispositive.

[a]ll knowledge and information regarding the Product shall be considered confidential and shall not be disclosed or otherwise used by [JMRL] without written permission from RC ...

[JMRL] does not acquire any rights to the Product by this Agreement ...

upon agreement to produce the Product for RC understands that RC has Exclusive Rights to the Product for all marketing and sales ...

(Compl., at 3-4.) RC disclosed to JMRL the idea of, and specifications for, creating a tour bus comprised of a single elevated deck with an open top.[FN4] RC requested that JMRL manufacture a prototype that could be evaluated by Private One. (*Id.* at 4.)

> FN4. The defendants dispute that Romano provided them with "specifications," and argue that the materials Romano did provide were neither created by Romano, nor were they specifications for a single deck, open-top bus. (Defs. Br., at 17.) For purposes of this motion, however, the Court need not decide the exact nature of the materials disclosed, nor who "invented" the RC CTB.

Romano, Bob Haswell, and representatives of Private One

had several meetings and discussions regarding the prototype. (RC Supp. Br., at 7.) Romano asserts that at a meeting with JMRL in November 2004, he disclosed the idea of adding a transparent, removable roof to the bus. (*Id.*)Romano's idea responded to Private One's request that the buses have some type of covering for use in inclement weather. JMRL delivered a prototype of the RC CTB in December 2004.(*Id.* at 8.) Modifications and changes were made to the prototype and a second version was delivered to Private One in February 2005. (*Id.*) But these prototypes did not include a transparent removable roof. (*Id.*) A prototype incorporating this idea was not completed until "mid-2005." (*Id.* at 7.)

**\*3** RC and JMRL executed an agreement in January 2005 setting forth RC and JMRL's rights and obligations in connection with the manufacture of the bus for Private One. (Compl., at 4.) The agreement covers "city sightseeing buses consisting of single or double deck open top city tour buses and single or double deck city tour buses with see through tops," and provides, *interalia:*

JMRL agrees not to build any "city sightseeing buses" for anyone else, in the State of New York, as long as Private One purchases all their "city sightseeing buses through JMRL.

JMRL also agrees that Roman will be the exclusive sales agent for Private One purchases.

It is agreed by JMRL, that Roman owns the exclusive sales rights for "city sightseeing buses" produced by JMRL on all such business produced through the franchise efforts of Private One ...

It is the intent of Roman to market "city sightseeing buses" worldwide. With this in mind JMRL agrees to build such buses exclusively for Roman.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880

(Cite as: 2006 WL 4483165 (D.N.J.))

Page 4

JMRL agrees that Roman has exclusive rights to design and sales of the "city sightseeing buses" (in continuation of previous agreement, see attachment); and JMRL agrees to continue production of said buses on a per order basis ...

Roman will set up a floor-plan that enables them to pay JMRL for each bus they order, from JMRL when said bus is completed by JMRL.

*Id.* at 4-5; Pavely Certif., Ex. B.) Between January 2005 and July 2005, JMRL manufactured ten tour buses for Private One, and three tour buses for an RC customer in Chicago. (RC Supp. Br., at 10; Compl., at 5.) JMRL sought to "redraw" the January 2005 agreement in August 2005 because it was concerned that the agreement was ambiguous and that the parties' responsibilities were not clearly defined. (Pavely Certif., Ex. E.) RC and JMRL disagreed over the redrawing of the agreement, but did not terminate their relationship. RC ordered four tour buses in October 2005 with an option to order ten more. (Romano Supp. Certif., at 9.) The four buses were completed and delivered to Private One. (RC Supp. Br., at 12.)

RC alleges that in December 2005, JMRL entered into an agreement to sell six RC CTBs to Suburban Transit, a competitor of Private One, without RC's authorization. (*Id.* at 13.)JMRL acknowledges that it sold six RC CTBs to Suburban Transit. The six RC CTBs were set to be delivered in February 2006. (Defs. Br., at 45; Pavely Certif., Ex. H.) [FN5]

> FN5. JMRL argues that it undertook these sales to avoid financial ruin. (Defs. Br., at 45.) JMRL asserts that Romano told it that Private One intended to purchase fifteen buses for delivery by Thanksgiving 2005.(*Id.* at 44.)To prepare for the order, JMRL placed binding orders for the chassis upon which the buses were built. (*Id.*) The Private One order, however, did not

immediately materialize. JMRL then told RC that it would be forced to sell buses to someone else to cover its losses. RC ordered buses for Private One in October 2005, but the order was for four buses, not fifteen, as previously indicated. (*Id.* at 45.)JMRL, therefore, was left with eleven unused chassis. It argues that it agreed to sell six buses to Suburban Transit to mitigate its losses. (*Id.;see also* 4-14-06 Robert J. Haswell Dep., at 276.)

RC brought this action on February 3, 2006. (Dkt. entry no. 1.) RC sought a temporary restraining order to prevent JMRL from, *interalia,* selling or offering to sell RC CTBs to anyone without RC's authorization. (Dkt. entry no. 2.) The Court held a hearing on the application for the temporary restraining order on February 17, 2006. At the hearing, JMRL confirmed that (1) one bus had been delivered to Suburban Transit, (2) two more buses were scheduled to be delivered on February 21, and (3) three more buses were scheduled to be delivered after February 21. (2-17-06 Tr., at 4 .) The Court declined to issue a temporary restraining order in part because the "bus has already left the station, at least one of them ."(*Id.* at 14.)The Court did recognize, however, that the denial of a preliminary injunction could result in the delivery of more buses. (*Id.*) The Court issued an order to show cause why a preliminary injunction should not be issued. (2-21-06 Order to Show Cause.) The resolution of that order is now before the Court.

*CONCLUSIONS OF LAW*

*4 RC moves to enjoin the defendants from (1) disclosing RC's trade secrets and confidential information concerning the ownership and exclusive right to sell and distribute RC CTBs, (2) selling, offering to sell, and delivering RC CTBs without authorization from RC, (3) accepting and fulfilling orders for RC CTBs without authorization from RC, and (4) using RC's trade secrets and confidential information for its own benefit or the benefit of any other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 5
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

entity other than RC. (2-21-06 Order to Show Cause.) The Court finds that RC has not demonstrated the elements required to issue a preliminary injunction, therefore, its requested relief is not warranted.

## I. Standard to Award a Preliminary Injunction

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances."*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir.1988)* (internal citation omitted). The Court must consider whether: (1) the party seeking a preliminary injunction has shown a reasonable probability of success on the merits, (2) the party will be irreparably injured by the denial of the relief, (3) granting preliminary relief will result in even greater harm to the nonmoving party, and (4) granting the preliminary relief will be in the public interest. *Allegheny Energy v. DOE, Inc., 171 F.3d 153, 158 (3d Cir.1999)* (citation omitted)."The Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits."*Apollo Tech. Corp. v. Centrosphere Indus. Corp., 805 F.Supp. 1157, 1205 (D.N.J.1992); see also Frank's GMC, 847 F.2d at 102.* The Court cannot issue a preliminary injunction if either one or both of those prerequisites is absent. *Id.* The Court is not required to issue findings regarding the balance of the hardships and the public interest when the party seeking a preliminary injunction does not establish both a reasonable likelihood of success and irreparable harm. See, e.g., Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed.Cir.1994).

## II. Analysis

### A. Likelihood of Success

To determine whether a moving party has demonstrated a reasonable likelihood of success on the merits, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a[p]rima facie case showing a reasonable probability that it will prevail on the merits."Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir.1975) (citations omitted).

For the purposes of this opinion, the Court assumes *arguendo* that RC has a reasonable likelihood of success on the merits as to the claims asserted in the complaint. The Court, however, will not issue a preliminary injunction because RC has failed to demonstrate that it will suffer irreparable harm. *SeeFrank's GMC, 847 F .2d at 102 n. 2* (noting that because the court's determination as to irreparable injury was dispositive, it did not need to determine whether the plaintiff demonstrated a likelihood of success on the merits). The Court cannot issue a preliminary injunction unless RC demonstrates both a likelihood of success on the merits and irreparable harm.

### B. Irreparable Harm

*5 RC has not established the existence of irreparable injury supporting the entry of injunctive relief. RC argues that an injunction is necessary to prevent irreparable harm to its trade secrets, good will, and reputation. (RC Supp. Br., at 22-24; RC Reply Br., at 14.)

A party seeking a preliminary injunction must generally make "a clear showing of immediate irreparable injury."*Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.1989); see also Apollo Tech. Corp., 805 F.Supp. at 1208* (noting that a plaintiff must show immediate irreparable injury, not a mere risk of irreparable harm)."[T]o show irreparable harm, the plaintiff must demonstrate potential harm which cannot be redressed by a legal remedy."*Instant Air Freight, Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir.1989).*"The requisite feared injury or harm must be irreparable-not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it."*ECRI v. McGraw-Hill, Inc., 809 F.2d*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 6
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

223, 226 (3d Cir.1987) (citations and quotations omitted); *see also* *Apollo Tech. Corp.,* 805 F.Supp. at 1206 (noting that issuing a preliminary injunction is proper when it is the *only* way of protecting the plaintiff from harm).

Economic loss does not constitute irreparable harm. *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994). "The availability of adequate money damages belies a claim of irreparable injury." *Frank's GMC,* 848 F.2d at 102. "Loss of potential business opportunities, profits, customers, or contracts is compensable by money damages and does not constitute irreparable injury." *Apollo Tech. Corp.,* 805 F.Supp. at 1209. "An inability to precisely measure financial harm does not make that harm irreparable or immeasurable." *Frank's GMC,* 848 F.2d at 655. "Mere injuries, however substantial, in terms of money ... are not enough." *Sampson v. Murray,* 415 U.S. 61, 90 (1974); *see also* *Instant Air Freight,* 882 F.2d at 801 (citing *Sampson* ).

1. Harm to RC's Trade Secrets

i. Applicable Law

RC asserts that a preliminary injunction must be issued in this action to prevent irreparable harm to its trade secrets and confidential information. Such an assertion, however, assumes that RC's idea of, and specifications for RC CTBs are a trade secret and confidential. For the purposes of this opinion, the Court will assume that RC's ideas and specifications are a trade secret.[FN6] The Court here will discuss trade secret law only to the extent necessary to analyze RC's claim of irreparable harm to its alleged trade secrets. Such discussion is not conclusive as to the merits of RC's substantive claims.

> FN6. The Court recognizes that the defendants argue that RC does not have a protectable trade secret. (Defs. Br., at 24.) RC argues, however,

that in order to be judicially protected "misappropriated information" need not rise to the level of a trade secret. (RC Supp. Br., at 20; RC Reply Br., at 11.) Misappropriation of ideas is a separate area of law from trade secret law. *Johnson v. Benjamin Moore & Co.,* 788 A.2d 906, 922 (N.J.App.Div.2002) (noting that the definition of a trade secret does not include a marketing concept or new product idea). Confidential and proprietary information that does not rise to the level of a trade secret, however, is not entitled to the same level of protection from disclosure as a trade secret. *Littlejohn v. Bic Corp.,* 851 F.2d 673, 685 (3d Cir.1988); *Hammock by Hammock v. Hoffman-LaRoche Inc .,* 662 A.2d 546, 560 (N.J.1995). By categorizing RC's information as a trade secret, the Court is affording RC's "idea" more protection. The Court, therefore, will not analyze the degree of protection that RC's information should be given if categorized as confidential, but not a trade secret.

In New Jersey, "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Rohm & Haas Co. v. ADCO Chem. Co.,* 689 F.2d 424, 431 (3d Cir.1982) (noting that in federal court the law of trade secrets is governed by state law); *see also* *Sun Dial Corp. v. Rideout,* 16 N.J. 252, 257 (1954). Matters of general knowledge in the industry, information in the public domain, and information that can be garnered by reverse engineering a finished product cannot be protected as trade secrets. *Id.;* *Smith v. BIC Corp.,* 869 F.2d 194, 199-200 (3d Cir.1989). New Jersey law provides a cause of action for misappropriation of a trade secret, however, "the right to protection begins and ends with the life of secrecy." *Darsyn Labs. Inc. v. Lenox Labs., Inc.,* 120 F.Supp. 42, 54 (D.N.J.1954); *see also* *Rohm & Haas Co.,* 689 F.2d at 429 (setting out elements of claim for trade secret misappropriation). Once a trade secret is disclosed to the public, it is no longer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

Page 7

protected.

**\*6** For purposes of a preliminary injunction, a threat of disclosure of a trade secret may establish irreparable harm. *Campbell Soup Co. v. Conagra Inc.,* 977 F.2d 86, 92 (3d Cir.1992). Further disclosure of a trade secret that has already been revealed, however, does not establish immediate irreparable harm. *Id.* (plaintiff seeking a preliminary injunction to protect disclosure of its trade secret by the defendant, and the court noting "[w]e fail to see how immediate irreparable harm could arise at this time in light of the fact that [the defendant] has *already* revealed the ... process").

ii. Application

RC has alleged that without a preliminary injunction it will be irreparably harmed because it will not be able to control the development of its product. (RC Supp. Br., at 21-22.) Harm to RC's trade secrets or idea, however, does not constitute irreparable harm sufficient to issue a preliminary injunction because RC's secret and ideas have already been disclosed to the public. There is no longer a secret or idea whose disclosure can be enjoined or prevented.[FN7] At oral argument, RC confirmed that buses embodying its idea are out in the public and on the road. (5-24-06 Tr., at 9.) At the prior hearing on RC's application for a temporary restraining order, RC asserted that JMRL has "disclosed the trade secret information that is embodied in these buses."(2-17-06 Tr., at 10.)

> FN7. The Court acknowledges that at oral argument RC indicated that it was not "pressing the trade secret claim on the preliminary injunction application," but instead was challenging the continued misappropriation of its idea and property. (5-24-06 Tr., at 8-9.) As noted, *supra,* by categorizing RC's "property" as a trade secret, the Court is affording RC more protection. (*See supra* note 6.) Regardless of

whether RC's "property" is considered an idea or a trade secret, it has been disclosed to the public.

RC CTBs are operating in New York and Chicago. (*See* www.romanchariot.net/pictures.shtml.) These buses were manufactured by JMRL pursuant to its agreement with RC. JMRL has also delivered at least six buses to Suburban Transit. One was delivered prior to the commencement of this lawsuit on February 2. (2-17-06 Tr., at 4, 9; 5-24-06 Tr., at 9.) Several more buses were due to be delivered in February and March. (Pavely Certif., Ex. H.) In addition to the RC CTBs themselves being exposed to the public, RC's own website provides a detailed description of the RC CTB's (1) dimensions, (2) the features and materials that comprise the standard body, construction, and passenger area, and (3) the elements that are included for the safety and comfort of the driver.[FN8]

> FN8.*See* www.romanchariot.net. The website also provides diagrams of the floorplan of the buses, and photographs of the buses operating in Chicago and New York.

The disclosure of RC's secret here is not merely a threat, it is a reality. The disclosure of the secret to the public has already occurred through the production and use of buses embodying the secret, and the posting of the design details on the internet. Any further or continued disclosure does not constitute an irreparable injury. As the court in *Campbell Soup* recognized, the threat of disclosure of a trade secret may constitute irreparable injury, but the further disclosure of something already revealed cannot. JMRL's action may have inappropriately revealed a trade secret of RC, and RC may prevail on its claims of misappropriation and breach of the confidentiality and exclusivity agreement. Any injury from JMRL's sale of RC CTBs, however, is not irreparable because it can be redressed through money damages. RC's secret has been disclosed. The Court, therefore, will not enjoin the disclosure and delivery of something that would be a nullity to enjoin.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

Page 8

2. Harm to Good Will and Reputation

i. Applicable Law

*7 RC asserts that without a preliminary injunction its
good will and reputation will be irreparably harmed.
Irreparable injury for the purposes of a preliminary
injunction may include "loss of control of reputation, loss
of trade, and loss of good will."*Opticians Assoc. of Amer.
v. Indep. Opticians of Amer.*, 920 F.2d 187, 195 (3d
Cir.1990); *see also* *Jiffy Lube Int'l, Inc. v. Weiss Bros.,
Inc.*, 834 F.Supp. 683, 692 (D.N.J.1993). The plaintiffs in
*Opticians* and *Jiffy Lube*, however, sought preliminary
injunctions to prevent harm to their reputation or good will
resulting from the defendants' use of their trademarks, not
the defendants' use or misappropriation of their trade
secrets or other confidential information. *Id.*

Trademark infringement cases, unlike trade secret cases,
are concerned with the confusion that results from the
misuse of another's mark. *Acierno*, 40 F.3d at 654
(distinguishing *Opticians* and finding that no significant
damage to plaintiff's reputation had been shown to
demonstrate irreparable harm); *see also* *Opticians*, 920
F.2d at 196 ("[p]otential damage to reputation constitutes
irreparable injury for the purpose of granting a preliminary
injunction in a *trademark case*" (emphasis added));
*Pedi-Care, Inc. v. Pedi-A-Care Nursing, Inc.*, 656 F.Supp.
449, 457 (D.N.J.1987) (enjoining defendant's use of
plaintiff's service mark noting that "the potential exists that
defendant's use of a name confusingly similar to the
plaintiff's service mark will result in damage to plaintiff's
reputation"); *cf.* *BP Chem. Ltd. v. Formosa Chem. Corp.*,
229 F.3d 254, 263 (3d Cir.2000) (affirming district court's
order granting a preliminary injunction when *threatened*
disclosure of a trade secret would affect a company's
reputation (emphasis added)).

ii. Application

The claims asserted by RC in the complaint do not
implicate or concern trademark infringement. RC neither
has a trademark in its name, nor prominently displays its
name on the buses that are manufactured for it. Rather, the
name of the tour company that purchases the buses
appears on the exterior of the bus. RC attempted to
register a trademark over a year and half after it went into
business, but the mark could not be registered because it
was already in use by another business. (Defs. Br., at 3;
5-24-06 Tr. at 23.)

Even without a trademark, RC alleges that other bus
purchasers will be confused because JMRL referred to the
bus as the "Roman Chariot" in its "secret sale" to
Suburban Transit. (RC Reply Br., at 14.) Without more,
however, JMRL's reference to the Roman Chariot does not
provide sufficient evidence to demonstrate that bus
manufacturers associate the term "Roman Chariot," or the
design of the RC CTB with the company RC. RC
functions as a broker for those companies seeking to
purchase tour buses. As stated *supra*, no RC name or logo
appears on the bus. Whether a bus purchaser goes through
RC or not, another company has to manufacture the bus.
In this action, therefore, there is no concern that either the
public or bus purchasers will be confused by JMRL's
manufacture of the RC CTB without the authorization of
RC. Those cases that have determined that harm to the
plaintiff's good will or reputation in the context of a
trademark or service mark was irreparable, therefore, are
distinguishable. *See e.g.,* *Acierno* 40 F.3d at 653-54
(distinguishing *Opticians* ).

*8 If injury to reputation and good will outside of the
trademark context were irreparable, RC does not
demonstrate sufficient harm to its reputation or good will
to warrant a preliminary injunction. "Any definition of
goodwill includes the concept of the advantage that the
proprietor of an existing business enjoys resulting from the
probabilities that old customers will continue their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 9
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880
(Cite as: 2006 WL 4483165 (D.N.J.))

patronage."*Marsh & McLennan, Inc. Comm'r of Internal Revenue,* 420 F.3d 667, 669-70 (3d Cir.1969); *see also* Black's Law Dictionary 694 (6th ed.1990) ("the favor which the management of a business wins from the public ... the benefit or advantage of having established a business and secured its patronage by the public). RC has not provided the Court with sufficient evidence to conclude that RC has good will or a reputation capable of injury.

RC was formed in 2004 for the purpose of commercializing the idea for a particular type of tour bus. The first bus embodying the idea was not created until December 2004 and a commercial sale was not made until February 2005. RC has had two customers, Private One in New York, and Gray Line in Chicago, over the course of its less than two year existence. A total of seventeen buses were sold between February 2005 and October 2005. (RC Supp. Br., at 12.) RC's efforts, if any, to market its RC CTB have been minimal. (*Id.* at 8.) It has not sold any buses in 2006. (*Id.* at 14.)RC has not presented evidence that its two customers will continue their patronage. It has not provided sufficient evidence that it enjoys a particular reputation, name recognition, or good will among bus purchasers, manufacturers, or riders.

RC argues that without an injunction its reputation will be affected because it will not be able to control the quality of the buses that are produced. It asserts that if JMRL produces an inferior product, RC's reputation will suffer. (RC Supp. Br., at 23.) As noted, *supra,* RC has not demonstrated that it enjoys a particular reputation capable of injury. Additionally, what constitutes an inferior product, and the potential injury that would result are speculative and cannot form the basis of irreparable harm to RC.

RC asserts that it has had no sales in 2006 and that JMRL's continued production of tour buses embodying RC's idea forces RC to (1) compete with JMRL, and (2) find another manufacturer for RC CTBs. These injuries,

however, amount to economic losses and are not so peculiar that a monetary remedy would not suffice. As recognized in *Apollo,* the loss of potential customers or profits is compensable by money damages. Such damages are not irreparable even though a precise measure of financial harm cannot be made. *SeeFrank's GMC,* 848 F.2d at 102;*Apollo,* 805 F.Supp. at 1209. Accordingly, RC has failed to demonstrate that it will suffer immediate, irreparable harm without the issuance of preliminary injunctive relief. The Court, therefore, will not issue a preliminary injunction.

**\*9** The Court need not address the harm to JMRL or the public interest because RC has failed to demonstrate irreparable harm will result in the absence of a preliminary injunction. *SeeClark,* 979 F.2d at 969.

*CONCLUSION*

RC has failed to establish its entitlement to a preliminary injunction against the defendants. It has not shown that it will suffer immediate, irreparable harm without the issuance of preliminary injunctive relief. The Court, therefore, will deny RC's motion for a preliminary injunction in an appropriate order.

D.N.J.,2006.
Roman Chariot, LLC. v. JMRL Sales & Service, Inc.
Slip Copy, 2006 WL 4483165 (D.N.J.), 81 U.S.P.Q.2d 1880

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MULTI-VET LTD.,

               *Plaintiff,*

    -against-

PREMIER PET PRODUCTS, INC.,

              *Defendant.*

08 Civ. 03251 (LMM)

**DECLARATION OF RICHARD
GARON IN OPPOSITION TO
DEFENDANT'S MOTION FOR
A PRELIMINARY INJUNCTION**

---

I, Richard Garon, declare and say that:

    1.   I am the President of the plaintiff, Multi-Vet Ltd. ("Multi-Vet").

    2.   The purpose of this declaration is to advise the Court of certain facts pertinent to the motion for a preliminary injunction filed by the defendant Premier Pet Products, Inc. ("Premier").

**MULTI-VET**

    3.   Multi-Vet was founded by my family in 1996 and is based in Saint-Hyacinthe, Québec, Canada.  It has grown since then to become one of the world's leading providers of animal behavioral systems designed to assist with the modification of pet behavior.

    4.   In 1997, Multi-Vet began distributing its anti-bark spray collar using the "ABOISTOP" trademark.  Multi-Vet's packaging, a copy of which is attached as Exhibit 1, used the image of a golden retriever and the general color scheme Premier now claims is its trade dress.

5.   The golden retriever photograph used on packaging for Multi-Vet's anti-bark spray collar was not, as Ms. Madere states in her declaration, an asset acquired from a third party, Animal Behaviors Systems, Inc.  It was created by and is owned by Multi-Vet, as is the color scheme used on the packaging.

6.   Premier's also suggests in its motion that Multi-Vet "copied other aspects of Premier's packaging, including, but not limited to ... a photo of a row of dogs ...." Premier is mistaken.  The photograph of the five dogs in a row that Premier is referring to was created at Multivet's request from a series of photos taken by a professional photographer and has been used on other Multivet products, an example of which is attached as Exhibit 2, which also shows another version of the NO SHOCK NO PAIN trademark.

**THE "NO SHOCK NO PAIN" TRADEMARK**

7.   The NO SHOCK NO PAIN trademark was developed by Multi-Vet in Québec for use with its anti-bark spray collars.  An illustration of Multi-Vet's packaging with the bilingual version of the NO SHOCK NO PAIN trademark is attached as Exhibit 3, and a copy of an invoice from the marketing consultants that produced the anti-shock "icon" for Multi-Vet is attached as Exhibit 4.

