Christopher J. Sorenson
Kristine M. Boylan
Elizabeth A. Zidones
MERCHANT & GOULD P.C.
80 South Eighth Street, Suite 3200
Minneapolis, Minnesota 55402-2215
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

Attorneys for Defendant and Counterclaim Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MULTI-VET LTD.,** ) | |
| ) | |
| **Plaintiff and** ) | |
| **Counterclaim Defendant,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 08-cv-03251 (LMM)** |
| **PREMIER PET PRODUCTS, LLC,** ) | |
| ) | |
| **Defendant and** ) | **PREMIER'S REPLY BRIEF IN** |
| **Counterclaim Plaintiff.** ) | **SUPPORT OF MOTION FOR** |
| ) | **PRELIMINARY INJUNCTION** |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ———————————————— ) | |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

I.   INTRODUCTION ..................................................................................................... 1

II.  RELEVANT FACTS ................................................................................................ 1

III. ARGUMENT ............................................................................................................ 2

A.   An Injunction Should Issue Preventing Multi-Vet's Further Violation of
     New York Unfair Competition Law ........................................................... 2

     1.   The Elements of Unfair Competition Under New York
          Law Are Met ...................................................................................... 2

          a.   Multi-Vet Acted In Bad Faith ............................................. 4

          b.   There is Confusion ............................................................... 5

B.   Premier is Likely to Prevail On Its Trademark Infringement
     Claim ............................................................................................................ 5

     1.   Premier Is Likely To Establish Its Ownership Claim ...................... 5

C.   Premier is Suffering Irreparable Harm ...................................................... 9

D.   This Court Should Not Require A Bond ..................................................... 9

IV.  CONCLUSION ....................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*AB Electrolux v. Bermil Indust. Corp.*,
481 F. Supp. 2d 325 (S.D.N.Y. 2007)..............................................................9

*Direct Marketing Education Foundation v. John Wiley Sons, Inc.*, No.
08Civ1464, 2008 U.S. Dist. LEXIS 18536 (S.D.N.Y. Mar. 11, 2008) ..........................8

*Genesse Brewing Co., Inc. v. Stroh Brewing Co.*,
124 F.3d 137 (2d Cir. 1997)..............................................................3

*International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*,
441 F. Supp. 2d 552 (S.D.N.Y. 2006)..............................................................9

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
58 F.3d 27 (2d Cir. 1995) ..............................................................3

*Lois Sportswear, USA, Inc. v. Levi Strauss & Co.*,
799 F.2d 867 (2d Cir. 1986)..............................................................5

*Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.*,
680 F.2d 891 (2d Cir. 1982)..............................................................9

*Tactica International, Inc. v. Atlantic Horizon International, Inc.*,
154 F. Supp. 2d 586 (S.D.N.Y. 2001)..............................................................5, 7

*Time Warner Cable, Inc. v. DirectTV, Inc.*,
No. 06Civ14245, 2007 U.S. Dist. LEXIS 32672 (S.D.N.Y. May 2, 2007)..................................9

### MISCELLANEOUS

J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition*,
§§ 16:48, 29:8 (4th ed. 2000)..............................................................6

## I.   INTRODUCTION

Just a few weeks ago, Multi-Vet introduced to the United States market the same anti-bark collar in knock-off packaging to unfairly compete with Premier, whose packaging looks like this:



At all relevant times before May 2008, Multi-Vet offered its anti-bark collar to the United States market in yellow packaging with a front facing West Highland White Terrier.  In May 2008, however, Multi-Vet changed its packaging and began offering its anti-bark collar to the United States market in purple and blue packaging with the profile of a Golden Retriever, which is a knock-off of Premier's anti-bark collar in purple and blue packaging with the profile of a Golden Retriever.

