Keith E. Sharkin
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

Attorneys for Defendant and Counterclaim Plaintiff

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULTI-VET LTD.,<br><br>    Plaintiff and<br>    Counterclaim Defendant,<br><br>v.<br><br>PREMIER PET PRODUCTS, INC.,<br><br>    Defendant and Counterclaim<br>    Plaintiff. | Civil Action No. 08-cv-03251 (LMM)<br><br>Declaration of Evan Wooton in Support of<br>Defendant's Motion for a Preliminary Injunction |

I, Evan Wooton, do hereby state as follows:

1. My name is Evan Wooton. I am the President and an owner of Premier Pet Products, LLC, ("Premier") and have served in that capacity since 1999. I have personal knowledge of the facts stated in this declaration, and if called upon, could so testify.

2. I submit this declaration in support of Premier's motion to ask this Court to prohibit any further sale by Plaintiff and Counterclaim Defendant Multi-Vet, Ltd. ("Multi-Vet"), of its "Gentle Spray" anti-bark collar in the United States until there can be a final adjudication on the merits of legal disputes between Premier and Multi-Vet.

3.  Before Premier became the exclusive licensee of Multi-Vet's anti-bark collars in 2001, Multi-Vet distributed its anti-bark collars in the United States through two distributors, Animal Behavior Systems, Inc. ("ABS") and Radio Systems Corporation ("Radio Systems").

4.  When Premier became the exclusive licensee of Multi-Vet's anti-bark collars in the United States, Multi-Vet was the majority shareholder of ABS and no longer distributed collars through Radio Systems.

5.  I was the executive charged with handling the transactions between Premier and Multi-Vet on April 30, 2001, namely the Asset Purchase Agreement between Premier and ABS and the distribution and consulting agreements between Premier and Multi-Vet.

6.  On April 30, 2001, Multi-Vet and Premier entered into a distribution agreement and a consulting agreement. Premier also purchased substantially all of the assets of ABS. Under the consulting agreement, Premier paid Multi-Vet $19,889 per month to develop new product. Premier paid almost $600,000 under the consulting agreement when it was terminated on November 1, 2003. During that period, Multi-Vet developed one new product, the Ssscat® product. A true and correct copy of the consulting agreement is attached hereto as **Exhibit 23**.

7.  During that period when Multi-Vet was a majority shareholder of ABS, ABS distributed anti-bark collars in packaging, which included a blue background and the image of a profile of a barking golden retriever ("the ABS packaging").

8.  I am personally familiar with the ABS packaging, which is nearly identical to the ABOISTOP packaging shown on page 6 of Multi-Vet's Memorandum in

Opposition to Premier's Motion for Preliminary Injunction.

9. The ABS packaging was an ABS asset that Premier purchased in 2001 under the Asset Purchase Agreement.

10. Multi-Vet began selling anti-bark collars in competition with Premier in 2006. The packaging used to sell those collars featured a yellow background, an image of a front-facing of a West Highland White Terrier, and the name "Anti-Bark Spray Collar."

11. Up until May 2008, Multi-Vet never used the GENTLE SPRAY name or packaging to sell anti-bark collars.

12. Premier conceived of the GENTLE SPRAY mark after entering into the 2001 distribution agreement with Multi-Vet.

13. Premier first affixed the GENTLE SPRAY mark to anti-bark collars.

14. In the course of Premier's relationship with Multi-Vet, Premier would receive boxes of unlabeled and unpackaged anti-bark collars. Premier then performed a comprehensive quality control and functionality test on each collar. A label, designed by and paid for by Premier, bearing the GENTLE SPRAY mark and the Premier name was affixed to each functional collar. The collars were then packaged into boxes, designed by and paid for by Premier, bearing both the GENTLE SPRAY mark and the Premier name. Defective devices were not packaged or labeled.

15. During its relationship with Multi-Vet, Premier tested every anti-bark collar it received from Multi-Vet. Multi-Vet never imposed any type of quality standard or control over anti-bark collars bearing the GENTLE SPRAY mark.

16. Premier continues to test every anti-bark collar before it is packaged and

labeled, even though Premier now manufacturers its own devices.

17. During its relationship with Multi-Vet, Premier maintained a customer service phone number and processed all product returns for United States GENTLE SPRAY anti-bark collars. During this period, Multi-Vet did not maintain a customer service number and never processed product returns for United States GENTLE SPRAY anti-bark collars.

18. Premier continues to accept customer returns of Multi-Vet's anti-bark collar.

19. The GENTLE SPRAY name only appears on the packaging insert in Multi-Vet's new packaging. A change in Multi-Vet's packaging can be implemented by simply switching out the purple packaging insert. The clamshell, the device label, and the instruction booklet in the packaging do not contain the GENTLE SPRAY trademark or any of Premier's images. The cost to Premier to change its packaging inserts costs from $0.08 to $0.115 per insert.

I declare under the penalty of perjury that the foregoing is true and correct.

_July 9, 2008_
Date

_Evan Wooton_
Evan Wooton

## CONSULTING AGREEMENT

**CONSULTING AGREEMENT** (the "Consulting Agreement"), dated and effective as of April 30, 2001, by and between Premier Pet Products, LLC, a Virginia limited liability company (the "Company"), and MultiVet International Inc., a Quebec Corporation (the "Consultant").

