```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
                                    :
MULTI-VET LTD.,                     :
                                    :
                Plaintiff,          :
                                    :   08 Civ. 3251 (LMM)
     -against-                      :   MEMORANDUM AND ORDER
                                    :
PREMIER PET PRODUCTS, INC.,         :
                                    :
                Defendant.          :
                                    :
- - - - - - - - - - - - - - - - - -X
```

McKENNA, D.J.

**1.**

Plaintiff Multi-Vet Ltd. ("Multi-Vet") is a Canadian company based in Saint-Hyacinthe, Québec, Canada, and is a provider of animal behavioral systems. Defendant Premier Pet Products, Inc. ("Premier") is a corporation based in Midlothian, Virginia that manufactures, promotes and distributes pet products. Plaintiff Multi-Vet filed this action on April 1, 2008, seeking injunctive relief and damages for trademark infringement, false designation of origin, and common law unfair competition. Defendant Premier asserted counterclaims for injunctive relief and damages for trademark infringement, false designation of origin, and common law unfair competition.

Premier here moves for a preliminary injunction to enjoin Multi-Vet's alleged trademark infringement and unfair

1

competition through its sale of the "Gentle Spray" anti-bark collar in the United States.

**2.**

This dispute stems from the shifting business relationship between Multi-Vet, a Canadian manufacturer and distributor of pet products, and Premier, which was for a time licensed by Multi-Vet as a distributor of its "Gentle Spray" anti-bark collar in the United States.

In 1997, Multi-Vet began distributing an anti-bark spray collar, apparently developed and packaged by Multi-Vet, using the "Aboistop" trademark, in packaging that features a similar color scheme and design to that of the Gentle Spray product at issue here.  (Declaration of Multi-Vet's President, Richard Garon ("Garon Decl.") ¶ 4 and Ex. 1.)  In the early 1990's, Premier manufactured and sold the "Gentle Leader Headcollar," a popular alternative to choke collars for dogs, which was developed by Dr. R.K. Anderson through his company Alpha M. (Declaration of Sharon Madere in Support of Premier's motion ("Madere Decl.") ¶¶ 8, 12, 34.)

The relationship between Multi-Vet and Premier is described in a series of licensing and distribution agreements between 2001 and 2006.  On April 30, 2001, Premier acquired the assets of Animal Behavior Systems, Inc. ("ABS"), a distributor of anti-bark spray collars, and a company in which Multi-Vet was the

majority shareholder.  (Brief in Support of Defendant's Motion for a Preliminary Injunction ("Def.'s Mem.") p. 8; Plaintiff's Memorandum in Opposition to Defendant's Motion for a Preliminary Injunction ("Pl.'s Mem.") p. 6.)  On the same day, Multi-Vet and Premier entered into an agreement (the "2001 Agreement") designating Premier as the exclusive distributor of Multi-Vet's patented (U.S. Patent No. 4,627,385) anti-bark spray collars in the United States.  (Pl.'s Mem p. 8; Def.'s Mem. p. 7; Garon Decl. Ex. 5.)

Under the 2001 Agreement, Multi-Vet permitted Premier to use its trademarks in connection with its distribution of Multi-Vet's products in the United States.  (Id.)  Subsequent to the 2001 Agreement, Premier began distributing the anti-bark collars patented by Multi-Vet under the "Gentle Spray" name in packaging similar to Multi-Vet's "Aboistop" packaging.  (Pl.'s Mem. p. 7; Garon Decl. ¶ 4 and Ex. 1.)  On September 19, 2001, Multi-Vet filed its application with the United States Trademark Office to register the "Gentle Spray" trademark, and the registration was issued on September 9, 2003 (Trademark No. 2762487).  (Pl.'s Mem. p. 7.)

Among other things, the 2001 Agreement provided that:

> Upon written notification of Premier's intent to use new marks associated with the Products, Multi-Vet is obligated to register these marks within the Territory within sixty (60) days, and hereby grants to Premier the exclusive right and

>           license, but not the obligation, to use the marks
>           in relation with the marketing, promotion, sale
>           and distribution of Products in the Territory.
>           After the initial term of the Agreement, or any
>           subsequent term, in the event the Agreement is
>           terminated for any reason other than breach by
>           Premier, then the new trademarks developed by
>           Premier and registered by Multi-Vet will be sold
>           to Premier by Multi-Vet for one (1) dollar each.

(2001 Agreement, Garon Decl. Ex. 5, ¶ 2.3.)  Section 12.1 of the 2001 Agreement provides that it will "terminate on April 30, 2011 unless previously extended by mutual consent or terminated in accordance with the terms of this Agreement."  (Id.)