8.   Subsequent to the 2001 Agreement, the NO SHOCK NO PAIN trademark was used on the Multi-Vet product packaging provided to and distributed by Premier in the U.S.

9.   I understand that Premier filed a application to register the NO SHOCK NO PAIN trademark with, and has obtained a registration for the trademark from the United States Patent and Trademark Office.  Since the NO SHOCK NO PAIN trademark was

- 2 -

developed by and is owned by Multi-Vet, Premier's representation in its trademark application that it owned the NO SHOCK NO PAIN trademark was not correct.

10.    In addition, Premier's application of Multi-Vet's NO SHOCK NO PAIN trademark on its products is deceptive and misleads the public.  The trademark was developed by Multi-Vet to emphasize the results of research undertaken by the College of Veterinary Medicine at Cornell University using its patented anti-bark spray collar technology.

11.    Premier's collar was not tested by Cornell.  The statement on Premier's packaging that its collar is "clinically proven 2X more effective than shock collars," and the reference to the Cornell research, although correct when referring to Multi-Vet's product, is not correct when applied to Premier's product.

12.    Since the NO SHOCK NO PAIN trademark that appears on the reverse of Multi-Vet's current packaging is quite small, it is unlikely to suggest to an appreciable number of consumers the source or origin of the product, although it does provide valuable information concerning its product.

**PREMIER'S RELATIONSHIP WITH MULTI-VET**

13.    I understand that in the mid-1990's, Premier, a business based in Midlothian, Virginia, began to distribute "head collars" under a license for the patents and GENTLE LEADER trademarks owned by a third party, Alpha-M Inc.

14.    After having achieved some success as a licensee and distributor of Alpha-M's collars and leashes, on April 30, 2001 Premier acquired the assets of a distributor of anti-bark

- 3 -

spray collars, Animal Behaviors Systems, Inc., from its majority
shareholder, Multi-Vet.

15.   On the same day, Multi-Vet and Premier entered
into an agreement (the "2001 Agreement"), a copy of which is
attached as Exhibit 5, that permitted Premier to distribute
Multi-Vet's patented (U.S. Patent No. 4,627,385) anti-bark spray
collars in the United States.

16.   After signing the 2001 Agreement, Premier began
distributing Multivet's anti-bark collar in packaging that was
essentially a of copy Multi-Vet's earlier ABOISTOP packaging,
with the GENTLE SPRAY trademark substituted for the ABOISTOP
trademark.  A copy of the original "GENTLE SPRAY" packaging is
attached as Exhibit 6.

17.   Under the 2001 Agreement, Multi-Vet allowed
Premier to use its trademarks in connection with its distribution
of Multi-Vet's products in the United States.

18.   Although paragraph 2.3 of the 2001 Agreement
provided that if Premier provided "... written notification of
Premier's intent to use new marks associated with the Products,"
Multi-Vet would register and license the trademark to Premier,
Premier never provided the required notice for the GENTLE SPRAY
trademark.

19.   Nor did Multi-Vet ever "promise" to assign the
GENTLE SPRAY trademark to Premier.

20.   Nor did Premier ever seek to compel the transfer
through arbitration as provided for in paragraph 17.1 of the 2001
Agreement.

21.   On September 19, 2001, Multi-Vet filed its application with the United States Trademark Office to register the GENTLE SPRAY trademark.  The trademark was published for opposition on August 20, 2002, and the registration issued on September 9, 2003.

22.   As the result of the advertising and use of the GENTLE SPRAY trademark in connection with Multi-Vet's anti-bark spray collar, consumers have come to associate the trademark with Multi-Vet's collar.

**THE SUBSEQUENT AGREEMENTS**

23.   On October 30, 2003, the parties entered into a "First Amended and Restated Licensing Agreement" (the "2003 Amendment"), a copy of which is attached as Exhibit 7.  Other than providing that "Premier will reimburse on closing the balance of note dated July 1st.  The capital due as of the date hereof is $204,426.56 ...", the 2003 Amendment is similar to the 2001 Agreement in all relevant aspects.

24.   On November 1, 2004, Multi-Vet and Premier entered into an "Exclusive Distribution Agreement" (the "2004 Distribution Agreement"), a copy of which is attached as Exhibit 8.

25.   The 2004 Distribution Agreement provided that Multi-Vet was the owner of all trademarks used with its collars and did not obligate Multi-Vet to transfer any of its trademarks to Premier.

26.   The merger provisions in the 2004 Distribution Agreement made it clear that it superseded the 2001 Agreement as amended by the 2003 Amendment.  Any possible rights that Premier

- 5 -

might have had to the GENTLE SPRAY trademark under the 2001 Agreement or the 2003 Amendment had therefore been extinguished.

27.   The 2004 Distribution Agreement was terminated on October 5, 2005 by the "Termination of Exclusive Distribution Agreement", a copy of which is attached as Exhibit 9.

28.   The following day, on October 6, 2005, Multi-Vet and Premier entered into a "Distribution Agreement" (the "2005 Distribution Agreement"), a copy of which is attached as Exhibit 10.

29.   The 2005 Distribution Agreement confirmed that the parties agreed that Multi-Vet owned all the trademarks used in connection with Multi-Vet's GENTLE SPRAY anti-bark collar.

## PREMIER'S INFRINGING ACTIVITIES

30.   After the 2005 Distribution Agreement expired at the end of 2006, Multi-Vet continued supplying Premier with anti-bark spray collars on a non-exclusive basis until orders from Premier stopped in October 2007. Premier then immediately began to market its own collar to compete with Multi-Vet's products.

31.   When in 2007, Multi-Vet learned that Premier had begun packaging and selling anti-bark spray collars using the trademarks that had been used in connection with Multi-Vet's collars and, pursuant to the distribution and licensing agreements between the parties were owned by Multi-Vet, it demanded that Premier discontinue their use.

32.   In response, around October of 2007 Premier discontinued its use of Multi-Vet's GENTLE SPRAY trademark and began selling its anti-bark collar using the name SPRAY SENSE.

- 6 -

33.   Thereafter however, Premier's Vice President, Charles David Mann, made Premier's intentions quite clear, threatening in a November 6th, 2007 letter to me to "... chase you into every consumer spray product channel you have or will ever find.  I am vindictive that way and I do not have any contractual requirements that require me to stop if Sharon and Evan say so."  A copy of his letter is attached as Exhibit 11.

34.   When Multi-Vet subsequently learned that Premier was again selling an anti-bark collar identified as the "Gentle Spray® Bark Citronella Anti-Bark Collar", our counsel sent a letter to Premier on February 19, 2008, a copy of which is attached as Exhibit 12, demanding that it cease doing so.

35.   After Premier refused to comply, this action was filed.

**THE IMPACT OF AN INJUNCTION ON MULTI-VET**

36.   I understand that Premier has filed a motion with the Court asking that it disturb the *status quo* that has been in place for some time and order Multivet to stop using its current packaging and advertising.

37.   The Court's issuance of such an order would work a sever hardship on Multi-Vet and its employees.

38.   The financial cost alone of changing its advertising and marketing materials, and repackaging its product would be in excess of US$ one million.

39.   More importantly however, the damage to Multi-Vet's reputation, which has been earned as the result of many years of dedicated work developing, marketing, distributing,

- 7 -

promoting, and advertising its high quality products, would be irreparable.

40.  Indeed, forcing Multi-Vet to change or recall its packaging would damage its reputation and customer relationships in a way that would be impossible to measure or repair.  In the circumstances, the issuance of such an injunction would deal a devastating blow to Multi-Vet's business.

**CONCLUSION**

41.  For these and the reasons in Multi-Vet's other submissions, I respectfully request that the Court deny Premier's motion in all regards.

42.  I declare under the penalty of perjury pursuant to the laws of the State of New York and Canada that the foregoing is true and correct.

Dated: June 27, 2008
        Saint-Hyacinthe                          Richard Garon

- 8 -

Exhibit 1



# ABOISTOP®

## The Humane Anti-Barking Spray Collar

Le collier anti-aboiement à la citronnelle

El Collar Antiladrido con Aerosol que no daña a su perro

MULTIVET

www.multivet-inter.com

Exhibit 2







Exhibit 3

LE COLLIER ANTI-ABOIEMENT À JET
EST LA SOLUTION SANS CRUAUTÉ
LA PLUS RECOMMANDÉE PAR LES
VÉTÉRINAIRES ET LA SPCA.

LE COLLIER ANTI-ABOIEMENT à jet
interrompt le chien au moment où
celui-ci aboie. Par son effet apaisant,
le dispositif permet à l'animal
de s'adapter calmement à son
environnement tout en assurant
la tranquillité de son maître.

Le COLLIER ANTI-ABOIEMENT
à jet est une solution innovatrice,
inoffensive et sans aucun effet
secondaire (peur, brûlure, douleur).

FONCTIONNEMENT
À chaque aboiement, le dispositif libère
un jet inoffensif qui conditionne votre
chien à cesser d'aboyer.

EFFICACITÉ SUPÉRIEURE ÉPROUVÉE :
DEUX FOIS PLUS EFFICACE que le
conditionnement par le choc.

| Jet | efficace à 88 % |
|-----|-----------------|
| Choc | efficace à 44 % |

Étude effectuée par le College of Veterinary Medicine,
Cornell University, et publiée dans *The Journal of the
American Animal Hospital Association* en 1996
(numéro 32, pp. 231-235).



Exhibit 4

tequila
trimax

Page 1 to 1

T² Marketing & Communications, 3556 Saint-Laurent Boulevard, Suite 200, Montreal (Quebec) Canada H2X 2V1

514 337 7575
Telephone

514 337 7574
Fax

Date: January 31, 2003

Client:    **Multivet International**
17420 Centrale
Ste-Hyacinthe (Quebec)
J2T 3L7

P.O # / Contact:    Andree Patry
T² Docket #:    103

| Description | Unit Price | Total |
|---|---|---|
| **January Misc Costs** | | |
| Competitive Product (purchased Sept/02) | | $413.97 |
| SSSCAT ad adaptation | | $250.00 |
| Courrier to magazine re: SSSCAT ad | | $25.00 |
| Dog Photography -- Casting / maquettes from photographer portfolio | | $390.00 |
| Photography -- on location supervision (4 sessions) | | $650.00 |
| Product labels (Jan) | | $485.00 |
| Spraylogik / anti shock icons | | $350.00 |

| Net Amount | GST | PST | TOTAL |
|---|---|---|---|
| $2563.97 | $179.48 | $205.76 | $2949.21 |

Terms: Net 30 days, 1.5% administration charge per month (18% per year) on all past-due accounts.
GST: 86447 6627    PST: 12027 32590 TQ0001

Exhibit 5

**Multi-Vet/Premier Agreement**                                    Page 1 *as signed*

AGREEMENT ENTERED INTO AT Montreal, on the 30th day of April, 2001.

BETWEEN:                **MULTI-VET LIMITED**, a Canadian corporation having its offices at 120, Ferland Street, Suite 11B, Nun's Island, Verdun, Quebec, Canada H3E 1L1,

(hereinafter referred to as "**Multi-Vet**");

AND:                    **MULTIVET INTERNATIONAL INC.,** a Canadian corporation having its offices at P.O. Box 651, St-Hyacinthe, Quebec, Canada H2S 7R5,

(hereinafter referred to as "**International**")

AND:                    **PREMIER PET PRODUCTS, LLC**, a Virginia limited liability company with its principal place of business at 406 Branchway Road, Richmond, Virginia, 23236 U.S.A.

(hereinafter referred to as "**Premier**");

WHEREAS Multi-Vet is the owner of patents and know-how related to the production of devices for the training of pets and of the spray technology used therein;

WHEREAS Premier is in the business of selling collars, leashes, and various other products for dogs, cats, birds and other small companion animals;

WHEREAS Multi-Vet has granted certain distribution rights to International with respect to anti-barking collars;

WHEREAS Premier desires to acquire from Multi-Vet an exclusive license allowing it to use the Spray Technology (as defined hereunder) and certain trademarks in association with the marketing, promotion, sale and distribution of Products (as defined hereunder) in the USA (hereinafter the «Territory»);

WHEREAS International has acquired valuable know-how with respect to the marketing and sale of Products in the Territory;

WHEREAS International is willing to renounce to said distribution rights in the Territory in consideration for the payment of consulting fees by Premier as further described in a Consulting Agreement entered concurrently with this Agreement;

WHEREAS Premier wishes to be supplied Products by Multi-Vet and Multi-Vet is willing to do so the whole in accordance with the following terms and conditions.

## THE PARTIES HAVE AGREED AS FOLLOWS:

## SECTION 1 - DEFINITIONS

In this Agreement,

**1.1    Affiliates.** A body corporate is deemed to be affiliated with an individual if such individual, directly or indirectly, controls (de jure or de facto) such body corporate. A body corporate is deemed to be affiliated with another body corporate, if one of them is the subsidiary of the other or both are the subsidiaries of the same body corporate or each of them is ultimately controlled by the same person(s). If two (2) bodies corporate are affiliated with the same person at the same time, they shall be deemed to be affiliated with each other.

**1.2    Confidential Information.** The meaning set forth in Section 15.

**1.3    Contract Year.** That period of time commencing on the Effective Date and ending on December 31, 2001 and any subsequent twelve month period ending on December 31st.

**1.4    Effective date.** April 30, 2001.

**1.5    International's Know-How.** All the present and future knowledge and accumulated experience acquired by International as a result of research, practical experience or otherwise in respect of the marketing and sale of the Products in the Territory.

**1.6    Net Sales.** The total number of units of Products as invoiced by Premier to its customers, less: (i) all credits and allowances actually granted by Premier to any of its customers in respect of uncollectible bad debt not to exceed two percent (2%), rejection or returns of units of Products and accounting errors; (ii) units of Products which are given away at no cost for promotional purposes, up to a total not to exceed three percent (3%) of total number of units of Products; and (iii) units of Products which are sold by Premier for a special defined promotion at a discount price, only with the prior approval of Multi-Vet, which shall not be unreasonably withheld. All of said exclusions shall not collectively exceed five percent (5%). Bad debt shall not be considered uncollectible until one (1) year after first invoiced, and Premier has turned the debt over to a collection agency.

**1.7    Patents.** Each and every presently-existing and after acquired unexpired patent of Multi-Vet in the Territory embodying any part of the Spray Technology, including, without limiting the generality of the foregoing, the following patents:

| COUNTRY | APPLICATION No. | PATENT No. | ISSUE DATE | EXPIRATION DATE |
|---------|-----------------|------------|------------|-----------------|
| USA | 709,433 | 4,627,385 | 9 December 1986 | 7 March 2005 |
| USA | 378,901 | 5,046,453 | 9 October 1991 | 12 July 2009 |

as well as all patents which may issue therefrom or from applications which may be filed in relation to the Spray Technology and any patent of importation, improvement or addition, utility models and inventors certificates, continuation, extension, division, re-validation, reissue or other combination or renewal of same in the Territory.

**1.8     Product.** Any device to train, contain or otherwise control pets using a spray, including anti-barking devices.     Without limiting the generality of the foregoing, Products that are presently manufactured by Multi-Vet are listed in Schedule A, which can be amended from time to time as new Products are invented or created.

**1.9     Spray Technology.** All the present and future commercial, scientific and technical knowledge and accumulated experience acquired by Multi-Vet and its predecessors in title as a result of research, practical experience or otherwise, in the design, manufacture, production, use, sale, distribution, marketing, advertising and/or merchandising of anti-barking collars and/or of other devices to train, contain or otherwise control pets using a spray, including, without limiting the generality of the foregoing: ideas, un-patented inventions, processes, manufacturing procedures, methods, designs and data pertaining to the Products and/or anti-barking devices using a spray.

**1.10     Territory.** The meaning set forth in the preamble.

## SECTION 2 - EXCLUSIVE LICENSE

**2.1     Exclusive license to use the Spray Technology and the Patents.** Subject to Section 2.7, Multi-Vet hereby grants to Premier an exclusive license in the Territory for the Term to sell, offer for sale, market, promote, distribute and service the Products which incorporate the Spray Technology and/or the Patents and for no other purpose.

**2.2     Right to use trademarks.** Multi-Vet hereby grants to Premier the exclusive right and license, but not the obligation, to use the following trademarks in relation with the marketing, promotion, sale and distribution of Products in the Territory:  Anti-Bark System, ABS, ABOISTOP, DIRECT STOP, SMART CAP, SPRAY CAP, Spray Barrier, Virtual Fence, Spray Commander and/or any new marks associated with the Products in relation with the marketing, promotion, sale and distribution of Products in the Territory.

**2.3     New trademarks.** Upon written notification of Premier's intent to use new marks associated with the Products, Multi-Vet is obligated to register these marks within

the Territory within sixty (60) days, and hereby grants to Premier the exclusive right and license, but not the obligation, to use the marks in relation with the marketing, promotion, sale and distribution of Products in the Territory. After the initial term of the Agreement, or any subsequent term, in the event the Agreement is terminated for any reason other than breach by Premier, then the new trademarks developed by Premier and registered by Multi-Vet will be sold to Premier by Multi-Vet for one (1) dollar each.

**2.4    Referral.**  If Multi-Vet receives any requests or inquiries from any country world-wide for products currently produced by Premier, Multi-Vet agrees to refer such requests or inquiries immediately to Premier. Similarly if Premier receives any requests or inquiries from any country world-wide for products produced by Multi-Vet, Premier agrees to refer such requests or inquiries immediately to Multi-Vet.

**2.5    Non-compete.**  Premier acknowledges that the Products are complementary to the products which it currently sells in the Territory. If applicable laws permit, Premier agrees that neither itself nor its Affiliates will, directly or indirectly, stock, distribute, promote or sell competitive products ("competitive" being defined as any product used to train, contain or otherwise control pets using a spray or a shock, including anti-barking devices) while this Agreement is in effect for any reason whatsoever without having previously obtained the written permission of Mult-Vet. In addition, in the event this License Agreement is rightfully terminated by Multi-Vet by reason of the breach of Premier, then Premier also shall not distriute, promote or sell competitive product for a period of one year (1) after termination.

**2.6    No sales outside Territory.**  Except as provided in Section 2.7, Premier shall not, except by written agreement with Multi-Vet, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product outside the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same outside the Territory. All requests or inquiries received by Premier with respect to any Product for delivery, use or purchase outside the Territory shall be referred immediately by Premier to Multi-Vet.

**2.7    No sales in the Territory.**  Except as provided in Section 2.7, Multi-Vet shall not, except by written agreement with Premier, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product in the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same in the Territory. All requests or inquiries received by Multi-Vet with respect to any Product for delivery, use or purchase in the Territory shall be referred immediately by Multi-Vet to Premier.

**2.8    Internet Sales.**  Notwithstanding any other Section of this Agreement, Multi-Vet shall have the right to sell Products through the Internet to individual consumers anywhere in the world, limited to normal consumer quantities. Notwithstanding any other Section of this Agreement, Premier shall have the right to sell Products through the Internet to individual consumers anywhere in the world, other than the below listed exclusions, limited to normal consumer quantities, provided that any and all Products

**Multi-Vet/Premier Agreement**                                              **Page 5**

sold by Premier outside the Territory shall be purchased from Multi-Vet at Multi-Vet's lowest published wholesale price.  Until such time as Multi-Vet notifies Premier in writing of the resolution of contract issues with Dynavet, Premier will not make Internet Sales in Europe.

## SECTION 3 - ROYALTIES and MINIMUMS

**3.1    Unit Royalty.** Premier will pay to Multi-Vet a unit royalty on the Net Sales of all Products and the spray refills it sells in the Territory while this Agreement in effect, in accordance with Schedule A annexed hereto.

**3.2    Change in Unit Royalty and Annual Minimum Royalty.**  In the event a third party introduces a competing spray product in the Territory then Multi-Vet and Premier agree to negotiate, in good faith, to adjust the Unit Royalty  and/or Annual Minimum Royalty and/or Purchase Price on the Product(s) which is (are) directly affected by such new competing product.

**3.3    Terms of payment.**  Premier will make royalty payments to Multi-Vet within 60 days of the end of each calendar month

**3.4    Annual Minimum Net Sales.**  Premier will be required to pay to Multi-Vet the royalties corresponding to the following minimum unit Net Sales of Products in the Territory:

| Year | Minimum Units Barking devices | Minimum Units Spray commanders |
|------|-------------------------------|--------------------------------|
| 2001 | None | None |
| 2002 | 30,000 | 5,000 |
| 2003 | 45,000 | 10,000 |
| 2004 | 65,000 | to be negotiated |

Premier will thereafter be required to maintain a 10% yearly increase in unit Net Sales over the actual average unit Net Sales of the two (2) previous years to maintain the agreement.  However, it is agreed that the Annual Minimum Net Sales for any given year will never be less than the actual Annual Net Sales of the previous year.

**3.5    Adjustment.**  If Multi-Vet cannot ship Product(s) to Premier for any period greater than thirty (30) days and thereby causing Premier to materially backorder its customers, or if Premier's ability to sell Products is otherwise materially impeded by circumstances beyond its reasonable control, Multi-Vet and Premier agree to renegotiate, in good faith, the Annual Minimum Net Sales and/or Royalties and make reasonable adjustments, as necessary.

**3.6    Calculation.**  The above minimum royalties will be payable monthly by Premier based on a rolling twelve-month forecast by adding to each monthly royalty payment any

balance (if any) between the minimum royalty due for the year-to-date period and the royalties otherwise payable for such year-to-date period and such additional payment shall be credited as a prepaid royalty.

**3.7    Failure to meet Annual Minimum Net Sales.**  If Premier does not make the Annual Minimum Net Sales provided in Section 3.4 during a given year, the parties agree to undertake a mutual review within 60 days of the end of the year of that year's sales activities and market conditions to determine the reason(s) for the shortfall.  If in Multi-Vet's opinion Premier has not put forth diligent and best efforts to reach the Annual Minimum Net Sales, Multi-Vet shall have the right (in addition to any other rights it may have pursuant to this Agreement) to transform it into a non-exclusive license.  Such transformation shall be effective thirty (30) days from the date of written notice from Multi-Vet to Premier.

**3.8    When sold.**  For the purposes of this Agreement, Products shall be considered sold when invoiced out, or if not invoiced, when delivered or shipped to the customers.

## SECTION 4 - REPORTS & PAYMENTS

**4.1    When Report due.**  Premier covenants and agrees to furnish royalty statements within twenty (20) days after each calendar month during the term of this Agreement.

**4.2    Content of Report.**  All statements shall:

> **4.2.1**   include the total Net Sales of each Products and the spray refills made during such month;

> **4.2.2**   include a calculation of the amount due to Multi-Vet for the royalties in respect of the Net Sales so reported, and of the minimum royalties, when applicable; and,

> **4.2.3**   be certified as correct by the Controller or some other senior officer of Premier.

**4.3    When Payment due.**  Premier covenants and agrees to make the royalty payment corresponding to the Net Sales of Products and the spray refills made during each calendar month during the term of this Agreement within sixty (60) days after the end of each such month.

**4.4    If no Sales.**  If no Net Sales have been made in any month, Premier shall so advise Multi-Vet within twenty (20) days after the end of the month.  The minimum Royalty for such month shall be payable within sixty (60) days after the end of each such month.

**4.5    Currency.** All dollar values expressed in this Agreement and any Schedule hereto and all payments required to be made by Premier, shall be in US dollars.

**4.6    Interest.** Any amount owed to Multi-Vet pursuant to this agreement which is not paid on its due date shall bear interest at the rate of one and one half percent (1½%) per month (eighteen percent (18%) per annum) or at the highest rate permitted by law, if lower than the above, calculated from the date upon which such amount was due. Unpaid interest will also bear interest at the same rate.

## SECTION 5 - ACCOUNTS

**5.1    Keeping of Records.** Premier shall:

> **5.1.1** Keep proper and detailed accounts and records, including invoices, receipts and vouchers relating thereto, (hereinafter referred to as the **"Records"**) in respect of its operations under this agreement, including the Net Sales of Products

> **5.1.2** Make the Records available during business hours on reasonable notice and permit representatives of Multi-Vet to audit and/or inspect the Records on an annual basis, to make notes or copies of documents relating to its operations under this Agreement, including royalty calculations and payments and to report to Multi-Vet only information relative to the accuracy of the royalties payable under the Agreement. In the event an error in favor of Multi-Vet is discovered during such audit or inspection, Premier shall pay the difference within thirty (30) days of such discovery. Furthermore, if such error exceeds three (3%) percent of the royalties actually paid, Premier shall reimburse Multi-Vet for all costs incurred in relation to such audit or inspection. Any inspection or audit of Records shall be subject to reasonable confidentiality agreements.