## II.   RELEVANT FACTS

Prior to April 30, 2001, Multi-Vet distributed its anti-bark collars in the United States through only two distributors, Animal Behavior Systems, Inc. ("ABS") and Radio Systems Corporation ("Radio Systems").  (Decl. Evan Wooton ¶ 3 (July 9, 2008).) Multi-Vet became the majority shareholder of Animal Behavior Systems, and the Multi-Vet/Radio Systems relationship eventually ended.  (*Id*. at ¶ 4.)

On April 30, 2001, three transactions between Multi-Vet and Premier took place. Premier entered into a distribution agreement to become the exclusive licensee to sell Multi-Vet's patented technology for anti-bark collars in the United States.  (Madere Decl. at ¶ 15; Ex. 3.)  Multi-Vet and Premier entered into a consulting agreement whereby

Premier paid Multi-Vet $19,889 per month to develop new products.[1]  (Wooton Decl. at ¶ 6; Ex. 23.)  Premier also paid $1 million United States dollars to purchase substantially all the assets of Animal Behavior Systems, including its intellectual property - namely, its trademarks, trade dress and copyrights.  (Madere Decl at ¶ 14; Garon Decl. at ¶ 14.)

It is undisputed that Premier purchased the assets of Animal Behavior Systems.  It is undisputed that Premier was licensed to sell Multi-Vet's patented technology.  It is undisputed that Multi-Vet's patent expired.  It is undisputed that Multi-Vet did not use the GENTLE SPRAY name and packaging in the United States until May 2008.  It is undisputed that there is a likelihood of confusion by the parties' competing uses of the GENTLE SPRAY name.  There are disputed facts at this juncture, but none of them foreclose the entry of injunctive relief in Premier's favor.[2]

## III.  ARGUMENT

### A.    An Injunction Should Issue Preventing Multi-Vet's Further Violation of New York Unfair Competition Law.

#### 1.  The Elements of Unfair Competition Under New York Law Are Met.

Unfair competition in New York occurs where there is a "bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or

---

[1] Premier paid almost $600,000 under the consulting agreement until it was terminated on November 1, 2003.  During that period, Multi-Vet only developed one new product.  (Wooton Decl. at ¶ 6.)

[2] Premier has served discovery request seeking information about the alleged usage and sales in the United States and to obtain specific information about Multi-Vet's unlawful conduct including:

    (1) How much product Multi-Vet has sold under the GENTLE SPRAY name in the United States;
    (2) When Multi-Vet sold product under Premier's GENTLE SPRAY name and packaging in the United States;
    (3) The amounts in United States dollar figures generated through sales of Multi-Vet's product to the United States;
    (4) The amounts of Multi-Vet's advertising, promotional and marketing expenditures devoted to developing sales of product bearing the GENTLE SPRAY name and packaging in the United States; and
    (5) The amounts of Multi-Vet's advertising, promotional and marketing expenditures devoted to developing sales of product bearing the GENTLE SPRAY name and packaging in the United States.

(Decl. Elizabeth Zidones ¶ 2 (July 9, 2008); Ex. 20.)

to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995). For this claim, there is no requirement that Premier prove it has protectable trade dress or that its marks have secondary meaning. Multi-Vet cites *Genesse Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 150 (2d Cir. 1997) to argue that proof of secondary meaning is required, but the *Genesse* opinion at page 150 discusses the federal common law of unfair competition, not the New York state common law. To prevail on an unfair competition claim under New common York law, a plaintiff must show that the conduct created a likelihood of confusion and that there is bad faith. *Jeffrey Milstein, Inc.*, 58 F.3d at 35.

Multi-Vet cannot credibly claim that it did not misappropriate Premier's packaging since it was involved in the taking of photos and creation of packaging as the majority shareholder of Animal Behavior Systems. Multi-Vet may have been involved in the development of certain images on the ABOISTOP and the ABS packages when it was majority shareholder of Animal Behavior Systems, but Multi-Vet's work was never independent of Animal Behavior Systems. The ABOISTOP packaging Multi-Vet includes in its brief was mostly used in Canada, and was nearly identical to the ABS packaging used by Animal Behavior Systems. (Wooton Decl. at ¶ 8.) Compare:



The original ABS packaging, which included a blue background and the image of a profile of a barking golden retriever, was an asset of Animal Behavior Systems and sold to Premier in 2001.  (Wooton Decl. at ¶ 7.)