### WITNESSETH:

**WHEREAS,** the Company wishes to secure the services of the Consultant as a consultant of the Company upon the terms and conditions hereinafter set forth, and the Consultant wishes to render such services to the Company upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants herein contained and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. <u>Consulting Relationship</u>. The Company agrees to retain the Consultant as an independent consultant of the Company, and the Consultant accepts such retention and agrees to perform the duties set forth on <u>Exhibit A</u> and such other duties to which the President of the Company and such Consultant may from time to time mutually agree.

2. <u>Term of Employment</u>. The term of this Consulting Agreement shall be for the initial period commencing on the date hereof and ending on April 30, 2011 (the "Term").

3. <u>Compensation</u>. As full compensation for all services to be rendered by the Consultant to the Company and its subsidiaries and affiliates in all capacities during the Term, the Consultant shall receive the following compensation and benefits:

   3.1 <u>Fee</u>. The compensation for the consulting services to be rendered hereunder, which the Company agrees to pay or cause to be paid to the Consultant and the Consultant agrees to accept, shall be $19,889.00 for each month of the Term. The first monthly payment shall be due and payable on the last day of the first calendar month of the Term, and each subsequent monthly payment shall be due and payable on the last day of each calendar month thereafter.

   3.2 <u>Expenses</u>. Subject to (i) prior written approval of the Company and (ii) such policies as may from time to time be established by the Company, the Company shall pay or reimburse the Consultant for all reasonable and necessary expenses actually incurred or paid by the Consultant during the Term in the performance of the Consultant's duties under this Consulting Agreement, upon submission and approval of expense statements, vouchers or other supporting information in accordance with the then customary practices of the Company.

Exhibit 23

3.3 **Withholding of Taxes**. The Company may withhold from any compensation or benefits payable under this Consulting Agreement all federal, state, city and other taxes as shall be required pursuant to any law or governmental regulation or ruling.

3.4 **Other**. The Consultant shall not be entitled to any other payments or benefits.

4. **Other Provisions**.

4.1 **Independent Contractor**. The Consultant shall be deemed for all purposes to be an independent contractor and not an employee of the Company. Nothing in this Consulting Agreement shall establish an agency, partnership, joint venture or employee relationship between the Company and the Consultant.

4.2 **Notices**. Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, telecopied, or sent by certified, registered or express mail, postage prepaid, to the parties at the following addresses, or at such other addresses as shall be specified by the parties by like notice, and shall be deemed given when so delivered personally, telecopied, telegraphed or telexed, or if mailed, three days after the date of mailing, as follows:

(i) if to the Company, to:

Premier Pet Products, LLC
406 Branchway Road
Richmond, Virginia 23236
Attn: President

with a copy (which shall not constitute notice) to:

LeClair Ryan, A Professional Corporation
707 East Main Street, 11th Floor
Richmond, Virginia 23219
Attention: Bradley A. Haneberg, Esq.

(ii) if to Consultant, to the address set forth below the signature of the Consultant on this Agreement.

4.3 **Entire Agreement**. This Consulting Agreement and that certain license agreement of even date herewith by and among the Company, the Consultant, and MultiVet Limited, a Quebec corporation (the "License Agreement") contain the entire agreement between the parties with respect to the subject matter hereof and supersede all prior contracts

and other agreements, written or oral, with respect thereto. This Consulting Agreement shall terminate immediately upon the termination of the License Agreement.

       4.4    <u>Waivers and Amendments</u>. This Consulting Agreement may be amended, modified, or superseded, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

       4.5    <u>Governing Law</u>. This Consulting Agreement shall be governed by, and construed in accordance with and subject to, the laws of the Commonwealth of Virginia applicable to agreements made and to be performed entirely within such Commonwealth.

       4.6    <u>Binding Effect; Benefit</u>. This Consulting Agreement shall inure to the benefit of and be binding upon the parties hereto and any successors and assigns permitted by Section 4.7 hereof. Except as otherwise provided in the License Agreement, nothing in this Consulting Agreement, expressed or implied, is intended to confer on any person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Consulting Agreement.

       4.7    <u>Assignment</u>. Except as provided in the following sentence, neither party shall assign this Consulting Agreement, and the rights and obligations hereunder, without the consent of the other party, which consent shall not be unreasonably withheld. Either party may assign this Consulting Agreement and its rights, together with its obligations, hereunder in connection with any sale, transfer or other disposition of all or substantially all of its assets or business, whether by merger, consolidation or otherwise or (ii) to a related company in the context of a corporate reorganization.

       4.8    <u>Counterparts</u>. This Consulting Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

       4.9    <u>Headings</u>. The headings in this Consulting Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Consulting Agreement.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Consulting Agreement as of the date first above written.

PREMIER PET PRODUCTS, LLC

By: _____
Name: Evan C. Wooton
Title:   President


CONSULTANT

MULTIVET INTERNATIONAL INC.

By: _____Richard Garon_____
Name: ___RICHARD GARON___
Title: ___PRESIDENT / C.E.O___

Address: ___17420 CENTRALE___
___ST-HYACINTHE, QUE___
___CANADA___

-4-

# Exhibit A – Duties

Throughout the term of this Agreement, the Consultant shall provide ongoing strategic advice to the Company relating to the commercialization of all rights, including without limitation rights in patents and other intellectual property, acquired by the Company pursuant to (i) that certain license agreement of even date herewith by and among the Company, the Consultant, and MultiVet Limited, a Quebec corporation (the "License Agreement"), (ii) that certain Asset Purchase Agreement of even date herewith by and among the Company, Animal Behavior Systems, Inc., a Florida corporation, the Consultant, and John A. Connell, and (iii) all agreements and transactions contemplated by the License Agreement and the Asset Purchase Agreement.