On October 30, 2003, Premier and Multi-Vet entered into a "First Amended and Restated Licensing Agreement."  (Garon Decl., Ex. 7.)  Neither party alleges that this 2003 agreement altered the 2001 Agreement in any significant respect other than by providing that "Premier will reimburse on closing the balance of note dated July 1st.  The capital due as of the date hereof is $204,426.56 ...."  (Pl.'s Mem. p. 9, fn 6.)

On November 1, 2004, Premier and Multi-Vet entered into an "Exclusive Distribution Agreement" (the "2004 Distribution Agreement"), which differs from the parties' prior agreements in a number of respects.  (See Pl.'s Mem. pp. 9-10; Garon Decl., Ex. 8.)  The 2004 Distribution Agreement provides in part:

>           19.3 Entire Agreement.  This agreement sets forth
>           the entire Agreement and understanding between
>           the parties with respect to the subject matter of
>           this Agreement and merges, supersedes and cancels
>           all prior discussions, representations,

4

> inducements, promises, undertakings, understandings, agreements or otherwise, whether oral, in writing or otherwise, between the parties with respect to such subject matter including our agreement dated October 30, 2003 between the parties .... This Agreement may be altered, modified or amended only by a written document signed by the parties.

(2004 Distribution Agreement at ¶ 19.3, Garon Decl., Ex. 8.) The 2004 Agreement additionally provides that Premier would not sell "competitive products" during the term of the agreement, and that all "intellectual property" used by Multi-Vet in association with its products was the "exclusive property" of Multi-Vet. (Id., at ¶ 2.4 and ¶ 13.1.)

The 2004 Distribution Agreement omits all mention of the provision contained in paragraph 2.3 of the 2001 Agreement, quoted above, in which Multi-Vet agreed to sell Premier new trademarks developed through their collaboration. (See Pl.'s Mem. p. 10.)

The 2004 Distribution agreement was terminated on October 5, 2005 by the "Termination of Exclusive Distribution Agreement," and the parties next entered into a "Distribution Agreement" (the "2005 Distribution Agreement") on the following day. (Pl.'s Mem. p. 10.) The 2005 Distribution Agreement provides that "[d]uring the term of this Agreement, Multivet will supply the Distributor [Premier] with Products on a NON-EXCLUSIVE BASIS" and that "Multivet grants to Distributor the

5

exclusive right to use the trademark 'Gentle Spray' free of any royalties or charges." (Garon Decl., Ex. 10, ¶¶ 1.2 and 1.3.)

Multi-Vet's patent for the anti-bark spray collar expired in 2005. (Madere Decl. ¶ 28.) The 2005 Distribution Agreement between the parties terminated on December 31, 2006. (Id., ¶ 1.1.) Following the termination of the 2005 Agreement, Multi-Vet apparently continued supplying Premier with anti-bark spray collars until October 2007, around which time Premier began manufacturing its own collars. (Garon Decl. ¶ 30; Madere Decl. ¶ 30.)

In response to Multi-Vet's request that Premier discontinue the use of the Gentle Spray name and related packaging in connection with its sales of spray collars, Premier discontinued its use of the "Gentle Spray" name in October of 2007 and began selling its collars using the name "Spray Sense." (Garon Decl. ¶¶ 31-32; Madere Decl. ¶ 31.)

**3.**

"A party seeking a preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is

6

denied." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007).

### 3(a).

Premier asserts a trademark infringement claim under the federal trademark laws, or Lanham Act, 15 U.S.C. §§ 1114 (imitation of a registered mark) and 1125(a) (false designation of origin). "To prevail on a claim of trademark infringement, a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion." Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 260 F.3d 125, 128 (2d Cir. 2004) (citing Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993)).

"A certificate of registration with the [United States Patent and Trademark Office] is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc. 192 F.3d 337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a)). "As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of mark's protectibility by a preponderance of the evidence." Id.

7

"[T]he crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in questions." Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978), cert. denied, 439 U.S. 1116 (1979).

The issue of the likelihood of consumer confusion is guided by consideration of the "nonexclusive list of eight factors, articulated by Judge Friendly in [Polaroid Corp. v. Polarad Elec. Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961)]." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 256 (2d Cir. 1987). These factors include "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will 'bridge the gap' between the two markets; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the purchasers." Id.

### 3(a)(1).

Premier claims in its briefs that Multi-Vet has infringed its trademarks with respect to the "Gentle Spray" mark, the "No Shock/No Pain" mark, and the overall packaging design used in

8

marketing the Gentle Spray product, featuring a purple background and a Golden Retriever barking, among other features.