**5.2    Duration.** Premier shall preserve the Records for a period of five (5) years from their creation.

## SECTION 6 - SUPPLY OF PRODUCTS

**6.1    Purchases.** Premier undertakes to purchase all of its needs in Products from Multi-Vet or a supplier designated by Multi-Vet. Premier also undertakes to purchase all of its needs in the spray substances used in conjunction with any Product from Multi-Vet. Multi-Vet agrees to provide all Products and associated supplies ordered by Premier.

**6.2    Prices.** The prices charged by Multi-Vet to Premier for each of the Product(s) are specified in Schedule B. These prices are in 2001 dollars and may be increased by Multi-Vet as set forth in Section 6.8 due to materials, labor or currency fluctuations.

**6.3    Payment terms.**  The payment terms will be net forty-five (45) days, F.O.B. Multi-Vet plant, from the date of shipment.

**6.4    Net of other charges.**  The said prices shall be the net selling price by Multi-Vet, exclusive of all sales and other similar taxes, custom and excise duties, insurance premiums, freight and storage charges and all other charges of a similar nature, whether currently imposed or applicable in the future.

**6.5    Temporary license.**  Contingent upon the event Multi-Vet and its designated sub-contractors are unwilling or are not able to supply Premier with such Products and associated supplies ordered by Premier, Multi-Vet grants to Premier a temporary license to produce such Products and associated supplies, or have another produce same, but only for resale within the Territory and only for as long as such failure to supply lasts.

**6.6    Quality standards.**  Such License to use the Spray Technology and the Patents granted to Premier shall be restricted to such Products that have a high and merchantable quality which meet or exceed Multi-Vet's pre-existing quality standards as communicated to Premier.

**6.7    Inspection.**  Multi-Vet shall have the right, at all reasonable times, to enter and inspect any premises used by Premier in its operation under such License for the purpose of determining compliance with the standards, specifications and requirements referred to in Section 6.6.

**6.8    Changes in prices.**  Multi-Vet will inform Premier in writing at least three (3) months prior to any change in its list prices.  With respect to any written purchase orders for units which may be placed by Premier between the date of such written notice by the company and the effective date of the price change, the price for the units so ordered shall be the price prevailing at the time the purchase order is received and accepted by Multi-Vet or its sub-contractors, provided that such written purchase order specifies delivery dates not exceeding six (6) months from the order date, failing which the increased purchase price shall be applicable.  In the event that Premier, as a condition of making a sale, is required to enter into an agreement with a customer(s) in which Premier must guarantee no change in wholesale price for a specified period of time, Premier will provide Multi-Vet with a copy of the terms of the contract, and Multi-Vet will have the option to agree thereto, in which case it will honor the price prevailing during at the beginning of the contract and throughout its duration, limited to units sold only to that customer pursuant to such contract.

**6.9    No changes.**  Premier agrees not to add to, remove from or in any way change the Products without the prior written approval of Multi-Vet.  Premier also agrees not to alter, remove or otherwise tamper with any registration numbers, serial numbers, date codes, patent numbers or other tracking marks that appear on the Products.

**6.10    Notification of defects.**  Premier will have the obligation to advise Multi-Vet of the existence of any defect as soon as possible after same is brought to its attention and to

provide Multi-Vet with all useful information and explanations relating to same. Multi-Vet will have the obligation to advise Premier of the existence of any defect as soon as possible after same is brought to its attention and to provide Premier with all useful information and explanations relating to same. Multi-Vet shall promptly remedy any major design, material or manufacturing defects in Products sold to Premier.

## SECTION 7 - WARRANTY

**7.1    Warranty.** "IP Warranties:" Multi-Vet warrants that: (1) it is the lawful owner of the Patents and the Spray Technology, and that Multi-Vet otherwise has all power and authority to grant the rights and licenses granted herein; (2) that, to the best of its knowledge, the use and exploitation of the Patents and the Spray Technology as licensed herein, including the sale of the Products by Premier and the use of the Products by Premier's customers, shall not infringe or violate the patent or other intellectual property rights of any third party; (3) that as of the Effective Date, it has no knowledge that any third party is infringing any of the Patents; and (4) that the Patents and the Spray Technology collectively comprise all rights and know how to distribute and sell the Products in the Territory and to otherwise exercise Premier's rights under this Agreement. "Quality Warranties:" Multi-Vet warrants that all Products manufactured by or for it and sold to Premier pursuant to this Agreement shall be free from any major material or workmanship defects and in full compliance with its specifications, quality control standards and all applicable laws. A Product that does not meet the foregoing requirements shall be deemed to be "defective" for purposes of this Section 7. This Quality Warranty on the Products shall be valid for a period of eighteen (18) months from the date of shipment to Premier. The Quality Warranty obligations of Multi-Vet are strictly limited to the replacement/repair of any Products found to have major manufacturing defects in materials or workmanship. Multi-Vet is not obligated for damages due to error, misuse, neglect, etc. by Premier, Premier's customers, or the end consumer. In the event that three (3) percent or more of Products purchased from Multi-Vet have major defects and/or are the subject of Quality Warranty claims, then Premier shall be entitled to a reduction in Minimum royalties payable, the rate of actual royalties on Net Sales, and/or purchase price of Products, which adjustment the parties shall promptly negotiate in good faith.

**7.2    No liability to customers or end consumers.** Premier shall assume all warranty obligations to its customers and end consumers in respect of Products, and Multi-Vet shall have no liability either to Premier or to its customers and end consumers in respect of such warranty obligations except as expressly provided herein.

**7.3    LIMITATIONS**  EXCEPT FOR THE WARRANTIES CONTAINED IN SECTION 7.1, MULTI-VET DOES NOT GRANT ANY WARRANTY, EITHER EXPRESSED OR IMPLIED, LEGAL OR CONVENTIONAL, WITH REGARD TO ANY PRODUCTS OR REFILLS AND DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE WARRANTIES EXPRESSLY CONTAINED IN SECTION 7.1 HEREOF ARE IN LIEU

OF ANY LIABILITY OR OBLIGATION OF MULTI-VET FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES (INCLUDING LOSS OF REVENUE OR OF BUSINESS OR OTHER SIMILAR LOSSES) SUSTAINED BY PREMIER (INCLUDING ITS EMPLOYEES, AGENTS, OR INVITEES) OR ANY OF ITS CLIENTS OR END CONSUMERS AND/OR IN ANY WAY ARISING FROM OR RELATING TO THE SALE, MAINTENANCE, USE, PERFORMANCE OR FAILURE OF ANY PRODUCTS OR REFILLS.

7.4    **Faulty actions.**  Multi-Vet's warranty obligations do not cover any faulty or negligent manipulation, storage or use of any Products or refills or any such manipulation or storage or use which is not in conformity with instructions provided by Multi-Vet.

7.5    **Notification.**  Premier will have the obligation to advise Multi-Vet of the existence of any warranty claim or any defect as soon as possible after same is brought to its attention and to provide Multi-Vet with all readily available useful information and explanations relating to same. Premier shall allow Multi-Vet to have free access to any Products at all reasonable times.

7.6    **Obligations of Multi-Vet.**  Multi-Vet shall replace or repair, free of charge, all defective Products (as defined in section 7.1 above) returned by Premier to Multi-Vet subject to the following terms:

7.6.1    The defective Products will be shipped in full cases (minimum 100 units per shipment) to Multi-Vet (subject to prior co-ordination with Multi-Vet), at Multi-Vet's expense and will include a list of the serial numbers of all returned units together with a description of each alleged defect. Notwithstanding the above, Multi-Vet shall, at its own discretion, be entitled to replace the reported defective Products without requesting shipment of same to Multi-Vet.

7.6.2    Upon receipt of the defective Products shipment, Multi-Vet's personnel will inspect and sort same. All Products covered by the warranty as per Section 7.1 above will be replaced within thirty (30) days free of charge. However, Products that will be found to have been returned for other reasons (dirt, misuse, physical damage, repair by unauthorized personnel, etc.) will be repaired against payment by Premier for parts and labor, but not without prior written authorization from Premier

7.6.3    The replaced/repaired units will be shipped to Premier at Multi-Vet's expense and include an itemized report and invoice with regard to the number of replaced units and an invoice for repaired units, if any.

## SECTION 8 - PRODUCT DEVELOPMENT

8.1    **Product development.**  Multi-Vet may, during the term of this Agreement, develop pet training products using the Spray Technology including but not limited to

remote trainers, containment fences and indoor animal control. Multi-Vet will provide a reasonably full disclosure of any R&D development to Premier. Multi-Vet will endeavor to get Premier's consultation as much as possible in the product development process, provided Premier will not charge any fees or expenses to Multi-Vet for such consultation unless otherwise agreed.

**8.2    Disclosure.**  Subject to reasonable confidentiality obligations, each party shall promptly disclose to the other party any discovery or invention which is a new or improved Product which it makes or acquires during the term of this Agreement and shall make available to the other party all information relating thereto, including blueprints, sketches, drawings, designs, test information and other data. All such disclosures and information shall be treated as confidential information (within the meaning of section 15) by the recipient.

**8.3    Ownership.**  Multi-Vet shall own all rights to the spray technology aspects of any such discovery or invention created while this Agreement is in effect, no matter by whom made. The other aspects of any such discovery or invention shall be owned by the party making it.

**8.4    Right to distribute.**  Any products developed or created making use of any developments, inventions, discoveries or improvements covered by this Section 8 shall be deemed to be "Products" as defined by this Agreement and subject to the licenses granted herein and the other terms and conditions of this Agreement. Multi-Vet undertakes to sell such new products to Premier at Multi-Vet's lowest trade price to any non-Affiliated customer.

**8.5    Distribution/supply agreement.**  The precise terms of such distribution/supply agreement will be incorporated in an addendum to this Agreement or a separate document.

## SECTION 9 - INTELLECTUAL PROPERTY

**9.1    No contest.**  Premier shall not, at any time during the term of this Agreement or thereafter, question or contest, directly or indirectly, the validity of the Spray Technology, the Patents or the trademarks listed in Section 2.2 or assist any other person to do so.

**9.2    Patent notices.**  Any labeling used in connection with the marketing, advertising, promotion and sale of every Product shall clearly indicate the existence of the Patents as well as their use under license and such label shall be in a form agreed upon by Multi-Vet in writing, and the consent of Multi-Vet shall not be unreasonably withheld. As an example, the following patent notice is agreeable provided in a font having at least 12 points:

«Covered by one or more of the following US Patents 4,627,385 and 5,046,453.»

«Made under license from Multi-Vet Ltd.»

**9.3    Trademark and copyright notices.** To the extent Premier uses a trademark or a copyrighted work of Multi-Vet, Premier will apply appropriate notices to the Products, their containers, accompanying materials and/or promotional materials in a form, size and location acceptable to Multi-Vet, acting reasonably.

## SECTION 10 - PROMOTION AND SALE

**10.1    Best efforts.** Premier shall exercise its diligent, best and good faith efforts at its expense to introduce, promote the sale and use of, obtain orders for, distribute and sell Products in every major part of the Territory and give adequate, efficient and prompt attention and service to local distributors and consumers.

**10.2    Premier discretion.** The details of the marketing, packaging and promotion of the Products shall be at Premier's discretion provided all the other terms and conditions of this agreement are respected by Premier.

**10.3    After sales service center.** Premier shall, at its own expense, organize and keep active an after sales service center for the Products in the Territory.

**10.4    Conformity with the law.** Premier shall ascertain that the Products and all packaging, instructions, advertising material, etc. is in conformity with the laws and regulations of every part of the Territory.

## SECTION 11 - MULTI-VET INTERNATIONAL

**11.1**    International hereby surrenders, waives and renounces in favor of Premier any distribution rights in the Territory granted to it by Multi-Vet for as long as this agreement remains in force.

**11.2**    In consideration for the above and to obtain access to International's Know-How, Premier undertakes to enter into a consulting agreement with International (the "**Consulting Agreement**"). Such Consulting Agreement will contain the usual clauses in such agreements and will provide that Premier will pay a fee of nineteen thousand eight hundred eighty-nine dollars ($19,889) per month to International for ten (10) years.

## SECTION 12 - TERM

**12.1**    This Agreement is deemed to have commenced on the date mentioned above and shall terminate on April 30, 2011 unless previously extended by mutual consent or terminated in accordance with the terms of this Agreement.

## SECTION 13 - TERMINATION

**13.1    Right to terminate by Multi-Vet.**  Multi-Vet shall be entitled to terminate upon fifteen (15) days prior written notice in the event:  i) Premier fails to pay when due any royalty (regular or minimum) or any other amount payable to Multi-Vet pursuant to this Agreement or  ii) the Consulting Agreement is terminated for any reason other than International's breach thereof.  Such right shall be exercised by giving a written notice to Premier specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than fifteen (15) days subsequent to the date of such notice unless the Premier has cured such breach within fifteen (15) days from the date of such notice.  In the case Premier fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

**13.2    Right to terminate by either party**  In the event of the material breach of any other provision of this Agreement by one of the parties, the other party shall have the right to terminate this Agreement.  Such right shall be exercised by giving a written notice to defaulting party specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than thirty  (30) days subsequent to the date of such notice unless the breaching party has cured such breach within thirty (30) days from the date of such notice.  In the case the defaulting party fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

**13.3    Material Breaches.**  Without limiting the generality of the foregoing, the occurrence of any one or more of the following events shall constitute a material breach under this Agreement:

**13.3.1** a party breaching a warranty it makes herein;

**13.3.2** a party institutes proceedings seeking relief under a bankruptcy law or any similar law, or consents to entry of an order for relief against it in any bankruptcy or insolvency proceeding or similar proceeding, or files a petition for or consent or answer consenting to reorganization or other relief under any bankruptcy act or other similar law, or consents to the filing against it of any request for the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of it or of any substantial part of its property, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due, or takes any action in furtherance of the foregoing;

**13.3.3** a party makes or attempts to make an assignment for the benefit of creditors;

**13.3.4** a Receiver is appointed over the whole or any part of the undertaking or assets of one of the parties;

**13.3.5** a party ceases or threatens to cease to carry on the whole or any substantial part of its business other than in the course of reconstruction or amalgamation; or,

**13.3.6** a party is convicted of a felony or other similar crime related to the conduct of the business related to this Agreement.

**13.4    No assignee rights.**  No assignee for the benefit of creditors, receiver, liquidator, sequestrator, trustee in bankruptcy, sheriff or any other officer of the court or official charged with taking over custody of a party's assets or business shall have any right to continue the performance of this Agreement.

**13.5    No release.**  Termination of this Agreement shall not release a party from any payments or obligations due and payable or accrued to the other or rescind any payment made or paid by one party to the other hereunder prior to the time such termination becomes effective nor release any party from those obligations hereunder which survive termination.  Furthermore, termination of this Agreement prior to the expiration of its term shall be without prejudice to any other rights which one party may have against the other, including, without limitation, damages for breach to the extent that same may be recoverable.

**13.6    Option to purchase remaining inventory.**  Premier hereby grants to Multi-Vet an option to re-purchase the inventory of Products and refills owned or controlled by Premier at the price at which it was sold to Premier, upon termination or expiration of this Agreement. This option shall apply only if and when the Agreement is terminated or expired.  For example, the transformation of the license into a non-exclusive license pursuant to section 3.7 shall not trigger such option.  If Multi-Vet does not exercise this option within thirty (30) days after the effective date of termination or expiration, as the case may be, then Premier shall be entitled, within the following ninety (90) days, to sell its inventory of such Products and refills notwithstanding the expiration or termination of the licenses herein.

**13.7    No additional amounts.**  In the event of the termination of this Agreement pursuant to section, and unless otherwise provided for in this Agreement, no party will be liable for the payment of additional amounts to the other party.

## SECTION 14 - INDEMNIFICATION

**14.1**  Premier shall indemnify and save and hold harmless Multi-Vet from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorneys' fees and expenses) which Multi-Vet or its Affiliates is or becomes liable for, arising from a third-party claim: (1) that Premier breached a warranty it made herein; (2) that Premier acted with gross negligence or wilful and malicious misconduct; or (3) that Premier made false or misleading claims with respect to the Products; or (4) that Premier exceeded the scope of the licenses granted herein.

**14.2**   Premier shall, at the request of Multi-Vet or one of its Affiliates, assume the defence of any demand, claim, action, suit or proceeding brought against Multi-Vet or any such Affiliate by reason of the foregoing and pay any and all damages assessed against or that are payable by Multi-Vet or any Affiliate as a result of the disposition of any such demand, claim, action, suit or proceeding.  Premier's obligation hereunder is conditioned upon Multi-Vet promptly notifying Premier of all such liabilities, claims, causes of action or suits for which indemnity may by sought.  In the defence of any such claim, Multi-Vet will cooperate fully with Premier, and will, from time to time, make available to Premier all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim.  Premier shall not enter into any settlement or material admission without the prior consent of Multi-Vet.  Notwithstanding the foregoing, Multi-Vet or its Affiliates as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

**14.3**   Multi-Vet shall indemnify and save and hold harmless Premier, its clients and their respective directors, officers, employees, agents and Affiliates from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorney's fees and expenses) which any of the above is or becomes liable for, arising from a third-party claim that: (1) Multi-Vet has breached a warranty it made herein; (2) that Multi-Vet acted with gross negligence or willful and malicious misconduct; (3) relating to product liability claims involving the Products; (4) that the sale or use of the Products and the practice of the licenses granted herein infringe or otherwise violate the intellectual property or other rights of any third party; or (5) resulting from proceedings instituted by Radio Systems Inc. based on its former relationship with Multi-Vet.

**14.4**   Multi-Vet shall, at the request of Premier, assume the defence of any demand, claim, action, suit or proceeding brought against Premier or any of the foregoing parties by reason of the foregoing and pay any and all damages assessed against or that are payable by Premier or any of the foregoing parties as a result of the disposition of any such demand, claim, action, suit or proceeding.  Multi-Vet's obligation hereunder is conditioned upon Premier promptly notifying Multi-Vet of all such liabilities, claims, causes of action or suits for which indemnity may by sought.  In the defence of any such claim, Premier will cooperate fully with Multi-Vet, and will, from time to time, make available to Multi-Vet all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim.  Multi-Vet shall not enter into any settlement or material admission without the prior consent of Premier.  Notwithstanding the foregoing, Premier or the foregoing parties as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

**14.5**   Should such suit, action or other proceeding contain allegations that the Spray Technology portion of any Product sold or distributed by Premier constitutes an infringement of one or more of the claims mentioned in such suit and that such action or

**Multi-Vet/Premier Agreement**                                      Page 16

other proceeding has not been settled six (6) months after the date of service thereof, either party shall have the right to terminate this Agreement upon written notice to the other without any further liability to the other.

**14.6**    During the Term of this Agreement and for 3 years thereafter, both parties shall maintain minimum general liability insurance of two (2) million dollars naming the other party as an additional insured and provide certificates or other proof of insurance to the other party.

## SECTION 15 - CONFIDENTIAL INFORMATION

**15.1**    Each Party acknowledges and understands that the other Party is involved in research, development, production and/or sale of different devices to train, contain or otherwise control pets and has acquired or shall acquire in the future great quantities of secret or proprietary technical, scientific, marketing and commercial information relating to its business and that of its Affiliates, including, but not limited to, products, customer lists, pricing policies, marketing plans and strategies, product development techniques or plans, business acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions (patented or not) and research programs, trade know-how, trade secrets, specific software (source, object and documentation), algorithms, computer processing systems, ideas, methods, experiments and data, no matter their form or support medium including any sketch, report, model, prototype, chip, diskette, tape, CD-ROM, DVD and other similar documents or objects (the **"Confidential Information"**) and that it is imperative for it that the Confidential Information remains secret.

**15.2**    Each Party agrees to maintain the confidentiality of the Confidential Information of the other Party and not to disclose, directly or indirectly, any part to anyone without prior written authorization from the other Party.

**15.3**    Each Party agrees not to use, directly or indirectly, any Confidential Information of the other Party for purposes other than as provided herein and not to assist or collaborate with third parties using, directly or indirectly, any similar Confidential Information for purposes other than those provided for in the present Agreement, without prior written authorization from the other Party.  Notwithstanding the foregoing, either party may disclose the other's Confidential Information to its employees, representatives and agents as is reasonably necessary in order to accomplish the purposes of this Agreement and to fulfil legal, regulatory or business obligations arising or likely to arise from performing pursuant to this Agreement, including without limitations making limited disclosures to bankers, investors, consultants and counsel in the course of obtaining professional services, making regulatory disclosures, and soliciting investors provided all such persons agree in writing to maintain the confidentiality thereof and to refrain from making any unauthorized use thereof.

**15.4** The confidentiality and non-use undertakings specified in the present Agreement do not apply to any part of the Confidential Information which, through no breach of the provisions of the present Agreement:

**15.4.1** the recipient can demonstrate was in the public domain at the time of disclosure of such information by the other party or which later becomes part of the public domain through no breach of this Agreement;

**15.4.2** the recipient can demonstrate was in its possession, prior to disclosure of such information by the other party and had not been previously obtained directly or indirectly from the other party;

**15.4.3** the recipient can demonstrate it had received from a third party after disclosure of such information by the other party hereunder, as a matter of right and having no direct or indirect obligation to the other party with respect to same, provided that such third party did not acquire such information directly or indirectly from the other party; or

**15.4.4** must be disclosed by virtue of the law but only to the extent specifically required.

**15.5** Notwithstanding the above, Confidential Information will not be deemed to be in the public domain or to have been known by a party mainly because it is embraced by more general information previously known to it or merely because it is expressed in publications, books, patents or other literature in general terms not specifically including such Confidential Information disclosed or made available to the other party.

**15.6** Each party undertakes to cause those of its employees who are likely, by reason of their employment, to have access to any part of the Confidential Information from the other party, including confidential information relating to the Product, to sign an agreement in which said employee agrees to treat Confidential Information learned during the course of his employment in the same manner as his employer treats such information.

**15.7** The confidentiality and non-use undertakings herein mentioned will remain in full force and effect for as long as the information at issue remains confidential.

### SECTION 16 - INFRINGEMENT

**16.1** In the event that either party learns of any infringement or threatened infringement or piracy of any of the Patents in the Territory, it shall forthwith give notice thereof to the other party together with all such information with respect thereof as it may from time to time obtain. The parties undertake and agree to consult with each other with respect to how to respond to each infringement or piracy.

**16.2**   Multi-Vet shall have the right, but not the obligation, at its own expense, to take all actions and procedures which it may deem appropriate to defend against infringement of its intellectual property licensed herein and all actions and procedures which it may deem appropriate to enforce and protect Premier's right under this Agreement.  Any recovery shall inure to the benefit of Multi-Vet.  Premier may, at its own discretion and at its own cost, join as plaintiff in an action against any such infringement and all recovery shall be divided between the parties hereto according to the losses and damages suffered by each party, including legal costs and fees associated with bringing the action and all other costs and damages related to the infringement.

**16.3**   In the event Multi-Vet undertakes the prosecution of any such legal proceedings, Premier agrees on behalf of, and at Multi-Vet's expense, to execute any and all documents and do such acts and things, including without limitation, being made a party to such proceedings, as may, in the opinion of counsel for Multi-Vet, be necessary or useful to carry out such prosecution.

**16.4**   Notwithstanding the foregoing, if Multi-Vet declines to institute legal proceedings, Premier shall have the right but not the obligation, at its sole expense, to commence legal proceedings against any third party infringing the Patents in the Territory or otherwise acting or exploiting the Spray Technology in a way that violates Premier's rights under this Agreement.  Multi-Vet agrees that, upon Premier's request and at Premier's cost, it shall join as a party in any such action and that it shall provide Premier with all reasonable non-monetary assistance in the enforcement of rights in the Patents or the Spray Technology.  To the extent any such claim results in an award resulting from infringement within the Territory, then Premier shall be entitled to such reward, as well as to any award of attorneys fees.

**16.5**   "**Legal proceedings**" as used herein shall include demand letters, negotiation and settlement of disputes, as well as the filing of formal legal actions with a court of proper jurisdiction.  Under no circumstances shall Premier have the authority to settle or compromise a matter which in any way mitigates, lessens or restricts the scope of the Patents or Multi-Vet's ownership in the Patents.