Richard  Garon and Multi-Vet cannot now claim ownership of Animal Behavior Systems assets that Premier purchased seven years ago.

a.    *Multi-Vet Acted In Bad Faith.*

Multi-Vet's actions are in bad faith.  At no time did Multi-Vet's packaging for United States sales look like the packaging Premier bought from Animal Behavior Systems.  (Wooton Decl. at ¶ 12.)  Multi-Vet did not use the GENTLE SPRAY name in the United States until May 2008.  (*Id.*)  Multi-Vet affirmatively promised not to use the GENTLE SPRAY name, yet introduced a product in knock-off packaging, under the same name, thereby creating a likelihood of confusion. There is no legitimate reason why Multi-Vet would choose to make the change from this:

 

to this:



Moreover, there is no legitimate reason why Multi-Vet only did so after the commencement of this lawsuit.  There is bad faith.

b.    *There is Confusion.*

Confusion is not only likely, but has already occurred.  *See* Decl. Holly Graham ¶¶ 3-4 (July 10, 2009) (detailing an instance of actual confusion.).  Courts have recognized that it is often difficult to ascertain actual confusion when a product has only been on the market for a short period of time.  *See e.g. Lois Sportswear, USA, Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).   Here, Multi-Vet began offering its GENTLE SPRAY packaging only weeks ago, yet Premier has already received evidence of one instance of confusion.  *See infra* Graham Decl.

**B.   Premier is Likely to Prevail On Its Trademark Infringement Claim.**

**1.    Premier Is Likely To Establish Its Ownership Claim.**

It is likely that this Court will find that Premier owns the GENTLE SPRAY trademark.  Where a question of trademark ownership exists between a manufacturer and an exclusive distributor, the parties' agreement controls.  *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001); J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition*, §§ 16:48, 29:8 (4th ed. 2000).

Here, the parties have an agreement, and under any reasonable interpretation, Premier owns the GENTLE SPRAY trademark. Under terms of the parties' April 30, 2001 contract, any trademark created, developed, and used by Premier would belong to Premier. (Madere Decl. at ¶14; Ex. 3.) Multi-Vet agreed to bear the legal costs associated with registration at the United States Patent and Trademark Office, and agreed that any such registration would be assigned to Premier following termination of the parties' relationship. (Ex. 3.) The relevant language stated:

> Upon written notification of Premier's intent to use new marks associated with the Products, Multi-Vet is obligated to register these marks within the Territory within sixty (60) days, and hereby grants to Premier the exclusive right and license, but not the obligation, to use the marks in relation with the marketing, promotion, sale and distribution of Products in the Territory. After the initial term of the Agreement, or any subsequent term, in the event the Agreement is terminated for any reason other than breach by Premier, then the new trademarks developed by Premier and registered by Multi-Vet will be sold to Premier by Multi-Vet for one (1) dollar each.

(Madere Decl. at ¶15; Ex. 3.)

The GENTLE SPRAY mark was developed by Premier after the April 30, 2001 agreement. (*Id*. at ¶ 17.) Multi-Vet's counsel registered the mark but never assigned it upon termination of the parties' business relationship in July of 2007. (*Id*. at ¶¶ 17, 19.) The parties' distribution agreements and licenses subsequent to 2001 have no bearing on the GENTLE SPRAY mark. They were concerned primarily with the conditions of sale – i.e., how many units would be purchased, under what schedule and on which terms. There is no other reasonable interpretation of the parties' contractual relationship but that Premier owns the GENTLE SPRAY trademark.

Should resolution of the ownership issue require interpretation of circumstances outside the contractual language, however, this court should consider the following

factors: (1) which party coined the mark and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and which party purchasers contacted. *Tactica Int'l, Inc.*, 154 F. Supp. 2d at 600.