First, Premier alleges that it is the lawful owner of U.S. Trademark Registration No. 2,762,487 for the mark "Gentle Spray" (the "Gentle Spray mark") and that Multi-Vet's use of the "Gentle Spray" name in connection with sales and advertising of pet products in interstate commerce infringes this trademark.

It is undisputed that the Gentle Spray mark is validly registered with the U.S. Patent and Trademark Office, and is registered to Multi-Vet.  This valid registration creates a presumption that Multi-Vet is the lawful owner of the mark and is exclusively licensed to use the mark in commerce.  See Lane Capital Mgmt., 192 F.3d at 345.

Premier argues that the terms of the 2001 Agreement required Multi-Vet to assign the Gentle Spray mark to Premier on the dissolution of the parties' business relationship, and that Premier is therefore the lawful owner of the Gentle Spray mark under the terms of the parties' agreement.  (Def.'s Mem. pp. 17-18.)  The terms of the 2001 Agreement, quoted above (pp. 3-4), provide for Multi-Vet to sell to Premier certain trademarks "developed by Premier and registered by Multi-Vet" following "the initial term of the Agreement, or any subsequent term, in the event the Agreement is terminated for any reason other than breach by Premier ...."  (Garon Decl. Ex. 5, ¶ 2.3.)

However, before the end of the "initial term" of the Agreement, scheduled to end on April 30, 2011, or a breach of the agreement by either party, the 2001 Agreement was superseded in its entirety by the Exclusive Distribution Agreement, which the parties entered into on November 1, 2004. (Garon Decl. Ex. 8.) As noted above, the Exclusive Distribution Agreement omits any reference to the trademark assignment provision contained in the 2001 Agreement, and also explicitly states that by its terms it constitutes "the entire Agreement and understanding between the parties with respect to the subject matter of this Agreement and merges, supersedes and cancels all prior" contracts between the parties. (Garon Decl. Ex. 8., ¶ 19.3.)

Subsequent agreements between the parties, including the "Termination of Exclusive Distribution Agreement," signed by the parties on October 5, 2005, and the 2005 Distribution Agreement, likewise contain no mention of an obligation on the part of Multi-Vet to transfer trademarks to Premier. (Garon Decl. Ex. 9 & 10.)

Premier also argues that the written assurances given by Multi-Vet that the Gentle Spray mark would be reserved for Premier's exclusive use in the United States support its argument that the Gentle Spray trademark is the lawful property of Premier. (Def.'s Mem. p. 10.) The written assurances include a letter from Multi-Vet's president, Richard Garon, in

2001, stating that Multivet had "no interest in the name 'Gentle Spray'" and that it would be "registered in the United States and licensed to Premier for the US market" and an email in September 2006 from Doug Belknap stating that the Gentle Spray trademark was "Premier's to use as long as Premiers [sic] uses it only with products sourced by Multivet."  (Id.)  As Multi-Vet contends in its briefs, the statements in question are consistent with the distribution agreements that were in place at the times of the respective statements, the 2001 Agreement and the 2005 Distribution Agreement; they do not therefore change the Court's analysis of the parties' agreements regarding ownership of the Gentle Spray and other trademarks.  Moreover, the statements, which confirm Premier's license to use the Gentle Spray mark with certain constraints, serve to reinforce the contention that Multi-Vet is the owner of the mark.

　　The plain language of the contracts between Multi-Vet and Premier contradicts Premier's contention that Multi-Vet has breached an obligation to transfer the Gentle Spray mark to Premier.  Prior to the termination date set forth in the 2001 Agreement, the Agreement was unequivocally superseded by subsequent agreements making no mention of such an obligation on the part of Multi-Vet.

　　Premier has not presented adequate evidence to overcome the presumption of Multi-Vet's legitimate ownership of the Gentle

11

Spray mark created by its registration of the mark with the Patent and Trademark Office.  As a consequence, Premier fails to establish that it is the owner of a mark meriting protection, the first prong required for a showing of trademark infringement.  The Court therefore finds that Premier has not demonstrated a likelihood of success on the merits on its trademark infringement claim with respect to the Gentle Spray mark adequate to justify injunctive relief.

3(a)(2).

Premier further alleges that it is the lawful owner of U.S. Trademark Registration No. 2,685,911 for the mark "No Shock No Pain" and design (the "No Shock/No Pain mark"), and that Multi-Vet's use of a mark virtually identical to the No Shock/No Pain mark on its packaging in connection with sales and advertising of pet products in interstate commerce infringes this trademark.