## SECTION 17 - ARBITRATION

**17.1**   Any dispute, controversy, claim or other matters of differences arising out of or relating to the contract, or the breach thereof, including any dispute relating to patent validity or infringement arising under this contract, shall be settled by arbitration in accordance with the Patent and International Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**17.2**   The place of arbitration shall be New York City, New York and the English language shall be used throughout the arbitration proceedings.

Final Version

**17.3**    The parties expressly agree to confer upon the arbitrator the powers to fill gaps, cure contractual omissions and to perform all other activities which he may deem necessary and/or opportune.

**17.4**    The award of the arbitrator shall be the sole and exclusive remedy between the parties regarding any claims and counter-claims presented to the arbitrator. The parties undertake to fully and punctually abide by the award rendered by the arbitrator. Failing such voluntary compliance, judgment upon the award or any other appropriate procedures may be entered or sought in any court having jurisdiction thereof to secure enforcement of said award.

**17.5**    The final award will be payable in United States currency without deduction or offset and costs, fees or taxes incidental to the enforcement of the arbitration award shall be charged in accordance with the decision of the arbitrator against a party resisting enforcement. Payment of the award including interest from the date of breach and violation shall be made in accordance with the relevant provisions of this Agreement.

**17.6**    Nothing herein contained shall prevent any party hereto from instituting an action at law against the other party requesting temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain *interim* relief when deemed necessary by such court to preserve the *status quo* or prevent irreparable injury pending final settlement of such dispute by arbitration.

## SECTION 18 - NOTICES

**18.1**    Any notice, demand, consent or other communication to be given in connection with this Agreement (collectively and individually the **"Notice"**) shall be in writing and addressed to its addressee at the address stated above or such addresses as the parties may specify from time to time by Notice.

**18.2**    Notices may be delivered by hand, registered mail or fax and shall be deemed to have been received as follows:

> **18.2.1** If delivered by hand:  at the time of delivery to a person who appears reasonably to be in charge.

> **18.2.2** If sent by fax:    at the time of confirmed transmission provided a confirmation copy is sent by airmail or registered mail within twenty-four (24) hours after the transmission.

> **18.2.3** If sent by registered mail:  at the time of delivery or of attempted delivery in the case delivery cannot be completed due to no fault of the sender.

**18.3** If the time of such deemed receipt as provided in paragraph 18.2 hereof is not during the customary hours of business, the Notice shall be deemed to have been received at 10:00 a.m. at the place of delivery on the first customary day of business thereafter.

## SECTION 19 - GENERAL PROVISIONS

**19.1    Preamble.** The preamble to this Agreement forms part hereof as if recited in full.

**19.2    Headings.** Headings are for reference purposes and do not in any way affect interpretation.

**19.3    Entire Agreement.** This Agreement sets forth the entire Agreement and understanding between the parties with respect to the subject matter of this Agreement and merges, supersedes and cancels all prior discussions, representations, inducements, promises, undertakings, understandings, agreements or otherwise, whether oral, in writing or otherwise, between the parties with respect to such subject matter including the letter of intent of March 15, 2001. Without limiting the generality of the foregoing, no oral explanation or oral information by the parties hereto, or any of them, shall alter the meaning or interpretation of this Agreement. There are no statements, terms, conditions, undertakings, representations, warranties or collateral agreements still in force or effect which have not been embodied in this Agreement. This Agreement may be altered, modified or amended only by a written document signed by the parties.

**19.4    Further Agreements and Actions.** The parties agree to cooperate with each other and execute and deliver such further or other documents and assurances and do such other acts as may, from time to time, be required in order to complete or fulfil actions required or contemplated by this Agreement or deemed useful by the other party to protect the Spray Technology the Patents, the trademarks or the copyrights or to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement or to otherwise give effect to the provisions of this Agreement.

**19.5    Independent Contractors.** Each party is an independent contractor and does not have any power (nor will it represent itself as having any power) to in any way enter into commitments or contracts, assume obligations, give any warranties, make any representation or incur liability of any kind in the name of the other party or on behalf of the other party or to otherwise bind or obligate the other or to assume or create any expressed or implied obligation or responsibility on behalf of the other or in the other's name. Nothing in this Agreement shall construed to create a relationship of partners, joint venturers, fiduciaries, master-servant, agency or other similar relationship between the parties.

**19.6    Severability.** The parties agree that notwithstanding anything otherwise contained in this Agreement, in the event that any clause, term or provision of this Agreement or any portion thereof is determined by any Court, arbitrator or agency of competent jurisdiction to be invalid, unenforceable, in conflict with any applicable law or

regulations or otherwise illegal, this Agreement shall continue in full force and effect as if the offending clause, terms and provisions hereof or portion thereof are no longer incorporated herein.

**19.7    Modifications to render valid.**  If any applicable and binding law or rule of any jurisdiction i) requires a greater prior notice of the termination of this Agreement than is required hereunder, or ii) requires the taking of some other action not required hereunder, or iii) makes any provision of this Agreement or any specification or standard prescribed by Multi-Vet invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and the parties agree to negotiate in good faith the modification of such invalid or unenforceable provision, specification or standard to the extent required to achieve validity and enforceability.  If the parties cannot agree as to the modifications which are required, the matter will be submitted to arbitration as provided for in this Agreement.

**19.8    Waiver of Default.**  The failure of any party at any time to take action against the other party, or the failure of either party to terminate the present Agreement as provided herein, shall not affect either party's right to require full performance of this Agreement at any time thereafter, and the waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach thereof nor nullify the effectiveness of such provisions or the right of such party to demand redress for their respective losses, damages and prejudices.

**19.9    Waiver in Writing.**  No waiver of any breach of any term or provision hereof shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived.

**19.10  Assignment by Premier.**  Premier shall not assign the rights and/or obligations created pursuant to the terms of this Agreement without the consent of Multi-Vet which it may withhold at its discretion except:

> **19.10.1**    to a related company in the context of a corporate reorganization; or

> **19.10.2**    to a successor, acquirer or purchaser of substantially all of Premier's business relating to its conduct hereunder, provided such successor is not a direct competitor of Multi-Vet and further provided a fee of $1,000,000 is paid to Multi-Vet at the time of closing of such assignment;

provided that the assignor will at all times guarantee performance by such assignee of each and every obligation assumed by the assignor under the terms of this agreement.

**19.11  Assignment by Multi-Vet.**  Multi-Vet shall not assign the rights and/or obligations created pursuant to the terms of this Agreement to any direct competitor of Premier without the consent of Premier, which shall not be unreasonably withheld.

**19.12  Successors & Assigns.**  Subject to the provisions of paragraphs 19.10 and 19.11, this Agreement shall inure to the benefit of and be binding upon the parties, and their heirs, executors, administrators, successors, permitted assigns and insurers and reinsurers.

**19.13  Applicable Law.**  This Agreement shall be governed, construed and enforced in accordance with the laws in force in the Province of Quebec except for patent matters which shall be governed by the laws of the Territory.  The enforcement of any awards rendered by arbitration pursuant to Section 17 and any disputes arising under this Agreement, which for any reason cannot be resolved by arbitration as provided in Section 17, shall be subject to the exclusive jurisdiction of the Courts of the jurisdiction of the defendant in such proceedings and both parties hereby irrevocably attorn to the jurisdiction of such Courts. All such proceedings will be carried out in the English language.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

Multi-Vet/Premier Agreement                                    Page 23

      IN WITNESS WHEREOF, the parties hereto have signed as of the place and date indicated above.

PREMIER PET PRODUCTS, LLC

Per :   _____

       Name:  Evan C. Wooton
       Title:  President

MULTI-VET LIMITED

Per :   _____

       Name:  Roger Garon
       Title:  President

MULTIVET INTERNATIONAL INC.

Per :   _____

       Name: Richard Garon
       Titre:  President

Final Version

Multi-Vet/Premier Agreement                                    Page 23

   IN WITNESS WHEREOF, the parties hereto have signed as of the place and
date indicated above.

PREMIER PET PRODUCTS, LLC


Per :    _____
         Name:   Evan C. Wooton
         Title:   President

MULTI-VET LIMITED


Per :    _____
         Name:  Roger Garon
         Title:   President

MULTIVET INTERNATIONAL INC.


Per :    _____
         Name: Richard Garon
         Titre:  President

Final Version

Multi-Vet/Premier Agreement                                    Page 24

<u>Schedule A</u>

<u>Royalty Schedule</u>

| <u>Products Containing Patents or the Spray Technology</u> | <u>Royalty</u> |
|---|---|
| Anti-Bark Collar Unit (device only) | $3.00 |
| Master Plus | to be negotiated |
| Spray Barrier | |
| Spray Commander | $6.00 |
| Virtual Fence | to be negotiated |
| Receiver Collar | to be negotiated |

<u>Products Not Patented or containing any Spray Technology, but the use of which is exclusively limited as Accessories to Patented Products or containing Spray Technology</u>

| | <u>Royalty Fee</u> |
|---|---|
| Citronella Refill | $0.35 |

Final Version

**Multi-Vet/Premier Agreement**                                                   **Page 25**

**Schedule B**

**Current Market-Ready Product Schedule**
(To Be Purchased From Multi-Vet)

|                                           | Purchase Price      |
|-------------------------------------------|---------------------|
| Anti-Bark Collar Unit (device only)       | $20.00              |
| Master Plus                               | to be negotiated    |
| Spray Barrier                             | to be negotiated    |
| Spray Commander                           | $50.00              |
| Virtual Fence                             | to be negotiated    |
| Citronella Refill                         | $3.50               |

Final Version

Exhibit 6

Exhibit 7

Multi-Vet/Premier Agreement                                          Page 1

**FIRST AMENDED AND RESTATED LICENSING AGREEMENT ENTERED INTO AT** Montreal, as of the 30th day of October, 2003.

| | |
|---|---|
| **BETWEEN:** | **MULTI-VET LIMITED**, a Canadian corporation having its offices at 120, Ferland Street, Suite 11B, Nun's Island, Verdun, Quebec, Canada H3E 1L1, |
| | (hereinafter referred to as "**Multi-Vet**"); |
| **AND:** | **MULTIVET INTERNATIONAL INC.**, a Canadian corporation having its offices at P.O. Box 651, St-Hyacinthe, Quebec, Canada H2S 7R5, |
| | (hereinafter referred to as "**International**") |
| **AND:** | **PREMIER PET PRODUCTS, LLC**, a Virginia limited liability company with its principal place of business at 406 Branchway Road, Richmond, Virginia, 23236 U.S.A. |
| | (hereinafter referred to as "**Premier**"); |

**WHEREAS** Multi-Vet is the owner of patents and know-how related to the production of devices for the training of pets and of the spray technology used therein;

**WHEREAS** Premier is in the business of selling collars, leashes, and various other products for dogs, cats, birds and other small companion animals;

**WHEREAS** Multi-Vet has granted certain distribution rights to International with respect to anti-barking collars;

**WHEREAS** [pursuant to an agreement dated as of April 30, 2001 (the "Original Agreement") Premier acquired] from Multi-Vet an exclusive license allowing it to use the Spray Technology (as defined hereunder) and certain trademarks in association with the marketing, promotion, sale and distribution of Products (as defined hereunder) in the USA (hereinafter the "**Territory**") to entities whose primary business is pet products and directly to end consumers in normal end-user consumer quantities (the "Market");

**WHEREAS** Premier and Multi-Vet desire to amend the Original Agreement; and

**WHEREAS** Premier will reimburse on closing the balance of note dated July 1st. The capital due as of the date hereof is $ 204,426.56.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS ACKNOWLEDGED HEREBY, THE PARTIES HAVE AGREED AS FOLLOWS:**

February 3, 2004

## SECTION 1 - DEFINITIONS

In this Agreement,

**1.1      Affiliates.** A body corporate is deemed to be affiliated with an individual if such individual, directly or indirectly, controls (de jure or de facto) such body corporate. A body corporate is deemed to be affiliated with another body corporate, if one of them is the subsidiary of the other or both are the subsidiaries of the same body corporate or each of them is ultimately controlled by the same person(s). If two (2) bodies corporate are affiliated with the same person at the same time, they shall be deemed to be affiliated with each other.

**1.2      Confidential Information.** The meaning set forth in Section 15.

**1.3      Contract Year.** That period of time commencing on the Effective Date and ending on December 31, 2001 and any subsequent twelve month period ending on December 31st.

**1.4      Effective date.** April 30, 2001.

**1.5      International's Know-How.** All the present and future knowledge and accumulated experience acquired by International as a result of research, practical experience or otherwise in respect of the marketing and sale of the Products in the Territory.

**1.6      Market.** The meaning set forth in the preamble.

**1.7      Net Sales.** The total number of units of Products as invoiced by Premier to its customers, less: (i) all credits and allowances actually granted by Premier to any of its customers in respect of uncollectible bad debt not to exceed two percent (2%), rejection or returns of units of Products and accounting errors; (ii) units of Products which are given away at no cost for promotional purposes, up to a total not to exceed three percent (3%) of total number of units of Products; and (iii) units of Products which are sold by Premier for a special defined promotion at a discount price, only with the prior approval of Multi-Vet, which shall not be unreasonably withheld. All of said exclusions shall not collectively exceed five percent (5%). Bad debt shall not be considered uncollectible until one (1) year after first invoiced, and Premier has turned the debt over to a collection agency.

February 3, 2004

1.8    **Patents.** Each and every presently-existing and after acquired unexpired patent of Multi-Vet in the Territory embodying any part of the Spray Technology, including, without limiting the generality of the foregoing, the following patents:

| COUNTRY | APPLICATION No. | PATENT No. | ISSUE DATE | EXPIRATION DATE |
|---------|-----------------|------------|------------|-----------------|
| USA | 709,433 | 4,627,385 | 9 December 1986 | 7 March 2005 |
| USA | 378,901 | 5,046,453 | 9 October 1991 | 12 July 2009 |

as well as all patents which may issue therefrom or from applications which may be filed in relation to the Spray Technology and any patent of importation, improvement or addition, utility models and inventors certificates, continuation, extension, division, re-validation, reissue or other combination or renewal of same in the Territory.

1.8    **Product.** Any device to train, contain or otherwise control pets using a spray, including anti-barking devices. Without limiting the generality of the foregoing, Products that are presently manufactured by Multi-Vet are listed in Schedule A, which can be amended from time to time as new Products are invented or created.

1.9    **Spray Technology.** All the present and future commercial, scientific and technical knowledge and accumulated experience acquired by Multi-Vet and its predecessors in title as a result of research, practical experience or otherwise, in the design, manufacture, production, use, sale, distribution, marketing, advertising and/or merchandising of anti-barking collars and/or of other devices to train, contain or otherwise control pets using a spray, including, without limiting the generality of the foregoing: ideas, un-patented inventions, processes, manufacturing procedures, methods, designs and data pertaining to the Products and/or anti-barking devices using a spray.

1.10   **Territory.** The meaning set forth in the preamble.

## SECTION 2 - EXCLUSIVE LICENSE

2.1    **Exclusive license to use the Spray Technology and the Patents.** Subject to Section 2.7, Multi-Vet hereby grants to Premier an exclusive license in the Territory for the Term to sell, offer for sale, market, promote, distribute and service the Products which incorporate the Spray Technology and/or the Patents in the Market and for no other purpose.

2.2    **Right to use trademarks.** Multi-Vet hereby grants to Premier the exclusive right and license, but not the obligation, to use the following trademarks in relation with the marketing, promotion, sale and distribution of Products in the Market in the Territory: Anti-Bark System, ABS, ABOISTOP, DIRECT STOP, SMART CAP, SPRAY CAP,

February 3, 2004

Spray Barrier, Virtual Fence, Spray Commander and/or any new marks associated with the Products in relation with the marketing, promotion, sale and distribution of Products in the Market in the Territory.

**2.3     New trademarks.**  Upon written notification of Premier's intent to use new marks associated with the Products, Multi-Vet is obligated to register these marks within the Territory within sixty (60) days, and hereby grants to Premier the exclusive right and license, but not the obligation, to use the marks in relation with the marketing, promotion, sale and distribution of Products in the Market in the Territory. After the initial term of the Agreement, or any subsequent term, in the event the Agreement is terminated for any reason other than breach by Premier, then the new trademarks developed by Premier and registered by Multi-Vet will be sold to Premier by Multi-Vet for one (1) dollar each.

**2.4     Referral.**  If Multi-Vet receives any requests or inquiries from any country world-wide for products (other than Products) currently produced by Premier, Multi-Vet agrees to refer such requests or inquiries immediately to Premier. Similarly if Premier receives any requests or inquiries from any country world-wide or from outside the Market in the Territory for products (including the Products) produced by Multi-Vet, Premier agrees to refer such requests or inquiries immediately to Multi-Vet.

**2.5     Non-compete.**  Premier acknowledges that the Products are complementary to the products which it currently sells in the Territory.  If applicable laws permit, Premier agrees that neither itself nor its Affiliates will, directly or indirectly, stock, distribute, promote or sell competitive products ("competitive" being defined as any product used to train, contain or otherwise control pets using a spray or a shock, including anti-barking devices) while this Agreement is in effect for any reason whatsoever without having previously obtained the written permission of Multi-Vet. In addition, in the event this License Agreement is rightfully terminated by Multi-Vet by reason of the breach of Premier, then Premier also shall not distribute, promote or sell competitive product for a period of one year (1) after termination.

**2.6     No sales outside Territory.**  Except as provided in Section 2.7, Premier shall not, except by written agreement with Multi-Vet, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product outside the Territory or outside the Market or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same outside the Territory or outside the Market. All requests or inquiries received by Premier with respect to any Product for delivery, use or purchase outside the Territory or outside the Market shall be referred immediately by Premier to Multi-Vet.

**2.7     No sales in the Territory.**  Except as provided in Section 2.7, Multi-Vet shall not, except by written agreement with Premier, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product in the Market within the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same in the Market within the Territory.  All requests or inquiries received by Multi-Vet with respect to any Product for delivery, use or purchase in the

**Multi-Vet/Premier Agreement**                                    Page 5

Market within the Territory shall be referred immediately by Multi-Vet to Premier.

**2.8    Internet Sales.** Notwithstanding any other Section of this Agreement, Multi-Vet shall have the right to sell Products through the Internet to individual consumers anywhere in the world, limited to normal consumer quantities. Notwithstanding any other Section of this Agreement, Premier shall have the right to sell Products through the Internet to individual consumers anywhere in the world, other than the below listed exclusions, limited to normal consumer quantities, provided that any and all Products sold by Premier outside the Territory shall be purchased from Multi-Vet at Multi-Vet's lowest published wholesale price. Until such time as Multi-Vet notifies Premier in writing of the resolution of contract issues with Dynavet, Premier will not make Internet Sales in Europe.

## SECTION 3 - ROYALTIES and MINIMUMS

**3.1    Royalty.** Premier will pay to Multi-Vet a royalty on the Net Sales of all Products and the spray refills it sells in the Territory while this Agreement in effect, in accordance with Schedule A annexed hereto.

**3.2    Change in Royalty and Annual Minimum Royalty.** In the event a third party introduces a competing spray product in the Market within the Territory then Multi-Vet and Premier agree to negotiate, in good faith, to adjust the Royalty and/or Annual Minimum Royalty and/or Purchase Price on the Product(s) which is (are) directly affected by such new competing product.

**3.3    Terms of payment.** Premier will make royalty payments to Multi-Vet within 60 days of the end of each calendar month

**3.4    Annual Minimum Net Sales.** Premier will be required to pay to Multi-Vet the royalties corresponding to the following minimum unit Net Sales of Products in the Territory:

| Year | Minimum Units<br>Barking devices | Minimum Units<br>Spray commanders |
|------|------|------|
| 2001 | None | None |
| 2002 | 30,000 | 5,000 |
| 2003 | 45,000 | 10,000 |
| 2004 | 65,000 | to be negotiated |

Premier will thereafter be required to maintain a 10% yearly increase in unit Net Sales over the actual average unit Net Sales of the two (2) previous years to maintain the agreement. However, it is agreed that the Annual Minimum Net Sales for any given year will never be less than the actual Annual Net Sales of the previous year.

February 3, 2004

**3.5     Adjustment.**  If Multi-Vet cannot ship Product(s) to Premier for any period greater than thirty (30) days and thereby causing Premier to materially backorder its customers, or if Premier's ability to sell Products is otherwise materially impeded by circumstances beyond its reasonable control, Multi-Vet and Premier agree to renegotiate, in good faith, the Annual Minimum Net Sales and/or Royalties and make reasonable adjustments, as necessary.

**3.6     Calculation.**  The above minimum royalties will be payable monthly by Premier based on a rolling twelve-month forecast by adding to each monthly royalty payment any balance (if any) between the minimum royalty due for the year-to-date period and the royalties otherwise payable for such year-to-date period and such additional payment shall be credited as a prepaid royalty.

**3.7     Failure to meet Annual Minimum Net Sales.**  If Premier does not make the Annual Minimum Net Sales provided in Section 3.4 during a given year, the parties agree to undertake a mutual review within 60 days of the end of the year of that year's sales activities and market conditions to determine the reason(s) for the shortfall.  If in Multi-Vet's opinion Premier has not put forth diligent and best efforts to reach the Annual Minimum Net Sales, Multi-Vet shall have the right (in addition to any other rights it may have pursuant to this Agreement) to transform it into a non-exclusive license.  Such transformation shall be effective thirty (30) days from the date of written notice from Multi-Vet to Premier.

**3.8     When sold.**  For the purposes of this Agreement, Products shall be considered sold when invoiced out, or if not invoiced, when delivered or shipped to the customers.

## SECTION 4 - REPORTS & PAYMENTS

**4.1     When Report due.**  Premier covenants and agrees to furnish royalty statements within twenty (20) days after each calendar month during the term of this Agreement.

**4.2     Content of Report.**  All statements shall:

> **4.2.1**   include the total Net Sales of each Products and the spray refills made during such month;

> **4.2.2**   include a calculation of the amount due to Multi-Vet for the royalties in respect of the Net Sales so reported, and of the minimum royalties, when applicable; and,

> **4.2.3**   be certified as correct by the Controller or some other senior officer of Premier.

February 3, 2004

**4.3    When Payment due.**  Premier covenants and agrees to make the royalty payment corresponding to the Net Sales of Products and the spray refills made during each calendar month during the term of this Agreement within sixty (60) days after the end of each such month.

**4.4    If no Sales.**  If no Net Sales have been made in any month, Premier shall so advise Multi-Vet within twenty (20) days after the end of the month.  The minimum Royalty for such month shall be payable within sixty (60) days after the end of each such month.

**4.5    Currency.**  All dollar values expressed in this Agreement and any Schedule hereto and all payments required to be made by Premier, shall be in US dollars.

**4.6    Interest.**  Any amount owed to Multi-Vet pursuant to this agreement which is not paid on its due date shall bear interest at the rate of one and one half percent (1½%) per month (eighteen percent (18%) per annum) or at the highest rate permitted by law, if lower than the above, calculated from the date upon which such amount was due.  Unpaid interest will also bear interest at the same rate.

## SECTION 5 - ACCOUNTS

**5.1    Keeping of Records.**  Premier shall:

**5.1.1**  Keep proper and detailed accounts and records, including invoices, receipts and vouchers relating thereto, (hereinafter referred to as the **"Records"**) in respect of its operations under this agreement, including the Net Sales of Products

**5.1.2**  Make the Records available during business hours on reasonable notice and permit representatives of Multi-Vet to audit and/or inspect the Records on an annual basis, to make notes or copies of documents relating to its operations under this Agreement, including royalty calculations and payments and to report to Multi-Vet only information relative to the accuracy of the royalties payable under the Agreement. In the event an error in favor of Multi-Vet is discovered during such audit or inspection, Premier shall pay the difference within thirty (30) days of such discovery. Furthermore, if such error exceeds three (3%) percent of the royalties actually paid, Premier shall reimburse Multi-Vet for all costs incurred in relation to such audit or inspection.  Any inspection or audit of Records shall be subject to reasonable confidentiality agreements.