Under these factors, Premier owns the trademark. Premier conceived of the GENTLE SPRAY mark and first affixed the mark to anti-bark collars. (Wooton Decl. at ¶¶ 12-13.) In the course of the relationship between Multi-Vet and Premier, Premier would receive unlabeled and unpackaged shipments of anti-bark collars. (*Id.* at ¶ 14.) Premier then affixed a label to the anti-bark collars, which bore the GENTLE SPRAY trademark and the Premier name. (*Id.*) Finally, Premier used packaging for the devices that conspicuously bore the Premier name along with the GENTLE SPRAY trademark. (*Id.*)

Before any unit leaves Premier's control, it must pass a functionality test. (*Id.* ) While Premier only sold product received from Multi-Vet under terms of the patent license, Premier received the anti-bark collar devices from Multi-Vet unlabeled and unpackaged. (*Id.*) Upon receiving Multi-Vet's devices, Premier performed a comprehensive quality control and functionality test before applying the Premier and GENTLE SPRAY names to the anti-bark collars. (*Id.*) Premier tested every device for functionality and did not use any defective devices. (*Id.*) Once Multi-Vet's patent expired and Premier purchased the same product from other manufacturing sources, Premier continued to exercise the same testing and quality control with respect to the devices sold with the GENTLE SPRAY name (*Id.* at ¶ 16.) At no time during the patent life or after its expiration, did Multi-

Vet ever impose any type of quality standard or control over the products bearing the GENTLE SPRAY name. (*Id*. at ¶ 15.) Multi-Vet never had control - on paper or in practice - over the packaging or labeling bearing the GENTLE SPRAY name. Multi-Vet never exercised any of the controls incumbent upon a trademark licensor under United States law.[3] Premier was at all times completely responsible and in control of the GENTLE SPRAY mark.

The evidence adduced to-date shows that consumers associate the GENTLE SPRAY anti-bark collar with Premier. (Madere Decl. at ¶ 24 (discussing advertising and promotional expenditures); Graham Decl. at ¶¶ 3-4 (discussing a consumer's association between Premier and the GENTLE SPRAY anti-bark collar). Premier is the company that maintains a customer service center to process returns. (Madere Decl. at ¶ 27; Wooton Decl. at ¶ 17.) Multi-Vet, on the other hand, does not have a United States customer service number and never processed returns of United States GENTLE SPRAY products during its relationship with Premier. (Wooton Decl. at ¶ 17.) Even at the time of this briefing, Premier continues to accept customer returns of Multi-Vet's anti-bark collar. (*Id*. at ¶ 18.) There is no evidence to establish that consumers associate the GENTLE SPRAY mark with any company other than Premier.[4]

At trial, Premier is likely to succeed on the merits and be found the owner of the GENTLE SPRAY trademark.

---

[3] *Direct Mktg Educ. Found. v. John Wiley Sons, Inc.*, No. 08Civ1464, 2008 U.S. Dist. LEXIS 18536, at *3-5 (S.D.N.Y. Mar. 11, 2008). This lack of quality control would also subject Multi-Vet to abandonment of any mark that it attempted to license, as a license without quality control is an invalid, naked license.

[4] The presumption accorded a manufacturer in a trademark dispute does not apply. The parties' contractual relationship indicates that Premier owns the mark, and Multi-Vet never exercised the requisite control to be found an owner today.

### C.    Premier is Suffering Irreparable Harm

Where there is a likelihood of confusion based on unfair competition, a presumption of irreparable injury applies to support the entry of an injunction. *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893-94 (2d Cir. 1982). The Second Circuit has clarified that this is true even in the absence of side-by-side sales. *Id.* There are side-by-side sales here, as Multi-Vet's knock-off appears alongside Premier's product in common retail channels. There is no questions that a presumption of irreparable injury applies. Entry of the injunction is proper.