The No Shock/No Pain mark is registered with the U.S. Patent and Trademark Office to Premier.  (See Zidones Decl. Ex. 16.)  As discussed above, at pages 7-8, registration with the Patent and Trademark Office creates a presumption that Premier is the lawful owner of the trademark.  See Lane Capital Mgmt., 192 F.3d at 345.

Multi-Vet argues that Premier is not the lawful owner of the No Shock/No Pain trademark, and that even if Premier did own the trademark, it is unable to show a likelihood of customer

confusion tied to this particular mark sufficient to justify injunctive relief. Multi-Vet alleges that Premier's trademark registration was fraudulently obtained and presents evidence suggesting that Multi-Vet in fact developed the No Shock/No Pain mark in Canada in the mid-1990's. (See Garon Decl. ¶¶ 7-8 and Ex. 3.) Multi-Vet also points to language contained in the 2004 Distribution Agreement, providing that Premier "...recognizes and admits that any ... trade mark, trade name or other identifying mark ... used by Multivet in association with its Products ... is the exclusive property of Multivet." (Garon Decl. Ex. 8, ¶ 13.1.)

The Court notes that Multi-Vet's documented use of a mark virtually identical to Premier's No Shock/No Pain mark in Canada prior to the parties' collaboration raises questions regarding the legitimacy of Premier's trademark application for registration of this mark. Additionally, the contract language highlighted by Multi-Vet strongly suggests that at the time of the quoted agreement, Multi-Vet and Premier believed all of the marks used in the distribution of the Gentle Spray product to be the property of Multi-Vet. Though the registration of the No Shock/No Pain mark to Premier creates a presumption of ownership on the part of Premier, Multi-Vet's use of the mark prior to the parties' relationship and the contractual language regarding trademark ownership by Multi-Vet constitutes relatively strong

evidence to rebut this presumption. On balance, the Court finds that the evidence regarding whether or not the No Shock/No Pain mark is a protectible mark owned by Premier is sufficiently even that Premier has not succeeded in raising a "sufficiently serious question[] going to the merits" to justify a preliminary injunction. Time Warner Cable, 497 F.3d at 153.

Even if Premier were able to demonstrate a likelihood of success on the merits of its trademark claim with respect to the No Shock/No Pain mark, it has in fact failed to present any evidence tending to show a likelihood of consumer confusion surrounding Multi-Vet's use of the No Shock/No Pain mark. In support of its allegation of actual consumer confusion, Premier presents several instances of Multi-Vet's Gentle Spray product being listed as a Premier product on the amazon.com website.[1] (See Declaration of Thanna Vickerman ("Vickerman Decl.") Ex. B & C.) However, Premier presents no foundation for the assertion that the use of the No Shock/No Pain mark, as distinct from the Gentle Spray mark or the product packaging, is creating confusion among consumers.

---

[1] Premier submitted two supplemental declarations on July 31, 2008, which allegedly provide two additional instances of consumer confusion with respect to the Gentle Spray mark. The instances of consumer confusion alleged in these declarations do not affect the Court's analysis of Premier's trademark infringement claims for purposes of the instant motion, so the Court finds it unnecessary at the present time to respond to Multi-Vet's objections to Premier's submission of these supplemental declarations.

Absent evidence of actual confusion, the Court finds it implausible that the use of the No Shock/No Pain mark has the potential to cause significant consumer confusion given the small size of the mark on the product packaging and its near invisibility in online advertisements. The No Shock/No Pain mark appears on the back of the Multi-Vet Gentle Spray package as a circular image less than half an inch in diameter, and is not shown at all in advertisements for the Multi-Vet product on amazon.com. The No Shock/No Pain mark appears on the front of Premier's Gentle Spray packaging as an even smaller image of less than a half inch in diameter, and on the back in somewhat larger form. The mark is barely visible in the advertisements for Premier's Gentle Spray product on amazon.com.

Further, neither party has presented evidence suggesting that the No Shock/No Pain mark commands any amount of consumer recognition independent of the Gentle Spray mark and product packaging, or that consumers tend to associate the No Shock/No Pain mark with Premier as opposed to Multi-Vet.

Given its failure to clearly demonstrate the protectibility of the No Shock/No Pain mark or the likelihood of consumer confusion with respect to the mark, Premier has failed to demonstrate a likelihood of success on the merits of its trademark infringement claim with respect to the No Shock/No Pain mark, and injunctive relief is not warranted.

3(a)(3).