**5.2    Duration.**  Premier shall preserve the Records for a period of five (5) years from their creation.

February 3, 2004

Multi-Vet/Premier Agreement                                               Page 8

## SECTION 6 - SUPPLY OF PRODUCTS

**6.1     Purchases.**  Premier undertakes to purchase all of its needs in Products from Multi-Vet or a supplier designated by Multi-Vet. Premier also undertakes to purchase all of its needs in the spray substances used in conjunction with any Product from Multi-Vet. Multi-Vet agrees to provide all Products and associated supplies ordered by Premier.

**6.2     Prices.**  The prices charged by Multi-Vet to Premier for each of the Product(s) are specified in Schedule B. These prices are in 2001 dollars and may be increased by Multi-Vet as set forth in Section 6.8 due to materials, labor or currency fluctuations.

**6.3     Payment terms.**  The payment terms will be net forty-five (45) days, F.O.B. Multi-Vet plant, from the date of shipment.

**6.4     Net of other charges.**  The said prices shall be the net selling price by Multi-Vet, exclusive of all sales and other similar taxes, custom and excise duties, insurance premiums, freight and storage charges and all other charges of a similar nature, whether currently imposed or applicable in the future.

**6.5     Temporary license.**  Contingent upon the event Multi-Vet and its designated sub-contractors are unwilling or are not able to supply Premier with such Products and associated supplies ordered by Premier, Multi-Vet grants to Premier a temporary license to produce such Products and associated supplies, or have another produce same, but only for resale within the Market and within the Territory and only for as long as such failure to supply lasts.

**6.6     Quality standards.**  Such License to use the Spray Technology and the Patents granted to Premier shall be restricted to such Products that have a high and merchantable quality which meet or exceed Multi-Vet's pre-existing quality standards as communicated to Premier.

**6.7     Inspection.**  Multi-Vet shall have the right, at all reasonable times, to enter and inspect any premises used by Premier in its operation under such License for the purpose of determining compliance with the standards, specifications and requirements referred to in Section 6.6.

**6.8     Changes in prices.**  Multi-Vet will inform Premier in writing at least three (3) months prior to any change in its list prices. With respect to any written purchase orders for units which may be placed by Premier between the date of such written notice by the company and the effective date of the price change, the price for the units so ordered shall be the price prevailing at the time the purchase order is received and accepted by Multi-Vet or its sub-contractors, provided that such written purchase order specifies delivery dates not exceeding six (6) months from the order date, failing which the increased purchase price shall be applicable. In the event that Premier, as a condition of making a sale, is required to enter into an agreement with a customer(s) in which Premier must guarantee no change in wholesale price for a specified period of time, Premier will

February 3, 2004

provide Multi-Vet with a copy of the terms of the contract, and Multi-Vet will have the option to agree thereto, in which case it will honor the price prevailing during at the beginning of the contract and throughout its duration, limited to units sold only to that customer pursuant to such contract.

**6.9     No changes.**  Premier agrees not to add to, remove from or in any way change the Products without the prior written approval of Multi-Vet.  Premier also agrees not to alter, remove or otherwise tamper with any registration numbers, serial numbers, date codes, patent numbers or other tracking marks that appear on the Products.

**6.10    Notification of defects.**  Premier will have the obligation to advise Multi-Vet of the existence of any defect as soon as possible after same is brought to its attention and to provide Multi-Vet with all useful information and explanations relating to same. Multi-Vet will have the obligation to advise Premier of the existence of any defect as soon as possible after same is brought to its attention and to provide Premier with all useful information and explanations relating to same.  Multi-Vet shall promptly remedy any major design, material or manufacturing defects in Products sold to Premier.


## SECTION 7 - WARRANTY

**7.1     Warranty.**  "IP Warranties:"  Multi-Vet warrants that: (1) it is the lawful owner of the Patents and the Spray Technology, and that Multi-Vet otherwise has all power and authority to grant the rights and licenses granted herein; (2) that, to the best of its knowledge, the use and exploitation of the Patents and the Spray Technology as licensed herein, including the sale of the Products by Premier and the use of the Products by Premier's customers, shall not infringe or violate the patent or other intellectual property rights of any third party; (3) that as of the Effective Date, it has no knowledge that any third party is infringing any of the Patents; and (4) that the Patents and the Spray Technology collectively comprise all rights and know how to distribute and sell the Products in the Market within the Territory and to otherwise exercise Premier's rights under this Agreement. "Quality Warranties:" Multi-Vet warrants that all Products manufactured by or for it and sold to Premier pursuant to this Agreement shall be free from any major material or workmanship defects and in full compliance with its specifications, quality control standards and all applicable laws.  A Product that does not meet the foregoing requirements shall be deemed to be "defective" for purposes of this Section 7.  This Quality Warranty on the Products shall be valid for a period of eighteen (18) months from the date of shipment to Premier.  The Quality Warranty obligations of Multi-Vet are strictly limited to the replacement/repair of any Products found to have major manufacturing defects in materials or workmanship.  Multi-Vet is not obligated for damages due to error, misuse, neglect, etc. by Premier, Premier's customers, or the end consumer.  In the event that three (3) percent or more of Products purchased from Multi-Vet have major defects and/or are the subject of Quality Warranty claims, then Premier shall be entitled to a reduction in Minimum royalties payable, the rate of actual royalties on Net Sales, and/or purchase price of Products, which adjustment the parties shall promptly negotiate in good faith.

February 3, 2004

**7.2**    **No liability to customers or end consumers.** Premier shall assume all warranty obligations to its customers and end consumers in respect of Products, and Multi-Vet shall have no liability either to Premier or to its customers and end consumers in respect of such warranty obligations except as expressly provided herein.

**7.3**    **LIMITATIONS**    EXCEPT FOR THE WARRANTIES CONTAINED IN SECTION 7.1, MULTI-VET DOES NOT GRANT ANY WARRANTY, EITHER EXPRESSED OR IMPLIED, LEGAL OR CONVENTIONAL, WITH REGARD TO ANY PRODUCTS OR REFILLS AND DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE WARRANTIES EXPRESSLY CONTAINED IN SECTION 7.1 HEREOF ARE IN LIEU OF ANY LIABILITY OR OBLIGATION OF MULTI-VET FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES (INCLUDING LOSS OF REVENUE OR OF BUSINESS OR OTHER SIMILAR LOSSES) SUSTAINED BY PREMIER (INCLUDING ITS EMPLOYEES, AGENTS, OR INVITEES) OR ANY OF ITS CLIENTS OR END CONSUMERS AND/OR IN ANY WAY ARISING FROM OR RELATING TO THE SALE, MAINTENANCE, USE, PERFORMANCE OR FAILURE OF ANY PRODUCTS OR REFILLS.

**7.4**    **Faulty actions.** Multi-Vet's warranty obligations do not cover any faulty or negligent manipulation, storage or use of any Products or refills or any such manipulation or storage or use which is not in conformity with instructions provided by Multi-Vet.

**7.5**    **Notification.** Premier will have the obligation to advise Multi-Vet of the existence of any warranty claim or any defect as soon as possible after same is brought to its attention and to provide Multi-Vet with all readily available useful information and explanations relating to same. Premier shall allow Multi-Vet to have free access to any Products at all reasonable times.

**7.6**    **Obligations of Multi-Vet.** Multi-Vet shall replace or repair, free of charge, all defective Products (as defined in section 7.1 above) returned by Premier to Multi-Vet subject to the following terms:

> **7.6.1** The defective Products will be shipped in full cases (minimum 100 units per shipment) to Multi-Vet (subject to prior co-ordination with Multi-Vet), at Multi-Vet's expense and will include a list of the serial numbers of all returned units together with a description of each alleged defect. Notwithstanding the above, Multi-Vet shall, at its own discretion, be entitled to replace the reported defective Products without requesting shipment of same to Multi-Vet.

> **7.6.2** Upon receipt of the defective Products shipment, Multi-Vet's personnel will inspect and sort same. All Products covered by the warranty as per Section 7.1 above will be replaced within thirty (30) days free of charge. However, Products that will be found to have been returned for other reasons (dirt, misuse, physical damage, repair by unauthorized personnel, etc.) will be repaired against

February 3, 2004

payment by Premier for parts and labor, but not without prior written authorization from Premier

**7.6.3** The replaced/repaired units will be shipped to Premier at Multi-Vet's expense and include an itemized report and invoice with regard to the number of replaced units and an invoice for repaired units, if any.

## SECTION 8 - PRODUCT DEVELOPMENT

**8.1    Product development.** Multi-Vet may, during the term of this Agreement, develop pet training products using the Spray Technology including but not limited to remote trainers, containment fences and indoor animal control. Multi-Vet will provide a reasonably full disclosure of any R&D development to Premier. Multi-Vet will endeavor to get Premier's consultation as much as possible in the product development process, provided Premier will not charge any fees or expenses to Multi-Vet for such consultation unless otherwise agreed.

**8.2    Disclosure.** Subject to reasonable confidentiality obligations, each party shall promptly disclose to the other party any discovery or invention which is a new or improved Product which it makes or acquires during the term of this Agreement and shall make available to the other party all information relating thereto, including blueprints, sketches, drawings, designs, test information and other data. All such disclosures and information shall be treated as confidential information (within the meaning of section 15) by the recipient.

**8.3    Ownership.** Multi-Vet shall own all rights to the spray technology aspects of any such discovery or invention created while this Agreement is in effect, no matter by whom made. The other aspects of any such discovery or invention shall be owned by the party making it.

**8.4    Right to distribute.** Any products developed or created making use of any developments, inventions, discoveries or improvements covered by this Section 8 shall be deemed to be "Products" as defined by this Agreement and subject to the licenses granted herein and the other terms and conditions of this Agreement. Multi-Vet undertakes to sell such new products to Premier at Multi-Vet's lowest trade price to any non-Affiliated customer.

**8.5    Distribution/supply agreement.** The precise terms of such distribution/supply agreement will be incorporated in an addendum to this Agreement or a separate document.

## SECTION 9 - INTELLECTUAL PROPERTY

**9.1    No contest.** Premier shall not, at any time during the term of this Agreement or

February 3, 2004

**Multi-Vet/Premier Agreement**                                    **Page 12**

thereafter, question or contest, directly or indirectly, the validity of the Spray Technology, the Patents or the trademarks listed in Section 2.2 or assist any other person to do so.

**9.2    Patent notices.** Any labeling used in connection with the marketing, advertising, promotion and sale of every Product shall clearly indicate the existence of the Patents as well as their use under license and such label shall be in a form agreed upon by Multi-Vet in writing, and the consent of Multi-Vet shall not be unreasonably withheld.  As an example, the following patent notice is agreeable provided in a font having at least 12 points:

"Covered by one or more of the following US Patents 4,627,385 and 5,046,453."
"Made under license from Multi-Vet Ltd."

**9.3    Trademark and copyright notices.** To the extent Premier uses a trademark or a copyrighted work of Multi-Vet, Premier will apply appropriate notices to the Products, their containers, accompanying materials and/or promotional materials in a form, size and location acceptable to Multi-Vet, acting reasonably.


## SECTION 10 - PROMOTION AND SALE

**10.1    Best efforts.** Premier shall exercise its diligent, best and good faith efforts at its expense to introduce, promote the sale and use of, obtain orders for, distribute and sell Products in the Market in every major part of the Territory and give adequate, efficient and prompt attention and service to local distributors and consumers.

**10.2    Premier discretion.** The details of the marketing, packaging and promotion of the Products shall be at Premier's discretion provided all the other terms and conditions of this agreement are respected by Premier.

**10.3    After sales service center.** Premier shall, at its own expense, organize and keep active an after sales service center for the Products in the Market within the Territory.

**10.4    Conformity with the law.** Premier shall ascertain that the Products and all packaging, instructions, advertising material, etc. is in conformity with the laws and regulations of every part of the Territory.


## SECTION 11 - MULTI-VET INTERNATIONAL

**11.1**    International hereby surrenders, waives and renounces in favor of Premier any distribution rights in the Market within the Territory granted to it by Multi-Vet for as long as this agreement remains in force.

February 3, 2004

## SECTION 12 - TERM

**12.1** This Agreement is deemed to have commenced on the date mentioned above and shall terminate on April 30, 2011 unless previously extended by mutual consent or terminated in accordance with the terms of this Agreement.

## SECTION 13 - TERMINATION

**13.1** **Right to terminate by Multi-Vet.** Multi-Vet shall be entitled to terminate upon fifteen (15) days prior written notice in the event Premier fails to pay when due any royalty (regular or minimum) or any other amount payable to Multi-Vet pursuant to this Agreement. Such right shall be exercised by giving a written notice to Premier specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than fifteen (15) days subsequent to the date of such notice unless the Premier has cured such breach within fifteen (15) days from the date of such notice. In the case Premier fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

**13.2** **Right to terminate by either party** In the event of the material breach of any other provision of this Agreement by one of the parties, the other party shall have the right to terminate this Agreement. Such right shall be exercised by giving a written notice to defaulting party specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than thirty (30) days subsequent to the date of such notice unless the breaching party has cured such breach within thirty (30) days from the date of such notice. In the case the defaulting party fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

**13.3** **Material Breaches.** Without limiting the generality of the foregoing, the occurrence of any one or more of the following events shall constitute a material breach under this Agreement:

**13.3.1** a party breaching a warranty it makes herein;

**13.3.2** a party institutes proceedings seeking relief under a bankruptcy law or any similar law, or consents to entry of an order for relief against it in any bankruptcy or insolvency proceeding or similar proceeding, or files a petition for or consent or answer consenting to reorganization or other relief under any bankruptcy act or other similar law, or consents to the filing against it of any request for the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of it or of any substantial part of its property, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due, or takes any action in furtherance of the foregoing;

**13.3.3** a party makes or attempts to make an assignment for the benefit of creditors;

February 3, 2004

**13.3.4** a Receiver is appointed over the whole or any part of the undertaking or assets of one of the parties;

**13.3.5** a party ceases or threatens to cease to carry on the whole or any substantial part of its business other than in the course of reconstruction or amalgamation; or,

**13.3.6** a party is convicted of a felony or other similar crime related to the conduct of the business related to this Agreement.

**13.4 No assignee rights.** No assignee for the benefit of creditors, receiver, liquidator, sequestrator, trustee in bankruptcy, sheriff or any other officer of the court or official charged with taking over custody of a party's assets or business shall have any right to continue the performance of this Agreement.

**13.5 No release.** Termination of this Agreement shall not release a party from any payments or obligations due and payable or accrued to the other or rescind any payment made or paid by one party to the other hereunder prior to the time such termination becomes effective nor release any party from those obligations hereunder which survive termination. Furthermore, termination of this Agreement prior to the expiration of its term shall be without prejudice to any other rights which one party may have against the other, including, without limitation, damages for breach to the extent that same may be recoverable.

**13.6 Option to purchase remaining inventory.** Premier hereby grants to Multi-Vet an option to re-purchase the inventory of Products and refills owned or controlled by Premier at the price at which it was sold to Premier, upon termination or expiration of this Agreement. This option shall apply only if and when the Agreement is terminated or expired. For example, the transformation of the license into a non-exclusive license pursuant to section 3.7 shall not trigger such option. If Multi-Vet does not exercise this option within thirty (30) days after the effective date of termination or expiration, as the case may be, then Premier shall be entitled, within the following ninety (90) days, to sell its inventory of such Products and refills notwithstanding the expiration or termination of the licenses herein.

**13.7 No additional amounts.** In the event of the termination of this Agreement pursuant to section, and unless otherwise provided for in this Agreement, no party will be liable for the payment of additional amounts to the other party.

## SECTION 14 - INDEMNIFICATION

**14.1** Premier shall indemnify and save and hold harmless Multi-Vet from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorneys' fees and expenses) which Multi-Vet or its Affiliates is or becomes liable for, arising from a third-party claim: (1) that Premier breached a warranty it made herein; (2)

February 3, 2004

that Premier acted with gross negligence or wilful and malicious misconduct; or (3) that Premier made false or misleading claims with respect to the Products; or (4) that Premier exceeded the scope of the licenses granted herein.

**14.2**    Premier shall, at the request of Multi-Vet or one of its Affiliates, assume the defence of any demand, claim, action, suit or proceeding brought against Multi-Vet or any such Affiliate by reason of the foregoing and pay any and all damages assessed against or that are payable by Multi-Vet or any Affiliate as a result of the disposition of any such demand, claim, action, suit or proceeding. Premier's obligation hereunder is conditioned upon Multi-Vet promptly notifying Premier of all such liabilities, claims, causes of action or suits for which indemnity may by sought. In the defence of any such claim, Multi-Vet will cooperate fully with Premier, and will, from time to time, make available to Premier all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim. Premier shall not enter into any settlement or material admission without the prior consent of Multi-Vet. Notwithstanding the foregoing, Multi-Vet or its Affiliates as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

**14.3**    Multi-Vet shall indemnify and save and hold harmless Premier, its clients and their respective directors, officers, employees, agents and Affiliates from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorney's fees and expenses) which any of the above is or becomes liable for, arising from a third-party claim that: (1) Multi-Vet has breached a warranty it made herein; (2) that Multi-Vet acted with gross negligence or willful and malicious misconduct; (3) relating to product liability claims involving the Products; (4) that the sale or use of the Products and the practice of the licenses granted herein infringe or otherwise violate the intellectual property or other rights of any third party; or (5) resulting from proceedings instituted by Radio Systems Inc. based on its former relationship with Multi-Vet.

**14.4**    Multi-Vet shall, at the request of Premier, assume the defence of any demand, claim, action, suit or proceeding brought against Premier or any of the foregoing parties by reason of the foregoing and pay any and all damages assessed against or that are payable by Premier or any of the foregoing parties as a result of the disposition of any such demand, claim, action, suit or proceeding. Multi-Vet's obligation hereunder is conditioned upon Premier promptly notifying Multi-Vet of all such liabilities, claims, causes of action or suits for which indemnity may by sought. In the defence of any such claim, Premier will cooperate fully with Multi-Vet, and will, from time to time, make available to Multi-Vet all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim. Multi-Vet shall not enter into any settlement or material admission without the prior consent of Premier. Notwithstanding the foregoing, Premier or the foregoing parties as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

February 3, 2004

**14.5**    Should such suit, action or other proceeding contain allegations that the Spray Technology portion of any Product sold or distributed by Premier constitutes an infringement of one or more of the claims mentioned in such suit and that such action or other proceeding has not been settled six (6) months after the date of service thereof, either party shall have the right to terminate this Agreement upon written notice to the other without any further liability to the other.

**14.6**    During the Term of this Agreement and for 3 years thereafter, both parties shall maintain minimum general liability insurance of two (2) million dollars naming the other party as an additional insured and provide certificates or other proof of insurance to the other party.

## SECTION 15 - CONFIDENTIAL INFORMATION

**15.1**    Each Party acknowledges and understands that the other Party is involved in research, development, production and/or sale of different devices to train, contain or otherwise control pets and has acquired or shall acquire in the future great quantities of secret or proprietary technical, scientific, marketing and commercial information relating to its business and that of its Affiliates, including, but not limited to, products, customer lists, pricing policies, marketing plans and strategies, product development techniques or plans, business acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions (patented or not) and research programs, trade know-how, trade secrets, specific software (source, object and documentation), algorithms, computer processing systems, ideas, methods, experiments and data, no matter their form or support medium including any sketch, report, model, prototype, chip, diskette, tape, CD-ROM, DVD and other similar documents or objects (the **"Confidential Information"**) and that it is imperative for it that the Confidential Information remains secret.

**15.2**    Each Party agrees to maintain the confidentiality of the Confidential Information of the other Party and not to disclose, directly or indirectly, any part to anyone without prior written authorization from the other Party.

**15.3**    Each Party agrees not to use, directly or indirectly, any Confidential Information of the other Party for purposes other than as provided herein and not to assist or collaborate with third parties using, directly or indirectly, any similar Confidential Information for purposes other than those provided for in the present Agreement, without prior written authorization from the other Party.  Notwithstanding the foregoing, either party may disclose the other's Confidential Information to its employees, representatives and agents as is reasonably necessary in order to accomplish the purposes of this Agreement and to fulfil legal, regulatory or business obligations arising or likely to arise from performing pursuant to this Agreement, including without limitations making limited disclosures to bankers, investors, consultants and counsel in the course of obtaining professional services, making regulatory disclosures, and soliciting investors provided all such persons agree in writing to maintain the confidentiality thereof and to

February 3, 2004

refrain from making any unauthorized use thereof.

**15.4**    The confidentiality and non-use undertakings specified in the present Agreement do not apply to any part of the Confidential Information which, through no breach of the provisions of the present Agreement:

> **15.4.1** the recipient can demonstrate was in the public domain at the time of disclosure of such information by the other party or which later becomes part of the public domain through no breach of this Agreement;

> **15.4.2** the recipient can demonstrate was in its possession, prior to disclosure of such information by the other party and had not been previously obtained directly or indirectly from the other party;

> **15.4.3** the recipient can demonstrate it had received from a third party after disclosure of such information by the other party hereunder, as a matter of right and having no direct or indirect obligation to the other party with respect to same, provided that such third party did not acquire such information directly or indirectly from the other party; or

> **15.4.4** must be disclosed by virtue of the law but only to the extent specifically required.

**15.5**    Notwithstanding the above, Confidential Information will not be deemed to be in the public domain or to have been known by a party mainly because it is embraced by more general information previously known to it or merely because it is expressed in publications, books, patents or other literature in general terms not specifically including such Confidential Information disclosed or made available to the other party.

**15.6**    Each party undertakes to cause those of its employees who are likely, by reason of their employment, to have access to any part of the Confidential Information from the other party, including confidential information relating to the Product, to sign an agreement in which said employee agrees to treat Confidential Information learned during the course of his employment in the same manner as his employer treats such information.

**15.7**    The confidentiality and non-use undertakings herein mentioned will remain in full force and effect for as long as the information at issue remains confidential.

## SECTION 16 - INFRINGEMENT

**16.1**    In the event that either party learns of any infringement or threatened infringement or piracy of any of the Patents in the Territory, it shall forthwith give notice thereof to the other party together with all such information with respect thereof as it may from time to time obtain. The parties undertake and agree to consult with each other with

February 3, 2004

respect to how to respond to each infringement or piracy.

**16.2**    Multi-Vet shall have the right, but not the obligation, at its own expense, to take all actions and procedures which it may deem appropriate to defend against infringement of its intellectual property licensed herein and all actions and procedures which it may deem appropriate to enforce and protect Premier's right under this Agreement. Any recovery shall inure to the benefit of Multi-Vet. Premier may, at its own discretion and at its own cost, join as plaintiff in an action against any such infringement and all recovery shall be divided between the parties hereto according to the losses and damages suffered by each party, including legal costs and fees associated with bringing the action and all other costs and damages related to the infringement.

**16.3**    In the event Multi-Vet undertakes the prosecution of any such legal proceedings, Premier agrees on behalf of, and at Multi-Vet's expense, to execute any and all documents and do such acts and things, including without limitation, being made a party to such proceedings, as may, in the opinion of counsel for Multi-Vet, be necessary or useful to carry out such prosecution.

**16.4**    Notwithstanding the foregoing, if Multi-Vet declines to institute legal proceedings, Premier shall have the right but not the obligation, at its sole expense, to commence legal proceedings against any third party infringing the Patents in the Market within the Territory or otherwise acting or exploiting the Spray Technology in a way that violates Premier's rights under this Agreement. Multi-Vet agrees that, upon Premier's request and at Premier's cost, it shall join as a party in any such action and that it shall provide Premier with all reasonable non-monetary assistance in the enforcement of rights in the Patents or the Spray Technology. To the extent any such claim results in an award resulting from infringement within the Market within the Territory, then Premier shall be entitled to such reward, as well as to any award of attorneys fees.

**16.5**    "**Legal proceedings**" as used herein shall include demand letters, negotiation and settlement of disputes, as well as the filing of formal legal actions with a court of proper jurisdiction. Under no circumstances shall Premier have the authority to settle or compromise a matter which in any way mitigates, lessens or restricts the scope of the Patents or Multi-Vet's ownership in the Patents.

## SECTION 17 - ARBITRATION

**17.1**    Any dispute, controversy, claim or other matters of differences arising out of or relating to the contract, or the breach thereof, including any dispute relating to patent validity or infringement arising under this contract, shall be settled by arbitration in accordance with the Patent and International Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**17.2**    The place of arbitration shall be New York City, New York and the English

February 3, 2004

language shall be used throughout the arbitration proceedings.