### D.    This Court Should Not Require A Bond

This Court requires that the party seeking a bond show a rational basis for the amount of any requested bond. *AB Electrolux v. Bermil Indust. Corp.*, 481 F. Supp. 2d. 325, 337 (S.D.N.Y. 2007) *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 441 F. Supp. 2d 552, 556 (S.D.N.Y. 2006). This includes evidence of the rational basis for the bond. *See Time Warner Cable, Inc. v. DirectTV, Inc*., No. 06Civ14245, 2007 U.S. Dist. LEXIS 32672, at *6-7 (S.D.N.Y. May 2, 2007) (stating that the party seeking the bond "provided concrete evidence" in the form of advertising expenditures for brochures that were accused of false advertising)

Here, there is no support for the assertion that the financial cost of changing advertising and marketing materials, and repackaging its product would be in excess of $1 million. *See* Garon Decl. at ¶ 38. Any costs associated with complying with the preliminary injunction should be Multi-Vet's alone to bear, as it adopted Premier's

9

GENTLE SPRAY name and packaging in a bad faith misappropriation of Premier's goodwill and effort.  There is no reason why Multi-Vet could not easily return to the packaging it used prior to May 2008.[5]  Entry of the requested injunctive relief without a bond requirement, or a minimum bond requirement, is appropriate.[6]

## IV.   CONCLUSION

For the reasons stated above, Premier respectfully requests that its motion for a preliminary injunction be granted.

Respectfully Submitted,

MERCHANT & GOULD P.C.

DATE: July 10, 2008             By: _s/ Elizabeth A. Zidones_____
                                Christopher J. Sorenson
                                Kristine M. Boylan
                                Elizabeth A. Zidones
                                MERCHANT & GOULD P.C.
                                80 South Eighth Street, Suite 3200
                                Minneapolis, Minnesota 55402-2215
                                Telephone:  (612) 332-5300
                                Facsimile:  (612) 332-9081

Keith E. Sharkin
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile:  (212) 556-2222
ksharkin@kslaw.com

**Attorneys for Premier Pet Products, LLC**

---

[5] The change in Multi-Vet's packaging can be implemented by simply switching out the purple packaging insert.  (Wooton Decl. ¶ 19.)  The clamshell, the device label, and the instruction booklet in the packaging do not contain the GENTLE SPRAY trademark or any of Premier's images.  (*Id.*)  The cost of the change is not likely to cost $1 million.  The cost to Premier to change its packaging inserts costs from $0.08 to $0.115 per insert.  (*Id.*)  At the highest cost of $0.115, Multi-Vet would have to possess over 8 million packages to incur a cost of $1 million to switch to its former packaging.
[6] Premier is without adequate information to assist the court in determining an appropriate bond amount as it is without answers to the discovery served on Multi-Vet.  *See supra* fn. 2.

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MULTI-VET LTD.,** | ) |
| | ) |
| **Plaintiff and** | ) |
| **Counterclaim Defendant,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 08-cv-03251** |
| **PREMIER PET PRODUCTS, INC.,** | ) |
| | ) |
| **Defendants and** | ) |
| **Counterclaim Plaintiff.** | ) |
| | ) |
| _____ | ) |

**CERTIFICATE OF SERVICE**

It is hereby certified that true and correct copy of the following documents:

1.  Premier's Reply Brief in Support of Motion for Preliminary Injunction;

2.  Declaration of Evan Wooton in Support of Defendant's Motion for Preliminary Injunction;

3.  Declaration of Holly Graham in Support of Defendant's Motion for Preliminary Injunction;

4.  Declaration of Elizabeth Zidones in Support of Defendant's Motion for Preliminary Injunction; and

5.  Certificate of Service.

were served this day via U.S. mail delivery, in an envelope addressed to:

Lawrence E. Abelman
Abelman, Frayne & Schwab
666 Third Avenue
New York, NY 10017

Dated: July 10, 2008                                    _s/ Elizabeth A. Zidones_____
                                                        Elizabeth A. Zidones