Premier further asserts in its briefs that it is the owner of a trademark encompassing the Gentle Spray packaging design, and that Multi-Vet has infringed this trademark.  Multi-Vet argues that Premier is unable to demonstrate a substantial likelihood of success on the merits of its "claim" regarding the packaging design, since Premier has not pled in its Amended Answer that it owns the design and that the design has been infringed, and it has therefore not presented the packaging design as a claim that may form the basis for relief.  (Pl.'s Mem. p. 21.)

It is well established that "[i]f a party cannot establish that it has a likelihood of success on the merits of its claim, no interlocutory injunction should be granted." 42 Am. Jur. 2d Injunction § 16 (2008).  It flows from this principle that the claim with respect to which injunctive relief is sought must be a part of the substantive case, previously set forth, typically in a complaint or an answer.  As Premier has alleged ownership of the Gentle Spray packaging design generally for the first time in its motion for a preliminary in junction, and did not state this claim in its Answer or Amended Answer, it does not constitute a claim for which likelihood of success on the merits may be demonstrated.

*

16

The Court finds that with respect to its claims for trademark infringement under the Lanham Act, Premier has failed to demonstrate "(a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." The Court therefore does not need to reach the second, irreparable harm, prong of the test for preliminary injunctive relief, and Defendant Premier's motion for a preliminary injunction is DENIED as to its trademark infringement claims.

### 3(b).

Premier additionally asserts a common law unfair competition claim under New York state law.

"[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" Rosenfeld v. W.B. Saunders, A Div. of Harcourt Brace Jovanovich, Inc., 728 F.Supp. 236, 249-50 (S.D.N.Y. 1990) (quoting Computer Assocs. Int'l, Inc. v. Computer Automation, Inc., 678 F.Supp. 424, 429 (S.D.N.Y. 1987)), aff'd, 923 F.2d 845 (2d Cir. 1990). "In a common law unfair competition claim under New York law, the plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief.

17

Additionally, there must be some showing of bad faith." Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34-35 (2d Cir. 1995), citing W.W.W. Pharmaceutical Co. v. Gillette Co., 984 F.2d 567, 576 (2d Cir. 1993) (citation omitted); Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).

As it has with respect to its Lanham Act claims, Premier has failed to demonstrate a likelihood of success on the merits on its unfair competition claim.

### 3(b)(1).

As discussed above in relation to the trademark infringement claims, Premier has not provided evidence demonstrating bad faith on the part of Multi-Vet with respect to its use of the Gentle Spray trademark. Multi-Vet's use of the Gentle Spray mark, registered to Multi-Vet, has accorded with the provisions of the parties' agreements, and has not otherwise included evidence of bad faith or unfair dealing.

### 3(b)(2).

Premier also fails to clearly establish bad faith in Multi-Vet's use of the No Shock/No Pain mark. Premier's registration of the mark creates a presumption that Premier is the mark's lawful owner. See Lane Capital Mgmt., 192 F.3d at 345. However, evidence presented by Multi-Vet, including Multi-Vet's documented use of the mark in Canada in 1996, prior to the

existence of any relationship between the two parties, and language from the 2004 Distribution Agreement asserting that "any ... trade mark, trade name or other identifying mark ... is the exclusive property of Multi-Vet" contradict Premier's claim to ownership of the mark, and at the least provide a plausible basis for Multi-Vet's having acted on a good faith belief that it had a right to use the No Shock/No Pain mark.  (See supra, pp. 13-14.)

Further, as discussed above at page 15, Premier is unable to demonstrate a likelihood of consumer confusion stemming from Multi-Vet's use of the No Shock/No Pain mark.

**3(b)(3).**

Finally, Premier also fails to establish a likelihood of success on the merits of its unfair competition claim with respect to Multi-Vet's use of the Gentle Spray packaging design, as this claim was not stated in Premier's Amended Answer.  See supra, pp. 16-17.

**\***

As in the case of its trademark infringement claim, the Court finds that Premier has failed to demonstrate "a likelihood of success on the merits" or a "sufficiently serious question[] going to the merits" on its common law unfair competition claim to justify preliminary injunctive relief.  Time Warner Cable, 497 F.3d at 153.  The Court therefore does not need to reach the

19

second, irreparable harm, prong of the test for preliminary injunctive relief, and Defendant Premier's motion for a preliminary injunction is DENIED as to its trademark infringement claims.

**4.**

For the foregoing reasons, Defendant Premier's motion for a preliminary injunction is DENIED in its entirety.

SO ORDERED.

Dated: August 22, 2008

                                      Lawrence M. McKenna
                                            U.S.D.J.