**17.3**    The parties expressly agree to confer upon the arbitrator the powers to fill gaps, cure contractual omissions and to perform all other activities which he may deem necessary and/or opportune.

**17.4**    The award of the arbitrator shall be the sole and exclusive remedy between the parties regarding any claims and counter-claims presented to the arbitrator. The parties undertake to fully and punctually abide by the award rendered by the arbitrator. Failing such voluntary compliance, judgment upon the award or any other appropriate procedures may be entered or sought in any court having jurisdiction thereof to secure enforcement of said award.

**17.5**    The final award will be payable in United States currency without deduction or offset and costs, fees or taxes incidental to the enforcement of the arbitration award shall be charged in accordance with the decision of the arbitrator against a party resisting enforcement. Payment of the award including interest from the date of breach and violation shall be made in accordance with the relevant provisions of this Agreement.

**17.6**    Nothing herein contained shall prevent any party hereto from instituting an action at law against the other party requesting temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain *interim* relief when deemed necessary by such court to preserve the *status quo* or prevent irreparable injury pending final settlement of such dispute by arbitration.


## SECTION 18 - NOTICES

**18.1**    Any notice, demand, consent or other communication to be given in connection with this Agreement (collectively and individually the **"Notice"**) shall be in writing and addressed to its addressee at the address stated above or such addresses as the parties may specify from time to time by Notice.

**18.2**    Notices may be delivered by hand, registered mail or fax and shall be deemed to have been received as follows:

   **18.2.1** If delivered by hand:  at the time of delivery to a person who appears reasonably to be in charge.

   **18.2.2** If sent by fax:  at the time of confirmed transmission provided a confirmation copy is sent by airmail or registered mail within twenty-four (24) hours after the transmission.

   **18.2.3** If sent by registered mail: at the time of delivery or of attempted delivery in the case delivery cannot be completed due to no fault of the sender.

February 3, 2004

**18.3**    If the time of such deemed receipt as provided in paragraph 18.2 hereof is not during the customary hours of business, the Notice shall be deemed to have been received at 10:00 a.m. at the place of delivery on the first customary day of business thereafter.

## SECTION 19 - GENERAL PROVISIONS

**19.1    Preamble.** The preamble to this Agreement forms part hereof as if recited in full.

**19.2    Headings.**  Headings are for reference purposes and do not in any way affect interpretation.

**19.3    Entire Agreement.**   This Agreement sets forth the entire Agreement and understanding between the parties with respect to the subject matter of this Agreement and merges, supersedes and cancels all prior discussions, representations, inducements, promises, undertakings, understandings, agreements or otherwise, whether oral, in writing or otherwise, between the parties with respect to such subject matter including the letter of intent of March 15, 2001.  Without limiting the generality of the foregoing, no oral explanation or oral information by the parties hereto, or any of them, shall alter the meaning or interpretation of this Agreement. There are no statements, terms, conditions, undertakings, representations, warranties or collateral agreements still in force or effect which have not been embodied in this Agreement.  This Agreement may be altered, modified or amended only by a written document signed by the parties.

**19.4    Further Agreements and Actions.**  The parties agree to cooperate with each other and execute and deliver such further or other documents and assurances and do such other acts as may, from time to time, be required in order to complete or fulfil actions required or contemplated by this Agreement or deemed useful by the other party to protect the Spray Technology the Patents, the trademarks or the copyrights or to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement or to otherwise give effect to the provisions of this Agreement.

**19.5    Independent Contractors.**  Each party is an independent contractor and does not have any power (nor will it represent itself as having any power) to in any way enter into commitments or contracts, assume obligations, give any warranties, make any representation or incur liability of any kind in the name of the other party or on behalf of the other party or to otherwise bind or obligate the other or to assume or create any expressed or implied obligation or responsibility on behalf of the other or in the other's name.  Nothing in this Agreement shall construe to create a relationship of partners, joint venturers, fiduciaries, master-servant, agency or other similar relationship between the parties.

**19.6    Severability.**   The parties agree that notwithstanding anything otherwise contained in this Agreement, in the event that any clause, term or provision of this Agreement or any portion thereof is determined by any Court, arbitrator or agency of competent jurisdiction to be invalid, unenforceable, in conflict with any applicable law or

February 3, 2004

regulations or otherwise illegal, this Agreement shall continue in full force and effect as if the offending clause, terms and provisions hereof or portion thereof are no longer incorporated herein.

**19.7    Modifications to render valid.**  If any applicable and binding law or rule of any jurisdiction i) requires a greater prior notice of the termination of this Agreement than is required hereunder, or ii) requires the taking of some other action not required hereunder, or iii) makes any provision of this Agreement or any specification or standard prescribed by Multi-Vet invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and the parties agree to negotiate in good faith the modification of such invalid or unenforceable provision, specification or standard to the extent required to achieve validity and enforceability.  If the parties cannot agree as to the modifications which are required, the matter will be submitted to arbitration as provided for in this Agreement.

**19.8    Waiver of Default.**  The failure of any party at any time to take action against the other party, or the failure of either party to terminate the present Agreement as provided herein, shall not affect either party's right to require full performance of this Agreement at any time thereafter, and the waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach thereof nor nullify the effectiveness of such provisions or the right of such party to demand redress for their respective losses, damages and prejudices.

**19.9    Waiver in Writing.**  No waiver of any breach of any term or provision hereof shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived.

**19.10  Assignment by Premier.**  Premier shall not assign the rights and/or obligations created pursuant to the terms of this Agreement without the consent of Multi-Vet which it may withhold at its discretion except:

> **19.10.1**        to a related company in the context of a corporate reorganization; or

> **19.10.2**        to a successor, acquirer or purchaser of substantially all of Premier's business relating to its conduct hereunder, provided such successor is not a direct competitor of Multi-Vet and further provided a fee of $1,000,000 is paid to Multi-Vet at the time of closing of such assignment;

provided that the assignor will at all times guarantee performance by such assignee of each and every obligation assumed by the assignor under the terms of this agreement.

**19.11  Assignment by Multi-Vet.**  Multi-Vet shall not assign the rights and/or obligations created pursuant to the terms of this Agreement to any direct competitor of Premier without the consent of Premier, which shall not be unreasonably withheld.

February 3, 2004

Multi-Vet/Premier Agreement                                    Page 22

**19.12  Successors & Assigns.**  Subject to the provisions of paragraphs 19.10 and 19.11, this Agreement shall inure to the benefit of and be binding upon the parties, and their heirs, executors, administrators, successors, permitted assigns and insurers and reinsurers.

**19.13  Applicable Law.**  This Agreement shall be governed, construed and enforced in accordance with the laws in force in the Province of Quebec except for patent matters which shall be governed by the laws of the Territory.  The enforcement of any awards rendered by arbitration pursuant to Section 17 and any disputes arising under this Agreement, which for any reason cannot be resolved by arbitration as provided in Section 17, shall be subject to the exclusive jurisdiction of the Courts of the jurisdiction of the defendant in such proceedings and both parties hereby irrevocably attorn to the jurisdiction of such Courts. All such proceedings will be carried out in the English language.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

February 3, 2004

Multi-Vet/Premier Agreement                                                      Page 23

**IN WITNESS WHEREOF,** the parties hereto have signed as of the place and date indicated above.

PREMIER PET PRODUCTS, LLC

Per :  _____

      Name:  Evan C. Wooton
      Title:   President

**MULTI-VET LIMITED**

Per :  _____

      Name:  Richard Garon
      Title:   President

**MULTIVET INTERNATIONAL INC.**

Per :  _____

      Name: Richard Garon
      Title:   President

February 3, 2004

Multi-Vet/Premier Agreement                                    Page 24

## SCHEDULE A

### Royalty Schedule

| **Products Containing Patents or the Spray Technology** | **Royalty** |
|---|---|
| Anti-Bark Kits | 5% |
| Spray Commander Kits | 5% |
| SSSCAT Kits | 5% |

| **Products Not Patented or containing any Spray Technology, but the use of which is exclusively limited as Accessories to Patented Products or containing Spray Technology** | **Royalty Fee** |
|---|---|
| Citronella Refill | 5% |
| Citronella Refills sold to PETsMART and Petco | 5% less $0.60 |

February 3, 2004

Multi-Vet/Premier Agreement                                    Page 25

## SCHEDULE B

### Current Market-Ready Product Schedule
(To Be Purchased From Multi-Vet)

| Description | Source | Terms | Lead Time | Price |
|---|---|---|---|---|
| Anti-bark device only | Made in France | 45 days | 8 weeks | $ 20.00 |
| Anti-bark base model device only | Made in China | 45 days | 8 weeks | $ 12.80 |
| Anti-bark pro model device only | Made in China | 45 days | 8 weeks | $ 14.60 |
| Anti-bark base model kit | Packaged in Canada | 45 days | 6 weeks | $ 17.50 |
| Anti-bark pro model kit | Packaged in Canada | 45 days | 6 weeks | $ 19.60 |
| Anti-bark base model kit | Packaged in China | 30 days | 12 weeks | $ 16.40 |
| Anti-bark pro model kit | Packaged in China | 30 days | 12 weeks | $ 17.40 |
| Spray Commander device only | Made in China | 45 days | 6 weeks | $ 37.00 |
| Spray Commander Kit | Packaged in Canada | 45 days | 6 weeks | $ 44.00 |
| Virtual Fence kit | Packaged in Canada | 45 days | 6 weeks | $ 58.00 |
| Virtual Barrier kit | Packaged in Canada | 45 days | 6 weeks | $ 44.00 |
| SSSCAT | Packaged in Canada | 45 days | 6 weeks | $ 11.85 |
| ABS refill 85 ml. | Made in USA | 45 days | 8 weeks | $ 2.90 |
| ABS refill 70 ml. | Made in France | 30 days | 10 weeks | $ 2.50 |
| ABS refill 70 ml. | Made in China | 30 days | 12 weeks | $ 2.10 |
| ABS refill 50 ml. | Made in Korea | 30 days | 12 weeks | $ 2.00 |
| SSSCAT refill 454 gr. | Made in USA | 45 days | 8 weeks | $ 3.90 |
| SSSCAT refill 250 gr. | Made in USA | 45 days | 8 weeks | $ 3.25 |

#50034211 v2 – Premier/Corp/1AR Licensing Agreement

February 3, 2004

Exhibit 8

03/02/2005  16:12    4507734009    MULTIVET    PAGE  02

# EXCLUSIVE DISTRIBUTION AGREEMENT

AS OF NOVEMBER 1, 2004

BETWEEN

**MULTIVET INTERNATIONAL INC.**

AND

**PREMIER PET PRODUCTS, LLC**

## TABLE OF CONTENTS

1.  DEFINITIONS ................................................................1
2.  EXCLUSIVE APPOINTMENT ...........................................2
3.  PRICES ........................................................................3
4.  TERMS OF PURCHASE ...............................................3
5.  MINIMUM PURCHASES ...............................................5
6.  PRODUCTS ...................................................................5
7.  WARRANTY ..................................................................5
8.  PRODUCT DEVELOPMENT ..........................................7
9.  PROMOTION AND SALE ...............................................8
10. COMMERCIAL INFORMATION .....................................9
11. TERM ..........................................................................9
12. TERMINATION .............................................................9
13. INTELLECTUAL PROPERTY .......................................11
14. CONFIDENTIAL INFORMATION ..................................12
15. INDEMNIFICATION ....................................................14
16. INFRINGEMENT ..........................................................15
17. ARBITRATION .............................................................16
18. NOTICES .....................................................................17
19. GENERAL PROVISIONS ...............................................17

**EXCLUSIVE DISTRIBUTION AGREEMENT ENTERED INTO AT** Montreal, as of the 1st day of November, 2004.

BETWEEN:                        **MULTIVET INTERNATIONAL INC.,**
                                corporation duly incorporated under the Canadian laws
                                having its head office at 17420 Centrale, St-Hyacinthe,
                                Quebec J2T 3L7;

                                (hereinafter referred to as **"Multivet"**)

AND:                            **PREMIER PET PRODUCTS, LLC,**
                                a corporation duly incorporated under the laws of the
                                Commonwealth of Virginia having its head office at
                                406 Branchway Road, Richmond, Virginia, 23233;

                                (hereinafter referred to as the **"Distributor"**)

    **WHEREAS** Multivet is in the business of manufacturing and selling the products set forth in Schedule A (hereinafter the **"Products"**);

    **WHEREAS** the Distributor is in the business of selling collars, leashes, and various other products for dogs, cats, birds and other small companion animals;

    **WHEREAS** the Distributor is prepared to further the distribution and sale of the Products within the USA for the mutual benefit of both parties;

    **WHEREAS** the Distributor wishes to acquire the exclusive rights to purchase and resell the Products within the Territory and Multivet is prepared to grant such rights;

    **THE PARTIES HAVE AGREED AS FOLLOWS:**

1.      **DEFINITIONS**

In this Agreement,

1.1     **Affiliates:** A body corporate is deemed to be affiliated with an individual if such individual, directly or indirectly, controls such body corporate. A body corporate is deemed to be affiliated with another body corporate, if one of them is the subsidiary of the other or both are the subsidiaries of the same body corporate or each of them is ultimately controlled by the same person(s). If two (2) bodies corporate are affiliated with the same person at the same time, they shall be deemed to be affiliated with each other;

November 1, 2004 Multivet International Inc.

1.2    **Contract Year**: that period of time beginning on the Effective Date and ending on December 31, 2004 and any subsequent twelve month period ending on December 31;

1.3    **Effective Date**: November 1, 2004;

1.4    **Territory**: the United States of America;

1.5    **Internet Sales**: the sale of Products to consumers in normal consumer amount solely in transactions conducted over the Internet or other network using an access device such as a personal computer or terminal.

1.6    **Product**: Any device to train, contain or otherwise control pets using a spray, including anti-barking devices.  Without limiting the generality of the foregoing, Products that are presently manufactured by MultiVet are listed in **Schedule A**, which can be amended from time to time as new Products are invented or created.

## 2.    **EXCLUSIVE APPOINTMENT**

2.1    **Exclusive license.**  Subject to Sections 2.5 and 2.6, Multivet hereby grants to the Distributor an exclusive license in the Territory for the Term to sell, offer for sale, market, promote, distribute and service the Products via all commercial methods including, but not limited to, the use of the Internet.

2.2    **Referral.**  If Multivet receives any requests or inquiries from any country world-wide for products (other than Products) currently produced or distributed by the Distributor, Multivet agrees to refer such requests or inquiries promptly to the Distributor.  Similarly if Distributor receives any requests or inquiries from any country world-wide or from outside the Territory for products (including the Products) produced or distributed by Multivet, the Distributor agrees to refer such requests or inquiries promptly to Multivet.

2.3    **No sales outside Territory.**  Except as provided in Section 2.5, the Distributor shall not, except by written agreement with Multivet, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product outside the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same outside the Territory.  All requests or inquiries received by the Distributor with respect to any Product for delivery, use or purchase outside the Territory shall be referred promptly by Distributor to Multivet.

2.4    The Distributor acknowledges that the Products are complementary to the products which it currently sells in the Territory.  The Distributor agrees not to, directly or indirectly, stock, distribute, promote or sell competitive products ("competitive" being defined as any product used to train, contain or otherwise control pets using a spray or a shock, including anti-barking devices) during the Term of this Agreement within the Territory without having previously obtained the written permission of Multivet.

2

November 1, 2004 Multivet International Inc.

2.5    **No sales in the Territory.**  Multivet shall not, without the prior written agreement of the Distributor, offer for sale, sell, distribute or deliver, whether directly or indirectly, any Product in the Territory or knowingly transfer possession of any Product to any person who may offer for sale, sell, distribute or deliver same in the Territory.  Multivet shall promptly refer all requests or inquiries received by Multivet with respect to any Product for delivery, use or purchase in the Territory.

2.6    **Internet Sales.**  Notwithstanding any other Section of this Agreement, Multivet shall have the right to engage in Internet Sales of the Products.

3.    **PRICES**

3.1    Multivet will supply the Distributor with Products, FOB Montreal OR Hong Kong, at the prices set forth in **Schedule B**.  The said prices shall be the net selling price by Multivet, exclusive of all sales and other similar taxes, custom and excise duties, insurance premiums, freight and storage charges and all other charges of a similar nature, whether currently imposed or applicable in the future.

3.2    Multivet will inform the Distributor at least one (1) month prior to any change in its list prices.  With respect to any written purchase orders for Products that have been placed by the Distributor between the date of such written notice by Multivet and the effective date of the price change, the price for Products so ordered shall be the price prevailing at the time the purchase order is received and accepted by Multivet, provided that such written purchase order specifies delivery dates not exceeding sixty (60) days from the order date, failing which the changed purchase price shall be applicable.  In the event that the Distributor, as a condition of making a sale, is required to enter into an agreement with a customer in which the Distributor must guarantee no change in wholesale price for a specified period of time, the Distributor will provide Multivet with a copy of the terms of the contract, and Multivet will have the option to agree thereto, in which case it will honor the price prevailing during at the beginning of the contract and throughout its duration, limited to units sold only to that customer pursuant to such contract.

3.3    All dollar values expressed in this Agreement and the Schedules hereto and all payments required to be made by the Distributor, shall be in U.S. dollars.  Any amount owed to Multivet which is not paid on its due date shall bear interest at the rate of eighteen percent (18%) per annum calculated from the date upon which such amount was due.

4.    **TERMS OF PURCHASE**

4.1    No order for Products received from the Distributor shall bind Multivet until such order is accepted by an authorized officer of Multivet.  Multivet agrees that it will fill firm orders for Products within ninety (90) days following the receipt of such order.

3

03/02/2005  16:12    4507734009        MULTIVET                    PAGE  07

November 1, 2004 Multivet International Inc.

4.2    The terms of payment will be net forty five (45) days from invoice, by bank transfer or by irrevocable letter of credit in favor of Multivet through a bank and in accordance to terms mutually acceptable to the Distributor and Multivet.

4.3    Multivet shall remain the sole owner of all Products sold to the Distributor until full payment is received by Multivet. Notwithstanding the above, the Distributor will bear the entire risk of loss, damage, destruction or theft of all or part of any Products from the time such Products, or parts thereof have been place in the hands of the carrier.

4.4    **Adjustment.** If Multivet cannot ship Product(s) to the Distributor for any period greater than thirty (30) days and thereby causes the Distributor to materially backorder its customers, or if the Distributor's ability to sell Products is otherwise materially impeded by circumstances beyond the Distributor's reasonable control, Multivet and the Distributor agrees to negotiate, in good faith, the Annual Minimum Net Sales and make reasonable adjustments, as necessary. There shall be no obligation, however, of either party to amend any term of this Agreement.

4.5    **Temporary license.** In the event Multivet and/or its designated sub-contractors are unwilling or are unable to supply the Distributor with such Products and associated supplies ordered by the Distributor or the terms referenced in this Agreement, Multivet grants to the Distributor a temporary license to produce such Products and associated supplies, or have another produce same, but only for resale in the Territory and only for as long as such failure to supply lasts.

4.6    **No changes.** The Distributor agrees not to add to, remove from or in any way change the Products in any material manner without the prior written approval of Multivet. The Distributor also agrees not to alter, remove or otherwise tamper with any registration numbers, serial numbers, date codes, patent numbers or other tracking marks that appear on the Products.

4.7    **Notification of defects.** The Distributor will have the obligation to advise Multivet of the existence of any defect as soon as possible after same is brought to its attention and to provide Multivet with all useful information and explanations relating to same. Multivet will have the obligation to advise the Distributor of the existence of any defect as soon as possible after same is brought to its attention and to provide the Distributor with all useful information and explanations relating to same. Multivet shall promptly remedy any major design, material or manufacturing defects in Products sold to the Distributor.

4.8    **Quality standards.** Such License to use the Spray Technology and the Patents granted to Distributor shall be restricted to such Products that have merchantable quality which meet or exceed Multivet's pre-existing quality standards as previously communicated to Distributor from time to time.

4.9    **Inspection.** Multivet shall have the right, at all reasonable times, to enter and inspect any premises used by Distributor in its operation under such License solely for the purpose of

4

**November 1, 2004 Multivet International Inc.**

determining compliance with the standards, specifications and requirements referred to in Section 4.8.

### 5.  MINIMUM PURCHASES

5.1   · The Distributor does hereby purchase from Multivet, for the first Contract Year the Products, in the quantities and for delivery set forth in **Schedule C** hereto.

5.2   The Distributor hereby undertakes to purchase from Multivet in each subsequent Contract Year the Products in the minimum quantities set forth in **Schedule D**.

5.3   In the event a third party introduces a competing spray product in the Territory then Multi-Vet and Distributor agree to negotiate, in good faith, to adjust the minimum quantities on the Product(s) which is (are) directly affected by such new competing product.

5.4   At least ninety (90) days prior to the first day of each Contract Year, the Distributor shall deliver to Multivet an approximation of the number of each Product that the Distributor expects to purchase during each month of said Contract Year.

5.5   The Distributor shall notify Multivet of any significant changes in the Distributor's sales forecasts.

### 6.  PRODUCTS

6.1   Subject to the prior written approval of Multivet, the Distributor is responsible for all marketing and sales aspects including the preparation and production of packaging, photography and merchandising materials.

6.2   Multivet shall give the Distributor ninety (90) days prior written notice of any proposed changes in the specifications and/or designs of Products.

6.3   Unless approved in writing by Multivet, the Distributor shall make no warranty regarding any Product other than the expressed warranties of Multivet.

6.4   The Distributor will have the obligation to advise Multivet of the existence of any warranty claim or any defect as soon as possible after same is brought to its attention and to promptly provide Multivet with all useful information and explanations that it may possess relating to same. Upon reasonable notice, the Distributor shall allow Multivet to have access to any Product during regular buiness hours and shall return, at Multivet's sole expense, any defective Product to Multivet warehouse designated by Multivet.

### 7.  WARRANTY

7.1   **Warranty.** "IP Warranties:" Multivet warrants that: (1) it is the lawful owner of the Patents and the Spray Technology, and that Multivet otherwise has all power and authority to

5

**November 1, 2004 Multivet International Inc.**

grant the rights and licenses granted herein; (2) that, to the best of its knowledge, the use and exploitation of the Patents and the Spray Technology as licensed herein, including the sale of the Products by the Distributor and the use of the Products by the Distributor's customers, shall not infringe or violate the patent or other intellectual property rights of any third party; (3) that as of the Effective Date, it has no knowledge that any third party is infringing any of the Patents; and (4) that the Patents and the Spray Technology collectively comprise all rights and know how to distribute and sell the Products in the Territory and to otherwise exercise Distributor's rights under this Agreement. "Quality Warranties:" Multivet warrants that all Products manufactured by or for it and sold to the Distributor pursuant to this Agreement shall be free from any major material or workmanship defects and in full compliance with specifications, quality control standards and all applicable laws.  A Product that does not meet the foregoing requirements shall be deemed to be "defective" for purposes of this Section 7.  This Quality Warranty on the Products shall be valid for a period of eighteen (18) months from the date of shipment to the Distributor.    The Quality Warranty obligations of Multivet are strictly limited to the replacement/repair of any Products found to have major manufacturing defects in materials or workmanship.  Multivet is not obligated for damages due to error, misuse or neglect by the Distributor, the Distributor's customers, or the end consumer.  In the event that three (3) percent or more of Products purchased from Multivet have major defects and/or are the subject of Quality Warranty claims, Multivet shall be in breach of their Agreement and the Distributor shall be entitled to a reduction in the annual minimum purchases for that product for that year, which adjustment the parties shall promptly negotiate in good faith.

7.2    **No liability to customers or end consumers**.  The Distributor shall assume all warranty obligations to its customers and end consumers in respect of Products, and Multivet shall have no liability either to the Distributor or to its customers and end consumers in respect of such warranty obligations except as expressly provided herein.

7.3    **LIMITATIONS**.  EXCEPT FOR THE WARRANTIES CONTAINED IN SECTION 7.1, MULTIVET DOES NOT GRANT ANY WARRANTY, EITHER EXPRESSED OR IMPLIED, LEGAL OR CONVENTIONAL, WITH REGARD TO ANY PRODUCTS OR REFILLS AND DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  THE WARRANTIES EXPRESSLY CONTAINED IN SECTION 7.1 HEREOF ARE IN LIEU OF ANY LIABILITY OR OBLIGATION OF MULTIVET FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES (INCLUDING LOSS OF REVENUE OR OF BUSINESS OR OTHER SIMILAR LOSSES) SUSTAINED BY DISTRIBUTOR (INCLUDING ITS EMPLOYEES, AGENTS, OR INVITEES) OR ANY OF ITS CLIENTS OR END CONSUMERS AND/OR IN ANY WAY ARISING FROM OR RELATING TO THE SALE, MAINTENANCE, USE, PERFORMANCE OR FAILURE OF ANY PRODUCTS OR REFILLS.

7.4    **Faulty actions**.  Multivet's warranty obligations do not cover any faulty or negligent manipulation, storage or use of any Products or refills or any such manipulation or storage or use which is not in conformity with instructions provided by Multivet.

November 1, 2004 Multivet International Inc.

7.5    **Obligations of Multivet.**  Multivet shall replace or repair, free of charge, all defective Products (as defined in section 7.1 above) returned by the Distributor to Multivet subject to the following terms:

 7.5.1    The defective Products will be shipped in full cases (minimum 100 units per shipment) to Multivet (subject to prior co-ordination with Multivet), at Multivet's expense and will include a list of the serial numbers of all returned units together with a description of each alleged defect. Notwithstanding the above, Multivet shall, at its own discretion, be entitled to replace the reported defective Products without requesting shipment of same to Multivet.

 7.5.2    Upon receipt of defective Products shipment, Multivet's personnel will inspect and sort same. All Products covered by the warranty as per Section 7.1 above will be replaced by Multivet within thirty (30) days free of charge. However, Products that are found to have been returned for other reasons (misuse, physical damage, repair by unauthorized personnel, etc.) will be repaired against payment by the Distributor for parts and labor, but not without prior written authorization from the Distributor.

 7.5.3    The replaced/repaired units will be shipped to the Distributor at Multivet's expense and will include an itemized report and invoice with regard to the number of replaced units and an invoice for repaired units, if any.

## 8.    PRODUCT DEVELOPMENT

8.1    **Product development.**  Multivet may, during the term of this Agreement, develop pet training products using the Spray Technology including but not limited to remote trainers, containment fences and indoor animal control. Multivet will provide a reasonably full disclosure of any R&D development to Distributor. Multivet will endeavor to get Distributor's consultation as much as possible in the product development process, provided Distributor will not charge any fees or expenses to Multivet for such consultation unless otherwise agreed.

8.2    **Disclosure.**  Subject to reasonable confidentiality obligations, each party shall promptly disclose to the other party any discovery or invention which is a new or improved Product which it makes or acquires during the term of this Agreement and shall make available to the other party all information relating thereto, including blueprints, sketches, drawings, designs, test information and other data. All such disclosures and information shall be treated as confidential information (within the meaning of Section 14) by the recipient.

8.3    **Ownership.**  All rights to any derivative works and other modifications, improvements, fixes, enhancements and upgrades to the Spray Technology ("Derivatives") created while this Agreement is in effect shall be owned by the party making such Derivatives. To the extent an unaffiliated third party attempts to negotiate a transaction by which Distributor would manufacture or distribute a Derivative, the parties agree that Distributor shall offer Multivet a first right of refusal to negotiate such right to manufacture or distribute the Derivative with the

7

November 1, 2004 Multivet International Inc.

third party.  Distributor shall promptly notify the third party of its obligations hereunder.  If Multivet does not exercise its right of first refusal within 60 days following notice from Distributor, Distributor may negotiate with the third party for its own benefit.  To the extent that Distributor develops a Derivative, the parties hereto agree to negotiate in good faith the terms and use of the Derivatives by Distributor and Multivet inside and outside the Territory.

## 9.    PROMOTION AND SALE

9.1    The Distributor shall exercise its diligent, best and good faith efforts at its expense to introduce, promote the sale and use of, obtain orders for, distribute and sell Products in the Territory and give adequate, efficient and prompt attention and service to local distributors and consumers. Without limiting the generality of the foregoing, the Distributor shall:

9.1.1  obtain Products exclusively from Multivet or suppliers previously approved by Multivet, in accordance with the terms of this Agreement;

9.1.2  develop and maintain a retail outlet network reasonably designed to meet the Distributor's obligations hereunder;

9.1.3  develop and maintain a marketing organization for Products reasonably designed to meet the Distributor's obligations hereunder, including the appointment of a dedicated product manager for Products;

9.2    **Distributor's discretion.**  The details of the marketing, packaging and promotion of Products shall be at the Distributor's sole and absolute discretion, provided the Distributor is not in material default of this Agreement.

9.3    **After sales service center.**  The Distributor shall, at its own expense, organize and keep active an after sales service center for Products in the Territory.

9.4    The Distributor shall obtain information and report to Multivet concerning existing and potential markets for Products and for new products or modified Products which Multivet might profitably add to its line of products.

9.5    The Distributor shall, from time to time, advise Multivet of market conditions, concerns of retailers and consumers, its marketing activities, its sales prospects, results and forecasts, and inventory levels.

9.6    The Distributor shall also advise Multivet, from time to time, of the activities of competitors and other matters in the Territory thought by the Distributor to be of interest to Multivet in the furtherance of its business.

9.7    The Distributor shall provide customer services typical for its business.

8

**November 1, 2004 Multivet International Inc.**

9.8    The Distributor shall also investigate any warranty claim or complaint made by a consumer or a retailer and promptly report same to Multivet.

9.9    The Distributor shall prepare and submit for an annual marketing plan for distribution of Products in the Territory to Multivet. The Distributor shall notify Multivet of any material changes in the Distributor's sales forecasts, personnel or method of conducting business.

9.10    In any advertising and promotion conducted by the Distributor, the Distributor shall ensure that all such advertising and promotional material is factual and conforms to appropriate standards of ethical advertising and be in material compliance with all applicable laws and regulations. No such materials may be used without the prior written authorization of Multivet, which may not be reasonable withheld.

## 10.    COMMERCIAL INFORMATION

10.1    Multivet will supply to the Distributor all its current technical and commercial information relating to Products. When dictated by good business practices, the Distributor shall prepare one or more version(s) of such documents for use in the Territory. The Distributor shall submit any such local version(s) to Multivet prior to using same.

## 11.    TERM

11.1    This Agreement is deemed to have commenced on the Effective Date above and shall terminate on December 31st, 2014 unless previously terminated in accordance with the terms of this Agreement (the "Initial Term").

11.2    This Agreement shall be automatically renewed for successive three (3) year periods if neither party hereto gives written notice of termination to the other at least three (3) months prior to the end of the then current period (together with the "Initial Term," the "Term").

## 12.    TERMINATION

12.1    Any party may terminate this Agreement on one (1) day's written notice to the other party upon the occurrence of one or more of the following events:

12.1.1    the other party ceases to function as a going concern or to conduct its operations in the normal course of business;

12.1.2    the other party's insolvency, dissolution, bankruptcy, assignment for the benefit of creditors or admission of its inability to pay its debts as they mature;

12.1.3    the merger or consolidation of the other party with another entity or the acquisition of all or substantially all of one party's assets by another person or entity except in the context of a corporate reorganization.

9

November 1, 2004 Multivet International Inc.

    12.1.4 the other party assigns this Agreement without such other party's prior written consent; or

    12.1.5 there is a change of control of any party.

12.2   In the event of the breach of any provision of this Agreement by one of the parties, the other party shall have the right to terminate this Agreement. Such right shall be exercised by giving a written notice to defaulting party specifying the circumstances in which it breached the Agreement and stating that it elects to terminate this Agreement as of a date not less than thirty (30) days subsequent to the date of such notice unless the defaulting party has cured such breach within said delay. In the case the defaulting party fails to cure such breach within the aforesaid delay, this Agreement shall come to an end on the date specified in such notice.

12.3   If, after the end of any given year, the Distributor fails to purchase the aggregate of the minimum purchases for all Products referenced in **Schedule C** and or **D** for such Contract Year, the parties agree to undertake a mutual review within 60 days of the end of the year of that year's sales activities and market conditions to determine the reason(s) for the shortfall. If, in Multivet's reasonable opinion, Distributor has not put forth diligent and best efforts, Multivet shall have the right (in addition to any other rights it may have pursuant to this Agreement) to transform it into a non-exclusive license by providing a written notice to this effect to the Distributor. Such transformation shall be effective thirty (30) days from the date of written notice from Multivet to Distributor.

12.4   Termination of this Agreement by either party shall be without prejudice to any other rights which a party may have against the other, including, without limitation, damages for breach to the extent that same may be recoverable.

12.5   All unfilled orders at the time of termination shall be deemed to have been cancelled. However, the acceptance of future orders from the Distributor or the continuous sale of Products to the Distributor or any other act after the termination of this Agreement shall not be construed as a renewal of this Agreement for any further term nor a waiver of the termination.

12.6   No assignee for the benefit of creditors, receiver, liquidator, sequestrator, trustee in bankruptcy, sheriff or any other officer of the court or official charged with taking over custody of a party's assets or business shall have any right to continue the performance of this Agreement.

12.7   Termination of this Agreement shall not release a party from any payments or obligations due and payable or accrued to the other or rescind any payment made or paid by one party to the other hereunder prior to the time such termination becomes effective nor release any party from those obligations hereunder which survive termination. Furthermore, termination of this Agreement prior to the expiration of its term shall be without prejudice to any other rights which one party may have against the other, including, without limitation, damages for breach to the extent that same may be recoverable.

November 1, 2004 Multivet International Inc.

12.8    **Option to purchase remaining inventory.**  The Distributor hereby grants to Multivet an option to re-purchase the inventory of Products and refills owned or controlled by the Distributor at the price at which it was sold to the Distributor, upon termination or expiration of this Agreement. This option shall apply only if and when the Agreement expires or is terminated. For example, the transformation of the license into a non-exclusive license pursuant to section 3.7 shall not trigger such option. If Multivet does not exercise this option within thirty (30) days after the effective date of termination or expiration, as the case may be, then the Distributor shall be entitled, within the following ninety (90) days, to sell its inventory of such Products and refills notwithstanding the expiration or termination of the licenses herein.

## 13.    INTELLECTUAL PROPERTY

13.1    The Distributor recognizes and admits that any invention, patent, trade mark, trade name or other identifying mark, industrial design, model, copyrightable document or object as well as any technical or commercial know-how or trade secret including, but without limitation, any price lists, specifications, technical data used by Multivet in association with its Products (hereinafter described as the **"Intellectual Property"**) is the exclusive property of Multivet.

13.2    Neither the Distributor, nor its Affiliates, if any, will use or permit any person to use the name Multivet or any modification hereof or any other trade mark, trade name or identifying mark of Multivet as part of its corporate name without the prior written consent of Multivet.

13.3    The Distributor will use Multivet trade marks, trade names and other identifying marks (**"Trade marks"**) only in accordance with the terms of this Agreement and in such manner as to sufficiently protect and preserve all the rights of Multivet in such trade marks, trade names and other identifying marks.  The Distributor will use the Trade marks correctly spelled and/or depicted and not as a verb or in any other manner which might endanger the validity of the Trade marks or of any registration thereof.

13.4    **Right to use trademarks.**  Multivet hereby grants to Distributor the exclusive right and license, but not the obligation, to use the following trademarks in relation with the marketing, promotion, sale and distribution of Products in the Market in the Territory: Anti-Bark System, ABS, ABOISTOP, DIRECT STOP, SMART CAP, SPRAY CAP, Spray Barrier, Virtual Fence, Spray Commander and/or any new marks associated with the Products in relation with the marketing, promotion, sale and distribution of Products in the Market in the Territory.

13.5    The Distributor shall not, during the course of this Agreement and thereafter, either directly or indirectly, adopt, use, register or attempt to register any Trade mark which is identical to, includes or is confusingly similar to any of the Trade marks, in any class, anywhere in the world or attempt to dilute the value of any goodwill attaching to the Trade marks.  The Distributor shall not use the Trade mark or any contraction, variation or abbreviation thereof in any manner calculated to represent or give the impression that it is the owner of the Trade mark.

11

November 1, 2004 Multivet International Inc.

13.6    **New trademarks.**  Upon written notification of Distributor's intent to use new marks associated with the Products, Multivet is obligated to register these marks within the Territory within sixty (60) days, and hereby grants to Distributor the exclusive right and license, but not the obligation, to use the marks in relation with the marketing, promotion, sale and distribution of Products in the Market in the Territory.

13.7    The Distributor agrees that any goodwill associated with the Trade marks including the goodwill associated with the Trade marks which arises throughout the activities of the Distributor in the Territory shall be exclusively to the benefit of Multivet and is the property of Multivet.  Upon termination or expiration of the term of this Agreement, no monetary amount shall be assigned or attributed to any goodwill associated with Distributor's use of the Trade marks.

13.8    **No contest.**  Distributor shall not, at any time during the term of this Agreement or thereafter, question or contest, directly or indirectly, the validity of the Spray Technology, the Patents or the trademarks listed in Section 2.2 or assist any other person to do so.

13.9    **Patent notices.**  Any labeling used in connection with the marketing, advertising, promotion and sale of every Product shall clearly indicate the existence of the Patents as well as their use under license and such label shall be in a form agreed upon by Multivet in writing, and the consent of Multivet shall not be unreasonably withheld.  As an example, the following patent notice is agreeable provided in a font having at least 12 points:

"Covered by one or more of the following US Patents 4,627,385 and 5,046,453."
"Made under license from Multivet Ltd."

13.10   **Trademark and copyright notices.**  To the extent Distributor uses a trademark or a copyrighted work of Multivet, Distributor will apply appropriate notices to the Products, their containers, accompanying materials and/or promotional materials in a form, size and location acceptable to Multivet, acting reasonably.

14.     **CONFIDENTIAL INFORMATION**

14.1    Each party hereto acknowledges and understands that the other party is involved in research, development, production and/or sale of different devices to train, contain or otherwise control pets and has acquired or shall acquire in the future great quantities of secret or proprietary technical, scientific, marketing and commercial information relating to its business and that of its Affiliates, including, but not limited to, products, customer lists, pricing policies, marketing plans and strategies, product development techniques or plans, business acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions (patented or not) and research programs, trade know-how, trade secrets, specific software (source, object and documentation), algorithms, computer processing systems, ideas, methods, experiments and data, no matter their form or support medium including any sketch, report, model, prototype, chip, diskette, tape, CD-ROM, DVD and other similar documents or objects

12

**November 1, 2004 Multivet International Inc.**

(the **"Confidential Information"**) and that it is imperative for it that the Confidential Information remains secret.

14.2    Each party hereto agrees to maintain the confidentiality of the Confidential Information of the other party and not to disclose, directly or indirectly, any part to anyone without prior written authorization from the other party.

14.3    Each party agrees not to use, directly or indirectly, any Confidential Information of the other party for purposes other than as provided herein and not to assist or collaborate with third parties using, directly or indirectly, any similar Confidential Information for purposes other than those provided for in the present Agreement, without prior written authorization from the other party.    Notwithstanding the foregoing, either party may disclose the other's Confidential Information to its employees, representatives and agents as is reasonably necessary in order to accomplish the purposes of this Agreement and to fulfil legal, regulatory or business obligations arising or likely to arise from performing pursuant to this Agreement, including without limitations making limited disclosures to bankers, investors, consultants and counsel in the course of obtaining professional services, making regulatory disclosures, and soliciting investors provided all such persons agree in writing to maintain the confidentiality thereof and to refrain from making any unauthorized use thereof.

14.4    The confidentiality and non-use undertakings specified in the present Agreement do not apply to any part of the Confidential Information which, through no breach of the provisions of the present Agreement:

14.4.1  the recipient can demonstrate was in the public domain at the time of disclosure of such information by the other party or which later becomes part of the public domain through no breach of this Agreement;

14.4.2  the recipient can demonstrate was in its possession, prior to disclosure of such information by the other party and had not been previously obtained directly or indirectly from the other party;

14.4.3  the recipient can demonstrate it had received from a third party after disclosure of such information by the other party hereunder, as a matter of right and having no direct or indirect obligation to the other party with respect to same, provided that such third party did not acquire such information directly or indirectly from the other party; or

14.4.4  must be disclosed by virtue of the law but only to the extent specifically required.

14.5    Notwithstanding the above, Confidential Information will not be deemed to be in the public domain or to have been known by a party mainly because it is embraced by more general information previously known to it or merely because it is expressed in publications, books, patents or other literature in general terms not specifically including such Confidential Information disclosed or made available to the other party.

13

November 1, 2004 Multivet International Inc.

14.6    Each party undertakes to cause those of its employees who are likely, by reason of their employment, to have access to any part of the Confidential Information from the other party, including confidential information relating to the Products, to sign an agreement in which said employee agrees to treat Confidential Information learned during the course of his or her employment in the same manner as his or her employer treats such information. .

14.7    The confidentiality and non-use undertakings herein mentioned will remain in full force and effect for as long as the information at issue remains confidential.

## 15.    INDEMNIFICATION

15.1    The Distributor shall indemnify and save and hold harmless Multivet from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorneys' fees and expenses) which Multivet or its Affiliates is or becomes liable for, arising from a third-party claim: (1) that the Distributor breached a warranty or covenant it made herein; (2) that the Distributor acted with gross negligence or wilful and malicious misconduct; or (3) that the Distributor made false or misleading claims with respect to the Products; or (4) that Distributor exceeded the scope of the licenses granted herein.

15.2    The Distributor shall, at the request of Multivet or one of its Affiliates, assume the defense of any demand, claim, action, suit or proceeding brought against Multivet or any such Affiliate by reason of the foregoing and pay any and all damages assessed against or that are payable by Multivet or any Affiliate as a result of the disposition of any such demand, claim, action, suit or proceeding. The Distributor's obligation hereunder is conditioned upon Multivet promptly notifying the Distributor of all such liabilities, claims, causes of action or suits for which indemnity may by sought. In the defense of any such claim, Multivet will cooperate fully with the Distributor, and will, from time to time, make available to the Distributor all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim. The Distributor shall not enter into any settlement or material admission without the prior consent of Multivet, which shall not be unreasonably withheld. Notwithstanding the foregoing, Multivet or its Affiliates as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

15.3    Multivet shall indemnify and save and hold harmless the Distributor, its clients and their respective directors, officers, employees,  agents and Affiliates from any liabilities, claims, causes of action, suits, damages and expenses (including reasonable attorney's fees and expenses) which any of the above is or becomes liable for, arising from a third-party claim that: (1) Multivet has breached a warranty or covenant it made herein; (2) that Multivet acted with gross negligence or willful and malicious misconduct; (3) relating to product liability claims involving the Products; (4) that the sale or use of the Products and the practice of the licenses granted herein infringe or otherwise violate the intellectual property or other rights of any third

14

November 1, 2004 Multivet International Inc.

party; or (5) resulting from proceedings instituted by Radio Systems Inc. based on its former relationship with Multivet.

15.4    Multivet shall, at the request of the Distributor, assume the defense of any demand, claim, action, suit or proceeding brought against the Distributor or any of the foregoing parties by reason of the foregoing and pay any and all damages assessed against or that are payable by Distributor or any of the foregoing parties as a result of the disposition of any such demand, claim, action, suit or proceeding.   Multivet's obligation hereunder is conditioned upon the Distributor promptly notifying Multivet of all such liabilities, claims, causes of action or suits for which indemnity may by sought. In the defense of any such claim, the Distributor will cooperate fully with Multivet, and will, from time to time, make available to Multivet all relevant records, papers, information, samples, specimens and other similar material and shall otherwise provide reasonable nonmonetary assistance in the defence of such claim.  Multivet shall not enter into any settlement or material admission without the prior consent of the Distributor, which shall not be unreasonably withheld.   Notwithstanding the foregoing, the Distributor or the foregoing parties as well as their respective successors, assigns, and their officers, directors, employees and agents may be represented in any such action, suit or proceeding at its or their own expense and by its or their own counsel.

15.5    Should such suit, action or other proceeding contain allegations that the spray technology portion of any Product sold or distributed by the Distributor constitutes an infringement of one or more of the claims mentioned in such suit and that such action or other proceeding has not been settled six (6) months after the date of service thereof, either party shall have the right to terminate this Agreement upon written notice to the other without any further liability to the other.

15.6    During the Term of this Agreement and for three (3) years thereafter, both parties shall maintain minimum general liability insurance of two (2) million dollars naming the other party as an additional insured and provide certificates or other proof of insurance to the other party.

16.    **INFRINGEMENT**

16.1    In the event that either party learns of any infringement or threatened infringement or piracy of any of the Patents in the Territory, it shall promptly give notice thereof to the other party together with all such information with respect thereof as it may from time to time obtain. The parties undertake and agree to consult with each other with respect to how to respond to each infringement or piracy.

16.2    Multivet shall have the right, but not the obligation, at its own expense, to take all actions and procedures which it may deem appropriate to defend against infringement of its intellectual property licensed herein and all actions and procedures which it may deem appropriate to enforce and protect the Distributor's right under this Agreement.  Any recovery shall inure to the benefit of Multivet. The Distributor may, at its own discretion and at its own cost, join as plaintiff in an action against any such infringement and all recovery shall be divided between the parties hereto

15

November 1, 2004 Multivet International Inc.

according to the losses and damages suffered by each party, including legal costs and fees associated with bringing the action and all other costs and damages related to the infringement.

16.3    Notwithstanding the foregoing, if Multivet declines to institute legal proceedings, the Distributor shall have the right but not the obligation, at its sole expense, to commence legal proceedings against any third party infringing the patents in the Territory or otherwise acting or exploiting the Spray Technology in a way that violates the Distributor's rights under this Agreement. Multivet agrees that, upon the Distributor's request and at the Distributor's cost, it shall join as a party in any such action and that it shall provide the Distributor with all reasonable non-monetary assistance in the enforcement of rights in the Patents or the Spray Technology. To the extent any such claim results in an award resulting from infringement within the Territory, then the Distributor shall be entitled to such reward, as well as to any award of attorneys fees.

16.4    The Distributor agrees that any relief (such as, injunctive relief) other than the monetary one which is requested to protect the Intellectual Property shall be sought for and on behalf of and shall be designated to the benefit of Multivet only.

16.5    "Legal proceedings" as used herein shall include demand letters, negotiation and settlement of disputes, as well as the filing of formal legal actions with a court of proper jurisdiction.

17.    **ARBITRATION**

17.1    Any dispute, controversy, claim or other matters of differences arising out of or relating to the contract, or the breach thereof, including any dispute relating to patent validity or infringement arising under this contract, shall be settled by arbitration in accordance with the Patent and International Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

17.2    The place of arbitration shall be New York City, New York and the English language shall be used throughout the arbitration proceedings.

17.3    The parties expressly agree to confer upon the arbitrator the powers to fill gaps, cure contractual omissions and to perform all other activities which he may deem necessary and/or opportune.

17.4    The award of the arbitrator shall be the sole and exclusive remedy between the parties regarding any claims and counter-claims presented to the arbitrator. The parties undertake to fully and punctually abide by the award rendered by the arbitrator. Failing such voluntary compliance, judgment upon the award or any other appropriate procedures may be entered or sought in any court having jurisdiction thereof to secure enforcement of said award.

16

November 1, 2004 Multivet International Inc.

17.5    The final award will be payable in United States currency without deduction or offset and costs, fees or taxes incidental to the enforcement of the arbitration award shall be charged in accordance with the decision of the arbitrator against a party resisting enforcement. Payment of the award including interest from the date of breach and violation shall be made in accordance with the relevant provisions of this Agreement.

17.6    Nothing herein contained shall prevent any party hereto from instituting an action at law against the other party requesting temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain *interim* relief when deemed necessary by such court to preserve the *status quo* or prevent irreparable injury pending final settlement of such dispute by arbitration.

## 18.    NOTICES

18.1    Any notice, demand, consent or other communication to be given in connection with this Agreement (collectively and individually the "**Notice**") shall be in writing and addressed to its addressee at the address stated above or such addresses as the parties may specify from time to time by Notice.

18.2    Notices may be delivered by hand, registered mail or fax and shall be deemed to have been received as follows:

18.2.1  If delivered by hand:    at the time of delivery to a person who appears reasonably to be in charge.

18.2.2  If sent by fax:    at the time of confirmed transmission provided a confirmation copy is sent by airmail or registered mail within twenty-four (24) hours after the transmission.

18.2.3  If sent by registered mail:    at the time of delivery or of attempted delivery in the case delivery cannot be completed due to no fault of the sender.

18.3    If the time of such deemed receipt as provided in paragraph  hereof is not during the customary hours of business, the Notice shall be deemed to have been received at 10:00 a.m. at the place of delivery on the first customary day of business thereafter.

18.4    All Notices shall be in the English language.

## 19.    GENERAL PROVISIONS

19.1    Applicable Law.  This Agreement shall be governed, construed and enforced in accordance with the laws in force in Québec except for trademark copyright and patent matters which shall be governed by the laws of the Territory.

17

November 1, 2004 Multivet International Inc.

19.2    Assignment.  The parties hereto shall not assign the rights and/or obligations created pursuant to the terms of this agreement without the consent of the other party which shall not be unreasonably withheld except to a related company in the context of a corporate reorganization; provided that the assignor will at all times guarantee performance by such assignee of each and every obligation assumed by the assignor under the terms of this Agreement.

19.3    Entire Agreement.  This Agreement sets forth the entire Agreement and understanding between the parties with respect to the subject matter of this Agreement and merges, supersedes and cancels all prior discussions, representations, inducements, promises, undertakings, understandings, agreements or otherwise, whether oral, in writing or otherwise, between the parties with respect to such subject matter including our Agreement dated October 30, 2003 between the parties .  Without limiting the generality of the foregoing, no oral explanation or oral information by the parties hereto, or any of them, shall alter the meaning or interpretation of this Agreement.  There are no statements, terms, conditions, undertakings, representations, warranties or collateral agreements still in force or effect which have not been embodied in this Agreement. This Agreement may be altered, modified or amended only by a written document signed by the parties.

19.4    Further Agreements and Actions.  The parties agree to execute and deliver such further or other documents and assurances and do such other acts as may, from time to time, be required or deemed useful by the other party to give effect to the provisions of this Agreement.

19.5    Headings.  The division of this Agreement into articles and sections and the insertion of headings are for convenience of reference only and shall not affect its construction or interpretation.

19.6    Language.  This Agreement has been drafted in the English language at the request of the parties.  À la demande des parties, cette convention a été rédigée en langue anglaise.

19.7    Preamble.  The preamble and schedules to this Agreement forms part hereof as if recited in full.

19.8    Severability.  The parties agree that notwithstanding anything otherwise contained in this Agreement, in the event that any clause, term or provision of this Agreement or any portion thereof is determined by any Court, arbitrator or agency of competent jurisdiction to be invalid, unenforceable, in conflict with any applicable law or regulations or otherwise illegal, this Agreement shall continue in full force and effect as if the offending clause, terms and provisions hereof or portion thereof are no longer incorporated herein.

19.9    Successors and Assigns.  Subject to the provisions of paragraph 17.2 , this Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and permitted assigns of the parties.

19.10   Tax Consequences.  Notwithstanding any other provision in this Agreement or any obligation of Multivet hereunder, nothing contained in this Agreement shall require, or be

18

-03/02/2005  15:12    4507734009             MULTIVET                        PAGE  22

**November 1, 2004 Multivet International Inc.**

deemed to require, Multivet to constitute a permanent establishment (as is defined in the relevant tax statutes) in the Territory.

19.11   Waiver of Default.  The failure of any party at any time to take action against the other party, or the failure of either party to terminate the present Agreement as provided herein, shall not affect either party's right to require full performance of this Agreement at any time thereafter, and the waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of any subsequent breach thereof nor nullify the effectiveness of such provisions or the right of such party to demand redress for their respective losses, damages and prejudices.

19.12   Waiver in Writing.  No waiver of any breach of any term or provision hereof shall be effective or binding unless made in writing and signed by the party purporting to give the same and, unless otherwise provided, shall be limited to the specific breach waived.

19

November 1, 2004 Multivet International Inc.

IN WITNESS WHEREOF, the parties hereto have signed as of the place and date indicated above.

MULTIVET INTERNATIONAL INC.

Per :    _____

Name:    Richard Garon
Title:    President

PREMIER PET PRODUCTS, LLC

Per :    _____

Name:    Evan C. Wooton
Title:    President

20

**November 1, 2004 Multivet International Inc.**

**Schedule A**
**Products**

Anti-bark collar
Spray Commander
Virtual Fence
Virtual Barrier
Citronella or scentless refills
Ssscat or Garden Ghost
Ssscat or Garden Ghost refills

November 1, 2004 Multivet International Inc.

**Schedule B**
**Prices**

| Product | US Dollars |
|---|---|
| Anti-bark collar – base model device (China) | $ 12.00 |
| Anti-bark collar – base model kit (China) | $ 18.00 |
| Anti-bark collar – pro model device (China) | $ 14.00 |
| Anti-bark collar – pro model kit (China) | $ 22.00 |
| Spray Commander – device (China) | $ 36.00 |
| Spray Commander – box kit (China) | $ 44.00 |
| Virtual Fence kit (China) | $ 53.00 |
| Virtual Barrier kit (China) | $ 53.00 |
| Receiver collar (China) | $ 24.00 |
| Citronella refill – 85g (USA) | $  3.20 |
| Scentless refill – 85g (USA) | $  3.20 |
| Citronella refill – 70g (China) | $  2.00 |
| Scentless refill – 70g (China) | $  2.00 |
| Ssscat or Garden Ghost (China) | $ 12.50 |
| Ssscat or Garden Ghost refill – 130g (USA) | $  3.25 |
| Ssscat or Garden Ghost refill – 285g (USA) | $  4.28 |

- - -

November 1, 2004 Multivet International Inc.

**Schedule C**
**2005 Minimums**

| Product | 2005 Minimum Units |
|---|---|
| Anti-bark collar – base or pro model | 150,000 |
| Spray Commander | 15,000 |
| Virtual Fence | no minimum |
| Virtual Barrier | no minimum |
| Citronella or scentless refills – any variety/size | 200,000 |
| Ssscat or Garden Ghost | 50,000 |
| Ssscat or Garden Ghost refills | 25,000 |

– – –

**November 1, 2004 Multivet International Inc.**

**Schedule D**
**Annual Minimum Percent Increases**

| Product | Percent Increase Over Prior Year Minimum | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009-10 | 2011-12 | 2013-14 |
| Anti-bark collar – base or pro model | 15% | 10% | 7.5% | 5% | 4% | 3% |
| Spray Commander | 50% | 10% | 7.5% | 5% | 4% | 3% |
| Citronella or scentless refills – any | 15% | 10% | 7.5% | 5% | 4% | 3% |
| Ssscat or Garden Ghost | 15% | 10% | 7.5% | 5% | 4% | 3% |
| Ssscat or Garden Ghost refills | 25% | 25% | 7.5% | 5% | 4% | 3% |

- - -

Exhibit 9

09/06/2006 WED 9:31 FAX 4507734009                                               ☒002/003

09/28/2005 22:46  8043790403              PREMIER PET PRODUCTS            PAGE 02/07

# TERMINATION OF EXCLUSIVE DISTRIBUTION AGREEMENT

This Termination of Exclusive Distribution Agreement (the "Agreement") is entered into as of October 5, 2005, between MultiVet International Inc., a corporation duly incorporated under the Canadian laws having its head office at 17420 Centrale, St-Hyacinthe, Quebec J2T 3L7 ("MultiVet"), and Premier Pet Products, LLC, a limited liability company duly incorporated under the laws of the Commonwealth of Virginia having its head office at 14201 Sommerville Court, Midlothian, VA 23113 ("Premier").

## RECITALS

**WHEREAS,** Premier has been a distributor for MultiVet pursuant to the terms of that certain Exclusive Distribution Agreement, dated as of November 1, 2004, by and between MultiVet and Premier, as amended from time to time; and

**WHEREAS,** pursuant to recent negotiation, MulitVet and Premier each desire to terminate the Exclusive Distribution Agreement pursuant to its terms.

## AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto agree as follows:

1.    <u>Termination</u>.   Pursuant to Section 19.3 of the Exclusive Distribution Agreement, the parties hereby terminate the Exclusive Distribution Agreement in accordance with its terms.

2.    <u>Binding Effect; Benefits</u>.    This Agreement shall inure to the benefit of the parties hereto and shall be binding upon the parties hereto and their respective successors and assigns, and legal representatives. Except as otherwise set forth herein, nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under of by reason of this Agreement.

3.    <u>Governing Law; Jurisdiction; Venue; Remedies; Independent Legal Counsel</u>. This Agreement shall be interpreted and construed as to both validity and performance and enforced in accordance with and governed by the laws of the Commonwealth of Virginia, without giving effect to the choice of law principles of any state. Each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall be brought in the courts of record of the Commonwealth of Virginia in the City of Richmond or in the district court of the United States for the Eastern District of Virginia; (b) consents to the jurisdiction of each such court in any suit, action or proceeding; and when (c) agrees that service of any court paper may be affected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws or court rules in said Commonwealth. The parties hereto acknowledge that the terms of this agreement have been negotiated by the parties hereto, and each of them has had a full

opportunity to receive Independent business, tax and legal counsel with respect to this Agreement and that the transaction contemplated hereby.in.

4.    Counterparts.  This Agreement may be executed in counterpart originals, each of which shall constitute an executed original and together shall constitute a fully-executed document.

5.    Further Assurances.  The parties hereby agree from time to time to execute and deliver, perform and/or clause the performance of such further and other transferees, assignments and documents and to do all matters and things which may be convenient or necessary to more effectively and completely cause to occur, effectuate, and to carry out the intentions of this Agreement.  In

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date first written above.

PREMIER PET PRODUCTS, LLC                MULTIVET INTERNATIONAL, INC.

By: _____              By: _____

    Evan C. Wooton                            Mark Garon
    President                                 Vice President – R&D

Date: _October 5, 2005_                  Date: _october 5, 2005_

Exhibit 10

09/06/2006 WED 15:05  FAX 4507734009                                                    ☒002/003

·   ·· 09/28/2005  22:46   804375~~03              PREMIER PET PRODUC...)            PAGE  04/07

# DISTRIBUTION AGREEMENT

This Distribution Agreement is entered into as of October 6, 2005, by and between MultiVet International Inc., a corporation duly incorporated under the Canadian laws having its head office at 17420 Centrale, St-Hyacinthe, Quebec J2T 3L7 ("Multivet"), and Premier Pet Products, LLC, a corporation duly incorporated under the laws of the Commonwealth of Virginia having its head office at 14201 Sommerville Court, Richmond, Virginia, 23113 ("Distributor").

   **WHEREAS** Multivet is in the business of manufacturing and selling the products set forth in Schedule A ("Products"); and

   **WHEREAS** the Distributor is in the business of selling collars, leashes, and various other products for dogs, cats, birds and other small companion animals; and

   **WHEREAS** the Distributor wishes to purchase and resell the Products and Multivet is prepared to sell to Distributor.

For good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto have agreed as follows: in

1.1    This Agreement shall be effective beginning October 6, 2005 and shall terminate, and on December 31, 2006.

· 1.2    During the term of this Agreement, Multivet will supply the Distributor with Products on a NON-EXCLUSIVE BASIS, FOB Montreal OR Hong Kong, at the prices set forth in Schedule B. The said prices shall be the net selling price by Multivet, exclusive of all sales and other similar taxes, custom and excise duties, insurance premiums, freight and storage charges and all other charges of a similar nature, whether currently imposed or applicable in the future.

1.3    Multivet grants to Distributor the exclusive right to use the trademark "Gentle Spray" free of any royalties or charges.

1.4  .  Multivet shall not sell Products PETsMART or Petco during the term of this agreement. In addition, the Distributor shall not directly or indirectly interfere, this route or adversely influence the Distributor's relationship with PETsMART and Petco during the term of this Agreement.

1.5    Applicable Law.   This Agreement shall be governed, construed and enforced in accordance with the laws of Québec.

1.6    Entire Agreement.  This Agreement sets forth the entire Agreement and understanding between the parties with respect to the subject matter of this Agreement and merges, supersedes and cancels all prior discussions, representations, inducements, promises, undertakings, understandings, agreements or otherwise, whether oral, in writing or otherwise, between the parties with respect to such subject matter including our Exclusive Distribution Agreement dated November 1, 2004 between the parties. Without limiting the generality of the foregoing, no oral explanation or oral information by the parties hereto, or any of them, shall alter the meaning or interpretation of this Agreement.   There are no statements, terms, conditions, undertakings, representations, warranties or collateral agreements still in force or effect which have not been embodied in this Agreement. This Agreement may be altered, modified or amended only by a written document signed by the parties.

1.7    Language.  This Agreement has been drafted in the English language at the request of the parties. À la demande des parties, cette convention a été rédigée en langue anglaise.

09/06/2006 WED 15:05  FAX 4507734009                                        ⓩ003/003

09/28/2005  23:07    8043790403           PREMIER PET PRODUCTS        PAGE  03/03

**IN WITNESS WHEREOF**, the parties hereto have signed as of the place and date indicated above.

MULTIVET INTERNATIONAL INC.

By : _____

Name:  Mark Garon

Title:    Vice President – R&D

Date : _____

PREMIER PET PRODUCTS, LLC

By : _____

Name:  Evan C. Wooton

Title:    President

Date : _____

Exhibit 11

# PREMIER

6 November 2007

Richard,

Evan returned from his meeting with you in Boston, fairly certain that you were going to go after
PetSmart, our #1 account, in an aggressive fashion. Had I my way, Evan never would have
given you the courtesy of the meeting in Boston. Evan felt there was a gentlemen's way to help
you see that a price war with Premier would be the poorest choice you and your family could
make for MultiVet. In his recapping your meeting to Sharon and myself I came to the
conclusion that you have not gotten the message, nor do you truly understand the consequences.
This may be because you are stubborn or because you do not have enough information to have
chosen differently.

I am clearly not the gentleman that Evan is, so now I am going to make myself crystal clear to
you, so that you are aware of what I will try to make happen when I find out that you have
started a price war with Premier.

It has been no secret that I have not seen eye to eye with both of my partners in the past over
MultiVet and other issues. Evan seems far more reasonable to you because he believes there is
profitable room for two competitive spray companies in the US and Internationally. I absolutely
do not believe this and I do not believe that Radio is seriously committed to spray, nor will they
be accepted as sincere as long as they mainly offer shock options. Sharon has seen more eye to
eye with Evan as long as she feels the category remains profitable.

I also believe that your price gouging strategy and inability to deliver promised product
improvement over the life of the patent has unnecessarily harmed spray's overall market share
against shock in bark control and other training and behavior product solutions. You pissed
away a golden opportunity for MultiVet and Premier to partner in a way that could have driven
gross sales into the 25 to 50 million dollar level.

What you do not know is that when you start a price war with Premier over PetSmart, that will
prove my position to Sharon and then I will have the two-thirds partnership vote to implement
my plan. Your PetSmart action will be "the straw that breaks the camels back," to her. She will
read your starting a price war as a willingness to gut all profitability out of this category.

Sharon has already agreed to the press release that announces Premier's full entry into the spray
manufacturing business. We may even take out full-page ads in all the trade magazines. Your

potential buyer for the pet portion of your spray business will surely be interested in this information that reflects on your value. Do you feel the market value sucking away?

Let me give you a bit of background information so you can weigh your options fully.

I've spent a great deal of time in China the last year setting up a complete, vertically integrated, electronics operation – it is now up and fully running. In parallel, I have been working with one of the countries top electronics and product design-consulting firms. I started out planning to come to the pet spray market only with 100% new and improved designs. Sharon and Evan felt that we should not give up the market they had built in the US for the base bark unit. Once I set my mind to it, it was relatively simple to step back for a bit and to reverse engineer the basic spray unit. What shocked and angered me most was when I found out I could make a better base unit (better materials, work at a lower voltage – extending battery life, better microphone filtering and a more reliable fluid transfer valve – you call it the "electrovan") at a cost of only US $2.50 for a FOB bark unit.

I was further shocked when I completed our version of Scatt (we will call it Spray Sentry) for a few cents more (the little motion sensor is a bit spendy). You have really been gouging Premier and the market for a long time. That's about to stop!

So you know, the only reason we ordered one last batch of 1,000 Spray Commander units from you, is that I found out with just a little extra time my base training transmitter and receiver could have many extra features at the same low cost. My molds are complete, my electronics are complete, and I'm just waiting for my voice chips to come in and the FCC & EU to finish up the official approval.

The upgrades I have made to our version of Virtual Barrier are: Transmitters exactly like the Innotek Zones puck - 1/3 the size of your plug in model, digital display and they run on batteries – so plug in is not necessary. Since the mechanical part of my base collar unit is more reliable than yours the combination will be quite successful. This product is also completed.

The only product we have decided is not worth offering similar to you – but upgraded, is the Virtual Fence. I'll get to what I do have coming to the market later.

Evan was missing a recent piece of information regarding sourcing 134a out of China. My lab tests came in this week. It took a bit longer, but I now have a 99.5% pure source of 134a coming out of China. I'm now ready to ship fully kitted units out of China to every country around the globe.

I don't think Evan gave you the entire picture of what I have finished and have planned, new product wise, for the next 6 months and 3 years out. Before I go into some general information

about my new products (see the attached product sheets we have started using with larger customers) you might be wondering, "Why is Chuck sharing this information with me?"

Well Richard, I am taking your greed and poor partnership decisions personally. I am far enough along that I know you cannot catch up with me in time to reach market with anything like I have completed. Also, I don't think you are smart enough – design wise – your deluxe model is light years behind where I'm already at and my new spray transfer valve has worked flawlessly through 100,000 + test cycles. I simply do not think you can hurt me with the information I am sharing and I get a great deal of ego satisfaction from changing the power dynamic that we have had to put up with in dealing with you for the last five years.

As for the new products on the sheets I have included in this letter, my micro spray is finished. I could bring it to market prior to Global 2008, but I do not see any advantage in an early introduction. Because you were able to get your 'Deluxe Spray' into PetSmart I had to accelerate Premier's Pro Spray Bark Unit. Although not 100% complete it will be ready by Global 2008. Virtual Kennel and Pro Trainer will be complete by third quarter 2008. I have 8 additional electronics products (not all of them spray) slated for introduction in 2009 and ideas to keep busy into 2010. Thank you for forcing me to take interest in spray and electronics. I am having a lot of fun and it really appeals to my creative side.

In addition to this product information I would also like to let you know my pricing strategy should you start a price war. Here it is in a nutshell: Premier has over 17 million dollars, and growing, of annual sales in product categories other than spray. We can afford to make $0.00 on the base spray units (Bark, Trainer, Barrier) in the spray category for several years. Can you?

Our International pricing will also start out at a 10% gross margin. We have nothing to loose in these markets and everything to gain. I think we should build market share quite quickly, don't you?

By the way, Evan also told me about your great initial success with a spray based insect repellent product in the consumer market. Congratulations!

You can be certain that if you start this pet channel spray price war, I will follow you, with my $2.60 spray head technology flooding into your newly found product channels. I will either duplicate break even pricing strategy or use the 10% model. I will chase you into every consumer spray product channel you have or will ever find. I am vindictive that way and I do not have any contractual requirements that require me to stop if Sharon and Evan say so. I have yet to add a timer release function to the spray head, but that is a simple process. I also have a master chemist ready to analyze any insect repellants you come out with. I figured *HUSH* to be a bust, but I think this repellant thing may have legs that I can grab on to.

It's too bad you did not get Premier to sign on to a non-compete in all consumer products (relative to spray technology) other than pet when you negotiated the last contract with Evan. I'm certain he would have thrown it in and I would have just missed it and signed off on it. Richard, I can assure you that I will not start this price war but *I will* finish it.

So, there you have it. You can decide if starting a price war with PetSmart and in the pet trade is winnable. You can decide if you want me chasing after you in other consumer markets. You, and your family, have had ample opportunity to be true partners with Premier. I have always seen through your 'friendly' façade. You make promises you have no intention of meeting, smile and shake with one hand while you try and stab us in the back with the other. Up until MultiVet proved yourself competitors by entering the US market, Evan and Sharon were on your side – I think you've kind of blown that too now.

MultiVet has always had the power and control in the relationship between our two companies. Now that I have a $2.50 cost on my own, higher quality – more reliable, base spray unit, a $2.60 cost on the spray head that you use for Scatt and a whole line-up of new spray products complete or nearly completed, that dynamic has shifted. I (Premier) have other pet product categories with very healthy growth and additional new products waiting to fill the pipeline. Premier is not just about spray. Are you ready to spend an additional $500,000.00 annually in spray research and development just to keep up with where I have brought Premier? Can you do this as your margin and cash flow dwindle? Are you ready to have me follow you into other product categories and suck the profitability out of them too?

Premier has had to scramble to recover from the damage your selfish anti-partnership decisions have forced upon us. We have risen to the challenge. We are in a much better position now and it is time to make some changes.

Sincerely,

Charles David Mann
VP Premier Pet Products, L.L.C.

Exhibit 12

# ABELMAN, FRAYNE & SCHWAB

Lawrence E. Abelman
Jeffrey A. Schwab
Victor M. Tannenbaum
Peter J. Lynfield
Alan J. Hartnick
Caridad Piñeiro Scordato
Michael Aschen
Julianne Abelman
Jonathan W. Gumport
Julie B. Seyler
Marie Anne Mastrovito
Joseph J. Catanzaro
Anthony A. Coppola
Richard L. Crisona
Ned W. Branthover
Anthony J. DiFilippi
Harry K. Ahn

Attorneys at Law
666 Third Avenue
New York, New York 10017-5612

Telephone: (212) 949-9022
Facsimile: (212) 949-9190
e-mail@lawabel.com

February 19, 2008

Of Counsel:
Norman S. Beier
Alan D. Gilliland
Thomas E. Spath
Melvin L. Ortner
Constance Golden
J. David Dainow
David Toren

Jay S. Cinnamon
Michael J. Schwab
Jennifer R. Waltman
Natasha J. Burns
Frank Terranella
Anthony J. Natoli
Steven M. Hertzberg
John H. Choi

*Alexander Zinchuk
*(Registered Patent Agent)

WRITER'S DIRECT DIAL:
(212) 885-9207

WRITER'S E-MAIL:
maschen@lawabel.com

**By email to "ewooton@premier.com",
and facsimile to 800.795.5930**

Evan C. Wooton
President
Premier Pet Products, Inc.
14201 Sommerville Ct
Midlothian, VA , 23113-6884

      Re:  Infringement of GENTLE SPRAY® Trademark.

Dear Mr. Wooton:

      We are intellectual property counsel for Multi-Vet Ltd., the owner of the Federally registered "GENTLE SPAY" trademark (No. 2762487).

      It has recently come to our client's attention that Premier Pet Products is selling a product identified as the "Gentle Spray® Bark Citronella Anti-Bark Collar." The product is promoted on your website at http://www.premier.com/View.aspx?page=dogs/products/behavior/sprays/gsbark/description. Your use of the designation "Gentle Spray" to identify this product infringes our client's registered "GENTLE SPRAY®" trademark, and is damaging its good will and reputation in violation of the Federal Trademark Law (the Lanham Act). Indeed, confusion in the market place is already occurring. Moreover, the circumstances strongly suggest that your infringement is willful and has continued with knowledge of our client's rights, possibly subjecting you to an award of treble damages and attorneys' fees.

      Multi-Vet vigorously enforces its intellectual property rights and considers this matter to be one of urgency. Accordingly, we ask that you advise us in writing within seven (7) days that you will:

Evan C. Wooton                                    **ABELMAN, FRAYNE & SCHWAB**
February 19, 2008
Page 2

1)    immediately cease and desist from any and all use of the
      "GENTLE SPRAY®" trademark,

2)    immediately destroy all products, packaging and
      promotional literature which bear any designation
      confusingly similar to the "GENTLE SPRAY®" trademark,

3)    recall all infringing products, advertisements and
      promotional materials from the distribution chain
      worldwide,

4)    surrender all profits attributable to your infringement
      and compensate our client for its damages, and

5)    provide us with written confirmation that you have
      complied with the foregoing and that you will not
      thereafter use the "GENTLE SPRAY®" trademark, or any
      confusingly similar mark or name.

      In the absence of such an assurance, our client will have
little choice other than to pursue other remedies.

                                    Sincerely,

                                    Michael Aschen

MA:zs
cc: Lawrence E. Abelman, Esq.
    Multi-Vet Ltd.
    Brouillette & Associés/partners, s.e.n.c.r.l/LLP